UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                 )
**ORLANDO RILEY,**                )
        Plaintiff         )
                                 )
v.                               )    Civil Action No.: 1:15-CV-14137-DJC
                                 )
**MASSACHUSETTS DEPARTMENT**      )
 **OF STATE POLICE**              )
        Defendant         )
_____)

## FIRST AMENDED COMPLAINT AND JURY DEMAND

### INTRODUCTORY STATEMENT

1.    This is an action for damages and equitable relief, brought by an African-American applicant for a trainee position within the Massachusetts State Police, who attained a perfect score on the qualifying examination and passed all preliminary tests, but was excluded based on a profoundly biased interview and background investigation by a single state trooper.

### PARTIES

2.    Plaintiff Orlando Riley ("Riley") is an adult African-American citizen of the United States who resides in Dartmouth, Bristol County, Massachusetts and has been employed for 14 years as a police officer by the city of New Bedford, Massachusetts.

3.    Defendant Massachusetts Department of State Police ("MSP") is a department constituted within the Massachusetts Executive Office of Public Safety, pursuant to Mass. G. L. c. 22C, §2, and is an employer within the meaning of Title VII of the Civil Rights Act of 1964, as amended, 42 USC §2000e(b).

**JURISDICTION AND VENUE**

4. Plaintiff seeks relief under Title VII of the Civil Rights Act of 1964, 42 USC §2000e et seq., as amended.

5. Jurisdiction is conferred on this court by 28 USC §§1331 and 1343(a)(4).

6. Venue is proper in this district under 28 USC §1391, in that the acts and omissions giving rise to Riley's claim occurred in the judicial district of Massachusetts.

**FACTS**

7. Riley entered the Plymouth Police Academy as a New Bedford Police Department recruit in December 2001 and upon graduation, became a patrol officer for the City of New Bedford, a position in which he has served since April 2002.

8. Riley has been cited for exemplary police work while employed as a New Bedford patrol officer.

9. On or about April 25, 2009, Riley sat for the MSP written examination, the initial screening step for an appointment to the State Police Academy. Enrollment as a trainee at, and graduation from, a 21-week training session at the State Police Academy ("Academy") is the final step before appointment as an MSP trooper.

10. Riley achieved a perfect score of 100 on the MSP written examination.

11. On or about February 18, 2011, Riley received a letter from the MSP notifying him of his eligibility to compete for the next Academy class, anticipated for October 2011, and asking him to formally confirm his interest. Riley did so.

12. On or about April 4, 2011, Riley received a written conditional offer of employment as an Academy trainee from the MSP, which instructed him to complete a detailed written application form, and stated that the factors upon which the offer was contingent were:

funding; available space in the class; successful completion of physical fitness, psychological and medical screening; sufficiently high written and oral interview scores; and a background investigation.

13. On or about May 3, 2011, Riley submitted his completed application (the "application"). On or about May 3, 2011, Riley successfully completed his physical fitness screening and oral interview. On or about June 3, 2011 and June 4, 2011, Riley completed his medical and psychological screenings, respectively. As a result, Riley's only remaining obstacle to entrance into the Academy was a background investigation.

14. MSP assigned Trooper Robert Lima ("Lima") to conduct Riley's background investigation, which Lima conducted between July and September, 2011. Lima is Caucasian.

15. On or about September 1, 2011, Lima met with Riley as part of MSP's background investigation. Lima's manner throughout the interview ("interview") was accusatory and suspicious, as if he were conducting an interrogation. For example, he repeated the same questions about whether Riley gambled numerous times, in a disbelieving tone, with only slight variations, as if he did not believe Riley's (truthful) denials.

16. During the interview, Lima also criticized Riley for "errors" on the application that were not truly errors. For example, he criticized Riley for failing to list Riley's membership in the New Bedford police union as membership in a "Professional Trade Organization," and instructed Riley to change his application to list his union membership as such, even though a union is not a professional trade organization.

17. Approximately one hour of the three hour interview was consumed with Lima's focus on his contention that Riley had allegedly failed to disclose that he had been the subject of an internal investigation and had received a written reprimand from the New Bedford Police

Department based on a November 2009 incident. Lima even confronted Riley with a document that Lima repeatedly, and incorrectly, insisted was a copy of the written reprimand.

18.     In fact, Riley had never received a written reprimand or any other discipline based on the 2009 incident, and had not been informed that he was a subject of the investigation into the incident until May 24, 2011, three weeks after he had completed and submitted the application. Riley had disclosed the incident and the internal affairs investigation on the application. He disclosed that he had recently learned that he had been the subject of the investigation at the interview.

19.     During the interview, Lima questioned Riley about his high school records. Riley explained that he had attended high school in Michigan his freshman year; had attended Bishop Stang High School, a Catholic school, his sophomore year, which he left after one year because his family could no longer afford it; had been enrolled for a few weeks at Dartmouth High School, a public school, in his junior year, but was forced to leave because his mother and aunt had enrolled him without meeting Town of Dartmouth residency requirements; and had ultimately attended New Bedford High School his junior and senior years and graduated from there. Riley had previously ensured that a transcript from New Bedford High School had been forwarded to Lima.

20.     Lima told Riley at the interview that transcripts from Dartmouth High School, unlike those from the Michigan school and Bishop Stang High School, need not be provided, because Riley had only attended Dartmouth briefly and had not received any grades.

21.     When Riley showed Lima an official graduation verification letter from New Bedford High School, Lima suggested that Riley had forged the document to make it appear that

he had graduated when he had not, stating "how do I know you didn't somehow have this letter doctored to make it look like you graduated from high school" or similar words.

22. Lima also made comments during the interview denigrating Riley's home and neighborhood.

23. During the interview, Lima challenged documentation Riley provided from his attorney demonstrating that a negative entry in his credit report was an error and that the underlying matter had been resolved in his favor. Lima claimed that the letter was insufficient and that he was going to report the entry as a negative in his investigation report.

24. At the end of the interview, Lima announced that he would visit Riley's home on the evening of September 3, 2011 to observe how Riley lived. Lima did not appear at any time that day or call to cancel. Lima appeared three days later at Riley's home unannounced. Upon arrival, he told Riley's fiancée that she and Riley "didn't live in the greatest neighborhood," or similar words.

25. On or about September 7, 2011, Lima submitted a report regarding his background investigation.

26. Lima's report stated that Lima "did not find anyone willing to go on record about [Riley's] work performance." In fact, Lima failed to contact four out of five of the references provided by Riley, which included his current sergeant at the New Bedford Police Department, his former sergeant, his former captain, and a fellow officer (whose telephone calls Lima failed to return). This is inconsistent with MSP standard practice.

27. The report falsely claimed that Riley stated in his interview that he had left Bishop Stang High School because he failed to meet residency requirements. Bishop Stang, a private religious institution, does not condition admission on residency. The report also claimed

that Lima had confirmed with Bishop Stang that Riley had left for academic reasons. Bishop Stang High School does not possess information regarding the reasons Riley left the school.

28. The report concluded that Riley had been "untruthful" on his application in failing to disclose that he had received "disciplinary action" from his department in the form of a written reprimand and that he had "not [been] completely forthright" in disclosing "work and academic" disciplinary action. The report also concluded that Riley "lack[ed] attention to personal credit reporting" – a reference to the negative in Riley's credit report for which Riley had provided explanatory documentation at the interview.

29. Knowingly making false statements to an MSP investigator or in an application is grounds for automatic disqualification from the Academy.

30. On or about September 17, 2011, Riley received a letter from the MSP rejecting him from the October 2011 Academy on the ground that he had been "untruthful" on his application and in his communications to Lima.

31. On or about September 18, 2011, Riley telephoned Lima to ask Lima to correct the errors in his report. Lima responded by making new assertions of "untruthfulness" that he had not made in the September 7, 2011 report. Lima claimed that Riley had been "untruthful" in failing to disclose that he had previously applied for a position in the Providence Police Department, and in stating that Riley had left Bishop Stang High School for financial rather than academic reasons.

32. The application called for disclosure of applications that had progressed to the stage of a background investigation. Because Riley's 12-year-old application to the Providence Police Department had never progressed beyond the initial stages and did not reach the stage of a

background investigation, he did not believe the question called for him to disclose that application and he did not do so.

33. Riley had not left Bishop Stang High School for academic reasons, but for financial reasons. Other than interviewing Riley, Lima had not performed any further investigation of the reasons Riley had actually left Bishop Stang.

34. Between on or about September 17, 2011, and on or about September 22, 2011, Riley obtained documentation that demonstrated that each allegation of supposed "untruthfulness" cited in Lima's report and telephone conversation with Riley was false. The documentation came from his police chief, Riley's department police union, his police union's attorney, Bishop Stang High School, and others. Riley also obtained further documentation that the debt that had affected his credit reports had been officially cancelled.

35. On or about September 22, 2011, Riley forwarded the documentation described in the preceding paragraph to MSP Chief Administrative Officer John Flynn ("Flynn") together with an explanatory letter requesting reconsideration of his candidacy.

36. On September 28, 2011, Lima issued a second report ("the 9/28/11 report") to his supervisors and the MSP Review Board, which purported to reexamine the evidence in Riley's case.

37. In the 9/28/11 report, Lima changed his claim that Riley had received a "written reprimand" for the November 2009 incident to a new allegation that Riley had failed to disclose he was the "subject" of the investigation of the incident, omitting to mention that he had erred about the "written reprimand", and omitting to mention any of the documentation Riley provided that demonstrated he had been unaware he was a subject of the investigation at the time he

submitted the application. Lima also neglected to mention that Riley had disclosed at the interview that he had recently learned that he had been the subject of the investigation.

38. The 9/28/11 report, like Lima's earlier report, inaccurately attributed to Riley the illogical claim that he had left Bishop Stang High School for "residency" reasons, then purported to expose that claim. The 9/28/11 report also called Riley "untruthful" in failing to advise Lima that he had attended Dartmouth High School briefly but had been excluded for non-residency while "utilizing a false address," although Riley had previously provided that information to Lima.

39. Any decisions about "utilizing a false address" for the purpose of enrolling Riley in high school had been made by Riley's mother and aunt when Riley was 15 years old, not by Riley.

40. Also in the 9/28/11 report, Lima added the new claim that Riley was "untruthful" in failing to disclose his application to the Providence Police Department on his application, although the application does not require disclosure of applications for which no background investigation has taken place.

41. In the 9/28/11 report, Lima failed to acknowledge receipt of Riley's documentation confirming that the debt stated on his credit report had been eliminated.

42. The 9/28/11 report falsely stated that Riley had failed to provide his New Bedford High School transcript to Lima, even though it had been sent to Lima months earlier and its receipt had been explicitly acknowledged by Lima in his September 7, 2011 report.

43. On or about September 28, 2011, Flynn sent Riley a letter advising Riley that upon reconsideration, the MSP Review Board affirmed its original decision to remove Riley from consideration for the October 2011 Academy class.

44.     Non-African-American applicants for the October 2011 Academy class were treated differently and better than Riley.

45.     In addition to Riley, Lima was assigned to investigate six other applicants for the October 2011 Academy class, all of whom were Caucasian. Of the six, one failed the required medical test, one withdrew, and one passed the background investigation and entered the Academy.

46.     The three remaining candidates who failed the background investigation had personal, legal, and employment histories that were significantly weak in areas central to MSP work. One lacked any police experience, had an "extensive drivers' history including suspensions," and received "substandard" employer references. Another received "poor" references, and had a record of being fired and a relatively recent failed drug test. The third had failed to complete a required safety training program arising from an OUI charge, also had an "extensive driver's history," and had failed to file income taxes for the previous year. Riley had extensive experience as a police officer, no negative "drivers' history," excellent references, had never been terminated, had never failed a drug test, had never been charged with an OUI and always paid his taxes.

47.     Non-African-American candidates for the October 2011 Academy class whose background investigations revealed discrepancies or raised questions were not characterized or treated as "untruthful" or disqualified on that basis, and were given the opportunity to correct or address discrepancies or questions.

48.     Riley was judged by harsher standards than those applied to Caucasian candidates for the October 2011 Academy class.

49. Non-African-American candidates for the October 2011 Academy were treated with respect and professionalism in the application process, unlike Riley.

50. The October 2011 Academy class ran as scheduled with approximately 250 trainees.

51. On information and belief, the October 2011 Academy class included a disproportionately low number of African-American trainees.

52. On information and belief, the proportion of sworn members of the MSP who are African-American steadily diminished from 2000 through 2012.

53. On or about April 26, 2012, Riley timely filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission alleging that Defendant MSP had intentionally discriminated against him on account of his race and color by treating him differently and worse than non-African-American candidates for the Academy and ending his candidacy for pretextual reasons.

54. On September 14, 2015, Riley received a right-to-sue notice from the Equal Employment Opportunity Commission, granting him the right to pursue his claims under Title VII in civil court.

## LEGAL CLAIM

55. The allegations in ¶¶ 1-54 above are hereby realleged and incorporated by reference.

56. By intentionally failing to hire Riley on the basis of his race and/or color, and by treating him differently than non-African-American candidates in the hiring process, Defendant discriminated against Riley in the terms and condition of his employment because of his race and

color in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e- 2(a) et seq., as amended.

57.   As a result of Defendant's acts and omissions, Riley has suffered and continues to suffer lost income and other economic losses, loss of personal and professional reputation, and emotional pain and suffering, and has incurred attorneys fees. Defendant is liable for all of Riley's losses.

**RELIEF REQUESTED**

WHEREFOR, Riley prays that this court:

   A.   Order Defendant to correct its background investigation reports to remove all false or misleading information;

   B.   Order Defendant to hire Riley in the position of Trainee and enroll him into the next available sessions of the Police Academy;

   C.   Award Riley back pay, prejudgment interest, and damages for all employment benefits he would have received but for Defendant's discriminatory acts, from October 2011 to the present;

   D.   Award Riley compensatory and punitive damages;

   E.   Award Riley reasonable attorneys fees;

   F.   Retain jurisdiction over this matter until such time as this court is satisfied that the unlawful acts at issue in this Complaint have ceased and that Defendant has complied with all remedial orders of this court; and

   G.   Award Riley costs, interests, and such other relief as the court deems just and proper.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL COUNTS TRIABLE TO A JURY.**

                              Respectfully submitted,

                              PLAINTIFF
                              By his attorneys,

                              /s/Ellen J. Messing
                              Ellen J. Messing
                              BBO No. 343960
                              emessing@mrwemploymentlaw.com
                              James S. Weliky
                              BBO No. 631066
                              jweliky@mrwemploymentlaw.com
                              Messing, Rudavsky & Weliky, P.C.
                              50 Congress St., 1000
                              Boston, MA  02109
Dated:  March 28, 2016            (617) 742-0004

**CERTIFICATE OF SERVICE**

     I, Ellen J. Messing, hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants, on March 25, 2016.

                              /s/ Ellen J. Messing
                              Ellen J. Messing, Esq.

Dated: March 28, 2016