# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

_____

ORLANDO RILEY

        Plaintiff,

        v.

MASSACHUSETTS STATE POLICE

        Defendant.

_____

C.A. 1:15-cv-14137-DJC

## DEFENDANT MASSACHUSETTS STATE POLICE'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

MAURA HEALEY
ATTORNEY GENERAL

Jesse M. Boodoo, BBO No. 678471
Nicholas Rose, BBO NO. 670421
Assistant Attorneys General
Government Bureau/Trial Division
One Ashburton Place, Room 1813
Boston, MA  02108
(617) 727-2200
jesse.boodoo@state.ma.us
nicholas.rose@state.ma.us

i

# TABLE OF CONTENTS[1]

INTRODUCTION…………………………………………………………………....…1

BACKGROUND……………………………………………………………………....…...2

I.     Riley Becomes a New Bedford Police Officer………………………………….……………2

II.    Riley Unsuccessfully Applies to the Providence Police Department. ……………………2

III.   Riley Fails His Background Investigation with the Rhode Island State Police……......……2

IV.    The New Bedford Police Department Conducts the Soares Investigation..………..............3

V.     Riley's Application to the Massachusetts State Police. …………………………………...4

VI.    Riley Attends the May 24, 2011 Meeting on the Soares Investigation..………………...…6

VII.   Riley Fails to Correct His Application...……………………………………….…………6

VIII.  Riley Provides False Answers on the Questionnaire………………………….…………...7

IX.    Lima Learns of the Soares Investigation and Interviews Riley...........…………………8

X.     Lima Conducts Follow-Up and Writes his Background Investigation Report………..….10

XI.    The Review Board Disqualifies Riley……………………………………….…….…...11

XII.   Riley Reacts to His Disqualification, and Lima Conducts Further Follow-Up……...……12

XIII.  The Review Board Disqualifies Riley for a Second Time…………………….…………13

XIV.   Riley Commences Litigation Against the New Bedford Police Department……...………13

XV.    Riley's Claims Against the Massachusetts State Police ..………......……………………...14

ARGUMENT..……………………………………………………..……………………14

I.     Riley Cannot Establish a Prima Facie Case Because He Was Not Similarly
       Situated to Any Hired Candidate……………………………………….......................15

---

[1] Defendant Massachusetts State Police's Local Rule 56.1 Statement of Material Facts is cited herein as SMF ¶ __. Exhibits to Defendant's Statement of Material Facts and Motion for Summary Judgment are attached to the contemporaneously-filed Affidavit of Jesse M. Boodoo, Esq. or, in the case of Exhibits 57 through 66, filed conventionally and under seal. All Exhibits are cited herein as Ex. ___. Defendant's Motion for Leave to file a thirty-page brief was allowed at [Doc. 117].

II.     MSP's Reasons for Disqualifying Riley Were Legitimate…………………………………19

III.    Riley Cannot Establish Pretext or that The True Reason for Lima's Actions
        Was Discrimination…………………………………………………………...…………19

        A.      There Was No Pretext in Finding Riley Untruthful..……………………………..20

        B.      It Does Not Matter Whether Riley Received the Reprimand…………………..…23

        C.      Lima's Statements to Riley's Fiancée Do Not Demonstrate Pretext….…………24

        D.      Riley's Comparative Evidence Only Demonstrates a Lack of
                Pretext and Discriminatory Animus……………………………...…..…………25

        E.      Riley's Attempt to Fall Back on Systemic Attacks on MSP
                is Improper.............…………………………………………………...…..…………25

IV.     Riley Cannot Establish That the Review Board Was Negligent in
        Relying on Lima……………………………………………………………………………29

        CONCLUSION…………………………………………………………………………..30

### INTRODUCTION

Plaintiff Orlando Riley ("Riley" or "Plaintiff") is a former candidate for a position as a State Trooper with Defendant Massachusetts State Police ("MSP") who failed his background investigation. Riley failed because MSP's Background Review Board ("Review Board") determined that Riley was an untruthful individual who had engaged in a broad pattern of deception designed to conceal embarrassing aspects of his past. Riley, while acknowledging mistakes, asserts that all of his mistakes were unintentional and that his background investigator— Trooper Robert Lima—was too quick to judge him as untruthful. In this race discrimination action pursuant to Title VII, Riley alleges that Trooper Lima acted with racial bias, and that such bias affected the Review Board's decision and is therefore attributable to MSP.

Summary judgment should now enter for MSP. In the first place, Riley cannot establish a prima facie case of discrimination because he cannot show that he was similarly situated to any candidate hired by MSP. Riley was disqualified because he was found untruthful, an unacceptable trait for anyone who would be a Trooper. Riley cannot point to any hired candidate for whom similar concerns were overlooked. Furthermore, Riley can point to no evidence to establish that MSP and Lima's belief that he was untruthful was not genuine, and that racial animus was the real reason for their actions. MSP and Lima's concerns with Riley's candor were multifold and founded in fact. Race had nothing to do with anything that happened to Riley.

Finally, in a case of this nature—where Riley alleges that the Review Board's decision was tainted by Trooper Lima—it is Riley's burden to demonstrate that the Review Board reasonably should have known of racial animus on the part of Lima. This Riley cannot do. The Review Board independently reached the conclusion that Riley was untruthful, and there is no evidence to suggest that the Review Board was somehow negligent in its review.

1

## BACKGROUND

### I.     Riley Becomes a New Bedford Police Officer.

Riley is an African-American resident of Massachusetts.  SMF ¶ 1.  In 1999, Riley applied to become a police officer with the New Bedford Police Department ("NBPD").  *Id.* ¶ 16.  The NBPD application required Riley to list all of his high schools.  *Id.* ¶ 17.  In response, Riley listed three high schools he had attended (Muskegon High School, Bishop Stang High School, and New Bedford High School) but omitted a fourth (Dartmouth High School).  *Id.* ¶¶ 3-12, 17.  Years earlier, Riley had been expelled from Dartmouth High School for using a false residency address.  *Id.* ¶¶ 10-11.  Riley was not hired by NBPD in 1999.  *Id.* ¶ 19.

In 2001, Riley applied to NBPD for a second time.  *Id.* ¶ 16.  The application again required Riley to list his high schools and Riley again omitted Dartmouth High School.  *Id.* ¶ 17.  Riley was hired by NBPD in 2001 and has been employed there as a police officer since.  *Id.* ¶¶ 2, 20.

### II.     Riley Unsuccessfully Applies to the Providence Police Department.

Riley also applied to become a police officer with the Providence Police Department in 1999.  *Id.* ¶ 13.  He submitted an application, took a physical exam, and interviewed, but because he received a low score on the written examination, he did not progress further.  *Id.* ¶¶ 13-15.

### III.     Riley Fails His Background Investigation with the Rhode Island State Police.

In 2003, Riley applied to become a state trooper with the Rhode Island State Police ("RISP").  *Id.* ¶ 21.  The application required Riley to disclose any law enforcement agency to which he had ever applied.  *Id.* ¶ 22.  In response, Riley listed his successful application to NBPD, but omitted that he had unsuccessfully applied to the Providence Police Department in 1999.  *Id.* ¶ 22.  The RISP application also called for Riley to list his high schools.  *Id.* ¶ 23.  In response, Riley listed only New Bedford High School, omitting his other three schools.  *Id.*

Riley's application to RISP proceeded to the point of a background investigation. *Id.* ¶¶ 24-25. After interviewing Riley, a RISP background investigator concluded that Riley was "Not Recommended" for continuing in the RISP selection process and, consequently, Riley was not hired by RISP. *Id.* ¶¶ 24-28. The investigator recorded that his decision was based on, among other factors, Riley's "lack of attention to detail, his lackadaisical attitude and his prior work performance." *Id.* ¶¶ 26-27. The RISP investigator noted in particular that Riley had failed to "indicate [in his application] that he had applied to the Providence Police Department." Ex. 6.

## IV. The New Bedford Police Department Conducts the Soares Investigation.

In late November 2009, an individual named John Soares was arrested on charges related to throwing explosives. SMF ¶ 29. Soares was brought to NBPD headquarters to await booking and was placed down on a bench in Riley's immediate vicinity. *Id.* ¶¶ 29-33; Ex. 10. While Riley stood by, Soares wriggled out of his handcuffs without Riley noticing. SMF ¶¶ 30-33. Not long after, Soares successfully fled off the grounds and evaded capture for several days. *Id.*

In December 2009, NBPD's Deputy Chief David Provencher initiated misconduct proceedings and an internal investigation against Riley, charging him with violating NBPD's rules and regulations in allowing the escape to occur (hereinafter, the "Soares investigation"). *Id.* ¶¶ 34-35, 46. On January 26, 2010, Riley appeared, represented by counsel, for an interview with NBPD's internal investigator. *Id.* ¶¶ 35-37. Before the interview began, Riley signed a "PSU Form 3" stating: "You are hereby being ordered . . . to . . . provide information you may have regarding a complaint" that "alleges Violation of Department Rules & Regulations and Neglect of Duty in connection with the escape of John Soares." *Id.* ¶ 37. In Provencher's view, the purpose of the Form was to inform Riley that he was a subject of the Soares investigation. *Id.* ¶ 38.

3

Following the interview, the investigator issued a report finding that Riley had violated several NBPD rules and regulations pertaining to neglect of duty.  *Id.* ¶¶ 39-40, 47.  On June 18, 2010, Provencher wrote a memorandum to NBPD Chief Ronald Teachman recommending that Riley receive a written reprimand due to the sustained finding that Riley had violated NBPD rules and regulations (hereinafter, the "June 18, 2010 Memorandum").  Ex. 13.   Teachman did not act on the recommendation and eventually retired in 2011 with the recommendation still on his desk.  SMF ¶ 42.  When Teachman retired, Provencher became the Chief of the NBPD.  *Id.*

## V.     Riley's Application to the Massachusetts State Police. [2]

In 2009, Riley took the written examination required for MSP Trooper candidates.  *Id.* ¶ 88.  Based on his score, Riley received and accepted an invitation to compete for MSP's 80th RTT in February 2011.  *Id.* ¶¶ 62, 89.  Upon accepting, Riley was required to complete MSP's "Application and Personal History Statement" (hereinafter, "Application").  *Id.* ¶ 63.  Riley did so and, on May 3, 2011, submitted his Application to MSP.  *Id.* ¶ 91.  Riley's Application, as he submitted it to MSP, was replete with misstatements and omissions.  *Id.* ¶¶ 96-107, 149; Ex. 25. [3]

Question No. 8 required Riley to list all of his high schools and colleges.  SMF ¶ 96.  In response, Riley listed all of his colleges.  *Id.* ¶ 97.  However, just as he had before in his NBPD and RISP applications, Riley only selectively disclosed his high schools.  *Id.* ¶¶ 17, 23, 98.  Riley listed only New Bedford High School, omitting his other three schools.  *Id.* ¶ 98.

Question 20.A. on the Application stated: "[H]as . . . any . . . law enforcement agency ever investigated your background for purposes of employment," and then specified that, if so, the

---

[2] MSP's application and hiring process for MSP's 80th Recruit Training Troop ("RTT") is generally described in detail at SMF ¶¶ 59-69 and Ex. 45.

[3] Two versions of Riley's Application are included in the record.  Exhibit 17 is Riley's Application, as he initially submitted it to MSP on May 3, 2011.  Exhibit 25 is Riley's Application with handwritten changes and corrections made by Riley at his September 1, 2011 interview with Lima.

applicant must list "ALL of the departments you have applied to." *Id.* ¶ 99.  Riley answered "YES" but did not disclose all of his prior police department applications.  *Id.* ¶¶ 100-01.  Specifically, Riley listed his successful 2001 application to NBPD but, just as he had before when applying to RISP, omitted his unsuccessful 1999 application to the Providence Police Department.  *Id.* ¶¶ 22, 101.  Riley also omitted his unsuccessful first application to NBPD from 1999.  *Id.* ¶¶ 16, 19, 102.

Question No. 20.E. on the Application stated: "If you are a . . . police officer . . . .  Have you ever been the subject of an internal investigation . . . ?"  *Id.* ¶ 103.  The Application further instructed that any "YES" answer should be "fully explain[ed]."  *Id.*  Riley checked "NO," thus failing to disclose his status as a subject of the Soares investigation.  *Id.* ¶¶ 104-05.  Below his answer, Riley wrote: "I have never been the subject of an internal investigation . . . .  The only time I was interviewed by my internal affairs unit was as a witness."  *Id.* ¶¶ 104, 106.[4]

At the end of the Application, Riley certified that he had "underst[ood] each question," and that his answers were "true and correct."  *Id.* ¶ 93.  Along with the Application, Riley also submitted a separate notarized agreement affirming his understanding "*that false or misleading information given herein or during interview(s) will result in my being disqualified from further consideration*."  Ex. 18 (emphasis added).  *See* SMF ¶ 94.

---

[4] Discovery has revealed that Riley's answer and explanation in response to Question No. 20.E. were also false in a second respect, unknown to MSP or Lima at the time.  Per NBPD records, Riley was also the subject of a second and separate internal investigation, known as the "Stallings investigation," which arose from allegations that Riley engaged in misconduct in the course of an arrest in 2006.  SMF ¶¶ 55-58.  Riley also omitted his status as a subject of the Stallings investigation in his Application.  *Id.* ¶¶ 55-58, 107.  Riley testified at his deposition that although he received notice that he was a subject of this investigation, he assumed the notice was a "mistake[]."  Ex. 47 (Riley Dep.) at Tr. 237-58.  Moreover, Riley was also interviewed by NBPD internal affairs as part of the Stallings investigation, SMF ¶ 57, meaning that his representation on the Application that he had only been interviewed once by internal affairs was also false.

## VI.    Riley Attends the May 24, 2011 Meeting on the Soares Investigation.

On May 24, 2011—21 days after submitting his Application to MSP—Riley was called to a meeting with Provencher (then in his new position as Chief) regarding the Soares investigation. *Id.* ¶ 43.  Provencher told Riley that while the charges against him had been sustained, Riley would only be issued a verbal warning and the investigation would then be closed.  *Id.*; Ex. 46 at 35.

Worried about his application to MSP and concerned that he was an active "candidate in the [MSP hiring] process," Riley then asked Provencher "whether or not something would end up in [his] file" related to the Soares investigation.  SMF ¶¶ 45, 225.  Provencher assured Riley "that nothing was going in [his] file."  *Id.* ¶ 45.  Not content with the assurance, and still concerned about his MSP candidacy, Riley waited until August 2011 and then personally went to view his NBPD personnel file to ensure that there was no sign of the Soares investigation.  *Id.* ¶¶ 53, 126.

In this litigation, Riley contends that he never understood that he was a subject of the Soares investigation until the meeting of May 24, 2011.  *Id.* ¶¶ 50-52.  It is doubtful that any reasonable jury could so conclude.  Nevertheless, MSP assumes for purposes of this motion that Riley did not know that he was a subject of the Soares investigation until May 24, 2011.

## VII.   Riley Fails to Correct His Application.

In or around early July 2011, Trooper Robert Lima was assigned to conduct Riley's background investigation.  *Id.* ¶ 108.[5]  Lima has been employed by MSP since 2006 and has never held a rank higher than Trooper.  *Id.* ¶ 109.  Lima is white.  *Id.* ¶ 115.

On July 7, 2011, Lima spoke to Riley for the first time and told Riley that he could answer any questions about the application material.  *Id.* ¶ 116.  Lima then followed up with an email

---

[5] In general, the background investigation process for the 80th RTT, and the distinction between individual background investigators (who played a fact-gathering and investigative role) and the Review Board (which acted as the decision-maker) is described in detail at SMF ¶¶ 70-87.

providing Riley with a document known as the "Questionnaire" for Riley to complete before his interview.  *Id.* ¶¶ 119, 130.  Although Riley had been concerned enough on May 24, 2011 to seek assurances "that nothing [on the Soares investigation] was going in [his] file" that could impair his MSP candidacy, Riley did not tell Lima in this initial discussion that he had learned that he was a subject of the Soares investigation, nor did he tell Lima that his Application needed to be corrected. *Id.* ¶¶ 45, 53, 117-18.

On July 20, 2011, Riley emailed Lima: "This email is to inform you that I have obtained all documentation that is required . . . .  If there is any further information that is needed please contact me."  *Id.* ¶ 120.  Riley did not tell Lima that he had learned that he was a subject of the Soares investigation, nor did he tell Lima that his Application needed to be corrected.  *Id.* ¶ 122.

On August 17, 2011, Riley emailed Lima: "*There has [sic] been some changes to my references on my application*," and then provided updated contact information for three references. Ex. 22 (emphasis added).  Riley did not tell Lima that he had learned that he was a subject of the Soares investigation, nor did he tell Lima that his Application needed to be otherwise corrected, aside from these few self-serving changes to references.  SMF ¶¶ 123-25.  *See also id.* ¶¶ 127-28 (further email of August 22, 2011).  At about the same point in August 2011, Riley went to view his NBPD personnel file to ensure for himself that there was no sign of the Soares investigation that MSP might consider a "negative" to his candidacy.  *Id.* ¶¶ 53, 126.

## VIII.   Riley Provides False Answers on the Questionnaire.

Prior to appearing for his interview with Lima, Riley completed and signed the Questionnaire document Lima had provided in July 2011.  *Id.* ¶¶ 119, 129-30.  The Questionnaire required Riley to certify that his answers were true and complete, as well as his understanding "*that false, incomplete or misleading information given herein may be sufficient cause for*

*disqualification*." Ex. 24 (emphasis added). Riley so certified and signed the Questionnaire on September 1, 2011—exactly 100 days after the meeting of May 24, 2011 where, at the very latest, Riley learned that he was a subject of the Soares investigation. *Id*.; SMF ¶¶ 50-52.

Beneath his certification, Riley provided three materially false answers: First, Riley was asked, "Have you broken any company rule?" Riley answered, "No." *Id.* ¶¶ 138-39. In fact, Riley knew that he had been found in violation of NBPD rules and regulations as a result of the Soares investigation. *Id.* Second, Riley was asked, "Is your name in a case report file with any police department or law enforcement agency that you are aware of?" Riley answered, "No." *Id.* ¶¶ 140-41. In fact, Riley knew that his name appeared in the investigation report for the Soares investigation. *Id.* Third, Riley was asked, "Is everything accurate and complete on you[r] application?" Riley answered, "Yes." *Id*. ¶¶ 133-37. In fact, Riley's Application was not "accurate and complete" as of September 1, 2011, and Riley knew, at the very least, that his answer to Question 20.E. needed to be corrected. *Id.* ¶¶ 133-37, 153.

## IX.    Lima Learns of the Soares Investigation and Interviews Riley.

Early in the day on September 1, 2011, Lima travelled to the NBPD to view their files related to Riley. *Id.* ¶ 142. Lima reviewed both Riley's personnel file (which Riley had previously reviewed in order to check for any signs of the Soares investigation) as well as Riley's internal affairs file (which, apparently, Riley did not know about). *Id.* ¶¶ 142-43, 225, 227. Within the internal affairs file, Lima found the June 18, 2010 Memorandum, which Lima then photocopied and took with him. *Id.* ¶ 143. Based on the June 18, 2010 Memorandum, Lima believed that Riley had in fact received the reprimand recommended in the document. *Id.* ¶ 145.

Following his visit to the NBPD, Lima travelled back to MSP's Dartmouth barracks to conduct his interview of Riley. *Id.* ¶ 146. The interview lasted approximately three hours. *Id.*

While the interview proceeded, Riley did not at any point affirmatively volunteer to Lima that he had learned that he was a subject of the Soares investigation, and that his Application needed to be corrected. *Id.* ¶¶ 151-55. Eventually, Lima asked, "[I]s there anything else about you in regards to internal affairs that you want to discuss?" *Id.* Only then, Riley revealed that he had learned that he was a subject of the Soares investigation. *Id.*[6] Lima further asked, "How come you did not call me and tell me about this?" *Id.* Riley replied, "[B]ecause there was no discipline involved and I would rather discuss this issue with you during my interview so I could tell you in detail about the incident and there wouldn't be any misunderstandings." *Id.*

At this point, Lima showed Riley the June 18, 2010 Memorandum. *Id.* ¶¶ 156-59. Riley immediately responded, "that's not supposed to be in my file," and then repeated that phrase for a second time when Lima asked for explanation. *Id.* Eventually, Riley stated that he had never seen the document before, but that he had been assured "that there was no discipline involved in [the] incident and the incident was not going in [his] file." *Id.* Ultimately, Riley changed his answer to Question 20.E. on the Application from "NO" to "YES" and initialed the change. *Id.* ¶ 161; Ex. 25. At the conclusion of this part of the interview, Lima thought it clear that Riley had been untruthful regarding the Soares investigation, and felt that Riley was attempting to minimize a major issue involving the escape of a prisoner. SMF ¶ 160.

At some point in the interview, Riley and Lima discussed Question 20.A., pertaining to other law enforcement agencies. *Id.* ¶¶ 162-63. Riley did not volunteer that, beyond what he had listed, he had also unsuccessfully applied to the Providence Police Department in 1999. *Id.*

---

[6] This is according to Riley. As Lima recalls it, Riley entirely failed to address the Soares investigation until Lima placed the June 18, 2010 Memorandum in front of him, effectively leaving Riley no choice. Ex. 27 at MSP00071; Ex. 48 at 33-38.

At some point in the interview, Riley and Lima discussed the fact that Riley had attended other high schools in addition to the single one listed on the Application (New Bedford High School), and Riley added Muskegon High School and Bishop Stang High School to the Application. *Id.* ¶¶ 164, 169; Ex. 25. Riley did not add Dartmouth High School to the Application. SMF ¶ 169. Lima asked Riley to procure transcripts from any other high schools, as Riley had only previously ordered a single transcript from New Bedford High School. *Id.* ¶¶ 121, 170. Lima and Riley also discussed why Riley had left his other unlisted high schools. *Id.* ¶¶ 164-68. While the parties dispute what was said in this regard, *id.* ¶¶ 165-66, this much is undisputed: Lima left the interview with the impression (right or wrong) that Riley had left Bishop Stang High School due to a residency requirement, *id.* ¶ 167, 179, 197-98.

## X.     Lima Conducts Follow-Up and Writes his Background Investigation Report.

Following the interview, and having understood Riley to say that he had left Bishop Stang High School due to residency issues, Lima reached out to Bishop Stang to attempt to confirm why Riley had left that school. *Id.* ¶¶ 165, 167, 173-74. Lima spoke with a school official "who informed [him] that [Riley] did attend the high school for a year but did not return the following year based on academic performance." *Id.* ¶ 174. At around this time, Lima also visited Riley's home to perform the required neighborhood check. *Id.* ¶¶ 175-78.

On September 7, 2011, Lima completed a 12-page background investigation report on Riley. Ex. 27. There, Lima explained in detail Riley's evasive statements and omissions regarding the Soares investigation, his conclusion that Riley had received a written reprimand, and his investigation into why Riley left Bishop Stang High School. *Id.* At the end of the report, Lima recorded that Riley's "negative employment aspects" included being "[u]ntruthful about disciplinary action," not being "completely forthright on disclosing disciplinary action," and

demonstrating a "[l]ack of attention to detail," "[l]ack of understanding," and "[a]cceptance of mediocrity" in connection with his completion of the Application.  *Id.  See* SMF ¶ 180.

## XI.     The Review Board Disqualifies Riley.

On September 7, 2011, MSP's Review Board met and considered Riley's background investigation.  *Id.* ¶ 181.  The three members of the Review Board unanimously concluded that Riley had failed his background investigation and would be disqualified from the hiring process. *Id.* ¶ 182.  *See* Ex. 50 (explaining in detail the Review Board's decisions).

In reaching its decision, the Review Board reviewed and considered Riley's Application and Questionnaire, and Lima's completed background investigation report.  SMF ¶ 183.  Based upon its review, the Board concluded that Riley had been knowingly untruthful in several respects: (1) Riley had lied on his Application about whether he was a subject of the Soares investigation; (2) Riley had lied on the Questionnaire in response to questions that called for information about the Soares investigation; (3) Riley had lied to Lima in denying that he received a written reprimand; and (4) Riley had lied about the reasons he left Bishop Stang High School.  *Id.* ¶ 185.

Pursuant to the "Automatic and Discretionary Disqualifiers" guidelines that applied to the Review Board's decision-making, candidates would be automatically disqualified if they "knowingly misrepresented or falsified information submitted on the Application . . . or any other documents filed in conjunction with the hiring process" or if they "knowingly made false statements to the background investigator."   Ex. 14.   *See* SMF ¶¶ 81, 83.   Based on its determination that Riley had knowingly made false statements, the Review Board deemed Riley subject to automatic disqualification.  *Id.* ¶¶ 184-85.  By letter dated September 15, 2011, Riley was informed that he had been disqualified because the Review Board determined that he "was untruthful on his application" and "untruthful to [his] background investigator."  Ex. 28.

**XII.    Riley Reacts to His Disqualification, and Lima Conducts Further Follow-Up.**

Also on September 15, 2011, Riley went to see Provencher to complain that MSP had discovered information about the Soares investigation.  SMF ¶ 225.  Riley asked Provencher, "why [he] was never informed about any recommendation for a written reprimand" and stated that he "thought [Provencher had] said none of this was going in [his] file."  *Id.*  Provencher replied, "I meant your personnel files [and] your internal affairs file is different."  *Id.*

Around September 18, 2011, Riley called Lima and angrily demanded an explanation of how he had been untruthful.  *Id.* ¶¶ 191-92.[7]  Lima replied that Riley had received a reprimand in the Soares investigation and that Riley had not told the truth about why he left Bishop Stang.  *Id.*  Lima also noted that Riley had failed to disclose his application to the Providence Police Department, which Lima had only learned about after completing his report. *Id.* ¶¶ 190-91.  On September 22, 2011, Riley wrote to MSP asking for a "second look" at his background and arguing that he had not been untruthful (hereinafter, the "September 22, 2011 Letter").  Ex. 29.

Separately, Lima sought and received permission to conduct additional follow-up investigation related Riley.  SMF ¶¶ 195-98.  Lima explained that he wanted to "make sure that [he] had not missed anything" because he "was, essentially, being accused [by Riley] of getting the report wrong."  *Id.* ¶ 195.  In conducting this follow-up, Lima learned from NBPD that the reprimand referenced in the June 18, 2010 Memorandum had been "initiated but . . . never acted on."  *Id.* ¶ 196.  Lima also spoke to another official of Bishop Stang High School who confirmed again that Riley had left the school under an academic cloud.  *Id.* ¶ 197.  On September 28, 2011, Lima completed a memorandum documenting the findings of his further investigation.  Ex. 30.

---

[7] Riley had his disqualification letter in hand at the time.  Nevertheless, Riley did not appear to understand that it was the Review Board, and not Lima, who disqualified him.  *See* SMF ¶¶ 70-87, 181-89.

### XIII.   The Review Board Disqualifies Riley for a Second Time.

On September 26, 2011, the Review Board met to reconsider Riley's background investigation in light of Riley's "appeal" in his September 22, 2011 Letter.  SMF ¶¶ 200-211.  The Review Board unanimously concluded that Riley would remain disqualified.  *Id.  See* Ex. 50.

In reviewing Riley's "appeal," the Review Board followed the same process as it had in its earlier meeting, reviewing Riley's documents as well as the September 22, 2011 Letter.  SMF ¶¶ 201-02.  The Board did not consider Lima's new memorandum which Lima had not yet completed. *Id.* ¶¶ 199, 203.  The Board was aware, however, that the reprimand referenced in the June 18, 2010 Memorandum had never been acted upon, which Lima conveyed prior to the meeting.  *Id.*

As it had weeks earlier, the Review Board again concluded that Riley had been knowingly untruthful and, therefore, was subject to automatic disqualification under the guidelines.  *Id.* ¶ 206. In particular, the Board continued to believe that Riley had lied on his Application and his Questionnaire in regards to the Soares investigation, and the fact that Riley had not received the recommended reprimand made no difference to this conclusion.  *Id.* ¶ 207.  The Board also continued to believe that Riley had lied about why he left Bishop Stang High School, and concluded that Riley had further lied in response to Question 20.A. on the Application by failing to disclose his unsuccessful application to the Providence Police Department.  *Id.* ¶¶ 204, 208-09.

By letter dated September 28, 2011, Riley was informed that "[a]fter reconsidering the information presented in the first instance as well as the representations advanced in your letter . . . the Review [Board] has affirmed its original decision to remove you from the process."  Ex. 67.

### XIV.   Riley Commences Litigation Against the New Bedford Police Department.

In June 2012, Riley filed a charge of race discrimination with the Massachusetts Commission Against Discrimination ("MCAD") against NBPD and Provencher.  SMF ¶¶ 226-28.

Riley alleged that Provencher discriminated against him by placing the June 18, 2010 Memorandum in his internal affairs file, causing him to fail his MSP background investigation. *Id.* Riley alleged that he had "specifically inquired as to whether or not something would end up in my file as I was a [MSP] candidate" and had been assured by Provencher that "nothing was going in [his] file." Ex. 32. The charge was dismissed for lack of probable cause. Ex. 38.

**XV.    Riley's Claims Against the Massachusetts State Police.**

Riley commenced this litigation in April 2012 by filing an MCAD charge against MSP and Lima. SMF ¶ 230. Riley focused his charge on Lima, alleging (incorrectly) that "Lima determined that [he] be withdrawn from the application process for being untruthful." Ex. 31. In 2014, the MCAD dismissed Riley's charge for lack of probable cause, specifically noting Riley's failure to point to any "appropriate comparators." Ex. 37. Riley thereafter appealed to an Investigating Commissioner who affirmed the lack of probable cause finding. Ex. 39. This lawsuit followed.

Riley's Amended Complaint alleges race discrimination in violation of Title VII. Riley claim is that Lima acted with racial animus and caused the Review Board to disqualify him. As the Court previously noted: "[T]he centerpiece of Plaintiff's discrimination claim is that he was excluded . . . 'based on a profoundly biased interview and background investigation by a single state trooper [Lima] . . . .' That is, Plaintiff's theory of the case is that by relying upon the racially biased interview and investigation conducted by Lima, Defendant discriminated against Plaintiff." October 3, 2017 Order on Objection, [Doc. 112] (quoting Am. Compl. ¶ 1).

## ARGUMENT

In the context of a discrimination claim under Title VII, "a plaintiff's ability to survive summary judgment depends on his ability to muster facts sufficient to support an inference of discrimination." *Charles v. Stop & Shop Supermarket Co.*, LLC, No. CIV.A. 10-10726-DJC, 2012

WL 2402790, at *1 (D. Mass. June 25, 2012) (quoting *Bennett v. Saint–Gobain Corp.*, 507 F.3d 23, 30 (1st Cir. 2007)).  Where, as here, the plaintiff seeks to proceed by indirect evidence, the Court applies the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[8]  "The ultimate burden of proving unlawful discrimination rests at all times with [the plaintiff]."  *Tobin v. Liberty Mut. Ins. Co.*, 433 F.3d 100, 105 (1st Cir. 2005).

Summary judgment should now enter in favor of MSP.  Riley cannot establish a prima facie case, nor can he establish that MSP or Lima's reasons were a pretext for discrimination. Moreover, even apart from the framework of *McDonnell Douglas*, Riley cannot establish that the Review Board was somehow negligent in relying on Lima.

## I.    Riley Cannot Establish a Prima Facie Case Because He Was Not Similarly Situated to Any Hired Candidate.

In a failure-to-hire case such as this, a plaintiff's prima facie case requires him to show: "(1) he is a member of a protected class; (2) he was qualified for the position to which he applied; (3) he applied to that position and was not hired; and (4) the position to which he applied was filled by a person possessing similar or inferior qualifications."  *Cruz v. Mattis*, 861 F.3d 22, 25 (1st Cir. 2017).  Here, at the least, Riley cannot establish the fourth element of his prima facie case because he cannot show that MSP hired another similarly situated candidate for the 80th RTT.  *See Cruz*, 861 F.3d at 25; *Goncalves v. Plymouth Cty. Sheriff's Dep't*, 659 F.3d 101, 106 (1st Cir. 2011) (fourth element requires plaintiff to "point[] to . . . evidence establishing that []he was similarly situated to the hired candidates"); *Martinez-Burgos v. Guayama Corp.*, 656 F.3d 7, 12 (1st Cir.

---

[8] That is, the plaintiff carries the initial burden of establishing a prima facie case of discrimination. *McDonnell Douglas Corp.*, 411 U.S. at 802.  If the plaintiff establishes a prima facie case, the burden of production shifts to the employer who must articulate a legitimate, nondiscriminatory reason for the challenged decision.  *Cruz v. Mattis*, 861 F.3d 22, 25 (1st Cir. 2017).  If the employer articulates such a reason, then the burden of production reverts to the plaintiff, who must offer evidence that the reason offered by the employer is a pretext for discrimination.  *Id.*

2011) (similar).  Specifically, Riley cannot show that MSP hired any similar individual subject to comparable concerns (or, indeed, any concerns at all) regarding their candor or truthfulness.

At this stage, it is Riley's burden to demonstrate that he was passed over in favor of a "similarly situated" candidate.  *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 258 (1981).  To meet that burden, Riley must point to someone hired who had "roughly equivalent qualifications" and who was similar to Riley in all "material respects."  *Goncalves*, 659 F.3d at 106 (internal citations omitted).  In other words, "apples should be compared to apples."  *Id.* (quoting *Dartmouth Review v. Dartmouth Coll.*, 889 F.2d 13, 19 (1st Cir. 1989)).  "The test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated."  *Dartmouth Coll.*, 889 F.2d at 19.

The facts relevant to Riley's prima facie case are straightforward.  Riley failed his background investigation because the Review Board determined that he made knowingly untruthful statements, principally with respect to the Soares investigation.  SMF ¶¶ 181-89, 200-211.  Riley does not dispute that his Application and Questionnaire contained multiple inaccuracies and omissions, or that he intentionally withheld information about the Soares investigation from Lima until the time of the interview.  *Id.* ¶¶ 152-55; Ex. 25; Ex. 29.  Riley instead offers a series of excuses and explanations for his conduct.  *See infra* Argument Section III.A.  In substance, Riley contends that he erred but did not lie.  Riley faults Lima and MSP for too quickly reaching a determination of untruthfulness and discounting his innocent explanations.  On these facts, Riley's prima facie case requires him to point to at least one similarly situated hired candidate for whom MSP overlooked comparable suggestions or concerns of potential untruthfulness.

Riley's universe of comparators is limited.  For the 80th RTT, Lima completed background investigations on four candidates in addition to Riley: Candidates A.G., A.P., J.W., and J.H.[9]  SMF ¶¶ 212-22.  All four were white.  *Id.* ¶ 214.  Of them, three—A.G., A.P., and J.W.—were also disqualified by the Review Board for failing their background investigations, and thus offer no help to Riley.  *See id.* ¶¶ 216-19; *Cruz*, 861 F.3d at 25; *Goncalves*, 659 F.3d at 106; *Martinez-Burgos*, 656 F.3d at 12.  The fourth, J.H., passed his background investigation.  SMF ¶ 222.  The inquiry at this stage thus reduces to a single, simple question: whether Riley was "similarly situated" to J.H.  The answer is that he was not.

With respect to the issue of truthfulness, J.H. and Riley could hardly have been more different.  Lima perceived no concerns with J.H.'s truthfulness and, indeed, J.H. earned praise from Lima for his honesty and forthrightness in acknowledging limited past use of marijuana.  *Id.* ¶ 220.  More generally, Lima recorded in his report that "[t]hroughout the interview, [he] found [J.H.'s] statements and[/]or explanations to questions [he] posed honest and accurate" and J.H.'s "demeanor reflected someone who was honest and of integrity."  Sealed Ex. 64 at MSP03659.  Ultimately, Lima perceived no negative aspects in J.H.'s background.  *Id.*  J.H. made three mistakes on his Application which he corrected at his interview with Lima: not listing a cell phone, an email address, or the one high school he attended.  SMF ¶ 221.  None of these mistakes suggested potential dishonesty, evasion, or concealment of bad facts.

Comparing their candidacies side-by-side, Riley simply cannot meet his burden of showing that he was similarly situated to J.H. in all material respects.  In this regard, the Seventh Circuit's

---

[9] As this Court, the Magistrate Judge, and the MCAD have all previously recognized, Riley can only be fairly compared to the four other candidates investigated by Trooper Lima.  *See* October 3, 2017 Order on Objection, [Doc. 112]; Ex. 37.  *See also Rodriguez-Cuervos v. Wal-Mart Stores, Inc.*, 181 F.3d 15, 21 (1st Cir. 1999) (comparators cannot have "differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it") (internal citations and quotation marks omitted).

decision in *Sweatt v. Union Pacific Railroad Co.*, 796 F.3d 701 (7th Cir. 2015), is particularly on point.  In *Sweatt*, the plaintiff failed a background investigation because he did not disclose a prior arrest on his application.  *Id.* at 705-06, 709.  After being confronted with the omission, the plaintiff—much like Riley—attributed his mistake to a "misunderstanding" about the status of the case.  *Id.*  The plaintiff was disqualified on grounds of untruthfulness and thereafter sued for race and age discrimination.  *Id.* at 706, 709, n.7.  The Seventh Circuit ruled that summary judgment was appropriate because the plaintiff had failed to establish the fourth prong of his prima facie case.  *Id.* at 709.  To meet his burden, the plaintiff had to point to a candidate who was hired, who was untruthful, and who was untruthful to a similarly serious degree as the plaintiff.  *Id.* at 709-10.  This the plaintiff could not do.  *Id.*  While different candidates who were hired also provided wrong answers on their applications or were arrested, those candidates "immediately rectified" their applications or "forthrightly admitted to their prior misdeeds," making them fundamentally dissimilar from the plaintiff.  *Id.*  The plaintiff thus had no qualitatively similar comparator to rely upon, and could not establish a prima facie case.  *Id.  See also Gaston v. New Jersey,* No. CIVA 05-CV-03006 FLW, 2008 WL 540853, at *3 (D.N.J. Feb. 25, 2008), aff'd 298 F. App'x 165 (3d Cir. 2008) (candidate for police position who failed background investigation for lack of "good moral character" could not point to any hired applicant raising similar concerns, and so could not establish fourth element of prima facie case); *Amini v. City of Minneapolis*, 643 F.3d 1068, 1072-76 (8th Cir. 2011) (police officer candidate failed background investigation after failing to disclose prior criminal and disciplinary history, and reacting defensively when being confronted with the information; candidate was not "similarly situated" to other candidates who did not have "similar reaction[s] when presented with information that was unfavorable or surprising").

18

Here, as in *Sweatt*, Riley cannot demonstrate that MSP hired any similarly situated candidate whose investigation raised comparable (or even any) red flags of potential untruthfulness. As such, summary judgment should enter in favor of MSP.

## II. MSP's Reasons for Disqualifying Riley Were Legitimate.

To the extent that Riley has established a prima facie case, MSP has met its burden of articulating legitimate, non-discriminatory reasons for Riley's disqualification. For law enforcement officers, there are few qualities more essential than truthfulness.[10] For the 80th RTT, untruthfulness constituted grounds for disqualification under the guidelines, SMF ¶¶ 83-84, and the Review Board disqualified no fewer than 22 candidates due, in whole or part, to untruthfulness, *id.* ¶ 224. Both the Application and Questionnaire expressly informed candidates—and required candidates to certify their understanding—that the provision of false or misleading information could result in their disqualification. *Id.* ¶¶ 94, 132. Therefore, MSP meets its burden at the second stage of *McDonnell Douglas*.

## III. Riley Cannot Establish Pretext or that The True Reason for Lima's Actions Was Discrimination.

To avoid summary judgment at the third stage of *McDonnell Douglas*, Riley "must introduce sufficient evidence to support two findings: (1) that [the] articulated reason. . . is a pretext, and (2) that the true reason is discriminatory." *Espinal v. Nat'l Grid NE Holdings 2, LLC*, 693 F.3d 31, 35 (1st Cir. 2012) (internal citations and quotation marks omitted).

---

[10] *See, e.g., Police Commr. of Boston v. Civil Serv. Commn.*, 22 Mass. App. Ct. 364, 371 (1986) ("Police officers must . . . behave in a manner that brings honor and respect for rather than public distrust of law enforcement personnel."); *Town Of Falmouth v. Civil Serv. Comm'n*, 61 Mass. App. Ct. 796, 801 (2004) (a police officer's "demonstrated willingness to fudge the truth in exigent circumstances is a significant problem, because [p]olice work frequently calls upon officers to speak the truth") (internal citations and quotation marks omitted). MSP has not hesitated to discharge existing State Troopers when discovering, even years later, that they lied in the course of their Applications. *See, e.g., Dasey v. Dep't of State Police*, 65 Mass. App. Ct. 1110, 2005 WL 3489556, at *1 (2005) (Rule 1:28 Decision); *McCormack v. Dep't of State Police*, 92 Mass. App. Ct. 1103, 2017 WL 3469601, at *3 (2017) (Rule 1:28 Decision).

In analyzing a claim of "pretext," the Court does not "sit as a super-personnel department that reexamines an entity's business decisions." *Id.* (internal citations and quotation marks omitted). Instead, the Court's task is to determine "whether the employer believed in the accuracy of the reason given for the adverse employment action." *Id.* (internal citations and quotation marks omitted). *See Kouvchinov v. Parametric Tech. Corp.*, 537 F.3d 62, 70 (1st Cir. 2008) (defendant's "reasonable belief . . . guides the inquiry" and where the plaintiff "has failed to make out a genuine issue as to the reasonableness of [the defendant's belief] . . . the charge of pretext fails"); *Shorette v. Rite Aid of Me., Inc.*, 155 F.3d 8, 15 (1st Cir. 1998) (similar). Where the employer relied on more than one justification for its action, the plaintiff may defeat summary judgment only by showing that each of the justifications was a pretext for discrimination. *See Dennis v. Osram Sylvania, Inc.*, 549 F.3d 851, 859 (1st Cir. 2008); *Curley v. City of N. Las Vegas*, 772 F.3d 629, 633 (9th Cir. 2014); *Jaramillo v. Colorado Jud. Dep't*, 427 F.3d 1303, 1309-10 (10th Cir. 2005).

All this means that Riley can avoid summary judgment only by advancing competent evidence that: (a) Lima and MSP's expressed belief that Riley was untruthful was not genuine; and (b) racial animus was the real reason for their conclusions. *See Espinal*, 693 F.3d at 35; *Dukanci v. Ann Inc. Retail*, 117 F. Supp. 3d 115, 123 (D. Mass. 2015). Riley cannot do so.

### A.    There Was No Pretext in Finding Riley Untruthful.

For Lima—and later the Review Board—the signs of Riley's mendacity were extensive. Riley's Application misrepresented his status as a subject of the Soares investigation, left out his unsuccessful application to the Providence Police Department, and omitted high schools that Riley left under questionable circumstances. Ex. 25. Despite knowing that the Soares investigation would be important to MSP, SMF ¶¶ 45, 53, 126, and despite making other self-serving corrections to his Application, *id.* ¶¶ 123-25, Riley intentionally declined to provide Lima with any correction

20

regarding the Soares investigation, *id.* ¶ 153.  At the same time, Riley actively worked to ensure that his personnel file would remain free from any reference to the Soares investigation that MSP might find.  *Id.* ¶¶ 45, 126, 225-27.  Riley's answers in the Questionnaire—completed months after the May 24, 2011 meeting—contained multiple false representations regarding the Soares investigation: that Riley had never broken any NBPD rule; that Riley's name did not appear in any NBPD case report; and that Riley's Application remained "accurate and complete."  *Id.* ¶¶ 129-41.  When his interview occurred, Riley addressed his status in the Soares investigation only reluctantly and defensively.  Riley waited for Lima to bring up the subject of investigations and only then finally addressed what he had learned on May 24, 2011.  *Id.* ¶¶ 151-60.  When shown the June 18, 2010 Memorandum, Riley immediately became defensive, responding (and then repeating), "that's not supposed to be in my file."  *Id.* ¶¶ 157-58.  Assessing the entire body of evidence, the head of MSP's Review Board thought it clear that Riley had engaged in a broad "pattern of deception" designed to conceal various embarrassing aspects of his past.  *Id.* ¶ 210.

With the passage of time, Riley has developed a series of excuses designed to explain away his various misstatements and omissions.  At this stage of the inquiry, none of them matter.  *See Kouvchinov*, 537 F.3d at 67; *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 824 (1st Cir. 1991) ("[A] court's focus must be on the perception of the decisionmaker."); *Sweatt*, 796 F.3d at 710 (even if the plaintiff had a "misunderstanding" with his background investigator, that would "not change the fact that [he] was not forthcoming"; "[F]or a position where honesty and integrity are paramount . . . lack of candor understandably served as the death knell for his candidacy").[11]

---

[11] *See also Gaston*, 2008 WL 540853, at *15 (plaintiff's "litany of weak explanations for his apparent misstatements" during background investigation were irrelevant to pretext inquiry); *Lopez v. Cont'l Ins. Corp.*, 1997 WL 148032, at *4 (N.D. Tex. Mar. 25, 1997) (plaintiff failed background investigation and argued that he made no "actual, knowing misrepresentations"; "the truth . . . is irrelevant to whether the

With respect to Question 20.E. on the Application, Riley claims that he did not learn of his status as a subject of the Soares investigation until the May 24, 2011 meeting (after completing the Application) and that he purposefully waited to correct his answer until the interview so that "there wouldn't be any misunderstandings."  SMF ¶¶ 50-52, 151-55.  Even if true, it does not matter.  Lima and MSP were entitled to conclude that Riley was untruthful, particularly considering his other selective and self-serving corrections to the Application, his false answers on the Questionnaire, and his defensiveness and lack of forthrightness at the interview itself.

With respect to the Questionnaire, Riley claims that he did not understand the meaning of the questions asked of him.  *Id.* ¶¶ 135-41.  Even if true, it does not matter.  For the same reasons applicable to Question 20.E., and given the plain language of the questions themselves, Lima and MSP were entitled to conclude that Riley was untruthful.

With respect to Question 20.A. on the Application and the Providence Police Department, Riley says that he "assumed that [his] involvement with this particular Department did not pertain to this question" because Providence "did not perform any background investigation," but he "apologize[s] if [he] did misread the question."  Ex. 29.  Even if true, it does not matter.  Lima and MSP were entitled to conclude that Riley was untruthful, particularly given Riley's larger pattern of misstatements and omissions, SMF ¶ 210, and particularly where Riley had previously failed his RISP background investigation in part for failing to disclose the exact same unsuccessful application to the Providence Police Department, *id.* ¶ 27.[12]

---

information provided a legitimate, nondiscriminatory basis for refusing to hire [the plaintiff]"; what matters is whether the investigator believed "in good faith believed that [the plaintiff] had committed . . . fraud").

[12] *See also* SMF ¶¶ 16, 18, 19, 102 (in response to Question 20.A., Riley also failed to disclose unsuccessful 1999 NBPD application, where a background investigation was performed).

Finally, with respect to his reasons for leaving Bishop Stang High School, Riley asserts that he told Lima that he left Dartmouth High School due to a residency requirement and that he left Bishop Stang for "financial reasons."  *Id.* ¶¶ 164-67.  Even if true, it does not matter.  If Lima confused the two schools, then that confusion was Riley's own fault.  Riley—just as he had before with NBPD and RISP—intentionally gave Lima an incomplete accounting of his high schools.  *Id.* ¶¶ 17, 23, 98, 121, 170.  And more important, even the reason that Riley claims he gave Lima for leaving Bishop Stang ("financial reasons") was not the full and true story.  In fact, Riley had failed his sophomore year, as Lima later learned from two school officials.  *Id.* ¶¶ 5-6, 168, 174, 197.

## B.   It Does Not Matter Whether Riley Received the Reprimand.

Riley's principal argument regarding pretext has long been that Lima offered 'shifting explanations' for whether Riley received a written reprimand.  *See* Ex. 1 at ¶¶ 18, 28, 37.  The argument misapprehends the undisputed facts surrounding the June 18, 2010 Memorandum.

There is no dispute that Lima, at the time he drafted his first report, believed based on the June 18, 2010 Memorandum that Riley had received a reprimand.  SMF ¶ 145.  Lima was reasonable in so believing and rejecting Riley's assertions to the contrary, particularly given the June 18, 2010 Memorandum (in which the NBPD then-Deputy Chief specifically recommend Riley receive a reprimand), the misrepresentations on Riley's Questionnaire, and Riley's troubling lack of forthrightness about the Soares investigation both at the interview and prior to the interview.  There was, in short, no reason for Lima to believe anything that Riley said about the Soares investigation, and every reason to believe that Riley had engaged in a botched cover-up.

There is also no dispute that Lima learned, after completing his initial report, that Riley had not received the reprimand.  *Id.* ¶ 196.  Lima corrected this fact with the Review Board, and

the Review Board fully understood the correct status of the reprimand when it decided again to disqualify Riley on September 26, 2011.[13]  *Id.* ¶ 203; Ex. 30.

Thus, while it is true that Lima eventually revised his understanding of the reprimand, nothing about that revision suggests that his initial understanding was unreasonable or a pretext for discrimination.  *See Mesnick*, 950 at 824; *Marcinuk v. Lew*, No. 13-CV-12722-DJC, 2016 WL 111409, at *4 (D. Mass. Jan. 11, 2016) (to show pretext, plaintiff must offer evidence "of such strength and quality . . . to permit a reasonable finding that [the adverse action] was *obviously or manifestly unsupported*") (quoting *Shorette*, 155 F.3d at 13) (emphasis in original).  Moreover, Lima's initial understanding of the reprimand ultimately made no difference to the Review Board's final decision to disqualify Riley.  Ex. 50.

### C.    Lima's Statements to Riley's Fiancée Do Not Demonstrate Pretext.

On the day that Lima conducted his neighborhood check, Lima went to Riley's home (on the third floor of an apartment building) and found the front door to the apartment building unlocked.  SMF ¶¶ 175-77.  Lima proceeded upstairs to Riley's unit, where Riley's fiancée was home.  *Id.*  Riley's fiancée expressed alarm that the front door had been left open and that Lima had been able to come straight up.  *Id.*  According to Riley's fiancée, Lima then stated, "You might want to get that door checked because you don't live in the greatest neighborhood."  *Id.*

Riley has argued that this statement demonstrates pretext.  *See* Ex. 1 at ¶ 22.  It does not. There was nothing racially-tinged about the remark, which was prompted by Riley's fiancée's own alarm at the door being unlocked.  Moreover, "regardless of the evidentiary course the plaintiff charts, [he] must show that alleged discriminatory conduct was not 'merely tinged' with remarks

---

[13] Even at the initial September 7, 2011 Review Board meeting, the Board deemed Riley subject to automatic disqualification not only because they believed he lied about the reprimand, but also because they believed that Riley lied on the Application and on the Questionnaire.  Ex. 50.

[concerning the protected characteristic] but actually was, in either character or substance, discrimination because of [the protected characteristic]." *Teague v. Brennan*, No. CIV.A. 13-10789-DJC, 2015 WL 3910192, at *7 (D. Mass. June 25, 2015) (quoting *Rivera v. Puerto Rico Aqueduct & Sewers*, 331 F.3d 183, 189 (1st Cir. 2003)). Riley cannot rely on this benign stray remark to show pretext. *See Williams v. Raytheon Co*., 220 F.3d 16, 18–20 (1st Cir. 2000) (isolated remark perceived as racially-tinged did not show pretext and was insufficient to support inference of animus); *Charles*, 2012 WL 2402790, at *10 (similar).

### D.   Riley's Comparative Evidence Only Demonstrates a Lack of Pretext and Discriminatory Animus.

As discussed above, Lima completed investigations on five candidates for the 80th RTT: Riley and four white men. SMF ¶¶ 212-22. Riley *and three out of the four white candidates* ultimately failed their background investigations. *Id.* Only a single candidate investigated by Lima for the 80th RTT (J.H.) eventually passed. *Id.* In addition to Riley, Lima found at least one other candidate (A.P.) untruthful under circumstances where the candidate similarly attempted to explain away his prior misstatements. Sealed Ex. 61 at MSP03365, 67. If Lima was hard on his candidates, then his hard approach did not discriminate. Riley's comparative evidence does not support—and, indeed, manifestly undercuts—his desired inferences of pretext and racial animus.

### E.   Riley's Attempt to Fall Back on Systemic Attacks on MSP is Improper.

In earlier phases of this litigation, Riley repeatedly attempted to compel discovery about general issues at MSP unrelated to the question of whether Lima acted with racial animus. Ultimately, this Court and the Magistrate Judge each respectively issued multiple orders turning back Riley's attempts, and agreeing that the relevant evidence must be "[]tethered to the actual allegations" that Lima acted with bias and that MSP was responsible for "relying upon the . . . interview and investigation conducted by Lima." October 3, 2017 Order on Objection, [Doc. 112].

Nevertheless, MSP expects Riley to continue to make two "systemic" arguments: (1) that general statistics for the 80th RTT show pretext; and (2) that "subjectivity" in the MSP background investigation process for the 80th RTT shows pretext.  Both arguments lack merit, lack relevance, and lack any connection to Lima, Riley, or the facts of this case.

As a general matter, 6 of 22 (27%) black candidates who competed for the 80th RTT failed their background investigations, while 45 of 501 (9%) white candidates who competed failed their background investigations.  Ex. 44.  Nothing about these general statistics demonstrates pretext or an inference of racial animus.

As the First Circuit has held, statistical evidence in a disparate treatment case "rarely suffices to rebut an employer's legitimate, nondiscriminatory rationale for its decision to dismiss an individual employee." *LeBlanc v. Great American Ins. Co*., 6 F.3d 836, 848 (1st Cir. 1993).  In a disparate treatment case, "the issue is less whether a pattern of discrimination existed and more how a particular individual was treated, and why." *Cumpiano v. Banco Santander P.R.*, 902 F.2d 148, 156 (1st Cir. 1990).  "A statistic is only helpful if it tends to prove the discriminatory intent of the decision makers involved, which often will be difficult." *Ray v. Ropes & Gray LLP*, 799 F.3d 99, 116 (1st Cir. 2015) (internal citations and quotation marks omitted).  Thus, for statistical evidence to matter at all in a disparate treatment case, there must be a "connection between the statistics, the practices of the employer, and the employee's case." *LeBlanc*, 6 F.3d at 848.[14]

Here, generalized statistics about the 80th RTT say nothing about Lima.  The statistics that matter with respect to Lima are these: 4 out of 5 (80%) of Lima's candidates failed their

---

[14] *See also Hillstrom v. Best Western TLC Hotel*, 354 F.3d 27, 32 (1st Cir. 2003) (to be useful in disparate impact case, statistical evidence must "tend[] to prove the discriminatory intent of the decision makers involved"); *Mack v. Great Atl. & Pac. Tea Co*., 871 F.2d 179, 183-84 n.3 (1st Cir. 1989) ("difficult to visualize" how general statistical evidence could be admissible in a disparate treatment case; "[p]laintiff's pleaded concern seemed to be with how *she* was treated") (emphasis in original).

background investigations, including 3 out of 4 (75%) of his white candidates.  SMF ¶¶ 212-22.

Lima himself conducted only 5 out of the 363 (1.4%) investigations that made it to the point of a

final background investigation determination, and that are reflected in the generalized statistics for

the entire 80th RTT.  *Id.* ¶¶ 212-13; Ex. 57.  Given the absence of any link to Lima, and particularly

where Riley's case is "precariously unsupported by other probative evidence of . . .

discrimination," *LeBlanc*, 6 F.3d at 848, Riley's generalized statistics are not competent evidence

of pretext and do not, in any way, suggest that Lima acted with racial animus.[15]

Riley has also argued that the background investigation process for the 80th RTT was overly

"subjective."  As best as can be determined, Riley appears to believe that individual background

investigators should have been subject to stricter supervision and standardization to ensure that all

candidates were treated in precisely the same way in the determination of characteristics like

"truthfulness."  But "truthfulness," like many other crucial qualities, cannot be quantified on a

numerical scale or measured by standardized testing.  Determining whether candidates display the

honesty and good character necessary to be State Troopers will always involve a degree of fact-

dependent subjectivity, and there is nothing surprising in so saying.  The First Circuit, like the

Supreme Court, has acknowledged that subjective evaluations are "essential in certain positions,"

and "[j]udicial tolerance of subjective criteria seems to increase with the complexity of the job

involved."  *Sweeney v. Bd. of Trustees*, 569 F.2d 169, 176 n.14 (1st Cir. 1978), vacated on other

grounds 439 U.S. 24 (1978).  *See Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 999 (1988).

---

[15] It is also improper for Riley to rely on generalized statistics about other failed candidates where the Court already foreclosed Riley's attempted discovery into the specifics of those candidates' background investigations.  The Court has already held that such evidence is irrelevant in this case.  *See* [Doc. 112].  No inference can be drawn based on the background investigations of five other black candidates in the abstract, absent context for why those particular candidates failed.  *See McMillan v. Mass. Soc. for Prevention of Cruelty to Animals*, 140 F.3d 288, 202 (1st Cir. 1998); *Rossiter v. IBM Corp.*, No. 04–10069–DPW, 2005 WL 2722929, at *14 (D. Mass. Oct. 19, 2005).

Moreover, within the framework of *McDonnell Douglas*, subjectivity alone does not demonstrate pretext.  *See Ray*, 799 F.3d at 115.  A plaintiff relying on such an argument must "suppl[y] . . . evidence that creates a credible inference that his own [subjective] review process was based on . . . racial animus."  *Id.*[16]  Here, Riley's argument about subjectivity within the background review process, like his argument about statistics, indicates nothing of relevance to Riley's own case.  *See* July 13, 2017 Order on Motion to Compel, [Doc. 84] (ruling that the question of whether MSP generally "validated its background investigation procedures" was not relevant to Riley's case).[17]  Lima  and the Review Board considered Riley—based on his own words, his own omissions, and his own deeds—to be untruthful.  No different process would have led to a different result.

*       *       *

For all of these reasons, Riley's evidence is "insufficient for a rational factfinder to infer that . . . actions were based not on [the plaintiff's] perceived failings, but on discriminatory animus."  *Ray*, 799 F.3d at 117 (internal citations and quotation marks omitted).  Particularly given the strength of MSP's "independent evidence that no discrimination occurred," and the weakness in Riley's prima facie case (if actionable at all), Riley cannot meet his burden at the third stage of *McDonnell Douglas*.  *Zapata-Matos v. Reckitt & Colman, Inc.*, 277 F.3d 40, 47 (1st Cir. 2002).  Summary judgment should enter in favor of MSP.

---

[16] *See also Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 104-105 (2d Cir. 2001) ("Where an employer's explanation, offered in clear and specific terms, is reasonably attributable to an honest even though partially subjective evaluation of qualifications, no inference of discrimination can be drawn.") (internal citations and punctuation omitted); *Vitug v. Multistate Tax Comm'n*, 88 F.3d 506, 513–14 (7th Cir. 1996) (similar).

[17] As with Riley's argument regarding general statistics, it is also improper for Riley to rely on a "subjectivity" argument given the results of the rulings on his discovery motions.  During 2017, Riley sought to compel discovery into how MSP ensured objectivity in its background investigation system.  *See* [Doc. 65].   The Magistrate Judge held that such discovery was improper in a single plaintiff disparate treatment case, *see* [Doc. 84], and Riley did not object to the ruling.

**IV.     Riley Cannot Establish That the Review Board Was Negligent in Relying on Lima.**

In the unique facts of this case, Riley must also surmount one further hurdle—he must show not only a legitimate question on animus, but also a question of whether the Review Board was negligent in missing the signs of such animus.  Riley cannot do so.

In this case, unlike in the typical case, Riley places the alleged racial animus at the level of Lima—who was neither a supervisor nor a decision-maker—rather than at the level of the decision-making Review Board.  SMF ¶¶ 72-81, 109.  Riley then alleges that the Review Board was tainted by Lima's animus.  The First Circuit has held that, under Title VII, an employer may be responsible for a *non*-supervisor's discriminatory animus only if the decision-makers were negligent—that is, if they "know[] (or reasonably should know) of the [subordinate's] discriminatory motivation." *Velazquez-Perez v. Developers Diversified Realty Corp*., 753 F.3d 265, 273-74 (1st Cir. 2014).[18]

There is no evidence that could support such a finding here.  Other than Riley's allegations in this case, Lima has never been the subject of a complaint of racial bias or discrimination, or even regarding background investigations generally.  SMF ¶ 223.  As a general matter, Lima's superiors considered him "one of [MSP's] more effective background investigators" and "an extremely thorough, hardworking investigator and very meticulous in all of his work."  *Id.* ¶¶ 112-13.  Lima serves as a respected investigator both within MSP and outside, currently serving as Deputy Inspector General for the Massachusetts National Guard.  *Id.* ¶ 114.  Certainly, Lima's overall body of work for the 80th RTT would have given the Review Board no cause for concern

---

[18] This question was initially left open by the Supreme Court in *Staub v. Proctor Hospital,* which held that an employer may be responsible for the discriminatory animus of a non-decision-making *supervisor* if that supervisor "performs an act motivated by . . . animus that is intended . . . to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action." 562 U.S. 411, 422 & n.4 (2011).  Under Title VII, an individual is a "supervisor" only if he is "empowered . . . to take tangible employment actions," such as having the power "the power to hire, fire, demote, promote, transfer, or discipline."  *Velazquez-Perez*, 753 F.3d at 271 (internal citations and quotation marks omitted).

regarding any disparate treatment.  As noted, 4 of 5 (80%) of Lima's candidates ultimately failed their background investigations including 3 of 4 (75%) of his white candidates.  *Id.* ¶¶ 212-22. When accused of "getting it wrong" by Riley, Lima proactively sought to review his work and advised the Review Board of the one thing on which he was initially mistaken.  *Id.* ¶¶ 195, 203, Ex. 30.  When Riley "appealed" the Board's initial determination, his September 22, 2011 Letter did not contend—or suggest in any way—that Lima had somehow acted with racial bias.  SMF ¶ 194; Ex. 29.  There was, in sum, nothing about any of the materials or information before the Review Board that could reasonably have suggested racial animus on the part of Lima.

Nor did the Review Board function as a rubber stamp for Lima.  The Review Board independently scrutinized Riley's materials and, having done that, independently satisfied itself that Riley had lied in multiple respects—based not only on Lima's report but also on Riley's own misstatements, omissions, and evasions that were clear on the face of the record.  Ex. 50.  In making its final decision on September 26, 2011, the Review Board concluded that Riley's lies stretched even beyond what was known to Lima weeks earlier, and included Riley's previously unknown failure to disclose his unsuccessful application to the Providence Police Department. SMF ¶¶ 190, 204, 209.

On this record, no jury could conclude that the Review Board "reasonably should have known" that Lima acted with bias.  As such, for this additional reason, summary judgment should enter in favor of MSP.  *See Ameen v. Amphenol Printed Circuits, Inc.*, 777 F.3d 63, 74 (1st Cir. 2015) (Kayatta, J., concurring) (although majority did not reach issue, summary judgment appropriate for employer that would not reasonably have known of subordinate's animus).

## CONCLUSION

For all of the foregoing reasons, Summary judgment should enter in favor of MSP.

Respectfully submitted,

MASSACHUSETTS STATE POLICE

By its attorneys,

MAURA HEALEY
ATTORNEY GENERAL,

/s/ Jesse M. Boodoo
Jesse M. Boodoo, BBO No. 678471
Nicholas Rose, BBO NO. 670421
Assistant Attorneys General
Government Bureau/Trial Division
One Ashburton Place, Room 1813
Boston, MA  02108
(617) 727-2200
jesse.boodoo@state.ma.us
nicholas.rose@state.ma.us

Dated:  November 2, 2017

## CERTIFICATE OF SERVICE

I, Jesse M. Boodoo, Assistant Attorney General, hereby certify that I have this day, November 2, 2017, served the foregoing document upon the attorney of record for all parties by filing it through the ECF system.

/s/ Jesse M. Boodoo
Jesse M. Boodoo