## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ORLANDO RILEY<br><br>Plaintiff,<br><br>v.<br><br>MASSACHUSETTS STATE POLICE<br><br>Defendant. | C.A. 1:15-cv-14137-DJC |

## DEFENDANT MASSACHUSETTS STATE POLICE'S
## LOCAL RULE 56.1 STATEMENT OF MATERIAL FACTS

Pursuant to L.R. 56.1, Defendant Massachusetts State Police ("MSP") hereby submits this Statement of Material Facts in Support of its Motion for Summary Judgment.[1]

1.    Plaintiff Orlando Riley ("Riley" or "Plaintiff") is an African-American resident of Massachusetts.  Ex. 1 at ¶ 2.

2.    Riley is currently employed as a police officer with the New Bedford Police Department ("NBPD"), a position that he has held since 2002.  Ex. 1 at ¶ 2.

**Riley's High Schools**

3.    As a youth, Riley attended four different high schools: Muskegon High School (Michigan); Bishop Stang High School (Massachusetts); Dartmouth High School (Massachusetts); and New Bedford High School (Massachusetts).  Ex. 43 at Response No. 26; Ex. 47 (Riley Dep.) at Tr. 14-21.

4.    Riley attended Bishop Stang High School as a sophomore (1993-1994).  Bishop Stang High School is a private school located in Dartmouth, Massachusetts.  Ex. 43 at Response No. 26; Ex. 47 (Riley Dep.) at Tr. 15-17.

---

[1] All Exhibits to MSP's Statement of Material Facts and Motion for Summary Judgment are attached to the contemporaneously-filed Affidavit of Jesse M. Boodoo, Esq. or, in the case of Exhibits 57 – 66, filed by hand and under seal.  All Exhibits are cited herein as Ex. ___.

5.      At Bishop Stang High School, Riley failed approximately 7 of his 11 courses.  Riley
        made up for some, but not all, of these course failures through summer school and
        private tutoring.  Ex. 2; Ex. 47 (Riley Dep.) at 41-44; Ex. 30 at MSP00075.

6.      Because of these course failures, Riley would not have been allowed to proceed on to
        his junior year at Bishop Stang High School without repeating the courses he had not
        yet made up.  If he returned to Bishop Stang High School, Riley would have needed to
        repeat his sophomore year.  Ex. 47 (Riley Dep.) at Tr. 41-44, 124-25; Ex. 30 at
        MSP00075

7.      Ultimately, Riley did not return to Bishop Stang High School.  Ex. 43 at Response No.
        26.

8.      For three weeks during the start of his junior year (1994-1995), Riley attended
        Dartmouth High School.  Dartmouth High School is a public school located in
        Dartmouth, Massachusetts.   Ex. 43 at Response No. 26; Ex. 47 (Riley Dep.) at Tr. 16-
        17.

9.      Dartmouth High School had a "residency requirement" mandating that its students live
        in Dartmouth, Massachusetts.  At the time, however, Riley was not living in
        Dartmouth; he was living in New Bedford.  Ex. 47 (Riley Dep.) at Tr. 16, 19.

10.     Riley was enrolled in Dartmouth High School using a false residency address—not his
        own, but that of an aunt who lived in Dartmouth.  Riley knew at the time that he was
        enrolled in Dartmouth High School without meeting the school's residency
        requirement.  Ex. 43 at Response No. 26; Ex. 47 (Riley Dep.) at Tr. 16-20.

11.     A few weeks into his junior year, Dartmouth High School discovered that Riley had
        been enrolled using a false residency address.  As a result, Riley was required to leave
        Dartmouth High School.  Ex. 47 (Riley Dep.) at Tr. 16-22.

12.     Riley thereafter completed his junior and senior years at New Bedford High School in
        New Bedford, Massachusetts, graduating in May 1996.  Ex. 43 at Response No. 26;
        Ex. 47 (Riley Dep.) at Tr. 15-16, 20-21.

**Riley's Application to the Providence Police Department**

13.     In 1999, Riley applied to become a police officer with the Providence Police
        Department.  Ex. 43 at Response No. 4.  He filled out an application, passed a physical
        exam, participated in an oral interview, and took a written exam.  Ex. 47 (Riley Dep.)
        at Tr. 70-73.

14.     Riley received a "low score" on the written examination for the Providence Police
        Department, and was informed "that [he] did not score strong enough to become a
        candidate for their Department."  Ex. 29 at P0066.

15. Because of his "low score" on the written examination, Riley never reached the point of having a background investigation performed by the Providence Police Department. Ex. 29 at P00066.

## Riley's Applications to the New Bedford Police Department

16. In 1999 and again in 2001, Riley applied to become a police officer with the New Bedford Police Department ("NBPD"). Ex. 3; Ex. 4; Ex. 47 (Riley Dep.) at Tr. 27-36.

17. Question 26 on Riley's NBPD applications—both in 1999 and 2001—requested a list of educational institutions that Riley had attended. Next to "High School," Riley listed Muskegon High School, Bishop Stang High School, and New Bedford High School. In both applications, Riley omitted Dartmouth High School. Ex. 3; Ex. 4; Ex. 47 (Riley Dep.) at Tr. 29-31, 38.

18. The NBPD conducted background investigations of Riley related to both his 1999 and 2001 applications. Ex. 47 (Riley Dep.) at Tr. 128.

19. Riley's 1999 application to NBPD was unsuccessful, and Riley was not hired by NBPD at that time. Ex. 47 (Riley Dep.) at Tr. 27-38.

20. Riley's 2001 application to NBPD was successful, and Riley became a NBPD police officer in 2002. Ex. 1 at ¶ 2; Ex. 47 (Riley Dep.) at Tr. 35-36, 53-56.

## Riley's Application to the Rhode Island State Police

21. In 2003, Riley applied to become a State Trooper with the Rhode Island State Police ("RISP"). Ex. 43 at Response No. 4.

22. Section II on Riley's RISP application asked, "Have you ever submitted an application with any other law enforcement agency in the U.S.? If yes, indicate the agency(s) and the date(s) of the application(s)." In response, Riley listed the New Bedford Police Department, but did not list that he had applied to the Providence Police Department in 1999. Ex. 5 at RISP0042; Ex. 47 (Riley Dep.) at Tr. 77-80.

23. Section III on Riley's RISP application also asked for Riley to list his "High School(s)." In response, Riley listed that he attended New Bedford High School, but did not list the other three high schools he attended. Ex. 5 at RISP0046; Ex. 47 (Riley Dep.) at Tr. 80-83.

24. In April 2004, Riley sat for an interview with a background investigator assigned by RISP. Ex. 6 at RISP0005, RISP00012.

25. The RISP background investigator subsequently completed a background investigation report concluding that Riley was "Not Recommended" for continuing in the RISP selection process. Ex. 6 at RISP0004-5.

26. The RISP background investigator wrote that his decision to not recommend Riley "[was] based on [Riley's] lack of attention to detail, his lackadaisical attitude and his prior work performance as a New Bedford Police Officer.  Other factors that were considered include [Riley's] unsatisfactory credit history, as well as his poor performance in the Massachusetts Municipal Police Academy."  Ex. 6 at RISP0005.

27. With respect to his conclusion that Riley "lack[ed] . . . attention to detail," the RISP background investigator explained that Riley had failed in his RISP written application to indicate that he had previously applied to the Providence Police Department, and that Riley had made multiple mistakes and omissions on his written application.  Ex. 6 at RISP0005.

28. As a result of the background investigator's negative recommendation, Riley was not selected to proceed further in the RISP hiring process and was not hired by RISP.  Ex. 47 (Riley Dep.) at Tr. 99-104; Ex. 30 at MSP00076.

**The Soares Investigation**

29. Just after midnight on November 30, 2009, Riley was on duty as an NBPD police officer and present in the booking room of the NBPD police station.  At around that time, an individual named John Soares was arrested by the NBPD on charges related to throwing explosives.  Soares was brought to the NBPD police station for booking.  Ex. 10 at NBPD000177-78, 185-86, 195.

30. While in NBPD's booking room, Soares sat in Riley's vicinity.  Ex. 10 at NBPD000177-78, 185-86, 195.

31. While in NBPD's booking room, Soares wriggled out of his handcuffs, stood up, and attempted to open a locked door that led outside.  Riley noticed Soares standing next to the door and instructed him to sit down.  Riley did not notice that Soares had wriggled out of his handcuffs.  Ex. 10 at NBPD000179, 195-98, 261-62.

32. At around 12:37 A.M. that night, Riley and another officer began escorting Soares and a second prisoner outside to an awaiting transport van.  When the group of four got outside the building, Soares took off running on foot.  Riley and others searched for Soares but were not able to find him.  Ex. 10 at NBPD000179-80, 185-86; Ex. 7.

33. Soares was eventually apprehended two days later and over forty miles away in East Greenwich, Rhode Island.  Ex. 7.

34. In or around December 2009, NBPD Deputy Chief David Provencher commenced a misconduct investigation against Riley by filing a complaint alleging that Riley had violated the rules and regulations of NBPD in connection with the Soares escape.  The complaint was assigned to NBPD Sgt. Steven D. Blackburn for an internal investigation.  Ex. 8; Ex. 9; Ex. 19; Ex. 10 at NBPD000177.

35.    On January 5, 2010, Sgt. Blackburn sent a notice of interview to Riley, stating: "As you know I have been assigned a case involving the escape of an arrestee named John Soares from police custody during the early morning hours of November 30, 2009. My case number is 1478. The complainant is Deputy Chief David Provencher. I have scheduled you for an interview on Tuesday January 26, 2010 at 7:00 a.m. in the New Bedford Police Department's Division of Professional Standards Office." Ex. 8.

36.    Riley sat for the interview with Sgt. Blackburn on January 26, 2010. At the interview, Riley was accompanied by an attorney as well as the Chief Shop Steward of his union. Ex. 10 at NBPD000184.

37.    Before starting the January 26, 2010 interview, Riley signed a "PSU Form 3" stating: "You are hereby being ordered in accordance with Rule #516.4 to . . . provide information you may have regarding a complaint filed by Deputy Chief David Provencher. This complaint is numbered #1478 and the complainant alleges Violation of Department Rules & Regulations and Neglect of Duty in connection with the escape of John Soares . . . ." Ex. 9.

38.    In Provencher's view, the PSU Form 3 was intended to convey to Riley that he was a subject of the investigation. Ex. 35; Ex. 36 at P00783-84; Ex. 47 (Riley Dep.) at Tr. 394-95.

39.    Following the interview, Sgt. Blackburn issued an investigative report "sustain[ing]" the complaint against Riley, and finding that Riley violated NBPD rules and regulations pertaining to neglect of duty. Ex. 10 at NBPD000198-200, 261-62.

40.    Sgt. Blackburn concluded in his investigative report that it was "apparent that [Riley] paid little attention to Mr. Soares until the very end of their time together," and "that the only reason . . . Officer Orlando Riley [was] not killed or seriously injured that night was because Mr. John Soares chose not to." Ex. 10 at NBPD000197-98.

41.    On June 18, 2010, NBPD Deputy Chief David Provencher wrote a memorandum to NBPD Chief Ronald Teachman recommending that Riley receive a written reprimand due to the sustained finding that Riley had violated NBPD's rules and regulations (hereinafter, the "June 18, 2010 Memorandum"). Ex. 13.

42.    NBPD Chief Ronald Teachman did not act upon the recommendation that Riley receive a written reprimand.   Teachman eventually retired in April or May 2011, still without having acted upon the recommendation in the June 18, 2010 Memorandum. Upon Teachman's retirement, Deputy Chief David Provencher became Chief of the NBPD. Ex. 46 at 34-36, 53[2]; Ex. 13; Ex. 68; Ex. 69.

---

[2] In August 2013, Riley filed an internal affairs complaint with MSP against Lima and, as a result, several witnesses were subsequently interviewed by MSP internal investigators. Ex. 36. Thus, in addition to deposition transcripts, transcriptions of certain internal affairs interviews are also included in the record. *See* Exs. 46, 48, 51, 53.

43.     On May 24, 2011, Provencher (then in his new position as Chief) met in person with Riley to discuss the Soares investigation.  Provencher told Riley that he was being issued a verbal warning and that the Soares investigation would be closed.  Ex. 29; Ex. 46 at 34-36; Ex. 13.

44.     Provencher then made the following handwritten annotation on the June 18, 2010 Memorandum: "OFFICERS M/WITH CHIEF & UNION – DISCUSSED & RESOLVED 5/24/11 FILE NO FURTHER ACTION.  DAP 5/24/11."  Ex. 13.

45.     At the meeting of May 24, 2011, Riley asked Provencher "whether or not something would end up in [his] file" related to the Soares investigation.   Riley asked the question because "[he] was a candidate in the process of being hired for the Massachusetts State Police."  In response, Provencher told Riley "that nothing was going in [his] file."  Ex. 32 at ¶ 3.  *See* Ex. 46 at 33-35; Ex. 34 at MCAD00047.

46.     On June 1, 2011, Riley received an email stating in part: "The investigation into Complaint #1478, which was filed by Deputy Chief David Provencher alleging violations of department rules and regulations resulting in a prisoner escape is now complete.  This complaint has been classified as SUSTAINED as there was sufficient evidence obtained to support the allegation."  Ex. 19.

47.     The final result of the Soares investigation was that Riley was found to have violated the following provisions of NBPD's Rules & Regulations Manual: "Failure to perform according to the department rules and regulations"; "Improperly performing or neglecting to perform the duties assigned"; "Neglect of Duty."  Ex. 10 at NBPD000198-200, 261-62; Ex. 42 at Response No. 3.

48.     As a result of the sustained finding that Riley violated NBPD's rules and regulations, Riley received a verbal warning at the meeting of May 24, 2011, and documents related to the Soares investigation were placed into Riley's internal affairs file.  Ex. 29; Ex. 32 at ¶ 5.

49.     Provencher indicated that the sustained allegations against Riley in the Soares investigation could be used in determining an appropriate response to any potential future disciplinary matters involving Riley.  Ex. 69.

50.     Riley denies knowing that he was a subject of the Soares investigation at any point prior to May 24, 2011, the day he met with Provencher and received the verbal warning.  Although Riley now acknowledges that he was a subject of the Soares investigation from its inception, Riley asserts that he was unaware of this fact until May 24, 2011.  Ex. 1 at ¶ 18; Ex. 42 at Response Nos. 19-22; Ex. 9; Ex. 36; Ex. 46 at 34-36.

51.     Riley asserts that he was never expressly told until May 24, 2011 that he was a subject of the Soares investigation; that he assumed at his January 26, 2010 interview that he

was only a witness to the investigation; and that the "PSU Form 3" he signed at the interview did not expressly inform him that he was a subject of the investigation.  Ex. 35; Ex. 46 at 29-33; Ex. 47 (Riley Dep.) at Tr. 189-95.

52.   Riley admits that starting on May 24, 2011 he understood that he had been a subject of the Soares investigation.   Ex. 1 at ¶ 18; Ex. 42 at Response Nos. 21-22; Ex. 47 (Riley Dep.) at Tr. 202-03.

53.   Following the meeting of May 24, 2011, Riley "started thinking to [himself]" about how he would explain the Soares investigation to his MSP background investigator. Riley started thinking about this because the Soares investigation was "the one thing in [his] ten year career that's somewhat of a blemish" because of "this sustained complaint."  Ex. 46 at 34-36.

54.   Provencher passed away in December 2015 and so was not deposed in this case. However, Provencher did testify before the Massachusetts Commission Against Discrimination.  Ex. 35; Ex. 36 at P00783-84; Ex. 68.

## The Stallings Investigation

55.   During 2006, two private citizens named Shayne Stallings and Tina Marie Pena filed a complaint with NBPD against Riley and another officer alleging that the two officers engaged in misconduct in the course of an arrest of Stallings.  The case was assigned within NBPD for an internal investigation (hereinafter, the "Stallings investigation"). Ex. 11; Ex. 43 at Response No. 23; Ex. 47 (Riley Dep.) at Tr. 236-40.

56.   Riley was a subject of the Stallings investigation.  Ex. 47 (Riley Dep.) at Tr. 237-40.

57.   During 2007, Riley was interviewed by an NBPD internal affairs investigator as part of the Stallings Investigation.  Before this interview, Riley was notified in writing that criminal proceedings could be instituted against him based on evidence obtained from other sources.  Ex. 47 (Riley Dep.) at Tr. 239-45.

58.   On May 10, 2010, Riley received an email stating that the "investigation into the complaint filed against you in September of 2006 . . . has been completed.  There was inadequate or insufficient evidence to either prove or disprove the complaint, therefore, the case is classified as Not Sustained."  Ex. 12.  *See* Ex. 47 (Riley Dep.) at Tr. 237-58.

## MSP's Application and Hiring Process

59.   The application and hiring process for MSP's 80th Recruit Training Troop ("RTT") was a multi-phase process that proceeded over the course of several months in 2011. Ex. 45 at ¶ 2.

60.   In the first phase of the process, individuals interested in becoming a Trooper were required to take a written Police Officer Examination ("Written Examination") administered by the Commonwealth's Human Resources Division ("HRD").  Ex. 45 at ¶ 3.

61.   Individuals taking the Written Examination could attain a maximum score of 102 points.  100 raw points could be earned on the Written Examination.  Qualifying military veterans who passed the Written Examination could have 2 points added to their raw score.  Ex. 45 at ¶ 4.

62.   In early 2011, MSP began the hiring process for the 80th RTT by compiling eligibility lists of individuals who had attained a final score of no lower than 98 points on the Written Examination, or who were otherwise subject to statutory preference.  Ex. 45 at ¶ 5.

63.   MSP thereafter sent letters to eligible individuals advising them that MSP was "beginning its preliminary screening process in anticipation of a future State Police Academy Class" and that, if interested in competing, the individual should: (a) return to MSP a "status form" indicating their interest in competing; and (b) complete MSP's written "Application and Personal History Statement" (hereinafter, "Application"). Ex. 15.  *See* Ex. 45 at ¶ 6.

64.   In total, MSP invited 1,394 individuals to compete for the 80th RTT.  Approximately 250 of these 1,394 individuals had final scores on the Written Examination of 100, 101, or 102.  Ex. 45 at ¶ 6.

65.   684 individuals accepted the invitation to compete by returning the "status form."   Ex. 45 at ¶¶ 6-7.

66.   The 684 individuals who accepted the invitation to compete were then provided with a "conditional offer of employment" by MSP.  The "conditional offer" advised that the "conditional offer [was] strictly contingent upon" available funding, available class space, sufficiently high scores, and the applicant's successful completion of all phases of MSP's selection process.  Ex. 16.  *See* Ex. 45 at ¶ 7.

67.   Candidates who received the "conditional offer of employment" then faced five further phases in the hiring process: (1) an oral interview; (2) a physical fitness screening; (3) a psychological screening; (4) a medical screening; and (5) a background investigation.  Ex. 16; Ex. 45 at ¶ 8.

68.   Candidates who failed one or more of the physical fitness, psychological screening, medical screening, or background investigation phases would be disqualified from the process.  Ex. 45 at ¶ 9.

69.   Ultimately, 290 candidates successfully completed all phases of the process, and received appointments to the 80th RTT and invitations to the State Police Academy.

250 of those candidates in fact reported to the State Police Academy in October 2011. 208 of those candidates ultimately graduated from the State Police Academy and became Massachusetts State Troopers.  Ex. 45 at ¶ 10.

## MSP's Background Investigation Process

70.   For the 80th RTT, the background investigation phase of MSP's hiring process was organized and administered by MSP's Certification Unit.  Ex. 49 (Lima Dep.) at Tr. 68-69; Ex. 52 (Butler Dep.) at Tr. 23-24.

71.   Background investigations were conducted by individual MSP Troopers, each of whom was assigned 5-10 candidates.  Ex. 53 at 3-6; Ex. 54 (Smith Dep.) at Tr. 28-31; Ex. 52 (Butler Dep.) at Tr. 35-36, 45-46.

72.   The background investigator's role was as an "investigator[] and a "fact-gather[er]." Ex. 55 (Flynn Dep.) at Tr. 34, 44-47.  *See* Ex. 48 at 5-8; Ex. 49 (Lima Dep.) at Tr. 45, 62-63; 54 (Smith Dep.) at Tr. at 61-64, 74-75.

73.   Background investigators were required to collect documentation related to the candidate; verify the information on a candidate's Application; provide the candidate with a "Questionnaire" document and verify the information provided by the candidate in response; perform criminal background and driver's history checks; conduct a neighborhood check; contact references; review the candidate's credit history; conduct an in-person interview with the candidate; and, ultimately, complete a written background investigation report. Ex. 48 at 5-10; Ex. 49 (Lima Dep.) at Tr. 46-49, 56-62; Ex. 55 (Flynn Dep.) at Tr. 44-50.

74.   The written background investigation report was completed on a form template.  Ex. 54 (Smith Dep.) at Tr. at 50-51.

75.   The background investigator was not responsible for rendering a judgment on whether a candidate had passed or failed the background investigation.  Ex. 55 (Flynn Dep.) at Tr. 34-35, 44-47; Ex. 49 (Lima Dep.) at Tr. 45, 62-63; Ex. 52 (Butler Dep.) at Tr. 21-23, 26-27; Ex. 54 (Smith Dep.) at Tr. at 61-64, 74-75.

76.   Instead, the function of the background investigator was to collect information for use by MSP's Background Review Board ("Review Board"), which bore the responsibility for deciding whether a candidate had passed or failed the background investigation. Ex. 50 at ¶ 2; Ex. 49 (Lima Dep.) at Tr. 45, 62-63; Ex. 52 (Butler Dep.) at Tr. 21-23, 26-27; Ex. 54 (Smith Dep.) at Tr. at 61-64; Ex. 55 (Flynn Dep.) at Tr. 34-35, 46-47, 55-56.

77.   Once the background investigator's work was complete, the investigator's completed background investigation report and all the documentation collected by the background investigator would be transmitted to the Review Board.  A candidate determined by the Review Board to have failed their background investigation would

be disqualified from the hiring process. Ex. 52 (Butler Dep.) at Tr. 24-26, 35, 40-42, 57-58; Ex. 51 at 2-3; Ex. 50 at ¶ 2.

78.     The Review Board consisted of three high-ranking MSP officers who were appointed to the position.  Major Kevin Butler, then the Deputy Commander of the Division of Standards and Training, served as the President of the Review Board and was present for every sitting of the Review Board.  Ex. 52 (Butler Dep.) at Tr. 11-20, 27-32, 56-57; Ex. 50 at ¶ 4.

79.     If an appointed member of the Review Board was unavailable for a particular sitting of the Board, other MSP officers holding the rank of Captain or above would substitute in their place.  Ex. 52 (Butler Dep.) at Tr. 27, 30-32.

80.     The three members of the Review Board each cast one vote, and decisions were made by a simple majority.  Ex. 50 at ¶ 4.

81.     In deciding whether candidates passed or failed, the Review Board applied an internal set of guidelines known as the "Automatic and Discretionary Disqualifiers."  Ex. 14; Ex. 50 at ¶ 3; Ex. 55 (Flynn Dep.) at Tr. 21-22, 29-31, 38, 51-52.

82.     In deciding whether candidates passed or failed, the Review Board also applied its own independent judgment and common sense on what made for candidates with good character, work ethic, and sound decision making skills.  Ex. 50 at ¶ 3; Ex. 55 (Flynn Dep.) at Tr. 21-22, 29-31, 38, 51-52; Ex. 52 (Butler Dep.) at Tr. 37-38, 41-43; Ex. 14 at MSP00012.

83.     The "Automatic and Discretionary Disqualifiers" guidelines specified that a candidate would be automatically disqualified—that is, that they would be automatically determined to have failed their background investigation—if they: (1) they "knowingly misrepresented or falsified information submitted on the Application and/or Personal History Statement, resumes or any other documents filed in conjunction with the hiring process for the Massachusetts State Police"; or (2) "knowingly made false statements to the background investigator." Ex. 14 at MSP0009-11.  *See* Ex. 50 at ¶¶ 7-9.

84.     The guidelines further specified that a candidate could be disqualified as a discretionary matter: (1) if he or she "could be impeached in reference to his/her character for truthfulness"; or (2) based on "any other issues which would be relevant to a candidate's eligibility to enter the State Police Academy."   Ex. 14 at MSP00012, 14.

85.     After the Review Board made a decision about a candidate, Butler would record the Board's determination on a spreadsheet which he maintained.  Ex. 50 at ¶ 10; Sealed Ex. 57.

86.     If a candidate failed, Butler would record the most important reasons for the failure in the spreadsheet.  Ex. 50 at ¶ 10.

87.     If a candidate failed, Jack Flynn—then MSP's Chief Administrative Officer—would send a letter to the candidate advising them of the Review Board's decision.  Ex. 28; Ex. 67; Ex. 52 (Butler Dep.) at Tr. 26-27.

## Riley's Application to MSP

88.     In April 2009, Riley sat for the Written Examination and achieved a raw score of 100. Ex. 1 at ¶¶ 9-10.

89.     In February 2011, Riley received a letter from MSP inviting him to compete for the 80th RTT.  Riley returned his "status form" to indicate his interest in competing.  Ex. 1 at ¶ 11; Ex. 15.

90.     On or around April 4, 2011, Riley received his "conditional offer of employment" from MSP.  Ex. 16; Ex. 1 at ¶ 12.

91.     On or around May 2, 2011, Riley completed his Application to MSP, which he then submitted to MSP the next day.  Ex. 1 at ¶ 13; Ex. 17 (Riley's original application).

92.     Riley typed his Application answers on a computer and signed by hand.  Ex. 47 (Riley Dep.) at Tr. 113-14; Ex. 17.

93.     The Application contained a Signature page, which required Riley to certify as follows: "I have read each question asked of me and understand each question.  My statements on this form and any attachments to this form are true and correct to the best of my knowledge and belief and are made in good faith."  Riley signed and dated the Signature page.    Ex. 17 at MSP00096.

94.     Along with the Application, Riley was also required to submit a notarized Agreement. Paragraph 3 of the Agreement required Riley to certify as follows: "I understand that false or misleading information given herein or during interview(s) will result in my being disqualified from further consideration and/or terminated from employment with the Department of State Police."  Riley signed the Agreement in the presence of a notary on May 2, 2011, and submitted it along with his Application.  Ex. 18.

95.     Riley agrees that accuracy and truthfulness are important parts of being a police officer.  Ex. 47 (Riley Dep.) at Tr. 411.

## Riley's Answers on the Application

96.     Question No. 8 on the Application stated: "Provide information about schools you are attending or, have attended, beyond Junior High School, beginning with the most recent . . . and working backward."  Space for description of four schools was

provided on the Application along with a note to "use continuation space or additional pages if necessary."  Ex. 17 at MSP00078.

97.  In response to Question No. 8, Riley listed all of the colleges he ever attended.  Ex. 17 at MSP00078; Ex. 47 (Riley Dep.) at Tr. 22-25.

98.  In response to Question No. 8, Riley did not list all of the high schools he attended. Riley listed only one high school (New Bedford High School), leaving out three others (Muskegon High School, Bishop Stang High School, and Dartmouth High School). Ex. 17 at MSP00078; Ex. 47 (Riley Dep.) at Tr. 120-22.

99.  Question No. 20.A. on the Application stated: "To the best of your knowledge, has the Commonwealth of Massachusetts, the United States Government or any other police or law enforcement agency ever investigated your background for purposes of employment," and then required the applicant to check a box for "YES" or "NO." Question No. 20 then continued, "If yes, list ALL of the departments you have applied to and the YEAR you applied."  Ex. 17 at MSP00086 (capitalization in original).

100.  In response to Question No. 20.A., Riley checked the box for "YES," but did not list all police departments he had ever applied to.   Ex. 17 at MSP00086; Ex. 29.

101.  Specifically, in response to Question No. 20.A., Riley listed that he had applied to the NBPD in 2001 and the Rhode Island State Police in 2004, but did not disclose his unsuccessful application to the Providence Police Department in 1999.  Ex. 17 at MSP00086; Ex. 29.

102.  In response to Question No. 20.A., Riley also did not disclose his unsuccessful application to NBPD in 1999.  Ex. 17 at MSP00086; Ex. 47 (Riley Dep.) at Tr. 27-38.

103.  Question No. 20.E. on the Application stated: "If you are a current or former police officer . . . .  Have you ever been the subject of an internal investigation or citizens complaint," and then required the applicant to check a box for "YES" or "NO."  The Application further instructed that any "YES" answer should be "fully explain[ed]." Ex. 17 at MSP00087.

104.  In response to Question No. 20.E., Riley checked the box for "NO."  Below his answer, Riley added: "I have never been the subject of an internal investigation within my police department.  The only time I was interviewed by my internal affairs unit was as a witness."  Ex. 17 at MSP00087.

105.  Riley's answer to Question No. 20.E. was not accurate because Riley had been a subject of the Soares investigation.  Ex. 1 at ¶ 18; Ex. 42 at Response Nos. 13-14, 21-22; Ex. 25 at MSP000111 (reflecting Riley's later change to his answer to Question 20.E.).

106. Riley's statement that "[t]he only time [he] was interviewed by my internal affairs unit was as a witness" was not accurate because Riley had been a subject of the Soares investigation.  Ex. 1 at ¶ 18; Ex. 42 at Response Nos. 13-14, 21-22; Ex. 25 at MSP000111.

107. Riley's answer and statement in response to Question 20.E. were also not accurate because Riley had been a subject of the Stallings investigation and had been interviewed as part of the Stallings investigation.  *Supra* SMF ¶¶ 55-58 (and sources cited).

**Lima is Assigned to Riley's Background Investigation, and Lima and Riley begin Communicating**

108. In or around early July 2011, Trooper Robert Lima was assigned to conduct Riley's background investigation.  Ex. 48 at 8; Ex. 20.

109. Lima has been employed by MSP as a Trooper since 2006.  Lima has never held a rank at MSP above the rank of Trooper.  Ex. 49 (Lima Dep.) at Tr. at 22-33.

110. During 2011, Lima's regular assignment within MSP was to the Bristol County District Attorney's Office as a homicide investigator.  Ex. 49 (Lima Dep.) at Tr. at 31, 38.

111. Lima, like other background investigators for the 80th RTT, was asked to conduct background investigations as a temporary, part-time assignment.  Ex. 53 at 3-4; Ex. 49 (Lima Dep.) at Tr. 68-69; Ex. 52 (Butler Dep.) at Tr. 36.

112. Major Kevin Butler—the President of the Review Board—considered Lima "one of the more effective background investigators" for MSP.  Ex. 51 at 5-6; Ex. 50 at ¶ 1.

113. Detective Lieutenant George Smith—the head of MSP's Certification Unit— considered Lima "based upon his work, to be an extremely thorough, hardworking investigator and very meticulous in all of his work," and described Lima's reports as "[e]xcellent in every way."  Ex. 53 at 2-5, 19.

114. Lima is a member of the Massachusetts National Guard, holding the position of Deputy Inspector General.  Lima is presently deployed to Guantanamo Bay in that role.  Ex. 49 (Lima Dep.) at Tr. 17-22, 36-38.

115. Lima is white.  Ex. 1 at ¶ 14.

116. On July 7, 2011, Lima reached out to Riley by telephone to have an initial conversation.  Lima told Riley during this call that "if [he] had any question about the material to contact him."  Ex. 47 (Riley Dep.) at Tr. 317; Ex. 49 (Lima Dep.) at Tr. 244.

117.   Riley did not ask any questions on the July 7, 2011 call about how to update his application materials.  Ex. 47 (Riley Dep.) at Tr. 317-20; Ex. 49 (Lima Dep.) at Tr. 244-45.

118.   Riley did not tell Lima on the July 7, 2011 call that he had learned that he was a subject of the Soares investigation, and that his answer to Application Question 20.E. therefore needed to be corrected.  Ex. 47 (Riley Dep.) at Tr. 318-20; Ex. 49 (Lima Dep.) at Tr. 244-45.

119.   On July 8, 2011, Lima sent Riley an email providing the "Questionnaire" document to be completed by Riley, a "To Do" list for Riley (which instructed Riley to obtain certain documentation including, *inter alia*, "diploma(s)" and "sealed transcripts") and asking Riley to reach out with any questions.  Ex. 20.

120.   On July 20, 2011, Riley emailed Lima: "This email is to inform you that I have obtained all documentation that is required.  My school transcripts should arrive to you via mail soon.  If there is any further information that is needed please contact me."  Ex. 21.

121.   While Riley had requested transcripts from all of the colleges he ever attended, he had not requested transcripts from all of his high schools.  Specifically, Riley had requested a transcript from New Bedford High School, but not from Muskegon High School, Bishop Stang High School, or Dartmouth High School.  Ex. 46 at 14-17, 61-62; Ex. 47 (Riley Dep.) at Tr. 339.

122.   Riley did not indicate in his July 20, 2011 email that he had learned that he was a subject of the Soares investigation, and that his answer to Application Question 20.E. therefore needed to be corrected.  Ex. 21; Ex. 49 (Lima Dep.) at Tr. 245.

123.   On August 17, 2011, Riley emailed Lima: "There has been some changes to my references on my application," and then provided updated contact information for some of Riley's references.  Ex. 22.  Riley thought these references could help his candidacy with MSP.  Ex. 47 (Riley Dep.) at Tr. 340-41.

124.   As of August 17, 2011—nearly three months after his May 24, 2011 meeting with Provencher—Riley undisputedly knew that he had been a subject of the Soares investigation.  *Supra* SMF ¶¶ 50-52 (and sources cited).

125.   Riley did not indicate in his August 17, 2011 email that he needed to make any other changes to his Application.  Riley did not indicate in his August 17, 2011 email that he had learned that he was a subject of the Soares investigation, and that his answer to Application Question 20.E. therefore needed to be changed and corrected.  Ex. 22; Ex. 47 (Riley Dep.) at Tr. 340-43; Ex. 49 (Lima Dep.) at Tr. 245-46.

126.   During August 2011, and around August 22, 2011, Riley personally went to view his NBPD personnel file.  Riley did so because he wanted "to go over everything in [the]

14

personnel file, any negatives that could be pointed out against you or anything like that."  Riley was worried that MSP might consider the Soares investigation to be a "negative."  Ex. 47 (Riley Dep.) at Tr. at 343-51.  *See* Ex. 32 at ¶ 4.

127.   On August 22, 2011, Riley emailed Lima to provide the name of his RISP background investigator.  Ex. 23.

128.   Riley did not indicate in his August 22, 2011 email that he had learned that he was a subject of the Soares investigation, and that his answer to Application Question 20.E. therefore needed to be corrected.   Ex. 23.

**Riley's Answers on the Questionnaire**

129.   At some point prior to the start of his interview on September 1, 2011, Riley completed the Questionnaire document that had been provided him by Lima on July 8, 2011.  Ex. 47 (Riley Dep.) at Tr. at 320-324; Ex. 20.

130.   In general, the Questionnaire required candidates to answer questions about their motor vehicle history, employment history, military service, financial history, criminal history, education, and drug use.  The Questionnaire also asked candidates if "everything [was] accurate and complete on [their] application."  Ex. 24; Ex. 55 (Flynn Dep.) at 47-50.

131.   The first page of the Questionnaire stated: "The purpose of this questionnaire/interview is to get truthful answers.  The fact that you tell the truth will receive more consideration for this position than any good impression you may try to make with untruthful answer."  Riley signed his initials next to that statement.  Ex. 24 at MSP000689.

132.   The Questionnaire also required Riley to "certify that all statements made in this questionnaire/interview are true and complete.  I understand that false, incomplete or misleading information given herein may be sufficient cause for disqualification from further consideration and/or termination from employment with the Department of State Police."  Riley so certified by signing his initials next to that statement.  Ex. 24 at MSP000689; Ex. 47 (Riley Dep.) at Tr. at 324-25.

133.   On the final page of the Questionnaire, Riley was asked "Is everything accurate and complete on you[r] application?"  In response, Riley answered "Yes."  Ex. 24 at MSP000693; Ex. 47 (Riley Dep.) at Tr. at 330-31.

134.   Riley's certification that "everything [was] accurate and complete on [his] application" was not accurate.  At the time he completed the Questionnaire, Riley knew that he had been a subject of the Soares investigation, and that his answer to Question 20.E. on the Application was incorrect.  Ex. 1 at ¶ 18; Ex. 42 at Response Nos. 13-14, 21-22; Ex. 52 (Butler Dep.) at Tr. 133-35.  *See* SMF ¶¶ 50-52.

135.   Riley testified at his deposition that he provided the answer of "Yes" on the final page of the Questionnaire because he interpreted the word "application" on the Questionnaire as referring to the Questionnaire, and not to his actual Application.  Ex. 47 (Riley Dep.) at Tr. at 330-35.

136.   The Questionnaire is nowhere described on the document as an "application."  Ex. 24.

137.   Riley himself had previously used the word "application" to refer to his written Application when providing Lima with the changes to his references.  Ex. 22.

138.   On the third page of the Questionnaire, Riley was asked "Have you broken any company rule"?  In response, Riley answered "No."  Ex. 24 at MSP000691.

139.   Riley's representation that he had not "broken any company rule" was not accurate. At the time he completed the Questionnaire, Riley knew that he had been found in violation of NBPD's rules and regulations in connection with the Soares investigation. Ex. 19; Ex. 42 at Response No. 22; *supra* SMF ¶¶ 46, 48-49 (and sources cited).

140.   On the fifth page of the Questionnaire, Riley was asked, "Is your name in a case report file with any police department or law enforcement agency that you are aware of?"  In response, Riley answered "No."  Ex. 24 at MSP000692.

141.   Riley's representation that his name was not in any "case report file with any police department" was not accurate.  At the time he completed the Questionnaire, Riley knew that he had been found in violation of NBPD's rules and regulations in the Soares investigation, and that the complaint was "being FILED with no disciplinary action taken."  Ex. 19.  *See* Ex. 52 (Butler Dep.) at Tr. 134-36.

## Riley's Interview with Lima

142.   On September 1, 2011, Lima visited the NBPD where he reviewed Riley's personnel and internal affairs files pursuant to a written release signed by Riley.  Ex. 48 at 32-34; Ex. 34 at MCAD00047.

143.   In reviewing Riley's internal affairs file, Lima discovered the June 18, 2010 Memorandum, with Provencher's further handwritten annotations from May 24, 2011. Lima was permitted to make a photocopy of the June 18, 2010 Memorandum, and he took that photocopy with him.  Ex. 18; Ex. 48 at 33-35; Ex. 49 (Lima Dep.) at Tr. 110-13, 174; Ex. 13.

144.   Prior to reviewing Riley's internal affairs file, Lima had no knowledge of Riley's status as a subject of the Soares investigation.  Ex. 48 at 33-35.

145.   Based on the June 18, 2010 Memorandum, Lima believed at the time that Riley had in fact received a written reprimand based on the results of the Soares investigation.  Ex. 49 (Lima Dep.) at Tr. 146-54, 246-47; Ex. 27 at MSP00068, 71; Ex. 13.

146. Later that same day, on September 1, 2011, Riley met with Lima for his in-person background investigation interview.   The interview took place at MSP's Dartmouth State Police barracks and lasted approximately three hours. Ex. 47 (Riley Dep.) at Tr. 116, 352-53.

147. Portions of the interview were dedicated to reviewing Riley's Application and correcting mistakes. Ex. 46 at 11-13, 19-28, 73; Ex. 47 (Riley Dep.) at Tr. 353-55; Ex. 48 at 23-27; Ex. 49 (Lima Dep.) at Tr. at 118-25.

148. Riley made multiple handwritten corrections to the Application, and initialed those corrections.   In total, Riley made and initialed thirteen corrections to the Application. Ex. 25 (Riley's Application with handwritten changes).  *See* Ex. 47 (Riley Dep.) at Tr. 116-32, 141-45; Ex. 48 at 13-14; Ex. 42 at Response No. 14.

149. With respect to Riley's corrections, Riley had placed numerous answers in the wrong locations; indicated that he was no longer employed by the NBPD (he was); indicated that he had not been involved in a car accident in the past seven years (he had); indicated that he was not registered for Selective Service (he was); and indicated that he did not currently own a motor vehicle (he did). Ex. 25 (Riley's Application with handwritten changes).

150. With respect to the mistakes on his application, Riley stated to Lima, "Well, it is what it is," or words to that effect.  Lima took Riley's statement to reflect an acceptance of mediocrity.   Ex. 49 (Lima Dep.) at Tr. at 203-05.

151. At no point in the interview did Riley affirmatively volunteer to Lima that he had learned that he had been a subject of the Soares investigation, and that his answer to Question 20.E. on the Application was therefore not accurate. Ex. 33 at P0937; Ex. 34 at MCAD00047; Ex. 27 at MSP00071; Ex. 48 at 33-38.

152. According to Riley, Lima at some point asked, "[I]s there anything else about you in regards to internal affairs that you want to discuss?"  At that point, Riley stated for the first time that he had learned on May 24, 2011 that he was a subject of the Soares investigation.  Riley stated that he had previously believed that he was just a witness and that he had "assumed" the investigation "was concluded." Ex. 33 at P0937.

153. According to Riley, Lima then asked, "How come you did not call me and tell me about this?"  Riley replied, "because there was no discipline involved and I would rather discuss this issue with you during my interview so I could tell you in detail about the incident and there wouldn't be any misunderstandings." Ex. 33 at P0937.

154. In fact, Riley had been issued a verbal warning by Provencher for his conduct related to the Soares investigation.  Additionally, Provencher had recommended that Riley receive a written reprimand. Ex. 29; Ex. 13.

155.  According to Riley, Lima then further asked, "How come you didn't discuss this incident on your application."  Riley replied, "because my application was completed on May 3, 2011" and "[m]y chief did not make a decision on this matter until May 24, 2011.  I didn't know this investigation was still pending because it was so long in between the time when I first spoke to internal affairs until the time my chief closed the investigations."  Ex. 33 at P0937.

156.  Lima then showed Riley the June 18, 2010 Memorandum, as Lima had photocopied earlier that day.  Ex. 48 at 34-36; Ex. 49 (Lima Dep.) at Tr. 110-12, 247-48; Ex. 29; Ex. 32 at ¶ 5; Ex. 34 at MCAD00048; Ex. 33 at P00940-41.

157.  Riley immediately responded, "that's not supposed to be in my file."  Ex. 47 (Riley Dep.) at Tr. 221; Ex. 48 at 35-37 (Lima recalling: "the first thing that came out of his mouth, I remember vividly and as if it was just a second ago, that's not supposed to be in my file").

158.  Lima asked Riley to explain the document, and Riley again reiterated that the document was not supposed to be in his file.  Ex. 48 at 35-37; Ex. 47 (Riley Dep.) at Tr. 221.

159.  Riley then stated to Lima that he had never seen the document before, but that he had been assured by Provencher "that there was no discipline involved in [the] incident and the incident was not going in [his] file."  Ex. 33 at P00937.  *See* Ex. 47 (Riley Dep.) at Tr. 221.

160.  Lima and Riley spent a substantial amount of time talking about the Soares investigation.  Lima regarded the Soares investigation as a "major issue" for several reasons, namely: (1) it involved "an internal investigation on a prisoner escaping"; (2) Lima perceived Riley as attempting to give the Soares investigation "the appearance . . . [of] something minor"; and (3) Lima thought it "blatantly clear" that Riley had been untruthful in regards to the extent of his involvement in the Soares investigation.  Ex. 48 at 37-38; Ex. 49 (Lima Dep.) at Tr. 190-91, 248-49.

161.  Riley changed his answer to Question 20.E. on the Application from "NO" to "YES" and initialed the change.  Ex. 25 at MSP000111; Ex. 47 (Riley Dep.) at 150-53.

162.  At some point in the interview, Riley and Lima discussed Question 20.A., pertaining to other law enforcement agencies that Riley had previously applied to.  Ex. 47 (Riley Dep.) at Tr. 128-33; Ex. 48 at 28-32.

163.  Riley did not disclose then, or at any other point during the interview, that he had also applied unsuccessfully to the Providence Police Department, which was not disclosed on the Application.  Riley asserts that Lima never specifically asked whether he had applied to police forces other than those he listed on the Application.  Ex. 46 at 28-29; Ex. 47 (Riley Dep.) at Tr. 131.

164. At some point in the interview, Riley and Lima discussed the fact that Riley had attended other high schools in addition to the single one listed on the Application (New Bedford High School).  Riley told Lima that he left one of his high schools due to a residency requirement.  Ex. 27 at MSP00071; Ex. 46 at 23-24; Ex. 25.

165. Riley asserts that he told Lima that he left Dartmouth High School due to a residency requirement, and that he left Bishop Stang High school for financial reasons because his family could no longer afford the tuition at a private school.  Ex. 46 at 23-24; Ex. 33 at P00939.

166. Lima asserts that Riley told him that he left Bishop High School due to a residency requirement, and that Riley never mentioned having attended Dartmouth High School at all.  Ex. 48 at 16-21; Ex. 49 (Lima Dep.) at Tr. 133-42; Ex. 30 at MSP00075.

167. Whatever may actually have been said, Lima left the interview with the impression that Riley had left Bishop High School due to a residency requirement.  Ex. 48 at 16-20; Ex. 49 (Lima Dep.) at Tr. 133-42; Ex. 27 at MSP00071; Ex. 30 at MSP00075-76.

168. Riley acknowledges that he did not tell Lima that he had failed multiple courses at Bishop Stang High School and would have needed to make up those courses or repeat sophomore year if he returned to Bishop Stang High School.  Ex. 47 (Riley Dep.) at Tr. 124-25.

169. Riley made two more handwritten changes to the Application to note that he had attended Muskegon High School and Bishop Stang High School.  Riley did not add Dartmouth High School to the Application.  Ex. 25 at MSP00019; Ex. 47 (Riley Dep.) at Tr. 121-24.

170. Lima asked Riley to procure transcripts for his high schools other than New Bedford High School, and Riley agreed that he would.  Ex. 46 at 14-17, 61-62; Ex. 49 (Lima Dep.) at Tr. 127-28, 166-67.

**Lima Conducts Follow-Up and Writes His Background Investigation Report**

171. On September 2, 2011, a NBPD union representative acted—at Riley's request—to contact Lima by telephone to discuss the Soares investigation.  The representative stated to Lima "that Officer Riley was in fact being truthful in any statement he provided as to not being the subject of an internal affairs investigation and as to not having been informed of any discipline as a result."  Ex. 26; Ex. 33 at P00940.

172. The union representative's representation that Riley was "not . . . the subject of an internal affairs investigation" was not accurate.  Riley had been a subject of "internal affairs investigation[s]."  Ex. 26; *supra* SMF ¶¶ 29-58 (and sources cited).

173. Following the interview, Lima reached out to Bishop Stang High School to attempt to determine why Riley had left the school.  Lima had understood Riley to say that he

had left Bishop Stang "due to the fact that there was a residency requirement," but Lima knew "that the high school was a private one, [so] the answer that [Riley] gave . . . did not appear plausible." Doubting Riley's explanation, Lima decided to reach out to Bishop Stang for further clarification. Ex. 27 at MSP00071; Ex. 49 (Lima Dep.) at Tr. 134-39.

174. Lima thereafter spoke to an official from Bishop Stang named Nancy Wood or Nancy Ward "who informed [him] that [Riley] did attend the high school for a year but did not return the following year based on academic performance." Ex. 27 at MSP00071.[3]

175. Also following the interview, Lima conducted the requisite neighborhood check and visited Riley's home. Riley was not present at the time, but his fiancée was. At the time, Riley lived with his fiancée on the third-floor of an apartment building in New Bedford. Ex. 27 at MSP00063, 72; Ex. 56 (Riley Fiancée Dep.) at Tr. 22.

176. When Lima arrived, the entrance to the apartment building was unlocked. Lima proceeded to Riley's apartment, where Riley's fiancée answered the door. Riley's fiancée was "surprised" and asked Lima "how did he get to the third floor" because the door "is usually locked." Ex. 56 (Riley Fiancée Dep.) at Tr. 17-27.

177. According to Riley's fiancée, Lima looked around the house and then stated, "You might want to get that door checked because you don't live in the greatest neighborhood." Ex. 56 (Riley Fiancée Dep.) at Tr. 20.

178. Lima completed his background investigation report on Riley on September 7, 2011. In the "Applicant Interview" section of the report, Lima described his conclusion that Riley had received a written reprimand as part of the Soares investigation, and described Riley's reaction to being confronted with the Soares investigation at the interview. Ex. 27 (Completed Background Investigation Report) at MSP00063, 71.

179. In his background investigation report, Lima also described his skepticism that Riley had left Bishop Stang for residency reasons, and documented his follow-up with Nancy Ward, who stated that Riley did not return to the school based on his academic performance. Ex. 27 (Completed Background Investigation Report) at MSP00071.

180. On the final page of the report, Lima recorded that Riley's "negative employment aspects" included being "[u]ntruthful about disciplinary action," being "[n]ot completely forthright on disclosing disciplinary action," and demonstrating a "[l]ack of attention to detail," "[l]ack of understanding," and "[a]cceptance of mediocrity" in

---

[3] Counsel for Riley has since procured two affidavits from Nancy Wood/Ward stating that she does "not recall having any conversations with Trooper Lima about Mr. Riley," but also offering that she has generally not "offered opinions or conclusions to prospective employers about the reason(s) that former students did or did not return to Bishop Stang High School." Ex. 40. These affidavits do not create a genuine dispute of fact. *See Charles v. Stop & Shop Supermarket Co.*, LLC, No. CIV.A. 0-10726-DJC, 2012 WL 2402790, at *2 (D. Mass. June 25, 2012) (citing *I.V. Servs. of Am., Inc. v. Inn Dev. & Mgmt., Inc.*, 182 F.3d 51, 55 (1st Cir. 1999)) ("A lack of recollection . . . is insufficient to raise a legitimate dispute of material fact.").

connection with his completion of the Application.  Ex. 27 (Completed Background Investigation Report) at MSP00073.  *See* Ex. 48 at 42-43, 56-57; Ex. 52 (Butler Dep.) at Tr. 43-44.

## The Background Review Board Disqualifies Riley

181.   On September 7, 2011, a Review Board consisting of Major Kevin Butler, Major William Christiansen, and Captain Frank McGinn met and considered the applications of a number of candidates, including Riley.  Ex. 50 at ¶ 5; Ex. 52 (Butler Dep.) at Tr. 118-19.

182.   The Review Board voted unanimously to disqualify Riley.  Ex. 50 at ¶ 7.

183.   In reaching its decision, the Review Board reviewed and considered Riley's completed Application, Riley's completed Questionnaire, and Lima's completed background investigation report on Riley.  Ex. 50 at ¶ 6.

184.   The Review Board concluded that Riley had knowingly made false statements in his Application, in his Questionnaire and to Lima during the interview, and that Riley's making of false statements constituted an automatic disqualifier under the "Automatic and Discretionary Disqualifiers" guidelines.  Ex. 50 at ¶ 7.

185.   Specifically, the Review Board concluded that Riley had been intentionally untruthful with respect to: (1) his role as a subject of the Soares investigation; (2) whether he received a written reprimand as a result of the Soares investigation; (3) his answers on the Questionnaire regarding the Soares investigation; and (4) the circumstances of his not returning to Bishop Stang High School.  Ex. 50 at ¶ 7.

186.   In reaching its decision, the Review Board also considered that Riley had failed his RISP background investigation, that Riley's Application had an abnormally large numbers of mistakes, and the quality of Riley's references.  The Review Board believed that these factors supported its decision, but these factors did not amount to automatic disqualifiers and therefore did not make a difference to the Review Board's decision.  Ex. 50 at ¶¶ 8-9.

187.   Riley's credit and financial issues played no role in the Review Board's decision.  Ex. 52 (Butler Dep.) at Tr. at 110.

188.   In its notes of decision for Riley, the Review Board recorded: "Made false statements on application re New Bedford PD IA invest.  Lied to investigator concerning reasons for dismissal from Bishop Stang High School.  Rejected by RISP 2004."  Sealed Ex. 57 at Row 59; Ex. 50 at ¶ 10.

189.   By letter dated September 15, 2011, Jack Flynn informed Riley that the Review Board had disqualified him from the hiring process because the Review Board had

determined that he "was untruthful on his application" and "untruthful to his background investigator." Ex. 28.

### Riley "Appeals" the Review Board's Decision

190. After completing his initial report, Lima spoke to a representative of RISP and learned that Riley had unsuccessfully applied to the Providence Police Department, which Riley had not disclosed on the Application and which Lima previously did not know. Sealed Ex. 60; Ex. 30 at MSP00076; Ex. 48 at 28-32; Ex. 25 at MSP000110.

191. On or around September 17 or 18, 2011, Riley received Flynn's rejection letter and called Lima by telephone. Riley stated that he wanted to know how Lima considered him to be untruthful. Lima stated that Riley had received a written reprimand arising from the Soares investigation and that Riley had left Bishop Stang due to academic performance issues. Lima also stated that Riley had failed to disclose his application to the Providence Police Department. Riley stated to Lima that his conclusions were inaccurate and that Lima should "reinvestigate." Ex. 47 (Riley Dep.) at Tr. 356-60; Ex. 29; Ex. 30 at MSP00074.

192. Lima perceived Riley as "berating" him, and Riley acknowledges that he was "mad" during the phone call. Lima told Riley that "berating [him] was unprofessional." Ex. 49 (Lima Dep.) at Tr. 217-20; Ex. 48 at 17-19; Ex. 47 (Riley Dep.) at Tr. 358-59.

193. After discussing the matter with a superior in the Certification Unit, Lima called Riley back and told him that he should contact MSP Human Resources. Riley did so and was told to write a letter to Chief Administrative Officer Jack Flynn. Ex. 47 (Riley Dep.) at Tr. 360-62; Ex. 48 at 53-54; Ex. 49 (Lima Dep.) at Tr. 220; Ex. 30 at MSP00074-75.

194. On September 22, 2011, Riley wrote to Jack Flynn asking for a "second look" at his candidacy and arguing that he had not been untruthful with respect to the Soares investigation, Bishop Stang High School, or the Providence Police Department. Riley's letter did not assert or allege that Lima had acted with racial bias. Ex. 29.

### Lima Conducts a Supplemental Investigation

195. Separately, and on his own initiative, Lima contacted the head of the Certification Unit and asked to review his background investigation report on Riley for completeness. Lima stated that he wanted to conduct follow-up and "make sure that [he] had not missed anything" because he "was, essentially . . . accused [by Riley] of getting the report wrong." Lima was authorized to proceed. Ex. 49 (Lima Dep.) at Tr. at 209-10, 218-22, 250-51; Ex. 48 at 22, 52-53.

196. On September 21, 2011, Lima met with NBPD Chief Provencher, who confirmed that Riley was a subject of the Soares investigation, but who also told Lima that the

recommendation for reprimand "was initiated but . . . never acted on."  Ex. 30 at MSP00075.  *See* Ex. 49 (Lima Dep.) at Tr.at 169-74.

197.  On September 22, 2011, Lima traveled to Bishop Stang High School in an effort to further investigate the reasons for Riley's leaving that school.  There, Lima met with Assistant Principal Kathleen Ruginis.  Ruginis reviewed Riley's transcript and told Lima that Riley would not have been allowed to "return and stay" at Bishop Stang unless he made up "three . . . failed courses."[4]  Ex. 30 at MSP00075-76.  *See* Ex. 49 (Lima Dep.) at Tr. at 225-27.

198.  Also on September 22, 2011, Lima traveled to New Bedford High School and saw records reflecting that Riley had attended Dartmouth High School.  Lima had not previously realized that Riley had attended Dartmouth High School.  Consequently, Lima traveled to Dartmouth High School on September 26, 2011.  At Dartmouth High School, Lima sought to determine whether Dartmouth High School had a residency requirement, and thus whether Riley's "residency issue was really with the Dartmouth High School and not Bishop Stang."  Ex. 30 at MSP00075-76.

199.  On September 28, 2011, Lima sent a memorandum to Major Kevin Butler (the President of the Review Board) and Det. Lt. George Smith (the commander of the Certification Unit) covering the findings of his supplemental investigation.  Ex. 30 (Lima Supplemental Memorandum of September 28, 2011); Ex. 50 at ¶ 1; Ex. 53 at 2-3.

**The Review Board Again Votes to Disqualify Riley**

200.  On September 26, 2011, a Review Board consisting of Butler, Christiansen, and Detective Captain Frank Hart met to reconsider its decision to disqualify Riley in light of Riley's letter of September 22, 2011.  Ex. 50 at ¶ 11.

201.  In considering such "appeals," the Review Board followed the same process as in in the original review by reviewing the candidate's file and considering any additional information.  Ex. 52 (Butler Dep.) at Tr. 98, 123-24; Ex. 67; Ex. 50 at ¶ 11.

202.  For Riley's "appeal," the Review Board once again considered Riley's completed Application, completed Questionnaire, and Lima's background investigation report.  The Review Board also reviewed and considered Riley's letter of September 22, 2011.  Ex. 50 at ¶ 11.

203.  The Review Board did not consider Lima's supplemental memorandum.  Prior to the meeting, however, Lima relayed some of the same information to Butler via telephone

---

[4] As with Nancy Wood, Riley's counsel has also procured an affidavit from Kathleen Ruginis stating that she does "not recall the specific details of [her] conversation" with Lima.  Ex. 41.  As with Wood, this affidavit is also insufficient to create a genuine dispute of fact.  *See Stop & Shop Supermarket Co.*, 2012 WL 2402790, at *2.

including, at least, the fact that Riley had not received the recommended reprimand. Ex. 52 (Butler Dep.) at Tr. 76-81, 131-32; Ex. 50 at ¶ 11; Ex. 30.

204.   The Review Board also considered the new information that Riley had unsuccessfully applied to the Providence Police Department which it learned from, at least, Riley's letter of September 22, 2011.  Ex. 29; Ex. 50 at ¶ 12.

205.   On September 26, 2011, the Review Board voted unanimously that Riley would remain disqualified.  Ex. 50 at ¶ 12.

206.   The Review Board determined that it remained the case that Riley had made knowingly false statements in his Application, in his Questionnaire and to Lima, and that Riley's making of false statements continued to constitute an automatic disqualifier under the "Automatic and Discretionary Disqualifiers" guidelines.  Ex. 50 at ¶ 12.

207.   In particular, the Review Board continued to believe that Riley had made false statements about his role as a subject of the Soares investigation, and that it did not make a difference whether Riley had actually received the written reprimand.  Ex. 50 at ¶ 12; Ex. 52 (Butler Dep.) at Tr. at 78-81.

208.   The Review Board also continued to believe that Riley had made knowingly false statements about his reasons for not returning to Bishop Stang High School.  Ex. 50 at ¶ 12.

209.   The Review Board also determined that Riley had falsely answered Question 20.A. by failing to disclose his unsuccessful application to the Providence Police Department. The Review Board considered Riley's explanation (that he misunderstood the question) to be not credible in light of "the overwhelming number of other indications that Riley was an untruthful individual who had attempted to conceal various embarrassing aspects of his past from MSP."  Ex. 50 at ¶ 12.

210.   Major Butler, the President of the Review Board, described Riley as having engaged in "pattern of deception that goes on and on."  Ex. 52 (Butler Dep.) at Tr. 94, 117-18; Ex. 50 at ¶¶ 1, 12.

211.   By letter dated September 28, 2011, Riley was informed that "[a]fter reconsidering the information presented in the first instance as well as the representations advanced in your letter [of September 22, 2011], the Review [Board] has affirmed its original decision to remove you from the process."  Ex. 67.

**Other Candidates Assigned to Lima for Background Investigations for the 80th RTT**

212.   For the 80th RTT, Lima was assigned background investigations for seven candidates in total, including Riley.  Ex. 45 at ¶ 11.

213. Of the six candidates other than Riley assigned to Lima, one failed his psychological assessment and did not make it to the point of a background investigation determination, and a second voluntarily withdrew from the process before the point of a background investigation determination.  Lima did not complete a background investigation report for either one of these candidates.  Ex. 45 at ¶ 12.

214. Lima completed his background investigations on the four remaining candidates, who had the initials: (1) A.G.; (2) A.P.; (3) J.W.; and (4) J.H.  All four of these candidates were white.  Ex. 45 at ¶ 13.  *See* Sealed Ex. 58 (A.G. investigation report); Sealed Ex. 61 (A.P. investigation report); Sealed Ex. 65 (J.H. investigation report); Sealed Ex. 64 (J.H. investigation report).

215. Candidate A.G. was assigned candidate number 100-0059.  Candidate A.P. was assigned candidate number 098-0481.  Candidate J.W. was assigned candidate number 100-0184.  Candidate J.H. was assigned candidate number 100-0070.  Ex. 45 at ¶ 14.

216. Like Riley, Candidates A.G., A.P., and J.W. were all found by MSP's Review Board to have failed their background investigation, and were disqualified from the hiring process on that basis.  Ex. 45 at ¶ 14; Sealed Ex. 57 at Rows 58, 60, and 350; Sealed Ex. 59 (A.G. Review Board letter); Sealed Ex. 62 (A.P. Review Board letter); Sealed Ex. 66 (J.W. Review Board letter).

217. Candidate A.G. failed his background investigation and was disqualified due to, *inter alia*, being untruthful on his application about history of drug use.  Sealed Ex. 57 at Row 58; Sealed Ex. 59; Ex. 45 at ¶ 14.

218. Candidate A.P. failed his background investigation and was disqualified due to, *inter alia*, providing incomplete and inaccurate information on his Application about his prior employment history, and a poor prior employment history.  Sealed Ex. 57 at Row 360; Sealed Ex. 62; Ex. 45 at ¶ 14.

219. Candidate J.W. failed his background investigation due to, *inter alia*, non-payment of taxes and an extensive driver's history.  Ex. 45 at ¶ 14; Sealed Ex. 57 at Row 60; Sealed Ex. 66.

220. Lima completed his background investigation report on Candidate J.H. on September 2, 2011.  Lima noted a number of "Positive Employment Aspects" for Candidate J.H., including "[h]onesty," particularly in acknowledging past use of marijuana, and "trustworth[iness]."  For "Negative Employment Aspects," Lima wrote: "[N]othing to report/Nothing found during background investigation."  Sealed Ex. 64.

221. At the time of his interview, J.H. made three written changes to his application: adding his one high school, correcting his cell phone number, and correcting his email information.  Sealed Ex. 63; Sealed Ex. 64 at MSP003658.

222.   Candidate J.H. was subsequently reviewed by the Review Board, and the Review
       Board determined that J.H. had passed his background investigation.  Sealed Ex. 57 at
       Row 110; Ex. 45 at ¶ 14;

223.   Other than Riley's allegations related to this case, Lima has never before been the
       subject of a complaint of racial bias or discrimination, and has never before been the
       subject of a complaint about his conducting of background investigations.  Ex. 49
       (Lima Dep.) at Tr. 66-67.

## Other Candidates to the 80th RTT Disqualified due to Untruthfulness

224.   In addition to Riley, at least twenty-two other candidates failed their background
       investigations for the 80th RTT due, at least in part, to issues of perceived
       untruthfulness.  Sealed Ex. 57 at Candidates 100-0123 (Row 32), 100-0059 (Row 58),
       099-0407 (Row 75), 098-0635 (Row 104); 098-0498 (Row 105); 099-0010 (Row
       130), 099-0053 (Row 131), 0098-141 (Row 135), 099-0294 (Row 162), 099-0247
       (Row 164), 099-0309 (Row 166), 096-0477 (Row 168), 098-0373 (Row 216), 102
       (Row 217), 102-0005 (Row 248), 098-0275 (Row 250), 099-0112 (Row 251), 100-
       0071 (Row 264), 100-0112 (Row 296), Unnumbered (Row 334), Unnumbered (Row
       336), Unnumbered (Row 337), 098-0481 (Row 360).

## Riley's MCAD Charge Against NBPD

225.   On September 15, 2011, Riley went to NBPD Chief David Provencher and asked him
       to explain the document Lima had shown Riley at the interview.  Provencher stated:
       "[B]ecause of your waiver we allowed access to your internal affairs file and in your
       file was a recommendation for a written reprimand."  Riley then asked Provencher,
       "why [he] was never informed about any recommendation for a written reprimand"
       and stated that he "thought [Provencher] said none of this was going in my file."
       Provencher replied, "I meant your personnel files [and] your internal affairs file is
       different."  Ex. 34 at MCAD00048.

226.   On June 19, 2012, Riley filed an MCAD charge against NBPD and David Provencher,
       alleging that both had discriminated against him on the basis of race.  Ex. 32.

227.   Riley alleged as follows:

       "On or about May of 2011, the Respondent, David Provencher, Chief of Police, informed
       all officers including myself involved in an incident from 2009 that there would be no
       discipline.  I specifically inquired as to whether or not something
       would end up in my file as I was a candidate in process of being hired for the
       Massachusetts State Police and Chief Provencher insured me that nothing was going in
       my file. On or about August of 2011, I requested my personnel file and it was clear from
       reprimand. On or about September of 2011, I met with Robert Lima, Massachusetts State
       Police, and informed him that I had no written reprimand during my interview process.
       Mr. Lima eliminated me from the State Police hiring process for being untruthful after he

discovered a recommendation for reprimand placed in my internal affairs file by Mr. Provencher. I had no knowledge of this recommendation for reprimand being in my internal affairs file and I do not have access to my internal affairs file . . . ."

Ex. 32.

228. Riley filed the charge against NBPD and Provencher because he believed that they intentionally misrepresented him to MSP by acting, without Riley's knowledge, to place the June 18, 2010 Memorandum into his internal affairs file. Ex. 34 at MCAD00047; Ex. 47 (Riley Dep.) at Tr. 392-93.

229. On January 16, 2015, the MCAD dismissed Riley's charge against NBPD for lack of probable cause. Ex. 38.

**Riley's MCAD Charge Against MSP**

230. On April 26, 2012, Riley filed an MCAD charge against MSP and Lima individually alleging discrimination on the basis of race. Ex. 31; Ex. 37.

231. On December 18, 2014, the MCAD dismissed Riley's charge against MSP and Lima for lack of probable cause. The MCAD ruled:

"[MSP] had a legitimate, nondiscriminatory reason for not hiring Complainant, as Complainant was untruthful during the application and background investigation process . . . . While he may not have understood the entirety of records that [MSP] had access to, including the recommendation for a written reprimand, Complainant had a responsibility to be truthful when asked whether he had been subjected to an internal investigation . . . . Moreover, Complainant does not provide sufficient evidence of discriminatory pretext. The five other candidates Mr. Lima interviewed were white. However, only one candidate was accepted by [MSP]. Four, including Complainant, were disqualified, and one withdrew. Complainant's two comparators . . . are not appropriate comparators, as they were not interviewed by Mr. Lima, which Complainant admitted. Moreover, [MSP] reviewed its original decision to eliminate Complainant from the application process, even though it did not have a formal appeals process."

Ex. 37.

232. Riley thereafter appealed the MCAD's findings. Following a hearing, and on June 9, 2015, an MCAD Investigating Commissioner affirmed the lack of probable cause finding. Ex. 39.

Respectfully submitted,

MASSACHUSETTS STATE POLICE

By its attorneys,

MAURA HEALEY
ATTORNEY GENERAL,

/s/ Jesse M. Boodoo
Jesse M. Boodoo, BBO No. 678471
Nicholas Rose, BBO NO. 670421
Assistant Attorneys General
Government Bureau/Trial Division
One Ashburton Place, Room 1813
Boston, MA  02108
(617) 727-2200
jesse.boodoo@state.ma.us
nicholas.rose@state.ma.us

Dated:  November 2, 2017

<u>**CERTIFICATE OF SERVICE**</u>

I, Jesse M. Boodoo, Assistant Attorney General, hereby certify that I have this day, November 2, 2017, served the foregoing document upon the attorney of record for all parties by filing it through the ECF system.

/s/ Jesse M. Boodoo
Jesse M. Boodoo