# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

_____
                     )

**ORLANDO RILEY,**          )
        **Plaintiff**       )
                     )

**v.**                    )
                     )

**MASSACHUSETTS DEPARTMENT**   )     Civil Action No.: 1:15-CV-14137-DJC
**OF STATE POLICE,**       )
                     )

        **Defendant**      )
_____)

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S
## <u>MOTION FOR SUMMARY JUDGMENT</u>

Respectfully submitted,

PLAINTIFF
Orlando Riley
By his attorneys,

Ellen J. Messing, BBO No. 343960
emessing@mrwemploymentlaw.com
James S. Weliky, BBO No. 631066
jweliky@mrwemploymentlaw.com
Gavriela M. Bogin-Farber, BBO No. 686081
gbogin-farber@mrwemploymentlaw.com
Messing, Rudavsky & Weliky, P.C.
50 Congress St., Suite 1000
Boston, MA  02109
(617) 742-0004

## I.  **INTRODUCTION**

To defeat summary judgment on his Title VII race discrimination claim, Riley must show that there are issues of material fact as to whether (1) he is a member of a protected class; (2) he applied for and was qualified for entrance into the 80th RTT training academy; (3) despite his qualifications, he was rejected and (4) MSP continued to seek applications from persons with the same qualifications. See McDonnell-Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); Oliver v. Digital Equip. Corp., 846 F.2d 103,111 (1st Cir. 1988). This formula is not rigid, but adapted to the circumstances of each case. McDonnell-Douglas at 802 n.13. Riley must also demonstrate that the asserted legitimate reasons MSPs advance for their actions are a pretext for bias. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993).

In this case, it is undisputed that Riley was a member of a protected class (African-American); that he was rejected for MSP's 80th RTT; and that others were selected (as MSP acknowledges, Riley was not competing for appointment against other candidates; multiple slots were available.) He was qualified: under the 2011 MSP process, candidates were required to achieve a high score on a written examination and pass physical, medical, and psychological screenings. Riley received the maximum score on the examination and passed all the other screenings. The background investigation is the final step; candidates who pass it are offered appointment.¶¶P1,[1]P2,P8,P24,P25.

MSP claims that its legitimate, non-discriminatory reason for rejecting Riley was his "untruthfulness" as revealed by his background investigation ("BI"). But there is overwhelming evidence that this was a pretext, and that investigator Robert Lima knowingly relied on false information about him. MSP's Memorandum in Support of its Motion for Summary Judgment ("Memo") largely avoids all that evidence, thus assuming away the central disputed material fact in

---

[1] Cites are to Plaintiff's Statement of Material Facts in Dispute and Response to Defendant's Statement of Material Facts. Plaintiff's material facts are cited as "¶P_," Defendant's material facts are cited as "¶_" and plaintiff's response to defendant's material facts are cited as "¶_Resp."

<u>this case</u>: that Lima did not truly believe that Riley was dishonest. In fact, a factfinder could readily conclude that both Lima and the ultimate decisionmaker, the Review Board to whom Lima reported, were presented with substantial evidence supporting Riley and chose to disregard it. Further, there is overwhelming evidence that Riley failed his BI only because a double standard was applied to him and white candidates, under an ad hoc and subjective process that allowed bias to flourish and resulted in a disproportionately failure rate for African-American candidates. Because Riley can show pretext and discrimination[2], MSP's motion must be denied.

## II.    FACTUAL BACKGROUND

### A.    MSP'S BACKGROUND INVESTIGATION PROCESS

The BI process was <u>ad hoc</u>, lacking in standards and subjective, and thereby susceptible to racial bias. A disproportionate number of African-American candidates failed the BI stage and were thereby eliminated from consideration. MSP does not appear to have analyzed, and provided no guidance to investigators about, how to determine whether candidates possessed MSP's required characteristics of "good moral character, sound work ethic, decision making consistent with the Oath of Office, and otherwise suitable", other than the creation of lists of automatic and discretionary disqualifiers. Those who supervised the BI process had no experience or training in selection processes or training others in the same. The Review Board members who rejected Riley, whose only qualification was their rank and availability, had no experience or training in serving on Review Boards. Two of the three had no experience conducting BIs; the other had not conducted one for 11 years prior to the 80th RTT. Background investigators likewise were not required to have

---

[2] MSP seeks to impose an overly heavy burden on Riley at the third stage of the <u>McDonnell-Douglas</u> framework. At summary judgment, if plaintiff establishes a prima facie case and defendant provides a legitimate reason, plaintiff must create a genuine issue of material fact as to whether the employer's reason was pretext <u>and</u> whether the real reason was discrimination, but the latter burden may be met with sufficient evidence of pretext and a strong prima facie case, without adducing additional, independent evidence of discrimination. <u>Reeves v. Sanderson Plumbing Prods.</u>, 530 U.S. 133, 143-49 (2000). <u>Accord</u>, <u>Tyree v. Foxx</u>, 835 F.3d 35, 41-42 (1st Cir. 2016); <u>Soto-Feliciano v. Villa Cofresí Hotels, Inc.</u>, 779 F.3d 19, 23, 25 (1st Cir. 2015); <u>Ahmed v. Johnson</u>, 752 F.3d 490, 496 (1st Cir. 2014). <u>See also</u> <u>Flood v. Bank of Am. Corp.</u>, 780 F.3d 1, 8-10 (1st Cir. 2015).

experience in conducting BIs, and trainers of background investigators were not themselves required to have any BI or BI-training experience. ¶¶P8-P14,P22.

The training background investigators received was perfunctory,[3] focusing on application forms, documentation and criminal and public record searches. There was no written training curriculum and investigators were given no information regarding attributes being investigated other than the disqualifiers. No training was provided on how to avoid subjectivity or bias. Nor did the MSP require that background investigators follow standard procedures. There were no standard questions of references, no requirement that any minimum number of references be contacted, no protocol for neighborhood visits, and no standard questions on any o topic addressed in the investigation. There were no record-keeping requirements, and no effort to monitor the quality or proficiency of the investigators.¶¶P15-P20.

Plaintiff's expert, Joel P. Wiesen, Ph.D., a highly experienced industrial psychologist, reviewed MSP's BI procedures and concluded that the foregoing characteristics are known, in his field of personnel selection, to invite subjective and idiosyncratic decisionmaking and the expression of conscious and unconscious prejudices. Thus it is not surprising that a review of the BIs performed by the MSP for the 80th RTT show a statistically significant disparity between the percent of black (57%) and white (85%) candidates who passed their BIs. Rpt., 12-14.¶¶P21-P22.

It is against this background that Lima's investigation of Riley must be assessed.

## B. RILEY'S BACKGROUND INVESTIGATION

Riley completed and submitted his written application on May 3, 2011. His application revealed that after graduating high school in June 1996 and taking two years of college courses, he had been continuously employed, the last 10 years as a police officer with the New Bedford Police Department ("NBPD"). He had no terminations or discipline on his work record. He had no

---

[3] Lima testified that the training lasted a total of only two to three hours, although MSP may have intended it to last a full day. ¶P17.

criminal record, had never used illegal drugs, never gambled, had never declared bankruptcy, was not delinquent on any loans or taxes and had never had any difficulties with state agencies. With the exception of a minor accident at work, his driving record was spotless.¶¶P25,P26.

After submitting his application, Riley instructed New Bedford High School ("NBHS"), from which he had graduated, to send Lima his transcript, which it did on July 14, 2011.  On September 1, 2011, Riley met with Lima for his BI interview, submitting a 102-question questionnaire to Lima at that time as well. Not having a diploma in his possession, he brought a letter from the NBHS headmaster confirming his graduation. Because he had been the victim of a mortgage fraud that had temporarily stained his credit record, he also brought a letter from his lawyer explaining that the dispute with his bank had been resolved and his mortgage debt was no longer owed.¶¶P28,P29,P30,P31.

Riley's interview with Lima lasted approximately three hours, during which Lima was needlessly hostile, suspicious and condescending. He spent excessive amounts of time repeating the same questions to Riley on the same subjects, for example repeatedly challenging Riley's statement that he had never gambled. He insinuated that Riley could have forged the document he brought from NBHS. He repeatedly denigrated Riley's racially diverse neighborhood, including by stating that it was not appropriate for a state trooper. He insisted that Riley's union was a "professional trade organization", chiding Riley for not listing it as such on his application. He complained that Riley failed to Riley repeat his disclosure of the same minor, work-related auto accident twice on the application form.¶P32.

Most significantly, Lima announced, then repeatedly insisted that Riley had been reprimanded as a result of an internal NBPD Internal Affairs investigation in which he was a subject (the "IA Investigation"), and that Riley had failed to disclose this "fact." Riley explained that after completing his application, he had first learned from his Chief on May 24, 2011 that he had indeed been the subject of an internal investigation, but that the Chief would not be imposing any discipline.

Riley further explained that he had initially thought he was only a witness in the investigation, and that it had been pending for so extended a period he had thought it was over at the time of his application. Nevertheless, Lima held a document up to Riley's face, insisting it was a "reprimand," to which Riley responded that no such "reprimand" was supposed to be in his file because he had not been disciplined. Despite the obvious import of those words, which Lima acknowledges Riley saying–that there should be no discipline in his file because he had not been disciplined--Lima treated Riley's statement as evidence of a backfired cover-up. ¶¶P32,P38,P39.

After the interview, Lima scheduled a time to conduct a home/neighborhood visit, but failed to show up on the promised date without explanation or notice. Instead, he surprised Riley's fiancé at home, stayed long enough to comment that she and Riley "did not live in the greatest neighborhood," and left.¶P93.

### C. MSP'S REJECTION OF RILEY'S APPLICATION

On or about September 5 or 7, 2011,[4] Lima issued his BI report (the "First Report") to the Review Board. At the conclusion of Lima's First Report, he listed three "positive employment aspects" (one of which was qualified) and six "negative employment aspects," including a claim that Riley had not been forthright on "disclosing disciplinary action (work and academic)" and was "untruthful about disciplinary action."[5]  On September 7, 2011, the Review Board rejected Riley's application based largely or solely on Lima's report,[6]  without conducting any independent investigation or analysis.¶¶P33,P34,P81-P83.

On September 18, 2011, not having seen the First Report, but shocked at receiving the

---

[4] The BI report bears both dates. Lima was unable to explain why.¶P33.

[5] Despite untruthfulness being an automatic disqualifier, Lima had not followed the MSP's formal procedures, which require suspending the investigation upon the discovery of an automatic disqualifier and seeking instruction from the Review Board.¶P5.

[6] Members of the Review Board disagreed on whether they reviewed any documents other than Lima's report. Member Christianson recalled reviewing only the report. Board Chair Butler said that the application and detailed questionnaire were also reviewed.¶P89.

Review Board's letter rejecting his application for untruthfulness, Riley called Lima and asked him how he had been "untruthful."[7] Lima responded that Riley had not disclosed his "written reprimand," that he had told Lima he left Bishop Stang High School for financial reasons when he had actually been forced out for academic reasons, and that he did not disclose an earlier application to the Providence Police Department. Distressed, Riley wrote MSP to explain, with supporting documentation, how all these claims were false. The Review Board reconvened (the "Appeal Board") to reconsider Riley's rejection on September 26, 2011, the day Riley's letter was received. MSP practice was to constitute an appeal board identical to the original Review Board whenever practical.[8] In this case, two of the three members had been members of the original Review Board. Unsurprisingly, the Appeal Board sustained its original decision. It is unclear whether Board members even read Riley's letter; MSP's witnesses contradict each other on this point. But even the Board chair, Kevin Butler, who testified that he read the letter, acknowledged that he rejected it <u>in toto</u> because he believed Riley a liar based on Lima's reports. ¶¶P86-P89.

On September 28, 2011, Lima issued a second report ("Second Report"), purporting to address Riley's complaints about the First Report. The Second Report effectively concedes that Riley had not been untruthful as claimed by Lima in the First Report. However, the Second Report adds new misstatements and accusations as if to compensate.¶¶P33,P43.

### D.      LIMA'S FIRST AND SECOND INVESTIGATION REPORTS

Both Lima's First and Second Reports were replete with distortions, inaccuracies and material omissions.

### 1.      <u>The Alleged "Written Reprimand"</u>

Lima's statement in his First Report that Riley had been reprimanded and had failed to

---

[7] Contrary to Lima's misrepresentation, Riley neither raised his voice nor "berated" Lima.¶85.

[8] This feature of the BI process—having appeals heard by the same body that made the original decision—is procedurally unfair, since it is well known in the personnel selection field that the same body will tend to confirm its original decision even with new information.¶P87.

disclose it was false, and he knew it to be false when he wrote it. Lima admitted at his deposition that the document he characterized as a reprimand was neither a reprimand nor said that Riley had been reprimanded. In fact, the document states the opposite. Lima also admitted that he had never found a reprimand in Riley's file. Rather, Riley's file confirmed, consistently with Riley's statements, that a reprimand had been recommended but not imposed, This was further corroborated to Lima by Riley's union president by phone on September 2, 2011. Lima admitted at deposition that when he stated as <u>fact</u> in his First Report that Riley had been reprimanded, he did not know that to be the case.¶P36.

After his rejection, Riley provided Lima with additional documentation corroborating his truthfulness about the purported "reprimand" from his union president, his union attorney and his police chief. Lima failed to mention of this documentation in his Second Report, or to mention that the document that he had characterized as a reprimand in his First Report reflected instead that no reprimand was issued. The Second Report fails to acknowledge any error in the devastating indictment that formed the centerpiece of the First Report.¶P40-P42.

### 2. Riley's Purported Failure to Disclose He Was the Subject of an <u>Investigation</u>

Instead, the Second Report switches gears, shifting to a new claim: that Riley failed to disclose that he was a subject of the investigation that resulted in the non-reprimand. But there was no failure to disclose. Riley readily disclosed in his application that he had been a <u>witness</u> in an internal investigation, and at his interview he disclosed as readily that he had learned after completing his application that he was one of its <u>subjects</u>. MSP claims that Riley did not disclose that fact until Lima confronted him with the putative "reprimand," but this is disputed. Further, the same documentation that he submitted to demonstrate that he had not been reprimanded corroborated his account that he was unaware he was a subject. MSP makes much of earlier NBPD communications to Riley about the investigation, but (like Lima) concedes that nothing in those

communications stated that Riley was a subject.[9]  More significant is that Lima neglected to mention in his Second Report any of the corroborative evidence Riley supplied to him–further revealing Lima's apparent focus on injuring Riley's candidacy regardless of the merits.[10]¶¶P38-P43,P45.

### 3. Lima's Misrepresentations About Riley's References

Lima's First Report claimed that he could not find anyone at the NBPD willing to go on record regarding Riley's work performance. He summarized the references he did receive by indicating that the most favorable ones said only that Riley was a "good guy" and an "alright worker." In fact, his references uniformly characterized Riley as a good worker, not an "alright" worker; law enforcement references all said that Riley was a good police officer as well. Moreover, Lima did not even list Riley's positive references as a "positive employment aspect" in his First Report. As for the claim that colleagues refused to "go on record" about Riley, Lima acknowledged that none said anything negative about Riley. Further, Lima could not identify a single individual who told him that, and though he claimed his notes reflect all reference statements he obtained, none reflect that anyone said he or she wished to remain anonymous.¶¶P48,P50.

Further, Lima failed to disclose that he did not bother to contact four of the five current or former NBPD colleagues whose names Riley provided, including his current and former

---

[9] MSP claims that Riley's failure to disclose an earlier investigation (the "Stallings Investigation") of a 2006 incident at "48 Nelson St." is "after acquired evidence" of Riley's untruthfulness. However, an unbiased evaluator would realize that Riley's nondisclosure was the result of a lack of knowledge, as with the IA Investigation. Riley was never informed that he was the subject of the Stallings investigation, only a witness. Contemporaneous NBPD documents are consistent with that understanding: none inform Riley that he was a subject. Riley received a 2010 notification that he was cleared of a 2006 complaint regarding a "disturbance in the area of County Street and Nelson Street," but he reasonably assumed this was a mistake because he had never been told there had been a complaint against him; he had never responded to a disturbance "in the area of County and Nelson Street;" the investigation had occurred four years earlier; and the department had just switched email accounts and had been experiencing bugs.¶P46.

[10] MSP also makes much of Riley's answer of "no" in his questionnaire answer about whether his name was in a law enforcement "case file." No reasonable jury would believe that MSP really thought that this proved untruthfulness. That question, which does not define "case file", appeared in a section of the questionnaire called "criminal history." Riley understood it to mean a police-involved offense like a hit and run accident, as distinct from an internal investigation. Riley had never been the subject of a criminal investigation, so of course he answered "no.¶P47.

supervisors, nor one of Riley's former supervisors. Two ex-supervisors confirm they were not contacted. He contacted two fellow state troopers who knew Riley, but failed to ascertain if they knew him well.¶P49.

### 4. Riley's Purported "Lack of Attention to Personal Credit Reporting"

In his First Report, Lima listed as a "negative employment aspect" Riley's purported "lack of attention to personal credit reporting," claiming that Riley belatedly disclosed at his interview and "did not document" a mortgage delinquency. Both statements were false. Riley disclosed the mortgage issue in his application. At the interview, he provided a letter from his lawyer explaining the pending resolution of the mortgage fraud, as described in §II(B) above. Shortly after the First Report, he provided Lima with additional written documentation from the mortgagee bank formally ending his liability. Nevertheless, Lima never corrected his original misstatement in the Second Report, nor mentioned Riley's additional documentation.¶¶P51-P52.

### 5. Lima's Mischaracterizations of Riley's Educational Record

In the educational history section of his application, Riley mistakenly listed only NBHS, from which he had graduated. When this was discussed at the interview, Riley told Lima that he had also attended Muskegon High School for his freshman year and Bishop Stang High School (a parochial school in Dartmouth, MA) for his sophomore year. He explained that his mother could not afford to return him to Bishop Stang, then enrolled him briefly in Dartmouth High School, also in Dartmouth, for his junior year. However, he was required to withdraw after only a few weeks due to non-Dartmouth residency, and then enrolled in NBHS. Lima asked him to obtain transcripts from Muskegon and Bishop Stang (he did), but told him not to bother with a Dartmouth transcript given his brief enrollment. In his First Report, Lima completely distorted what he had discussed with Riley. He claimed that Riley told him that he was required to withdraw from <u>Bishop Stang</u> due to a residency requirement, even though this would make no sense given that private schools do not have residency requirements.¶¶P55-P58.

Lima's report also claimed, purportedly as additional "evidence" of Riley's lack of honesty, that he "discovered" that Riley left Bishop Stang due to academic failure, and that this was revealed to him by a Bishop Stang employee. However, this too was false. That employee states that she had no knowledge of Riley's reasons for withdrawing at the time she allegedly spoke to Lima, was not authorized to give opinions about why students left, and has never done so. She could thus not have given Lima those reasons. Further, Lima conceded in his Second Report that after speaking with another Bishop Stang official and reviewing Riley's transcript, Riley had <u>not</u> been required to leave for academic reasons, just as Riley had told him. He even conceded that Riley told him that he left due to finances. However, nowhere in the report does Lima acknowledge that Riley had not in fact been untruthful, but instead actively created a distorted impression of dishonesty.¶¶P58-P60.

The Second Report also added additional misstatements about Riley's school record, claiming that Riley had not provided Lima his NBHS transcript (the First Report reflects that he had); and that he "discovered" in a visit to NBHS what Riley had actually told him at his interview: that Riley attended Dartmouth briefly but was required to leave due to residency. The Second Report then tosses gratuitous mud, implicitly blaming Riley, then a 15-year old boy not in charge of his own school enrollment, for misrepresenting his residency to school officials.¶¶P57,P62-P63.

### 6.      The Providence Police Department Application

Lima claimed that he believed Riley to be "untruthful" in failing to disclose his 1999 application to the Providence Police Department in response to question 20(A) of his application, which asked whether he had ever been the subject of a BI and if the answer "yes," to list all the departments to which the applicant had applied. But as Riley has testified; as he contemporaneously explained to the Review Board; and as Dr. Wiesen concurs, the question was plainly confusing. Its fundamentally unfair structure fails to meet basic standards of employee selection systems. Virtually every other similar question in the application followed the format of "if x, then list all examples of x." But question 20(A) instead followed the format of "if x, then list y." Having answered every other

question by providing specific examples of the subject of the question, Riley understood Question 20(A) the same way: since he was not the subject of a BI in Providence, it should not be listed. A jury could reasonably believe that this was self-evidently a mistake (for which Riley even apologized) and would only be interpreted as evidence of dishonesty by someone predisposed by prejudice to see it as such.¶¶P70,P86.

## E. MSP'S TREATMENT OF RILEY'S WHITE COMPARATORS DEMONSTRATE THAT HE WOULD NOT HAVE BEEN DISQUALIFIED ABSENT ITS DISCRIMINATORY TREATMENT

Riley did not lie about a non-existent reprimand, intentionally hide that he had been the subject of a disciplinary investigation, fail to disclose his mortgage loan dispute nor invent an implausible and readily-exploded story about being expelled from a private school on residency grounds to cover up being expelled from a public school on residency grounds. A jury could also reasonably conclude that had Lima actually interviewed Riley's references and reported them honestly, they would have been a very "positive employment aspect." Moreover, each of the white comparators were denied for (or accepted despite) flaws far more serious than were present in Riley's case. Absent bias, an investigator would have had only minor errors to consider of a type not considered disqualifying or even important when made by white candidates.

### 1. Riley's Comparators Were Denied Selection for Egregious Flaws Not Present in Riley's Application

White candidates AG and JW were rejected in part because they had poor driving records, including multiple incidents of such infractions as speeding, no inspection sticker and license suspensions. JW's record included an OUI. Riley's driving record, on the other hand, was excellent. AG's application was also rejected for negative employment references and lying about drug use. Riley had positive employment references from those Lima contacted, and would have had more had Lima conducted an unbiased investigation; Riley never used drugs. JW was also rejected for not paying taxes; Riley always paid his. AP and JW had criminal histories, unlike Riley. JW had been

terminated from two jobs, but Riley had never been terminated.¶¶P26,P72-P74.

### 2. Loans and Debts

One of Riley's minor errors was that in response to the application question seeking all outstanding "loans," he did not list his $1,465.00 balance on a single credit card, and he supposedly did not provide documentation showing he was not subject to a $65,000 mortgage that it had been cancelled as fraudulent. Riley explained that he had not thought of credit card balances as "loans," and as explained above, he provided Lima with ample information demonstrating that he had been released from the mortgage. Riley subsequently sent Lima an email with additional explanation, attaching a letter from the mortgage investigator releasing him from any obligations of the debt. Exh. 37. Had Riley been white, these would not have been issues. Candidate "JH", a white applicant who passed his BI, made a similar but substantially more egregious omission: he failed to disclose $40,410 in balances on six credit cards yet Lima failed to note this omission. Instead Lima called him "honest" and "trustworthy." Similarly, JW failed to disclose debts owed to the Department of Veterans Affairs, did not disclose credit card debt or the fact that he was delinquent on his 2009 and 2010 tax returns, and failed to disclose that he owed 2010 unpaid taxes until his interview. Lima did not label him "untruthful" and these glaring omissions were not identified by the Review Board as a basis for JW's rejection.¶¶P51-P54,P74-P75,P77.

### 3. High Schools

As noted, Riley was criticized for omitting from his application the high schools he attended prior to NBHS. This too would not have been fatal to his application. Successful white candidate JH omitted all his high schools from his application. Lima neither drew this to JH's attention during JH's interview nor required him to correct it. Unlike Riley's case, Lima did not assume that JH was thereby hiding some wrongdoing that called for investigation. Instead, he ignored the issue in his report, even stating that JH had a "good academic record," with no apparent basis to say that about JH's high school career at least.¶P77.

### 4. Selective Service

Riley erroneously marked "no" on his application when asked whether he had registered for selective service. Lima claimed this was evidence of his purported lack of attention to detail. But this was a common slip-up; white candidates JW and AP made the same error. Lima did not even notice the mistake in their cases, asserting in his deposition that only Riley had erred. ¶P67.

### 5. Favorable Treatment

In contrast to Riley, his white comparators were treated with indulgence and favoritism. Successful candidate JH's most recent employment review from his supervisor was negative, yet Lima ignored it and claimed that he somehow "got the impression" that his supervisor thought JH was an "exemplary employee". Lima listed JH's employment record as a "positive employment aspect." JH similarly admitted to drug use, something Riley had never done, yet Lima also treated this as a _positive_ employment aspect. As noted, JW failed to disclose a termination, substantial debt and delinquent taxes, yet Lima did not label him as "untruthful," instead characterizing these omissions as minor. AG failed to disclose his past drug use and medical issues and was likewise not labeled "untruthful". To the contrary: Lima lauded AG for appearing "repentant" and disclosing these matters "upon questioning." Riley's "repentance" for misunderstanding Question 20(A) was not met with the same generosity, and his disclosure of the IA investigation "upon questioning" hardly received the same indulgence from Lima. ¶¶P26,P72,P77.

In contrast to Riley's case, Lima accurately characterized candidates' references (or in JH's case overstated them). Also, in no case but Riley's did Lima include a negative in his list of "positive" employment aspects, as he did in writing that Riley "appeared timid." Worse, Lima's report supplies no grounds for this subjective, inappropriate conclusion, or any reason to include it (it is unrelated to any stated BI criteria). ¶P78.

Finally, Lima did not label any other candidate he investigated, including those who, like

Riley, made mistakes filling out their applications, as being "accepting" of "mediocrity." While

Lima claims that this is a reference to a statement that Riley purportedly made in reference to those

errors: "it is what it is," Riley denies it and a jury could believe him. When challenged, Lima could

not point to a single error to which Riley had this response, recount how many times it was said, and

no reference to this statement appears in his investigation report. A factfinder could easily conclude

that this statement was simply a putdown of Riley to which his white comparators were not

subjected.¶P79.

### III. ARGUMENT

### A. THE QUESTION OF WHETHER LIMA AND THE MSP REALLY BELIEVED RILEY TO BE UNTRUTHFUL IS THE CENTRAL DISPUTED MATERIAL FACT IN THIS CASE

MSP argues that Riley fails to make out a prima facie case of discrimination under the

fourth prong of the McDonnell-Douglas scheme because there is no comparable applicant hired as

to whom the MSP had similar concerns about truthfulness. Memo, 15. However, this formulation

assumes away the most important disputed fact in this case: whether MSP genuinely had such

concerns with respect to Riley, or instead consciously or unconsciously assumed the worst about

him at every turn, applying a double standard to deny him a position. Riley contends, and a

reasonable jury could conclude from the admissible evidence summarized in §II infra, that Lima did

not genuinely believe him to be untruthful. Thus, Riley establishes a genuine dispute of material

fact as to whether he was treated differently and worse than white applicants and makes out a prima

facie case of race discrimination. Further, the evidence summarized in §II easily establishes a

dispute of material fact as to whether MSP's "dishonesty" charge was only a pretext for

discrimination. There is substantial evidence from which a jury could conclude that had Riley been

white, he would have been given the benefit of the doubt despite his minor errors on his application.

He lost that benefit due to his race. This is the essence of race discrimination. E.g., Washington v.

Milton Bradley Co., 340 F. Supp. 2d 69, 76 (D. Mass. 2004).

## B.    THE EVIDENCE ESTABLISHES A GENUINE DISPUTE OF MATERIAL FACT AS TO WHETHER MSP BELIEVED RILEY TO BE DISHONEST

MSP argues that even if Riley was not dishonest, the real issue is whether Lima believed he was, and it is incontrovertible that they did based on Riley's many "falsities" and other inaccuracies in his application. In fact, the evidence shows that Lima and the Review Board knew that Riley was not untruthful.

### 1.    Both Lima and the Review Board Knew that Riley was Never Untruthful About His Nonexistent Reprimand

As discussed in §II, a jury could conclude that both Lima and the Review Board knew full well that Riley had <u>not</u> been untruthful about his reprimand. Lima admitted that he did not know that Riley had been reprimanded when he stated it as fact in his First Report. He covered up the fact that Riley had told him the truth at the outset and further covered up Riley's corroborating evidence, and he mischaracterized the evidence of the "reprimand" in his First Report. Once Lima had to acknowledge that there was no reprimand, Lima so informed Butler, and the Review Board discussed it when it met as an Appeal Board.¶P88.

### 2.    Both Lima and the Review Board Knew that Riley Had Been Truthful About Being the Subject of the IA Investigation

As noted in §II, once it became clear that Riley had been truthful about never having been reprimanded, Lima shifted focus, attacking Riley for not earlier divulging that he had been a subject of the investigation (that did not lead to a reprimand). This shift alone is evidence of pretext. See Dominguez-Cruz v. Suttle Caribe, Inc., 202 F.3d 424, 427, 431-32 (1st Cir. 2000) (jury may infer pretext where employer provides different and inconsistent explanations for adverse action; this determination involves credibility assessments to be left for jury) (citing cases). Accord, Billings v. Town of Grafton, 515 F.3d 39, 56 (1st Cir. 2008); Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 56 (1st Cir. 2000); Pierce v. President & Fellows of Harvard Coll., 994 F. Supp. 2d 157, 163 (D. Mass. Jan. 13, 2014). Further, Lima's new tack was no less dubious. Riley provided

Lima with evidence corroborating his claim that at the time he completed his application, and until his May 24, 2011 meeting with his Chief, he had been unaware that he was a subject of the investigation. He provided corroborative information from his union, before and after the First Report and later to the Review Board. A jury could find that Lima's and the Review Board's decision to reject all the evidence Riley provided was made not in good faith, but out of fealty to a prejudgment about him.¶¶P40,P41,P46,P86,P89.

The entire pattern of MSP's behavior with respect to Riley's application would support a jury's conclusion of bias. This includes but is not limited to Lima's repeated misstatements in his First and Second Reports, his failure to interview references (and cover-up of his mishandling of it), his differential treatment of the minor <u>actual</u> faults in Riley's application as compared to similar faults among his white comparators, and the more favorable treatment overall that Riley's comparators received. It also includes evidence of the <u>ad hoc</u>, subjective, standards-less BI process itself which created a fertile environment for the exercise of bias.

### 3. <u>MSP's "Evidence" of Riley's Purported Mendacity is Unavailing</u>

MSP relies on certain other "facts" to demonstrate MSP's supposed belief in Riley's dishonesty, but even those that are relevant at most create disputes of fact.

#### (a) **"Intentionally Declined" to Correct His Application**

MSP argues (6-7, 20-21) that Riley "intentionally declined" to correct his application prior to his interview. This characterization is highly misleading. Riley was never informed that there was some vehicle to update his 150 +/- application responses before the interview, and at his first logical opportunity (the interview), he proactively did so. The few communications he had with Lima before the interview were focused on dealing with then-current topics, such as gathering the documents listed on Lima's "to-do" list and updating reference contact information. None of his communications with Lima looked backward to his application. ¶¶117,119,120,123,128Resp. A jury could conclude it was reasonable to wait until the interview, when the application would be a

focus, to discuss the topic, and that only a biased investigator would read something sinister into that decision. Accordingly, this "evidence" at most creates a dispute of fact.

### (b) Did Not Volunteer Fact of IA Investigation and Reacted "Defensively" When Discussing It

MSP claims that the "fact" that Riley only acknowledged that he had been the subject of the IA Investigation after Lima showed him the purported "reprimand" supports Lima's conclusion that Riley was untruthful. But that "fact" is disputed. As Riley has expressly made clear, as soon as the issue arose, he readily explained to Lima what he had learned at the May 24, 2011 meeting about his status as a subject. It is up to the jury to decide if Riley's account on this point is credible.¶P38-P39.

As for the "defensiveness" claim, this is premised entirely on Lima's claim that when confronted with a purported "reprimand," Riley immediately said: "that's not supposed to be in my file." MSP (and Lima) assert that this signified that Riley had been hoping that Lima would not discover it. But MSP misstates the evidence. According to Lima, Riley actually said: "[h]e told me that this letter should not be in his file because he was not disciplined or something to that effect." A jury would be entitled to believe that an unbiased interviewer, given the context and surrounding circumstances, would have taken that not as a confession of a failed cover-up, but as a straightforward expression of surprise that a discipline document would be in his file if he had not been disciplined. When Riley had reviewed his file in August 2011, he had confirmed that no reprimand was in his file, and would naturally tell that to Lima. Moreover, Riley's understanding was corroborated by the underlined actual document Lima called a reprimand, Lima I:150; Exh. 28, , as well as by multiple other individuals and documents provided to MSP. Nothing in Riley's statement, once accurately reproduced, supports MSP's interpretation.¶P36,P39,¶126Resp.

### (c) The Questionnaire

Piling on, MSP points to "multiple falsities" in Riley's questionnaire responses as evidence

of MSP's good faith belief in his untruthfulness. But there is no evidence that Riley's questionnaire answers were considered in any decisions about his candidacy: they were not mentioned by Lima or the Review Board as having any significance. In any event, there were no "multiple falsities." Riley answered "no" to a question about whether his name was in a "case report file" with a police department, appearing under the topic "Criminal History" in a section that applied equally to civilian and law enforcement workers. A jury could find that it was perfectly reasonable for Riley to answer "no" to that question, and to understand "case file" as referring, in context, to a criminal case file. A jury is not required to believe that MSP thought Riley dishonest because MSP has now, at the litigation stage, attached an implausible, idiosyncratic meaning to the term "case file". A jury could also believe that MSP's insistence on finding something sinister in Riley's answer is additional evidence of biased prejudgment. A jury could also find that Riley's affirmation that his application was correct to be routine and innocuous, given that he had completed his application four months previously, had not reviewed it since, and read the questionnaire's use of the term "application" to apply only to the questionnaire itself.¶P47,¶135 Resp.

### (d)  Reviewed His NBPD Personnel File

MSP also points to Riley's review of his personnel file shortly before his interview, asserting that Riley was hoping to prevent MSP from finding references to the IA investigation. (Memo 6, 21.) Even if this had occurred, it would be irrelevant, because MSP has pointed to no evidence that Riley's file review affected his rejection. More importantly, MSP's assertion is sheer speculation, since there is no evidence that this was Riley's purpose. Riley's review of his file shows conscientiousness and an understandable desire before an important job interview to ensure a positive and accurate presentation, not a plot to hide information from MSP. At a minimum, this is a dispute of material fact. Again, a jury could find that failing to consider the more plausible and innocuous explanation for Riley's actions is itself biased prejudgment.¶126Resp.

Riley does not dispute that he misunderstood the application question and accordingly only listed his high school of graduation on his application. What Riley disputes is that MSP would have regarded this error as anything other than innocuous if he had been white. A jury could conclude that MSP's total lack of concern that successful white candidate JH left <u>all</u> of his high school history off of his application demonstrates that it would not.¶¶P55,P77.

Riley also disputes MSP's claim that he hid high schools or hid the reasons he left. Rather, he disclosed all of them, and his reasons for leaving, during his interview, including that he left Bishop Stang High School for financial reasons and left Dartmouth High School due to residency. He filled in the missing information by hand, leaving off his few weeks at Dartmouth only because Lima told him, reasonably, that there was no reason to include a high school from which he received no grades or transcript. This dispute, like many others, turns on witness credibility and must go to the jury.¶¶P56,P57.

Moreover, there is ample evidence for a jury to conclude that Lima fabricated his account of the conversation. First, as Lima acknowledged in his First Report, it makes no sense for someone to claim that he left a private school because of residency, since it is common knowledge that such schools have no residency limits. Second, Lima described an implausible conversation with Bishop Stang employee Nancy Wood: no school staff member would divulge the kind of confidential student information Lima claimed she revealed by phone, and she flatly denies that she did. Third, Riley's records show, and Lima later confirmed, that there is no evidence to support Lima's claim that Riley was expelled from Bishop Stang for academic reasons.[11]  Fourth, Lima acknowledged in

---

[11] MSP makes much of Riley's sophomore year academic difficulties, but cannot show that Riley was forced to leave because of them. To the contrary, his transcript shows that he had every intention of staying: he spent his entire summer making up the four courses he needed to remain at the school. His unrebutted testimony is that he intended to address the other courses in his remaining time at the school. Nothing about these facts suggest someone who left Bishop Stang under "questionable circumstances" or that Riley would have an incentive to cover it up.

his Second Report that Riley told him during the interview that he left Bishop Stang for financial

reasons. Fifth, Lima claimed in his Second Report that Riley did not provide him with his NBHS

transcript, but NBHS's records and the First Report show that this claim is false. Sixth, both Lima

and MSP treat Riley's expulsion from Dartmouth High School as evidence of <u>Riley's</u> dishonesty,

even though he was 15 at the time and not making his own enrollment decisions.[12] Seventh, this

belittlement of Riley for behavior <u>not</u> engaged in by him as a young adolescent contrasts strikingly

with Lima's forgiving attitude toward <u>actual</u> adolescent misconduct by his white comparators, <u>See</u>

P77 (JH praised for honestly revealing prior marijuana use), further highlighting discriminatory

animus.¶¶P58,P60,P62-P63.

### (f)      Providence Police Application

As described in §II, MSP also points to Riley's failure to disclose his application to the

Providence Police Department in 1999 in response to Application Question 20A. Once again, this

allegation is irrelevant, because it was not considered when the Review Board made either of its

decisions to reject Riley's application. Moreover, a jury could conclude that an unbiased

decisionmaker would not have considered his nondisclosure as a sign of dishonesty, but merely as a

predictable response to a poorly worded question (as discussed above). As with so much else in this

case, MSP attempts to convert an innocuous and readily-explained event into monstrous

wrongdoing. A jury is not required to agree that MSP actually believed that.¶13Resp.,¶P92.

### C.      RILEY ESTABLISHES A GENUINE DISPUTE OF MATERIAL FACT REGARDING RACE DISCRIMINATION

Preceding sections have summarized the substantial available evidence of pretext and

discrimination. But there is additional evidence, including Lima's repeated disparaging comments

about Riley's neighborhood. MSP dismisses that evidence as benign and race neutral stray remarks,

---

[12] In the end, the circumstances of Riley's attendance at Dartmouth High School, his expulsion, and his disclosure of his attendance are immaterial for purposes of summary judgment, because MSP did not consider these issues in making the decision to disqualify Riley.¶P61,¶8Resp.

treating Lima's comments as only a response to Riley's then-fiancée's alarm at her door being unlocked. But MSP excludes much of the story. Lima denigrated Riley's racially diverse neighborhood not only to Riley's fiancée, but repetitively to Riley during his interview, characterizing it as unfit for a state trooper. ¶¶P32,P93. A jury could conclude that the fact that Lima saw fit to repeat the same comment to Riley's fiancée, and that he made the comment about a racially diverse neighborhood twice with no supporting evidence, demonstrates racial stereotyping by Lima. Such references to "good" or "bad" neighborhoods are racially coded language meaning "white" or "black," respectively. See, e.g., Boston Public Health Comm'n, Place Matters, 1, 12 (Spring 2013); Robin DiAngelo, White Fragility, 3 Int'l J. of Crit. Pedagogy 54, 58-59, 62 (2011); Tamerra Griffin, 14 Words That Carry A Coded Meaning For Black People (Feb. 10, 2015), https://www.buzzfeed.com/tamerragriffin/loaded-words-coded-meanings-black-people?utm term=.sc3YXDmbV#.uugwaNgWK (last viewed 12/1/17).

MSP argues that because three of the four applicants Lima disqualified were white, he could not have disqualified Riley because he was African-American. This argument misses the point. All of the evidence cited in this Memorandum demonstrates that had Riley been white, he would not have been disqualified, because the errors MSP insists on painting as evidence of dishonesty were not treated as such when white applicants made them, and white applicants were disqualified not for such errors, but for egregious faults that were entirely lacking in Riley's case.

D. THE DEFICIENCIES IN THE BI SYSTEM, AND THE RACIALLY BIASED RESULTS THEY PRODUCED, HELP DEMONSTRATE PRETEXT AND DISCRIMINATION

The Memo seeks to exclude all evidence about the flaws in the BI methods used by Lima, as well as about those methods' racially skewed results. However, that evidence is admissible and relevant to show pretext and discrimination. MSP first seeks to exclude evidence that its BI system had weaknesses that did not allow for a fair or accurate assessment of the traits it purported to measure. Investigators were not provided guidance on behaviors to look for, the information that

might be relevant to particular traits, information-gathering methods, record-keeping, or methods of structuring interviews. Little attention was paid to whether the BIs measured job-related matter. Methodology could vary significantly among investigators, resulting in different results for similar candidates. Investigators received minimal training and supervision and were overworked, many performing the investigations on top of their regular duties. Procedural rules were not necessarily followed, and the system did not include any features to avoid the effects of conscious or unconscious bias. ¶¶P9-P11,P15-P21.

Courts have long held that such evidence helps demonstrate pretext and discrimination in disparate treatment cases. First, if the BI system does not actually measure the characteristics that MSP claims, and/or does not do so consistently over time or across different investigators, then MSP's claim that it rejected Riley because of purported deficiencies revealed by his BI becomes simply a subjective judgment, a significant indicator of pretext. See, e.g., Garrett v. Hewlett-Packard Co., 305 F.3d 1210, 1218 (10th Cir.2002) (disparate treatment case; fact that evaluation system "disturbingly lacking in objective standards" demonstrates pretext); Bergene v. Salt River Project Agr. Imp. and Power Dist., 272 F.3d 1136, 1142 (9th Cir.2001) (subjective promotional criteria evidence of pretext); Goosby v. Johnson & Johnson Medical, Inc., 228 F.3d 313, 320 (3d Cir. 2000) (subjective evaluations more susceptible of abuse, more likely to mask pretext); Weldon v. Kraft, Inc., 896 F.2d 793, 798 (3d Cir. 1990) (same). See also Duckworth v. Mid-State Mach. Prods., 736 F. Supp. 2d 278, 289-91 (D. Me. 2010) (in hiring discrimination case, use of subjective standards to deny employment helps establish pretext and discrimination); Phair v. New Page Corp., 708 F. Supp. 2d 57 (D. Me. 2010) (same; termination case).

Second, an employee selection system's lack of indicia of objectivity in itself supports an inference of discrimination. See, e.g., Jauregui v. City of Glendale, 852 F.2d 1128, 1136 (9th Cir. 1988)(subjective criteria in selection decisions are "particularly susceptible to discriminatory abuse and should be closely scrutinized"); Pegues v. Mississippi State Employment Serv. of Miss.

Employment Sec. Com., 699 F.2d 760, 765 (5th Cir. 1983)("selection processes which rely on subjective judgments, despite the corralling by objective standards, provide the opportunity for the intentional discrimination cognizable in a disparate treatment action"); Royal v. Missouri Highway & Transp. Comm'n, 655 F.2d 159, 164 (8th Cir. 1981)(subjectivity can be evidence of pretext; "subjective promotion procedures are to be closely scrutinized because of their susceptibility to discriminatory abuse"); Banks v. City of Albany Fire Dep't, 953 F. Supp. 28 (N.D.N.Y. 1997) (subjective decision-making evidence of discrimination). Cf. Satz v. ITT Financial Corp., 619 F.2d 738, 746 (8th Cir. 1980) (disparate treatment may be proven where employment decisions made subjectively without definite standard, and decisions result in pattern clearly disfavoring minorities or females). See also Love v. TVA Bd. of Directors, No. 3, 06-00754, 2008 WL 906115, *6, *9, *18 (M.D. Tenn. Mar. 31, 2008)(expert testimony that employer did not insure interview questions' job-relatedness nor maintain objective scoring system, creating environment where discrimination "could easily occur", helped support inference of discrimination in disparate treatment case).

MSP argues (27-28) that any subjectivity in its methods is irrelevant to pretext, first claiming (without citation) that truthfulness is necessarily a subjective judgment not measurable by standardized methods. Of course, that is inaccurate as a factual matter. See, e.g., Pluskota v. Roadrunner Freight Sys., 524 N.W.2d 904, 908 (Wis.1994) (written "honesty tests" are in wide use by employers and are not prohibited by state law aimed at polygraph-like tests). MSP's argument also assumes away the central issues of whether Lima in fact was not legitimately engaged in assessing Riley's "truthfulness" (see Section II supra), and whether the flaws in the BI process facilitated Lima and the Review Board's misuse of that process.

Ignoring both the deficiencies in its process of assessing Riley's "truthfulness", and the law underscoring the importance of those deficiencies for showing pretext, MSP asserts that the subjectivity of its process is irrelevant. But the authorities it cites prove no such thing; in some cases they stand for the opposite proposition. See Sweeney v. Bd. of Trustees, 569 F.2d 169, 176, 176 n.4

23

(1978) (subjective evaluation system necessary for academic judgments, but courts must still review those judgments for discrimination; subjective criteria provide ready mechanism for discrimination that can be covertly concealed); Watson v. Fort Worth Bank & Tr., 487 U.S. 977, 999 (1988) (management jobs not amenable to standardized testing); Vitug v. Multistate Tax Comm., 88 F.3d 506 (7th Cir. 1996) (in disparate impact case, insufficient to show selection process arbitrary without showing actual disparate statistical impact on protected class); Byrnie v. Town of Cromwell Bd. of Educ., 243 F.3d 93 (2d Cir. 2001) (discrimination cannot be inferred from employer's clear, specific, honest evaluation even if partially subjective, but evaluation raises pretext issues sufficient to defeat summary judgment); Ray v. Ropes & Gray LLP, 799 F.3d 99, 114-15 (1st Cir. 2015) (use of subjective evaluation standard does not mask race discrimination in this case, although it could in other cases, because negative evaluation tied to specific cited instances of poor treatment of colleagues).

MSP also seeks to exclude evidence if its own statistics, which reveal gross racial disparities in the 2011 BI pass rates: 85% for whites, 57% for blacks. Deft's. Third Supp. Resp. to Plf.'s First Ints., 2-3. The difference is statistically significant. Rpt., 12-14. This stark gap is related to the the BI system's flaws: Dr. Wiesen notes that it "underscores the question of the fairness of the MSP BI system." Rpt. 14. Under applicable law, such statistics help prove that the particular negative treatment of the plaintiff is discriminatory, and that the reasons for it are pretextual, if bolstered (as here) by other facts demonstrating pretext. Ever since McMillan v. Mass. SPCA, 140 F.3d 288 (1st Cir. 1998), it has been the law of this Circuit that statistical data evidencing discriminatory patterns are admissible in disparate treatment cases "unless they are 'so incomplete as to be inadmissible as irrelevant.'" Id. at 303, quoting Bazemore v. Friday, 478 U.S. 385, 400 n.10 (1986). Such evidence may be considered by the jury to support a finding of discrimination, buttressing other facts that point to bias. See Currier v. United Techs. Corp., 393 F.3d 246, 250-53, 253 n.8 (1st Cir. 2004) (citing McMillan; statistical evidence along with evidence of pretext sufficient to support jury verdict; with

proper instructions jury unlikely to mistakenly consider statistics under a disparate impact theory);

Phair, 708 F.Supp. 2d at 68 (citing McMillan and Currier; statistical correlation between age and

chances of termination relevant in disparate treatment case); Martin v. Envelope Div. of Westvaco

Corp., 850 F. Supp. 83, 90-91 (D.Mass. 1994) (adverse impact of employer's actions on protected

class relevant in disparate treatment case, and is sufficient in itself to satisfy fourth element of prima

facie McDonnell Douglas framework, and to demonstrate pretext in combination with other

circumstantial evidence of discrimination); Seiface v. Areva, Inc., 2015 U.S. Dist. LEXIS 152356 at

*9-12 (D. Mass. 2015) (disproportionately negative treatment of protected class alone sufficient to

raise disputed issue of material fact on disparate treatment claim); Flebotte v. Dow Jones & Co., 2000

U.S. Dist. LEXIS 19875 (D. Mass. 2000) (citing McMillan; disproportionate impact of adverse

employment action on protected class relevant in disparate treatment claim). Cf. Love, 2008 U.S.

Dist. LEXIS 26853 at *15, 18-19, 49 (underrepresentation of minority employees in job category that

plaintiff sought to join, as well as MSP's failure to meet numerical hiring goals of its affirmative

action plan, relevant in disparate treatment hiring case because "significant underrepresentation of a

racial group in an employer's workforce, combined with independent circumstantial evidence, can

support an inference of discrimination" ).[13] Here as in these cases, statistics support the ample

circumstantial evidence of pretext and discrimination summarized in Section II.¶P22.

Virtually all the case law on which MSP relies as standing for the contrary proposition dates

from the 1980's/early 1990's, prior to McMillan, and accordingly is unpersuasive. Even so, it

provides little support for MSP's position. See Leblanc v. Great Am. Ins. Co., 6 F.3d 836, 848 (1st

Cir. 1993) (flawed data about general age composition of work force, mixing voluntary with

---

[13] The cases cited by MSP are not to the contrary. See Raytheon Co. v. Hernandez, 540 U.S. 44 (2003) (where employer relies on alleged legitimate, non-discriminatory policy to support decision not to rehire plaintiff, appropriate next step in analysis is whether that policy served as pretext for discrimination under disparate treatment analysis, not whether policy was job-related and consistent with business necessity under disparate impact analysis); Ray v. Ropes & Gray LLP, 799 F. 3d at 116 (statistic about failure of law firm to promote black associates historically is admissible but inadequate in itself to defeat summary judgment where statistic was unconnected to plaintiff's own treatment by decisionmakers in his case).

involuntary departures, and using small numbers, insufficient to defeat summary judgment; statistics were unconnected to termination decision, and case lacks other evidence of discrimination; statistical evidence in disparate treatment cases rarely suffice in and of itself to rebut employer's asserted legitimate reason); Cumpiano v. Banco Santander P.R., 902 F.2d 148, 156 (1st Cir. 1990) (factfinder need not be swayed by statistical evidence; statistical comparisons in disparate treatment case less crucial "although often relevant"); Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179 (1st Cir. 1989) (general evidence of workplace demographics, without expert interpretation, not connected to plaintiff's treatment and not probative.

In this case, the statistics offered are closely linked to the decision Riley challenges. They relate to the racial disparity in selecting for the same position for which he was rejected, for the same recruit class for which he was considered. Although investigators varied, all utilized the same BI system to which he was subjected, with the decision made by the same Review Board as in his case. In these circumstances, the racial disparity is important evidence in demonstrating the discriminatory nature of the selection process.¶P6.

MSP alleges that these statistics are valueless unless they are specifically linked to Lima. But it has never been the standard under the case law that only statistics applicable to a particular decisionmaker are significant to demonstrate pretext or discrimination. Furthermore, MSP's position ignores that Lima was acting within the same flawed system, allowing for the same exercise of conscious and unconscious biases, as other investigators who disproportionately rejected black applicants. As Dr. Wiesen's report explains, Lima's harshly unfair treatment of Riley, as well as Lima's relatively generous approach to white candidates he investigated, arose within and was facilitated by the deficiencies of the same system that produced a disproportionate black failure rate.

The statistical evidence and the evidence of the flawed system dovetail to create further links in the chain of evidence demonstrating discrimination and pretext in the handling of Riley's case.[14]¶P21.

### E. MSP IS LIABLE FOR DISCRIMINATION BASED ON ITS BLIND ACCEPTANCE OF LIMA'S DISCRIMINATORY ACTIONS

Although Lima was not himself a decisionmaker, MSP is liable if Lima exhibited animus, and the final decisionmaker (the Review Board) acted as a conduit for that animus, under the so-called "cat's paw" theory. See Donahue v. Clair Car Connection, Inc., 736 F. Supp.2d 294, 320-21 (D. Me. 2010) (discrimination where co-workers harbored age animus and influenced decisionmaker's layoff decision). See also Weeks v. Lower Pioneer Valley Educ. Collab., 2016 U.S. Dist. LEXIS 20467, at *34-35 (D. Mass. Feb. 19, 2016)(dispute of material fact regarding whether ultimate decisionmaker merely rubber-stamped biased termination decision by Human Resources director); Tuli v. Brigham & Women's Hosp., Inc., 566 F. Supp. 2d 32, 55-56 (D. Mass. 2008)(biased presentation by plaintiff's department chair played significant role in decisionmaker-committee's ultimate adverse decision), aff'd, 656 F.3d 33 (1st Cir. 2011).

Here, Riley meets that burden. See discussion in §§II(E), III(C) supra regarding evidence of Lima's bias. And as Riley's chief interface with MSP and the author of a report relied upon heavily by the decisionmaker, Lima's role is most analogous to that of the Human Resources staffer in Weeks, supra. That might have less significance had MSP "independently scrutinized Riley's materials" as MSP claims (30), but that is not the case.

In fact, Review Board chair Kevin Butler actively resisted all evidence not in lockstep with Lima's anti-Riley posture. Even as the evidence against Riley withered, Butler remained loyal to Lima's conclusions. Thus, Lima's Sept. 7, 2011 report relied on Riley having allegedly received a written reprimand, a point that had "concerned" Butler about Riley's application. Yet Butler was no

---

[14] The statistical evidence would be even more meaningful if it included data on the 2011 candidates, other than those investigated by Lima, who were excluded at the background investigation stage, information Riley sought in earlier discovery and presently seeks through his pending Motion under Rule 56(d) for Further Discovery Prior to Adjudication of Summary Judgment (Doc. 129).

less negative toward Riley after he learned that Riley had not received a reprimand. It having become evident that Lima's first report had erred in relying on the "written reprimand," Lima's subsequent report switched its emphasis to Riley's alleged deceptiveness about being a subject of an Internal Affairs investigation. Notably, Lima allegedly based his conclusion on a conversation with the New Bedford police chief, but the chief (per Lima's report) never indicated that Riley knew he was a target of the IA investigation. Butler was nevertheless confident that Riley knew, and was undeterred by the switch in Lima's reasoning, or by information he received questioning Lima's conclusion. Instead, he elected to discredit the information source—who was someone he knew and had previously worked with, had no negative experience with, and did not find dishonest. Butler 86-88. Nevertheless, Butler simply excluded the possibility that Riley's explanation was truthful, based on Riley's "whole pattern of deception"—for which his only source was Lima's two reports.¶¶P89-P91.

Similarly, Lima's first report claimed that Riley gave a false reason (residency requirement) for leaving Bishop Stang High School, and that Riley was actually forced to leave for academic performance, according to a high school official. Butler adopted Lima's point of view uncritically, insisting that Riley had admitted the essence of Lima's statements, basing his opinion only on Lima's report. Butler 102-04. In fact, as Lima admitted in his second report, Riley had not been required to leave Bishop Stang for academic reasons. Moreover, Butler reviewed a letter Riley submitted to the Review Board, in which Riley explained that he was not expelled for academic reasons (something he had previously explained to Lima and provided a school reference for corroboration. Butler did not question Lima's credibility although his story changed between his first and second reports. Instead, Butler persisted in assuming that Riley was lying, basing his opinion only on Lima's reports.¶¶P56,P89-P91.

Nor is there any evidence that the other two members of the Review Board examined Lima's BI report with an eye any more independent than Butler's. (did not recall performing any

independent investigation of facts or conclusions in BI reports or fact-checking investigator's conclusions); (no recollection regarding whether he reviewed any materials and if so, what). Both had little familiarity with BIs, which would have made evaluating their quality challenging: McGinn never performed a BI or received training on how to do so, and Christiansen never performed a BI nor had an opinion on what factors contribute to a good one.¶¶P13,P83.

The record certainly establishes a disputed issue of material fact as to whether Butler and the Review Board acted as conduits for Lima's animus, creating liability for MSP.[15] MSP mistakenly claims (at 29-30) that in order for liability to attach, Riley would have to show that the Review Board was negligent in disregarding signs of racial animus by Lima. This standard has no application outside harassment cases. MSP's reliance on Velázquez-Pérez v. Devs. Divers. Realty Corp., 753 F.3d 265 (1st Cir. 2014), is misplaced. Id. at 270 (analysis expressly limited to quid pro quo harassment cases). MSP also wrongly relies on the concurrence in Ameen v. Amphenol Printed Circuits, Inc., 777 F.3d 63, 74 (1st Cir. 2015), which proposed a negligence standard in that FMLA retaliation case that the majority rejected. The majority instead analyzed the claim using the "cat's paw" theory described above.

## IV.     CONCLUSION

For all the reasons described above, this Court should deny defendant's motion for summary judgment.

---

[15] The Providence Police Department issue is a red herring. Contrary to the Memo (30), Butler testified that he did not learn about any issue involving the Providence Police Department until he saw Lima's second report. That Sept . 28 report was not available at the time of the Review Board's decision to reject Riley either initially or on appeal. Although Butler received some information informally from Lima before the Sept. 26 appeal decision, the only information he received that was of consequence to the Board's decision related to the New Bedford IA investigation, not the Providence Police Department. To the extent that Butler's new Affidavit(¶¶P13,P83) now seeks to contradict his deposition testimony on this point, it cannot be considered. See, e.g., Morales v. A.C. Orssleff's EFTF, 246 F.3d 32, 35 (1st Cir. 2001)(affidavit contradicting prior deposition testimony may not be considered on summary judgment), citing Colantuoni v. Alfred Calcagni & Sons, 44 F.3d 1, 4-5 (1st Cir. 1994).¶¶P88,P92.

Respectfully submitted,

PLAINTIFF
Orlando Riley

By his attorneys,

/s/ Ellen J. Messing
Ellen J. Messing, BBO No. 343960
emessing@mrwemploymentlaw.com
James S. Weliky, BBO No. 631066
jweliky@mrwemploymentlaw.com
Gavriela M. Bogin-Farber, BBO No. 686081
gbogin-farber@mrwemploymentlaw.com
Messing, Rudavsky & Weliky, P.C.
50 Congress St., Suite 1000
Boston, MA 02109
(617) 742-0004

Dated: December 4, 2017

## CERTIFICATE OF SERVICE

I, Ellen J. Messing, hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants, on December 4, 2017.

/s/ Ellen J. Messing