ORLANDO RILEY

        Plaintiff,

        v.

MASSACHUSETTS STATE POLICE

        Defendant.

C.A. 1:15-cv-14137-DJC

**DEFENDANT MASSACHUSETTS STATE POLICE'S LOCAL RULE 56.1
STATEMENT OF UNDISPUTED MATERIAL FACTS, AND RESPONSES TO
PLAINTIFF'S STATEMENT OF MATERIAL FACTS IN DISPUTE**

Defendant Massachusetts State Police hereby submits, in consolidated format: (1) beginning on Page 1, Defendant's Statement of Material Facts, with Plaintiff's Responses; and (2) beginning on Page 47, Plaintiff's Statement of Material Facts in Dispute, with Defendant's Responses:

**I.**     **DEFENDANT'S STATEMENT OF MATERIAL FACTS, WITH PLAINTIFF'S RESPONSES**

1.     Plaintiff Orlando Riley ("Riley" or "Plaintiff") is an African-American resident of Massachusetts. Ex. 1 at ¶ 2.

**Undisputed.**

2.     Riley is currently employed as a police officer with the New Bedford Police Department ("NBPD"), a position that he has held since 2002. Ex. 1 at ¶ 2.

**Undisputed.**

**Riley's High Schools**

3. As a youth, Riley attended four different high schools: Muskegon High School (Michigan); Bishop Stang High School (Massachusetts); Dartmouth High School (Massachusetts); and New Bedford High School (Massachusetts). Ex. 43 at Response No. 26; Ex. 47 (Riley Dep.) at 14-21.

**Undisputed.**

4. Riley attended Bishop Stang High School as a sophomore (1993-1994). Bishop Stang High School is a private school located in Dartmouth, Massachusetts. Ex. 43 at Response No. 26; Ex. 47 (Riley Dep.) at 15-17.

**Undisputed.**

5. At Bishop Stang High School, Riley failed approximately 7 of his 11 courses. Riley made up for some, but not all, of these course failures through summer school and private tutoring. Ex. 2; Ex. 47 (Riley Dep.) at 41-44; Ex. 30 at MSP00075.

**Undisputed.**

6. Because of these course failures, Riley would not have been allowed to proceed on to his junior year at Bishop Stang High School without repeating the courses he had not yet made up. If he returned to Bishop Stang High School, Riley would have needed to repeat his sophomore year. Ex. 47 (Riley Dep.) at 41-44, 124-25; Ex. 30 at MSP00075

**Disputed**. Riley would have been permitted to return to Bishop Stang High School for his junior year, since he made up most of his classes he had failed, and could make up the remaining courses before graduation, one of which was a typing course. See Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Opposition"), at §IIIB(3)(e). See also Plaintiff's Statement of Material Facts in Dispute ("Plf. Stmt."), ¶¶P57, P59-P62.

7. Ultimately, Riley did not return to Bishop Stang High School. Ex. 43 at Response No. 26.

**Undisputed.**

8. For three weeks during the start of his junior year (1994-1995), Riley attended Dartmouth High School. Dartmouth High School is a public school located in Dartmouth, Massachusetts. Ex. 43 at Response No. 26; Ex. 47 (Riley Dep.) at 16-17.

**Disputed** only to the extent that Riley's tenure at Dartmouth High School is not a material fact because it was not a basis for defendant's rejection of Riley's application. Ex. 51, at 10-11; Ex. 57 at ln. 59.

9.  Dartmouth High School had a "residency requirement" mandating that its students live in Dartmouth, Massachusetts. At the time, however, Riley was not living in Dartmouth; he was living in New Bedford. Ex. 47 (Riley Dep.) at 16, 19.

**Disputed** only to the extent that Riley's tenure at Dartmouth High School is not a material fact because it was not a basis for defendant's rejection of Riley's application. Ex. 51, at 10-11; Ex. 57 at ln. 59.

10. Riley was enrolled in Dartmouth High School using a false residency address—not his own, but that of an aunt who lived in Dartmouth. Riley knew at the time that he was enrolled in Dartmouth High School without meeting the school's residency requirement. Ex. 43 at Response No. 26; Ex. 47 (Riley Dep.) at 16-20.

**Disputed** to the extent that Riley's enrollment at Dartmouth High School was not a basis for defendant's rejection of Riley's application. **Disputed** that Riley (age 15) made the decision to enroll in Dartmouth High School. See ¶P62.

11. A few weeks into his junior year, Dartmouth High School discovered that Riley had been enrolled using a false residency address. As a result, Riley was required to leave Dartmouth High School. Ex. 47 (Riley Dep.) at 16-22.

**Disputed** to the extent that Riley's enrollment at Dartmouth High School was not a basis for defendant's rejection of Riley's application. **Disputed** that Riley (age 15) made the decision to enroll in Dartmouth High School. See ¶P62.

12. Riley thereafter completed his junior and senior years at New Bedford High School in New Bedford, Massachusetts, graduating in May 1996. Ex. 43 at Response No. 26; Ex. 47 (Riley Dep.) at 15-16, 20-21.

**Undisputed**.

**Riley's Application to the Providence Police Department**

13. In 1999, Riley applied to become a police officer with the Providence Police Department. Ex. 43 at Response No. 4. He filled out an application, passed a physical exam, participated in an oral interview, and took a written exam. Ex. 47 (Riley Dep.) at 70-73.

**Disputed** only to the extent that Riley's application to the Providence Police Department is not a material fact because it is not a basis for defendant's rejection of Riley's application. Ex. 51, at 10-11; Ex. 57 at ln. 59.

14. Riley received a "low score" on the written examination for the Providence Police Department, and was informed "that [he] did not score strong enough to become a candidate for their Department." Ex. 29 at P0066.

**Disputed** only to the extent that Riley's application to the Providence Police Department is not a material fact because it is not a basis for defendant's rejection of Riley's application. Ex. 51, at 10-11; Ex. 57 at ln. 59.

15.    Because of his "low score" on the written examination, Riley never reached the point of having a background investigation performed by the Providence Police Department. Ex. 29 at P00066.

**Disputed** only to the extent that Riley's application to the Providence Police Department is not a material fact because it is not a basis for defendant's rejection of Riley's application. Ex. 51, at 10-11; Ex. 57 at ln. 59.

### Riley's Applications to the New Bedford Police Department

16.    In 1999 and again in 2001, Riley applied to become a police officer with the New Bedford Police Department ("NBPD"). Ex. 3; Ex. 4; Ex. 47 (Riley Dep.) at 27-36.

**Undisputed**.

17.    Question 26 on Riley's NBPD applications—both in 1999 and 2001—requested a list of educational institutions that Riley had attended. Next to "High School," Riley listed Muskegon High School, Bishop Stang High School, and New Bedford High School. In both applications, Riley omitted Dartmouth High School. Ex. 3; Ex. 4; Ex. 47 (Riley Dep.) at 29-31, 38.

**Disputed** only to the extent that Riley's application process regarding the New Bedford Police Department are not material facts because they were not a basis for defendant's rejection of Riley's application. Ex. 51, at 10-11; Ex. 57 at ln. 59.

18.    The NBPD conducted background investigations of Riley related to both his 1999 and 2001 applications. Ex. 47 (Riley Dep.) at 128.

**Disputed** only to the extent that Riley's application process regarding the New Bedford Police Department are not material facts because they were not a basis for defendant's rejection of Riley's application. Ex. 51, at 10-11; Ex. 57 at ln. 59.

19.    Riley's 1999 application to NBPD was unsuccessful, and Riley was not hired by NBPD at that time. Ex. 47 (Riley Dep.) at 27-38.

**Disputed** only to the extent that Riley's application process regarding the New Bedford Police Department are not material facts because they were not a basis for defendant's rejection of Riley's application. Ex. 51, at 10-11; Ex. 57 at ln. 59.

20.    Riley's 2001 application to NBPD was successful, and Riley became a NBPD police officer in 2002. Ex. 1 at ¶ 2; Ex. 47 (Riley Dep.) at 35-36, 53-56.

**Undisputed.**

**Riley's Application to the Rhode Island State Police**

21.     In 2003, Riley applied to become a State Trooper with the Rhode Island State Police ("RISP").  Ex. 43 at Response No. 4.

**Undisputed.**

22.     Section II on Riley's RISP application asked, "Have you ever submitted an application with any other law enforcement agency in the U.S.?  If yes, indicate the agency(s) and the date(s) of the application(s)."  In response, Riley listed the New Bedford Police Department, but did not list that he had applied to the Providence Police Department in 1999.  Ex. 5 at RISP0042; Ex. 47 (Riley Dep.) at 77-80.

**Disputed** only to the extent that the contents of and process regarding Riley's 2003 application to the RISP is not a material fact because it is not a basis for defendant's rejection of Riley's application and the fact of Riley's unsuccessful application did not make a difference to the Review Board's decision regarding Riley's MSP application.  Ex. 51, at 10-11; Ex. 57 at ln. 59; ¶186.

23.     Section III on Riley's RISP application also asked for Riley to list his "High School(s)."  In response, Riley listed that he attended New Bedford High School, but did not list the other three high schools he attended.  Ex. 5 at RISP0046; Ex. 47 (Riley Dep.) at 80-83.

**Disputed** only to the extent that the contents of and process regarding Riley's 2003 application to the RISP is not a material fact because it is not a basis for defendant's rejection of Riley's application and the fact of Riley's unsuccessful application did not make a difference to the Review Board's decision regarding Riley's MSP application.  Ex. 51, at 10-11; Ex. 57 at ln. 59; ¶186.
Response to ¶22.

24.     In April 2004, Riley sat for an interview with a background investigator assigned by RISP.  Ex. 6 at RISP0005, RISP00012.

**Disputed** only to the extent that the contents of and process regarding Riley's 2003 application to the RISP is not a material fact because it is not a basis for defendant's rejection of Riley's application and the fact of Riley's unsuccessful application did not make a difference to the Review Board's decision regarding Riley's MSP application.  Ex. 51, at 10-11; Ex. 57 at ln. 59; ¶186.
Response to ¶22.

25.     The RISP background investigator subsequently completed a background investigation report concluding that Riley was "Not Recommended" for continuing in the RISP selection process.  Ex. 6 at RISP0004-5.

**Undisputed**.

26.    The RISP background investigator wrote that his decision to not recommend Riley "[was] based on [Riley's] lack of attention to detail, his lackadaisical attitude and his prior work performance as a New Bedford Police Officer. Other factors that were considered include [Riley's] unsatisfactory credit history, as well as his poor performance in the Massachusetts Municipal Police Academy." Ex. 6 at RISP0005.

**Disputed** only to the extent that the contents of and process regarding Riley's 2003 application to the RISP is not a material fact because it is not a basis for defendant's rejection of Riley's application and the fact of Riley's unsuccessful application did not make a difference to the Review Board's decision regarding Riley's MSP application. Ex. 51, at 10-11; Ex. 57 at ln. 59; ¶186.

27.    With respect to his conclusion that Riley "lack[ed] . . . attention to detail," the RISP background investigator explained that Riley had failed in his RISP written application to indicate that he had previously applied to the Providence Police Department, and that Riley had made multiple mistakes and omissions on his written application. Ex. 6 at RISP0005.

**Disputed.** Errors or omissions, including an omission of a reference to an application to the Providence Police Department in an application completed eight years prior to Riley's 2011 MSP application, have no tendency to prove or disprove any contested issue in this case because Riley's errors and omissions in his RISP application and omission of a reference to an application to the Providence Police Department were not a basis for defendant's rejection of Riley's application. Ex. 51, at 10-11; Ex. 57 at ln. 59. Further, <u>see</u> Response to ¶22.

28.    As a result of the background investigator's negative recommendation, Riley was not selected to proceed further in the RISP hiring process and was not hired by RISP. Ex. 47 (Riley Dep.) at 99-104; Ex. 30 at MSP00076.

**Undisputed.**

**<u>The Soares Investigation</u>**

29.    Just after midnight on November 30, 2009, Riley was on duty as an NBPD police officer and present in the booking room of the NBPD police station. At around that time, an individual named John Soares was arrested by the NBPD on charges related to throwing explosives. Soares was brought to the NBPD police station for booking. Ex. 10 at NBPD000177-78, 185-86, 195.

**Undisputed.**

30.    While in NBPD's booking room, Soares sat in Riley's vicinity. Ex. 10 at NBPD000177-78, 185-86, 195.

**Disputed** as misleading. Riley was responsible for his own prisoner, and Soares was under the charge of another officer. See Response to ¶31.

31.     While in NBPD's booking room, Soares wriggled out of his handcuffs, stood up, and attempted to open a locked door that led outside. Riley noticed Soares standing next to the door and instructed him to sit down. Riley did not notice that Soares had wriggled out of his handcuffs. Ex. 10 at NBPD000179, 195-98, 261-62.

**Disputed.** This paragraph is misleading and incomplete. At the time referenced in ¶31, Riley was in the NBPD booking room with his own prisoner, completing his prisoner's booking process. This included working on the computer to put his charges together, taking his picture and offering him a phone call. He then left the booking room with his prisoner to take the prisoner's photograph. Because the prisoner transport officer was with Riley and his prisoner in the photograph room, Riley briefly checked on Soares in the booking room, at which time he observed that Soares had stood up and was by a locked door that led to the sallyport, which in turn led outside. The locked door needed a passcode to unlock. Soares's hands were behind his back, so Riley did not observe that he had escaped his handcuffs. Riley instructed him to sit back on the bench and Soares complied. Ex. 47 (Riley Dep.) at 162-169.

32.     At around 12:37 A.M. that night, Riley and another officer began escorting Soares and a second prisoner outside to an awaiting transport van. When the group of four got outside the building, Soares took off running on foot. Riley and others searched for Soares but were not able to find him. Ex. 10 at NBPD000179-80, 185-86; Ex. 7.

**Disputed** as misleading. Riley was escorting his own prisoner and a second officer was responsible for Soares. See Response to ¶31.

33.     Soares was eventually apprehended two days later and over forty miles away in East Greenwich, Rhode Island. Ex. 7.

**Disputed** only to the extent that the date and place of Soares's apprehension are not material facts.

34.     In or around December 2009, NBPD Deputy Chief David Provencher commenced a misconduct investigation against Riley by filing a complaint alleging that Riley had violated the rules and regulations of NBPD in connection with the Soares escape. The complaint was assigned to NBPD Sgt. Steven D. Blackburn for an internal investigation. Ex. 8; Ex. 9; Ex. 19; Ex. 10 at NBPD000177.

**Disputed** as incomplete and misleading in that the investigation was not exclusively or primarily focused on Riley. Ex. 10 at NBPD000200, 262-63.

35.     On January 5, 2010, Sgt. Blackburn sent a notice of interview to Riley, stating: "As you know I have been assigned a case involving the escape of an arrestee named John Soares from police custody during the early morning hours of November 30, 2009.

My case number is 1478.  The complainant is Deputy Chief David Provencher.  I have scheduled you for an interview on Tuesday January 26, 2010 at 7:00 a.m. in the New Bedford Police Department's Division of Professional Standards Office."  Ex. 8.

**Disputed** as incomplete and misleading.  Nothing in the notice stated that Riley was a subject of the referenced investigation.  Ex. 47 (Riley Dep.) at 189; Ex. 8.

36.    Riley sat for the interview with Sgt. Blackburn on January 26, 2010.  At the interview, Riley was accompanied by an attorney as well as the Chief Shop Steward of his union.  Ex. 10 at NBPD000184.

**Disputed** as incomplete and misleading.  Riley was not informed at this interview that he was a subject of the Soares investigation.  Ex. 8; Riley 188-189. Ex. 42 at Response No. 20; Ex. 47 (Riley Dep.) at 203, 208; Ex. 13; Supp. Exs. 84, 85, 86.

37.    Before starting the January 26, 2010 interview, Riley signed a "PSU Form 3" stating: "You are hereby being ordered in accordance with Rule #516.4 to . . . provide information you may have regarding a complaint filed by Deputy Chief David Provencher.  This complaint is numbered #1478 and the complainant alleges Violation of Department Rules & Regulations and Neglect of Duty in connection with the escape of John Soares . . . ."  Ex. 9.

**Disputed** as incomplete and misleading.  Nothing in the notice stated that Riley was a subject of the referenced investigation.  NBPD officers are asked to sign Form 3's for all interviews, even if they are the complaining party.  Ex. 36, at P00782-83; Ex. 9.  See also Plf. Stmt. ¶P45.

38.    In Provencher's view, the PSU Form 3 was intended to convey to Riley that he was a subject of the investigation.  Ex. 35; Ex. 36 at P00783-84; Ex. 47 (Riley Dep.) at 394-95.

**Disputed.**  Defendant has proffered no admissible evidence of Provencher's "view," but only evidence of an out of cour statement by Provencher, offered for its truth (of what Form 3 means).  As such it is inadmissible hearsay.  Fed. R. Evid. 801 et seq.  Second, Provencher is not competent to testify to the "intent" of Form 3, which speaks for itself.

39.    Following the interview, Sgt. Blackburn issued an investigative report "sustain[ing]" the complaint against Riley, and finding that Riley violated NBPD rules and regulations pertaining to neglect of duty.  Ex. 10 at NBPD000198-200, 261-62.

**Undisputed.**

40.    Sgt. Blackburn concluded in his investigative report that it was "apparent that [Riley] paid little attention to Mr. Soares until the very end of their time together," and "that the only reason . . . Officer Orlando Riley [was] not killed or seriously injured that night was because Mr. John Soares chose not to."  Ex. 10 at NBPD000197-98.

**Undisputed.**

41. On June 18, 2010, NBPD Deputy Chief David Provencher wrote a memorandum to NBPD Chief Ronald Teachman recommending that Riley receive a written reprimand due to the sustained finding that Riley had violated NBPD's rules and regulations (hereinafter, the "June 18, 2010 Memorandum"). Ex. 13.

**Undisputed.**

42. NBPD Chief Ronald Teachman did not act upon the recommendation that Riley receive a written reprimand. Teachman eventually retired in April or May 2011, still without having acted upon the recommendation in the June 18, 2010 Memorandum. Upon Teachman's retirement, Deputy Chief David Provencher became Chief of the NBPD. Ex. 46 at 34-36, 53[1]; Ex. 13; Ex. 68; Ex. 69.

**Undisputed.**

43. On May 24, 2011, Provencher (then in his new position as Chief) met in person with Riley to discuss the Soares investigation. Provencher told Riley that he was being issued a verbal warning and that the Soares investigation would be closed. Ex. 29; Ex. 46 at 34-36; Ex. 13.

**Disputed** as incomplete and misleading. Provencher also met with a union representative and agreed that Riley and the other officers involved, one of whom had been slated for harsher punishment than Riley, would not be disciplined. Provencher told Riley that there was no discipline involved and that nothing would be placed in his file. See Plf. Stmt. ¶P38; Ex. 13.

44. Provencher then made the following handwritten annotation on the June 18, 2010 Memorandum: "OFFICERS M/WITH CHIEF & UNION – DISCUSSED & RESOLVED 5/24/11 FILE NO FURTHER ACTION. DAP 5/24/11." Ex. 13.

**Undisputed.**

45. At the meeting of May 24, 2011, Riley asked Provencher "whether or not something would end up in [his] file" related to the Soares investigation. Riley asked the question because "[he] was a candidate in the process of being hired for the Massachusetts State Police." In response, Provencher told Riley "that nothing was going in [his] file." Ex. 32 at ¶ 3. See Ex. 46 at 33-35; Ex. 34 at MCAD00047.

**Undisputed.**

---

[1] In August 2013, Riley filed an internal affairs complaint with MSP against Lima and, as a result, several witnesses were subsequently interviewed by MSP internal investigators. Ex. 36. Thus, in addition to deposition transcripts, transcriptions of certain internal affairs interviews are also included in the record. See Exs. 46, 48, 51, 53.

46. On June 1, 2011, Riley received an email stating in part: "The investigation into Complaint #1478, which was filed by Deputy Chief David Provencher alleging violations of department rules and regulations resulting in a prisoner escape is now complete. This complaint has been classified as SUSTAINED as there was sufficient evidence obtained to support the allegation." Ex. 19.

**Disputed** as incomplete and misleading. The email also stated: "This complaint is being FILED with no disciplinary action taken." Ex. 19.

47. The final result of the Soares investigation was that Riley was found to have violated the following provisions of NBPD's Rules & Regulations Manual: "Failure to perform according to the department rules and regulations"; "Improperly performing or neglecting to perform the duties assigned"; "Neglect of Duty." Ex. 10 at NBPD000198-200, 261-62; Ex. 42 at Response No. 3.

**Undisputed.**

48. As a result of the sustained finding that Riley violated NBPD's rules and regulations, Riley received a verbal warning at the meeting of May 24, 2011, and documents related to the Soares investigation were placed into Riley's internal affairs file. Ex. 29; Ex. 32 at ¶ 5.

**Disputed.** The fact that Riley received a verbal warning at the meeting of May 24, 2011 is not a material fact because it is not a basis for defendant's rejection of Riley's application. Ex. 51, at 10-11; Ex. 57 at ln. 59. Moreover, this paragraph is incomplete and misleading. The verbal warning is an informal description and not a form of discipline. Ex. 19; Ex. 46 at 35.

49. Provencher indicated that the sustained allegations against Riley in the Soares investigation could be used in determining an appropriate response to any potential future disciplinary matters involving Riley. Ex. 69.

**Disputed.** The fact that Provencher "indicated" that the allegations against Riley could be used in determining future discipline is not a material fact because it is not a basis for defendant's rejection of Riley's application and it was not used in any such circumstances. Ex. 51, at 10-11; Ex. 57 at ln. 59.

50. Riley denies knowing that he was a subject of the Soares investigation at any point prior to May 24, 2011, the day he met with Provencher and received the verbal warning. Although Riley now acknowledges that he was a subject of the Soares investigation from its inception, Riley asserts that he was unaware of this fact until May 24, 2011. Ex. 1 at ¶ 18; Ex. 42 at Response Nos. 19-22; Ex. 9; Ex. 36; Ex. 46 at 34-36.

**Disputed** as misleading. Riley did not in fact know that he was a subject of the Soares investigation prior to May 24, 2011. See Plf. Stmt. ¶¶P39-P43, P45. Further, Riley's "acknowledgment" that he was a subject is not probative of any disputed issue in this case,

inasmuch as the only genuine dispute of material fact at issue is whether he was <u>aware</u> that he was a subject of the Soares investigation prior to May 24, 2011, and there is substantial evidence of record that he was not. <u>Id</u>.

51.  Riley asserts that he was never expressly told until May 24, 2011 that he was a subject of the Soares investigation; that he assumed at his January 26, 2010 interview that he was only a witness to the investigation; and that the "PSU Form 3" he signed at the interview did not expressly inform him that he was a subject of the investigation. Ex. 35; Ex. 46 at 29-33; Ex. 47 (Riley Dep.) at 189-95.

**Disputed** in part. Riley had no reason to believe he was a subject of the investigation until May 24, 2011. The Form 3 was not informative on the subject. <u>See</u> Plf. Stmt. ¶¶P39-P43, P45.

52.  Riley admits that starting on May 24, 2011 he understood that he had been a subject of the Soares investigation.   Ex. 1 at ¶ 18; Ex. 42 at Response Nos. 21-22; Ex. 47 (Riley Dep.) at 202-03.

**Undisputed** that Riley learned on May 24, 2011 that he had been a subject of the Soares Investigation.

53.  Following the meeting of May 24, 2011, Riley "started thinking to [himself]" about how he would explain the Soares investigation to his MSP background investigator. Riley started thinking about this because the Soares investigation was "the one thing in [his] ten-year career that's somewhat of a blemish" because of "this sustained complaint." Ex. 46 at 34-36.

**Undisputed.**

54.  Provencher passed away in December 2015 and so was not deposed in this case. However, Provencher did testify before the Massachusetts Commission Against Discrimination. Ex. 35; Ex. 36 at P00783-84; Ex. 68.

**Disputed** only to the extent that the fact that Provencher passed away in December 2015, was not deposed, or testified at the Massachusetts Commission Against Discrimination are not material facts, as they are not probative of any disputed issue in this case.  Moreover, Provencher did not "testify" at the MCAD.

### The Stallings Investigation

55.  During 2006, two private citizens named Shayne Stallings and Tina Marie Pena filed a complaint with NBPD against Riley and another officer alleging that the two officers engaged in misconduct in the course of an arrest of Stallings.  The case was assigned within NBPD for an internal investigation (hereinafter, the "Stallings investigation"). Ex. 11; Ex. 43 at Response No. 23; Ex. 47 (Riley Dep.) at 236-40.

**Disputed** on the basis that the fact that Riley was a subject of a complaint in 2006 is not a material fact because it is not a basis for defendant's rejection of Riley's application. Ex. 51, at 10-11; Ex. 57 at ln. 59. Further, this paragraph is incomplete. The complaint made by Stallings and Pena alleged misconduct at 48 Nelson Street in New Bedford. See Plf. Stmt., ¶P46.

56. Riley was a subject of the Stallings investigation. Ex. 47 (Riley Dep.) at 237-40.

**Disputed** on the basis that the fact that Riley was a subject of the Stallings Investigation is not a material fact because it is not a basis for defendant's rejection of Riley's application. Ex. 51, at 10-11; Ex. 57 at ln. 59. Further, this paragraph is incomplete and misleading. Riley was not informed at any time that he was a subject of the Stallings investigation, and believed only that he was a witness given the grave misbehavior he had witnesses. Ex. 47 (Riley Dep.) at 244; Plf. Stmt. ¶P46.

57. During 2007, Riley was interviewed by an NBPD internal affairs investigator as part of the Stallings Investigation. Before this interview, Riley was notified in writing that criminal proceedings could be instituted against him based on evidence obtained from other sources. Ex. 47 (Riley Dep.) at 239-45.

**Disputed** on the basis that the fact that Riley was a subject of the Stallings Investigation is not a material fact because it is not a basis for defendant's rejection of Riley's application. Ex. 51, at 10-11; Ex. 57 at ln. 59. Further, this paragraph is incomplete and misleading. Riley was not informed at any time that he was a subject of the Stallings investigation, and believed only that he was a witness given the grave misbehavior he had witnesses. Ex. 47 (Riley Dep.) at 244; Plf. Stmt. ¶P46. See Response to ¶56.

58. On May 10, 2010, Riley received an email stating that the "investigation into the complaint filed against you in September of 2006 . . . has been completed. There was inadequate or insufficient evidence to either prove or disprove the complaint, therefore, the case is classified as Not Sustained." Ex. 12. See Ex. 47 (Riley Dep.) at 237-58.

**Disputed** on the basis that the fact that Riley was a subject of the Stallings Investigation and the fact of its findings are not material facts because they are not bases for defendant's rejection of Riley's application. Ex. 51, at 10-11; Ex. 57 at ln. 59. Further, this paragraph is incomplete and misleading. Riley was not informed in this email or at any other time that he was a subject of the Stallings investigation – only that he was a witness. Plf. Stmt. ¶46.

**MSP's Application and Hiring Process**

59. The application and hiring process for MSP's 80th Recruit Training Troop ("RTT") was a multi-phase process that proceeded over the course of several months in 2011. Ex. 45 at ¶ 2.

**Undisputed.**

60.     In the first phase of the process, individuals interested in becoming a Trooper were required to take a written Police Officer Examination ("Written Examination") administered by the Commonwealth's Human Resources Division ("HRD"). Ex. 45 at ¶ 3.

**Undisputed.**

61.     Individuals taking the Written Examination could attain a maximum score of 102 points. 100 raw points could be earned on the Written Examination. Qualifying military veterans who passed the Written Examination could have 2 points added to their raw score. Ex. 45 at ¶ 4.

**Undisputed.**

62.     In early 2011, MSP began the hiring process for the 80th RTT by compiling eligibility lists of individuals who had attained a final score of no lower than 98 points on the Written Examination, or who were otherwise subject to statutory preference. Ex. 45 at ¶ 5.

**Undisputed.**

63.     MSP thereafter sent letters to eligible individuals advising them that MSP was "beginning its preliminary screening process in anticipation of a future State Police Academy Class" and that, if interested in competing, the individual should: (a) return to MSP a "status form" indicating their interest in competing; and (b) complete MSP's written "Application and Personal History Statement" (hereinafter, "Application"). Ex. 15. *See* Ex. 45 at ¶ 6.

**Undisputed.**

64.     In total, MSP invited 1,394 individuals to compete for the 80th RTT. Approximately 250 of these 1,394 individuals had final scores on the Written Examination of 100, 101, or 102. Ex. 45 at ¶ 6.

**Undisputed.**

65.     684 individuals accepted the invitation to compete by returning the "status form." Ex. 45 at ¶¶ 6-7.

**Undisputed.**

66.     The 684 individuals who accepted the invitation to compete were then provided with a "conditional offer of employment" by MSP. The "conditional offer" advised that the "conditional offer [was] strictly contingent upon" available funding, available class space, sufficiently high scores, and the applicant's successful completion of all phases of MSP's selection process. Ex. 16. *See* Ex. 45 at ¶ 7.

**Undisputed.**

67.   Candidates who received the "conditional offer of employment" then faced five further phases in the hiring process: (1) an oral interview; (2) a physical fitness screening; (3) a psychological screening; (4) a medical screening; and (5) a background investigation. Ex. 16; Ex. 45 at ¶ 8.

**Undisputed.**

68.   Candidates who failed one or more of the physical fitness, psychological screening, medical screening, or background investigation phases would be disqualified from the process. Ex. 45 at ¶ 9.

**Undisputed**.

69.   Ultimately, 290 candidates successfully completed all phases of the process, and received appointments to the 80th RTT and invitations to the State Police Academy. 250 of those candidates in fact reported to the State Police Academy in October 2011. 208 of those candidates ultimately graduated from the State Police Academy and became Massachusetts State Troopers. Ex. 45 at ¶ 10.

**Undisputed.**

## MSP's Background Investigation Process

70.   For the 80th RTT, the background investigation phase of MSP's hiring process was organized and administered by MSP's Certification Unit. Ex. 49 (Lima Dep.) at 68-69; Ex. 52 (Butler Dep.) at 23-24.

**Undisputed.**

71.   Background investigations were conducted by individual MSP Troopers, each of whom was assigned 5-10 candidates. Ex. 53 at 3-6; Ex. 54 (Smith Dep.) at 28-31; Ex. 52 (Butler Dep.) at 35-36, 45-46.

**Disputed** as incomplete. Some background investigations were conducted by full-time Certification Unit staff. Ex. 54 (Smith Dep.) at 29; Ex. 52 (Butler Dep.) at 35-36. Many background investigators, including Lima, were assigned background investigations in addition to their regular duties, and were expected to complete the investigation responsibilities while performing those regular job duties. The only criteria used to determine whether an individual MSP Trooper outside the Certification Unit would be assigned background investigations were his or her employment as an investigator in a detective unit or District Attorney's office and availability. Plf. Stmt. ¶P15.

72. The background investigator's role was as an "investigator[] a "fact-gather[er]." Supp. Ex. 71 (Flynn Dep.) at 34, 44-47. *See* Ex. 48 at 5-8; Ex. 49 (Lima Dep.) at 45, 62-63; Supp. Ex. 70 (Smith Dep.) at 61-64, 74-75.

**Disputed.** Investigators, including Lima, were also expected to, and did, offer subjective, unsubstantiated evaluative opinions about information discovered during their investigation and the positives and negatives of candidates they investigated. Supp. Ex. 75, at 17-19, 21; Ex. 27, at MSP 1895, MSP 1899-1900; Ex. 30; Ex. 59 at MSP 4641; Ex. 64 at MSP 3660; Supp. Ex. 94 at MSP 4232; Ex. 61, at MSP 3367

73. Background investigators were required to collect documentation related to the candidate; verify the information on a candidate's Application; provide the candidate with a "Questionnaire" document and verify the information provided by the candidate in response; perform criminal background and driver's history checks; conduct a neighborhood check; contact references; review the candidate's credit history; conduct an in-person interview with the candidate; and, ultimately, complete a written background investigation report. Ex. 48 at 5-10; Ex. 49 (Lima Dep.) at 46-49, 56-62; Supp. Ex. 71 (Flynn Dep.) at 44-50.

**Undisputed.**

74. The written background investigation report was completed on a form template. Supp. Ex. 70 (Smith Dep.) at 50-51.

**Disputed.** Background investigators also report information regarding their background investigations in memorandum form that does not conform to any template. Exh. 29.

75. The background investigator was not responsible for rendering a judgment on whether a candidate had passed or failed the background investigation. Supp. Ex. 71 (Flynn Dep.) at 34-35, 44-47; Ex. 49 (Lima Dep.) at 45, 62-63; Ex. 52 (Butler Dep.) at 21-23, 26-27; Supp. Ex. 70 (Smith Dep.) at 61-64, 74-75.

**Disputed.** Investigators, including Lima, were also expected to, and did, offer subjective, unsubstantiated evaluative opinions about information discovered during their investigation and the positives and negatives of candidates they investigated. These conclusions were relied upon by the Review Board. Moreover, the background investigator was the chief source of information considered by the Review Board relative to a candidate's application. The Review Board did no independent investigation or fact checking of the background investigator's assertions in his report. See ¶72 Response; Plf. Stmt. ¶P83.

76. Instead, the function of the background investigator was to collect information for use by MSP's Background Review Board ("Review Board"), which bore the responsibility for deciding whether a candidate had passed or failed the background investigation. Ex. 50 at ¶ 2; Ex. 49 (Lima Dep.) at 45, 62-63; Ex. 52 (Butler Dep.) at 21-23, 26-27; Supp. Ex. 70 (Smith Dep.) at 61-64; Supp. Ex. 71 (Flynn Dep.) at 34-35, 46-47, 55-56.

**Undisputed**.

77. Once the background investigator's work was complete, the investigator's completed background investigation report and all the documentation collected by the background investigator would be transmitted to the Review Board. A candidate determined by the Review Board to have failed their background investigation would be disqualified from the hiring process. Ex. 52 (Butler Dep.) at 24-26, 35, 40-42, 57-58; Ex. 51 at 2-3; Ex. 50 at ¶ 2.

**Disputed**. This statement is not supported by the evidence. In Riley's case, members of the Review Board disagreed as to what information was provided to them. See Plf. Stmt. ¶P82.

78. The Review Board consisted of three high-ranking MSP officers who were appointed to the position. Major Kevin Butler, then the Deputy Commander of the Division of Standards and Training, served as the President of the Review Board and was present for every sitting of the Review Board. Ex. 52 (Butler Dep.) at 11-20, 27-32, 56-57; Ex. 50 at ¶ 4.

**Undisputed.**

79. If an appointed member of the Review Board was unavailable for a particular sitting of the Board, other MSP officers holding the rank of Captain or above would substitute in their place. Ex. 52 (Butler Dep.) at 27, 30-32.

**Undisputed.**

80. The three members of the Review Board each cast one vote, and decisions were made by a simple majority. Ex. 50 at ¶ 4.

**Undisputed.**

81. In deciding whether candidates passed or failed, the Review Board applied an internal set of guidelines known as the "Automatic and Discretionary Disqualifiers." Ex. 14; Ex. 50 at ¶ 3; Supp. Ex. 71 (Flynn Dep.) at 21-22, 29-31, 38, 51-52.

**Disputed** in part. While the guidelines were available to the Review Board, the Review Board authorized candidates who met the automatic disqualifiers and rejected those who did not. Supp. Ex. 107 (Christiansen Dep.) at 35. See also Ex. 52 (Butler Dep.) at 38.

82. In deciding whether candidates passed or failed, the Review Board also applied its own independent judgment and common sense on what made for candidates with good character, work ethic, and sound decision making skills. Ex. 50 at ¶ 3; Supp. Ex. 71 (Flynn Dep.) at 21-22, 29-31, 38, 51-52; Ex. 52 (Butler Dep.) at 37-38, 41-43; Ex. 14 at MSP00012.

**Disputed.** The Review Board had little information beyond that provided by the background investigator and did as the background investigator suggested. In Riley's case, the Review Board was heavily influenced by Lima's reasoning, even as it reportedly changed. See Plf. Stmt., at ¶¶P83, P89-P92.

83. The "Automatic and Discretionary Disqualifiers" guidelines specified that a candidate would be automatically disqualified—that is, that they would be automatically determined to have failed their background investigation—if they: (1) they "knowingly misrepresented or falsified information submitted on the Application and/or Personal History Statement, resumes or any other documents filed in conjunction with the hiring process for the Massachusetts State Police"; or (2) "knowingly made false statements to the background investigator." Ex. 14 at MSP0009-11. *See* Ex. 50 at ¶¶ 7-9.

**Undisputed**.

84. The guidelines further specified that a candidate could be disqualified as a discretionary matter: (1) if he or she "could be impeached in reference to his/her character for truthfulness"; or (2) based on "any other issues which would be relevant to a candidate's eligibility to enter the State Police Academy." Ex. 14 at MSP00012, 14.

**Undisputed**.

85. After the Review Board made a decision about a candidate, Butler would record the Board's determination on a spreadsheet which he maintained. Ex. 50 at ¶ 10; Sealed Ex. 57.

**Undisputed.**

86. If a candidate failed, Butler would record the most important reasons for the failure in the spreadsheet. Ex. 50 at ¶ 10.

**Disputed.** The spreadsheet, Ex. 57, reflected all of the reasons for the candidate's failure. Ex. 51, at 10-11.

87. If a candidate failed, Jack Flynn—then MSP's Chief Administrative Officer—would send a letter to the candidate advising them of the Review Board's decision. Ex. 28; Ex. 67; Ex. 52 (Butler Dep.) at 26-27.

**Undisputed**.

### Riley's Application to MSP

88. In April 2009, Riley sat for the Written Examination and achieved a raw score of 100. Ex. 1 at ¶¶ 9-10.

**Undisputed.**

89.     In February 2011, Riley received a letter from MSP inviting him to compete for the 80th RTT.  Riley returned his "status form" to indicate his interest in competing.  Ex. 1 at ¶ 11; Ex. 15.

**Undisputed.**

90.     On or around April 4, 2011, Riley received his "conditional offer of employment" from MSP.  Ex. 16; Ex. 1 at ¶ 12.

**Undisputed.**

91.     On or around May 2, 2011, Riley completed his Application to MSP, which he then submitted to MSP the next day.  Ex. 1 at ¶ 13; Ex. 17 (Riley's original application).

**Undisputed.**

92.     Riley typed his Application answers on a computer and signed by hand.  Ex. 47 (Riley Dep.) at 113-14; Ex. 17.

**Undisputed.**

93.     The Application contained a Signature page, which required Riley to certify as follows: "I have read each question asked of me and understand each question.  My statements on this form and any attachments to this form are true and correct to the best of my knowledge and belief and are made in good faith."  Riley signed and dated the Signature page.   Ex. 17 at MSP00096.

**Undisputed.**

94.     Along with the Application, Riley was also required to submit a notarized Agreement.  Paragraph 3 of the Agreement required Riley to certify as follows: "I understand that false or misleading information given herein or during interview(s) will result in my being disqualified from further consideration and/or terminated from employment with the Department of State Police."  Riley signed the Agreement in the presence of a notary on May 2, 2011, and submitted it along with his Application.  Ex. 18.

**Undisputed.**

95.     Riley agrees that accuracy and truthfulness are important parts of being a police officer.  Ex. 47 (Riley Dep.) at 411.

**Undisputed.** Riley's agreement, or not, regarding important parts of being a police officer is not a material fact, in that it is Lima's and defendant's motive and state of mind that are at issue in this case.

**<u>Riley's Answers on the Application</u>**

96.     Question No. 8 on the Application stated: "Provide information about schools you are attending or, have attended, beyond Junior High School, beginning with the most recent . . . and working backward." Space for description of four schools was provided on the Application along with a note to "use continuation space or additional pages if necessary." Ex. 17 at MSP00078.

**Undisputed.**

97.     In response to Question No. 8, Riley listed all of the colleges he ever attended. Ex. 17 at MSP00078; Ex. 47 (Riley Dep.) at 22-25.

**Undisputed.**

98.     In response to Question No. 8, Riley did not list all of the high schools he attended. Riley listed only one high school (New Bedford High School), leaving out three others (Muskegon High School, Bishop Stang High School, and Dartmouth High School). Ex. 17 at MSP00078; Ex. 47 (Riley Dep.) at 120-22.

**Disputed** only in that Riley's omission of some of the high schools he attended is not a material fact because it is not a basis for defendant's rejection of Riley's application. Ex. 51, at 10-11; Ex. 57 at ln. 59.

99.     Question No. 20.A. on the Application stated: "To the best of your knowledge, has the Commonwealth of Massachusetts, the United States Government or any other police or law enforcement agency ever investigated your background for purposes of employment," and then required the applicant to check a box for "YES" or "NO." Question No. 20 then continued, "If yes, list ALL of the departments you have applied to and the YEAR you applied." Ex. 17 at MSP00086 (capitalization in original).

**Undisputed.**

100.    In response to Question No. 20.A., Riley checked the box for "YES," but did not list all police departments he had ever applied to. Ex. 17 at MSP00086; Ex. 29.

**Disputed** only in that Riley's omission of all of the police departments he ever applied to is not a material fact, because it is not the basis for defendant's rejection of his application. Ex. 51, at 10-11; Ex. 57 at ln. 59. <u>See also</u> Plf. Stmt., ¶P92.

101.    Specifically, in response to Question No. 20.A., Riley listed that he had applied to the NBPD in 2001 and the Rhode Island State Police in 2004, but did not disclose his

unsuccessful application to the Providence Police Department in 1999.  Ex. 17 at MSP00086; Ex. 29.

**Disputed** only in that Riley's omission of all of the police departments he ever applied to is not a material fact, because it is not the basis for defendant's rejection of his application.  Ex. 51, at 10-11; Ex. 57 at ln. 59.  See also Plf. Stmt., ¶P92.

102.    In response to Question No. 20.A., Riley also did not disclose his unsuccessful application to NBPD in 1999.  Ex. 17 at MSP00086; Ex. 47 (Riley Dep.) at 27-38.

**Disputed** only in that Riley's omission of all of the police departments he ever applied to is not a material fact, because it is not the basis for defendant's rejection of his application.  Ex. 51, at 10-11; Ex. 57 at ln. 59.  See also Plf. Stmt., ¶P92.
See Response to ¶100.

103.    Question No. 20.E. on the Application stated: "If you are a current or former police officer . . . .  Have you ever been the subject of an internal investigation or citizens complaint," and then required the applicant to check a box for "YES" or "NO."  The Application further instructed that any "YES" answer should be "fully explain[ed]." Ex. 17 at MSP00087.

**Undisputed.**

104.    In response to Question No. 20.E., Riley checked the box for "NO."  Below his answer, Riley added: "I have never been the subject of an internal investigation within my police department.  The only time I was interviewed by my internal affairs unit was as a witness."  Ex. 17 at MSP00087.

**Undisputed.**

105.    Riley's answer to Question No. 20.E. was not accurate because Riley had been a subject of the Soares investigation.  Ex. 1 at ¶ 18; Ex. 42 at Response Nos. 13-14, 21-22; Ex. 25 at MSP000111 (reflecting Riley's later change to his answer to Question 20.E.).

**Disputed.**  Riley's answer to Question No. 20E was accurate to the extent he was aware at the time he completed and submitted his application on May 3, 2011.  He did not learn to the contrary until May 24, 2011. Plf. Stmt. ¶¶P39-P43, P45.

106.    Riley's statement that "[t]he only time [he] was interviewed by my internal affairs unit was as a witness" was not accurate because Riley had been a subject of the Soares investigation.  Ex. 1 at ¶ 18; Ex. 42 at Response Nos. 13-14, 21-22; Ex. 25 at MSP000111.

**Disputed.**  See Response to ¶105.

107.   Riley's answer and statement in response to Question 20.E. were also not accurate because Riley had been a subject of the Stallings investigation and had been interviewed as part of the Stallings investigation. *Supra* SMF ¶¶ 55-58 (and sources cited).

**Disputed** on the basis that the fact that Riley was a subject of the Stallings Investigation and the fact of its findings are not material facts because they are not bases for defendant's rejection of Riley's application. Ex. 51, at 10-11; Ex. 57 at ln. 59. Further, Riley was not informed at any time prior to his completion of his application that he was a subject of the Stallings investigation – only that he was a witness. Plf. Stmt., ¶P46.

### Lima is Assigned to Riley's Background Investigation, and Lima and Riley begin Communicating

108.   In or around early July 2011, Trooper Robert Lima was assigned to conduct Riley's background investigation. Ex. 48 at 8; Ex. 20.

**Undisputed.**

109.   Lima has been employed by MSP as a Trooper since 2006. Lima has never held a rank at MSP above the rank of Trooper. Ex. 49 (Lima Dep.) at 22-33.

**Undisputed.**

110.   During 2011, Lima's regular assignment within MSP was to the Bristol County District Attorney's Office as a homicide investigator. Ex. 49 (Lima Dep.) at 31, 38.

**Undisputed.**

111.   Lima, like other background investigators for the 80th RTT, was asked to conduct background investigations as a temporary, part-time assignment. Ex. 53 at 3-4; Ex. 49 (Lima Dep.) at Tr. 68-69; Ex. 52 (Butler Dep.) at Tr. 36.

**Disputed** as incomplete and misleading. Lima's assignment as a background investigator was in addition to his regular duties. See Response to ¶71.

112.   Major Kevin Butler—the President of the Review Board—considered Lima "one of the more effective background investigators" for MSP. Ex. 51 at 5-6; Ex. 50 at ¶ 1.

**Disputed.** Butler's opinion of Lima as an investigator has no probative value with respect to any contested issue in this case. Butler was not Lima's supervisor and did not assess his work. Ex. 49 (Lima Dep.) at 35; Supp. Ex. 93. He had never been trained in the conduct of background investigations; the last background investigation he had conducted had been performed 11 years previously, and not on behalf of the MSP. Plf. Stmt., ¶P13.

113.     Detective Lieutenant George Smith—the head of MSP's Certification Unit—
         considered Lima "based upon his work, to be an extremely thorough, hardworking
         investigator and very meticulous in all of his work," and described Lima's reports as
         "[e]xcellent in every way." Ex. 53 at 2-5, 19.

**Disputed.** Smith's opinion about Lima is not a material fact, as it has no probative value as to
any contested issue in this case. Smith did not provide input into the decision to reject Riley's
application or his request for reconsideration of that decision. Ex. 52 (Butler Dep.) at 24-25.
Further, even were Smith's opinion relevant, it has little probative value, inasmuch he has no
objective basis for evaluating Lima's skills as a background investigator. He has not had any
formal training in principles of employee selection or selection testing, has never designed
personnel selection programs, including background investigation programs, and has not trained
any others in how to design and/or conduct background investigations. Plf. Stmt., ¶P12.

114.     Lima is a member of the Massachusetts National Guard, holding the position of
         Deputy Inspector General. Lima is presently deployed to Guantanamo Bay in that
         role. Ex. 49 (Lima Dep.) at Tr. 17-22, 36-38.

**Disputed**. Lima's membership, rank or deployment in the National Guard is not a material fact,
as it has no relevance to any contested issue in this case.

115.     Lima is white. Ex. 1 at ¶ 14.

**Undisputed.**

116.     On July 7, 2011, Lima reached out to Riley by telephone to have an initial
         conversation. Lima told Riley during this call that "if [he] had any question about the
         material to contact him." Ex. 47 (Riley Dep.) at Tr. 317; Ex. 49 (Lima Dep.) at Tr.
         244.

**Undisputed.**

117.     Riley did not ask any questions on the July 7, 2011 call about how to update his
         application materials. Ex. 47 (Riley Dep.) at 317-20; Ex. 49 (Lima Dep.) at 244-45.

**Disputed** as incomplete and misleading. Riley had decided that he would wait to discuss the
Soares investigation with Lima in person at his background investigation interview. Ex. 47
(Riley Dep.) at 342. Nothing in the application form Riley completed set forth a process by
which errors discovered after its completion could be corrected, Ex. 17, and Riley was not
provided such instruction in any other written communication he received from the MSP. See,
e.g., Ex. 16; Ex. 20; Ex. 23. Nothing in any communication Riley received instructed him, or
suggested, that if he waited until his interview with the background investigator to make
corrections, this would be taken as evidence of untruthfulness. Id. Further, Lima provided no
indication during this conversation that there was any opportunity for Riley to correct his
application, that he was required to do so prior to his interview with Lima, or that Riley's

decision to discuss the issue regarding the Soares investigation at his interview would be taken as evidence of "untruthfulness." Ex. 47 (Riley Dep.) at 317; Ex. 49 (Lima Dep.) at 244.

118. Riley did not tell Lima on the July 7, 2011 call that he had learned that he was a subject of the Soares investigation, and that his answer to Application Question 20.E. therefore needed to be corrected. Ex. 47 (Riley Dep.) at 318-20; Ex. 49 (Lima Dep.) at 244-45.

**Disputed.** <u>See</u> Response to ¶117.

119. On July 8, 2011, Lima sent Riley an email providing the "Questionnaire" document to be completed by Riley, a "To Do" list for Riley (which instructed Riley to obtain certain documentation including, *inter alia*, "diploma(s)" and "sealed transcripts") and asking Riley to reach out with any questions. Ex. 20.

**Disputed** as misleading. The email did not instruct Riley that this was an opportunity, or that he was required, to take advantage of the communication to correct his application. Nor did the email suggest that if Riley did not take advantage of such an opportunity, it would be taken as evidence of untruthfulness. Ex. 20.

120. On July 20, 2011, Riley emailed Lima: "This email is to inform you that I have obtained all documentation that is required. My school transcripts should arrive to you via mail soon. If there is any further information that is needed please contact me." Ex. 21.

**Undisputed**. Further, there is no evidence that Lima responded to this email with an instruction to correct any errors in his application, and that if he did not do so, it would be taken as evidence of untruthfulness.

121. While Riley had requested transcripts from all of the colleges he ever attended, he had not requested transcripts from all of his high schools. Specifically, Riley had requested a transcript from New Bedford High School, but not from Muskegeon High School, Bishop Stang High School, or Dartmouth High School. Ex. 46 at 14-17, 61-62; Ex. 47 (Riley Dep.) at 339.

**Disputed** only that Riley's failure to request transcripts from all of his high schools is not a material fact because it is not the basis for defendant's rejection of his application. Ex. 51, at 10-11; Ex. 57 at ln. 59.

122. Riley did not indicate in his July 20, 2011 email that he had learned that he was a subject of the Soares investigation, and that his answer to Application Question 20.E. therefore needed to be corrected. Ex. 21; Ex. 49 (Lima Dep.) at 245.

**Disputed** as in complete and misleading for the reasons set forth in plaintiff's Response to ¶117.

123. On August 17, 2011, Riley emailed Lima: "There has been some changes to my references on my application," and then provided updated contact information for some of Riley's references. Ex. 22. Riley thought these references could help his candidacy with MSP. Ex. 47 (Riley Dep.) at 340-41.

**Undisputed.**

124. As of August 17, 2011—nearly three months after his May 24, 2011 meeting with Provencher—Riley undisputedly knew that he had been a subject of the Soares investigation. *Supra* SMF ¶¶ 50-52 (and sources cited).

**Undisputed.**

125. Riley did not indicate in his August 17, 2011 email that he needed to make any other changes to his Application. Riley did not indicate in his August 17, 2011 email that he had learned that he was a subject of the Soares investigation, and that his answer to Application Question 20.E. therefore needed to be changed and corrected. Ex. 22; Ex. 47 (Riley Dep.) at 340-43; Ex. 49 (Lima Dep.) at 245-46.

**Disputed** as incomplete and misleading. See Response to ¶117.

126. During August 2011, and around August 22, 2011, Riley personally went to view his NBPD personnel file. Riley did so because he wanted "to go over everything in [the] personnel file, any negatives that could be pointed out against you or anything like that." Riley was worried that MSP might consider the Soares investigation to be a "negative." Ex. 47 (Riley Dep.) at 343-51. *See* Ex. 32 at ¶ 4.

**Disputed.** Riley's review of his NBPD personnel file is not a material fact, because it is not a basis for defendant's rejection of his application. Ex. 57. Further, ¶126 is incomplete. When Riley reviewed his personnel file, he wished to confirm that no disciplinary information had been placed in it as he had been assured would be the case. Ex. 47 (Riley Dep.) at 343-51.

127. On August 22, 2011, Riley emailed Lima to provide the name of his RISP background investigator. Ex. 23.

**Undisputed.**

128. Riley did not indicate in his August 22, 2011 email that he had learned that he was a subject of the Soares investigation, and that his answer to Application Question 20.E. therefore needed to be corrected. Ex. 23.

**Disputed** as incomplete and misleading. See Response to ¶117.

**Riley's Answers on the Questionnaire**

129. At some point prior to the start of his interview on September 1, 2011, Riley completed the Questionnaire document that had been provided to him by Lima on July 8, 2011. Ex. 47 (Riley Dep.) at 320-324; Ex. 20.

**Undisputed.**

130. In general, the Questionnaire required candidates to answer questions about their motor vehicle history, employment history, military service, financial history, criminal history, education, and drug use. The Questionnaire also asked candidates if "everything [was] accurate and complete on [their] application." Ex. 24; Supp. Ex. 71 (Flynn Dep.) at 47-50.

**Undisputed.**

131. The first page of the Questionnaire stated: "The purpose of this questionnaire/interview is to get truthful answers. The fact that you tell the truth will receive more consideration for this position than any good impression you may try to make with untruthful answer." Riley signed his initials next to that statement. Ex. 24 at MSP000689.

**Disputed** only in that Riley's answers on the Questionnaire are not material facts, because they are not the basis for defendant's rejection of his application. Ex. 51, at 10-11; Ex. 57 at ln. 59.

132. The Questionnaire also required Riley to "certify that all statements made in this questionnaire/interview are true and complete. I understand that false, incomplete or misleading information given herein may be sufficient cause for disqualification from further consideration and/or termination from employment with the Department of State Police." Riley so certified by signing his initials next to that statement. Ex. 24 at MSP000689; Ex. 47 (Riley Dep.) at 324-25.

**Disputed** only in that Riley's answers on the Questionnaire are not material facts, because they are not the basis for defendant's rejection of his application. Ex. 51, at 10-11; Ex. 57 at ln. 59.

133. On the final page of the Questionnaire, Riley was asked "Is everything accurate and complete on you[r] application?" In response, Riley answered "Yes." Ex. 24 at MSP000693; Ex. 47 (Riley Dep.) at 330-31.

**Disputed** only in that Riley's answers on the Questionnaire are not material facts, because they are not the basis for defendant's rejection of his application. Ex. 51, at 10-11; Ex. 57 at ln. 59.

134. Riley's certification that "everything [was] accurate and complete on [his] application" was not accurate. At the time he completed the Questionnaire, Riley knew that he had been a subject of the Soares investigation, and that his answer to Question 20.E. on the Application was incorrect. Ex. 1 at ¶ 18; Ex. 42 at Response Nos. 13-14, 21-22; Ex. 52 (Butler Dep.) at 133-35. *See* SMF ¶¶ 50-52.

**Disputed** in that Riley's answers on the Questionnaire are not material facts, because they are not the basis for defendant's rejection of his application. Ex. 51, at 10-11; Ex. 57 at ln. 59. Further, Riley's certification was not knowingly inaccurate, Riley understood it to refer to the Questionnaire only. <u>See</u> Response to ¶136.

135. Riley testified at his deposition that he provided the answer of "Yes" on the final page of the Questionnaire because he interpreted the word "application" on the Questionnaire as referring to the Questionnaire, and not to his actual Application. Ex. 47 (Riley Dep.) at 330-35.

**Disputed** on the basis that Riley's answers on the Questionnaire are not material facts, because they are not the basis for defendant's rejection of his application. Ex. 51, at 10-11; Ex. 57 at ln. 59. Further, ¶135 is incomplete. Riley misinterpreted the word "application" to be referring to the Questionnaire because it did not seem reasonable to him that a questionnaire with hundreds of questions that he had just completed would be referring to an entirely different document that he had completed four months previously. Ex. 47 (Riley Dep.), at 333-335.

136. The Questionnaire is nowhere described on the document as an "application." Ex. 24.

**Disputed.** <u>See</u> Response to ¶135.

137. Riley himself had previously used the word "application" to refer to his written Application when providing Lima with the changes to his references. Ex. 22.

**Disputed.** <u>See</u> Response to ¶135.

138. On the third page of the Questionnaire, Riley was asked "Have you broken any company rule"? In response, Riley answered "No." Ex. 24 at MSP000691.

**Disputed** on the basis that Riley's answers on the Questionnaire are not material facts, because they are not the basis for defendant's rejection of his application. Ex. 51, at 10-11; Ex. 57 at ln. 59.

139. Riley's representation that he had not "broken any company rule" was not accurate. At the time he completed the Questionnaire, Riley knew that he had been found in violation of NBPD's rules and regulations in connection with the Soares investigation. Ex. 19; Ex. 42 at Response No. 22; *supra* SMF ¶¶ 46, 48-49 (and sources cited).

**Disputed** on the basis that Riley's answers on the Questionnaire are not material facts, because they are not the basis for defendant's rejection of his application. Ex. 51, at 10-11; Ex. 57 at ln. 59. Further, Riley had not broken any company rule. He understood that he had handled the situation appropriately. Ex. 47 (Riley Dep.), at 158-180.

140. On the fifth page of the Questionnaire, Riley was asked, "Is your name in a case report file with any police department or law enforcement agency that you are aware of?" In response, Riley answered "No." Ex. 24 at MSP000692.

**Disputed** only on the basis that Riley's answers on the Questionnaire are not material facts, because they are not the basis for defendant's rejection of his application. Ex. 51, at 10-11; Ex. 57 at ln. 59.

141. Riley's representation that his name was not in any "case report file with any police department" was not accurate. At the time he completed the Questionnaire, Riley knew that he had been found in violation of NBPD's rules and regulations in the Soares investigation, and that the complaint was "being FILED with no disciplinary action taken." Ex. 19. *See* Ex. 52 (Butler Dep.) at 134-36.

**Disputed.** Riley's answers on the Questionnaire are not material facts, because they are not the basis for defendant's rejection of his application. Ex. 51, at 10-11; Ex. 57 at ln. 59. Further, Riley's answer was accurate. The term "case report file" is not defined in the questionnaire, Ex. 24, and the question appears under the "Criminal History" section of the questionnaire. Riley therefore understood the term to mean a file regarding a criminal case investigation. Ex. 47 (Riley Dep.), at 328-330. Riley's answer is fully consistent with the questionnaire's characterization of the question.

### Riley's Interview with Lima

142. On September 1, 2011, Lima visited the NBPD where he reviewed Riley's personnel and internal affairs files pursuant to a written release signed by Riley. Ex. 48 at 32-34; Ex. 34 at MCAD00047.

**Undisputed.**

143. In reviewing Riley's internal affairs file, Lima discovered the June 18, 2010 Memorandum, with Provencher's further handwritten annotations from May 24, 2011. Lima was permitted to make a photocopy of the June 18, 2010 Memorandum, and he took that photocopy with him. Ex. 18; Ex. 48 at 33-35; Ex. 49 (Lima Dep.) at 110-13, 174; Ex. 13.

**Undisputed.**

144. Prior to reviewing Riley's internal affairs file, Lima had no knowledge of Riley's status as a subject of the Soares investigation. Ex. 48 at 33-35.

**Undisputed.**

145. Based on the June 18, 2010 Memorandum, Lima believed at the time that Riley had in fact received a written reprimand based on the results of the Soares investigation. Ex. 49 (Lima Dep.) at 146-54, 246-47; Ex. 27 at MSP00068, 71; Ex. 13.

**Disputed.** The plain language of the June 18, 2011 Memorandum states that it is a recommendation for a reprimand. Lima knew that the document was a recommendation for a reprimand and that it did not say that Riley had been reprimanded. Lima also knew that a recommendation for a reprimand is not the same as a reprimand, and he admits that he did not actually know whether Riley had been reprimanded or not until he spoke to Chief Provencher after the completion of his First Report of Investigation. ¶P36.

146. Later that same day, on September 1, 2011, Riley met with Lima for his in-person background investigation interview. The interview took place at MSP's Dartmouth State Police barracks and lasted approximately three hours. Ex. 47 (Riley Dep.) at 116, 352-53.

**Undisputed.**

147. Portions of the interview were dedicated to reviewing Riley's Application and correcting mistakes. Ex. 46 at 11-13, 19-28, 73; Ex. 47 (Riley Dep.) at 353-55; Ex. 48 at 23-27; Ex. 49 (Lima Dep.) at 118-25.

**Disputed.** Riley's claimed mistakes on his Application are not material facts, because they are not the basis for defendant's rejection of his application. Ex. 51, at 10-11; Ex. 57 at ln. 59.

Further disputed as an inaccurate, incomplete and misleading account of what occurred during Riley's interview. Lima was suspicious, hostile and condescending, spent excessive time repeating the same questions on the same subjects, including challenging Riley's answer that he did not gamble, denigrated Riley's neighborhood, insinuated that Riley forged documents, claimed he made mistakes that were not mistakes and repeatedly insisted over Riley's denials that Riley had been reprimanded. ¶¶P32.

148. Riley made multiple handwritten corrections to the Application, and initialed those corrections. In total, Riley made and initialed thirteen corrections to the Application. Ex. 25 (Riley's Application with handwritten changes). *See* Ex. 47 (Riley Dep.) at 116-32, 141-45; Ex. 48 at 13-14; Ex. 42 at Response No. 14.

**Disputed.** See Response to ¶147.

149. With respect to Riley's corrections, Riley had placed numerous answers in the wrong locations; indicated that he was no longer employed by the NBPD (he was); indicated that he had not been involved in a car accident in the past seven years (he had); indicated that he was not registered for Selective Service (he was); and indicated that he did not currently own a motor vehicle (he did). Ex. 25 (Riley's Application with handwritten changes).

**Disputed.** Riley's claimed mistakes on his Application are not material facts, because they are not the basis for defendant's rejection of his application. Ex. 51, at 10-11; Ex. 57 at ln. 59. The application form did not contain instruction, ¶P65, and the software used to create the form caused errors where information added in the correct location was placed by the software at an

incorrect location. ¶P66. Riley entered information for his car and it never registered in the document. Supp. Ex. 110 (Riley Aff.), ¶7. Riley did not indicate that he was no longer employed by the NBPD. Rather, when he completed his application at the beginning of May 2011, he indicated that he had been employed at the NBPD through April 2011, which was as of the current date. Ex. 17; Ex. 47 (Riley Dep.) at 117-18; Supp. Ex. 110 (Riley Aff.), ¶3. Riley listed the minor car accident with which he was involved, but did not think he needed to list it on the form twice. ¶P68. He did make a mistake answering the Selective Service question, but it was a common mistake. ¶P67.

150. With respect to the mistakes on his application, Riley stated to Lima, "Well, it is what it is," or words to that effect. Lima took Riley's statement to reflect an acceptance of mediocrity. Ex. 49 (Lima Dep.) at 203-05.

**Disputed.** Riley did not say this. ¶P79.

151. At no point in the interview did Riley affirmatively volunteer to Lima that he had learned that he had been a subject of the Soares investigation, and that his answer to Question 20.E. on the Application was therefore not accurate. Ex. 33 at P0937; Ex. 34 at MCAD00047; Ex. 27 at MSP00071; Ex. 48 at 33-38.

**Disputed.** Riley discussed the subject at the appropriate point in the conversation, when they had reached the topic of investigations and Riley offered that he had learned that he was a subject of the Soares Investigation on May 24, 2011, after he completed his application. ¶¶P38, P39.

152. According to Riley, Lima at some point asked, "[I]s there anything else about you in regards to internal affairs that you want to discuss?" At that point, Riley stated for the first time that he had learned on May 24, 2011 that he was a subject of the Soares investigation. Riley stated that he had previously believed that he was just a witness and that he had "assumed" the investigation "was concluded." Ex. 33 at P0937.

**Undisputed.**.

153. According to Riley, Lima then asked, "How come you did not call me and tell me about this?" Riley replied, "because there was no discipline involved and I would rather discuss this issue with you during my interview so I could tell you in detail about the incident and there wouldn't be any misunderstandings." Ex. 33 at P0937.

**Undisputed**.

154. In fact, Riley had been issued a verbal warning by Provencher for his conduct related to the Soares investigation. Additionally, Provencher had recommended that Riley receive a written reprimand. Ex. 29; Ex. 13.

**Disputed.** Riley was not "issued" a verbal warning or any other form of discipline. He was informally warned that he should be more careful in future, and there were to be no further consequences. Provencher had received a written recommendation, but decided against it. ¶P38.

155. According to Riley, Lima then further asked, "How come you didn't discuss this incident on your application." Riley replied, "because my application was completed on May 3, 2011" and "[m]y chief did not make a decision on this matter until May 24, 2011. I didn't know this investigation was still pending because it was so long in between the time when I first spoke to internal affairs until the time my chief closed the investigations." Ex. 33 at P0937.

**Undisputed.**.

156. Lima then showed Riley the June 18, 2010 Memorandum, as Lima had photocopied earlier that day. Ex. 48 at 34-36; Ex. 49 (Lima Dep.) at 110-12, 247-48; Ex. 29; Ex. 32 at ¶ 5; Ex. 34 at MCAD00048; Ex. 33 at P00940-41.

**Disputed** that Lima "showed" Riley the June 18, 2010 Memorandum. Lima brandished it in Riley's face and insisted that it was a "reprimand." ¶P39. Riley did not have a chance to actually read the document. ¶P39.

157. Riley immediately responded, "that's not supposed to be in my file." Ex. 47 (Riley Dep.) at 221; Ex. 48 at 35-37 (Lima recalling: "the first thing that came out of his mouth, I remember vividly and as if it was just a second ago, that's not supposed to be in my file").

**Disputed** as inaccurate and incomplete. Lima reported that Riley said: "[h]e told me that this letter should not be in his file because he was not disciplined" or "something to that effect." ¶P39.

158. Lima asked Riley to explain the document, and Riley again reiterated that the document was not supposed to be in his file. Ex. 48 at 35-37; Ex. 47 (Riley Dep.) at 221.

**Disputed.** Riley informed Lima that he had not been reprimanded, that he had only learned that he was a subject of a disciplinary investigation on May 24, 2011, and that he had been told that he was not going to be disciplined and nothing would be going into his file. ¶¶P38, P39.

159. Riley then stated to Lima that he had never seen the document before, but that he had been assured by Provencher "that there was no discipline involved in [the] incident and the incident was not going in [his] file." Ex. 33 at P00937. *See* Ex. 47 (Riley Dep.) at 221.

**Undisputed**.

160. Lima and Riley spent a substantial amount of time talking about the Soares investigation. Lima regarded the Soares investigation as a "major issue" for several reasons, namely: (1) it involved "an internal investigation on a prisoner escaping"; (2) Lima perceived Riley as attempting to give the Soares investigation "the appearance . . . [of] something minor"; and (3) Lima thought it "blatantly clear" that Riley had been untruthful in regards to the extent of his involvement in the Soares investigation. Ex. 48 at 37-38; Ex. 49 (Lima Dep.) at 190-91, 248-49.

**Disputed**. There is no evidence that Lima was concerned about the nature of the Soares investigation – that topic is not mentioned in his First or Second Reports nor in any other contemporaneous evidence. Ex. 27; Ex. 30. Further, Riley gave no "appearance" of attempting to make the investigation "minor." He explained that he had only learned that he was a subject of a disciplinary investigation on May 24, 2011, and that he had been told that he was not going to be disciplined and nothing would be going into his file. ¶¶P38, P39. Riley further disputes that Lima thought it "blatantly clear" that Riley had been untruthful regarding the Soares Investigation. He knew at the time that Riley was being truthful. See ¶145 Resp.

161. Riley changed his answer to Question 20.E. on the Application from "NO" to "YES" and initialed the change. Ex. 25 at MSP000111; Ex. 47 (Riley Dep.) at 150-53.

**Undisputed.**

162. At some point in the interview, Riley and Lima discussed Question 20.A., pertaining to other law enforcement agencies that Riley had previously applied to. Ex. 47 (Riley Dep.) at 128-33; Ex. 48 at 28-32.

**Undisputed.**

163. Riley did not disclose then, or at any other point during the interview, that he had also applied unsuccessfully to the Providence Police Department, which was not disclosed on the Application. Riley asserts that Lima never specifically asked whether he had applied to police forces other than those he listed on the Application. Ex. 46 at 28-29; Ex. 47 (Riley Dep.) at 131.

**Disputed** to the extent that Riley's non-disclosure of his application to the Providence Police Department is not a material fact because it is not the basis for defendant's rejection of his application. Ex. 51, at 10-11; Ex. 57 at ln. 59. Further, this statement is incomplete and misleading in that it suggests that that the sole reason Riley did not disclose the application to Lima was because Lima did not ask. Riley neither disclosed it to Lima nor reported it on his application because he reasonably misunderstood the poorly worded Question 20A as only requiring information regarding those applications for which background investigations had been conducted, given the structure of virtually every other similar question in the application. ¶P70.

164. At some point in the interview, Riley and Lima discussed the fact that Riley had attended other high schools in addition to the single one listed on the Application

31

(New Bedford High School).  Riley told Lima that he left one of his high schools due to a residency requirement.  Ex. 27 at MSP00071; Ex. 46 at 23-24; Ex. 25.

**Disputed** as incomplete and misleading.  Riley informed Lima that his mother had enrolled him in Dartmouth High School using his aunt's address as his residence, but that the high school discovered this and required that his mother remove him due to lack of residency after only a few weeks.  ¶¶P56, P57.

165.  Riley asserts that he told Lima that he left Dartmouth High School due to a residency requirement, and that he left Bishop Stang High school for financial reasons because his family could no longer afford the tuition at a private school.  Ex. 46 at 23-24; Ex. 33 at P00939.

**Disputed** only on the basis that Riley's tenure at Dartmouth High School is not a material fact because it was not a basis for defendant's rejection of Riley's application.

166.  Lima asserts that Riley told him that he left Bishop High School [sic] due to a residency requirement, and that Riley never mentioned having attended Dartmouth High School at all.  Ex. 48 at 16-21; Ex. 49 (Lima Dep.) at 133-42; Ex. 30 at MSP00075.

**Disputed.**  Riley informed Lima that he left Dartmouth High School for residency reasons and that he left Bishop High School for financial reasons.  Moreover, Lima's account of this conversation is not credible for multiple reasons set forth in ¶¶P56-P64.  Further, Lima did acknowledge that Riley told him that he left Bishop Stang for financial reasons.  ¶P59.

167.  Whatever may actually have been said, Lima left the interview with the impression that Riley had left Bishop High School due to a residency requirement.  Ex. 48 at 16-20; Ex. 49 (Lima Dep.) at 133-42; Ex. 27 at MSP00071; Ex. 30 at MSP00075-76.

**Disputed** that Lima left the interview with the "impression" that Riley had left Bishop Stang High School due to a residency requirement.  Riley told him that he had left Dartmouth High School for those reasons, Lima later claimed to have "discovered" that Riley really left Bishop Stang for academic reasons from a telephone call from a Bishop Stang staff member that she denies making.  After visiting Bishop Stang and confirming that Riley had not, in fact, left for academic reasons, Lima failed to acknowledge in his Second Report that Riley had not been untruthful for failing to disclose the non-fact.  Lima then conceded in his Second Report that Riley indeed left Bishop Stang for financial reasons.  ¶¶P57-P62

168.  Riley acknowledges that he did not tell Lima that he had failed multiple courses at Bishop Stang High School and would have needed to make up those courses or repeat sophomore year if he returned to Bishop Stang High School.  Ex. 47 (Riley Dep.) at 124-25.

**Disputed** as incomplete and misleading.  Riley would not have told Lima the referenced information because it had nothing to do with his reasons for leaving Bishop Stang High School,

and would be misleading, since he had already made up some of the courses he had failed. He did, however, tell Lima that he did not do well academically and had academic problems. ¶P56.

169. Riley made two more handwritten changes to the Application to note that he had attended Muskegon High School and Bishop Stang High School. Riley did not add Dartmouth High School to the Application. Ex. 25 at MSP00019; Ex. 47 (Riley Dep.) at 121-24.

**Disputed** as incomplete. Riley did not add Dartmouth High School on Lima's instruction. ¶P57.

170. Lima asked Riley to procure transcripts for his high schools other than New Bedford High School, and Riley agreed that he would. Ex. 46 at 14-17, 61-62; Ex. 49 (Lima Dep.) at 127-28, 166-67.

**Undisputed.**

## Lima Conducts Follow-Up and Writes His Background Investigation Report

171. On September 2, 2011, a NBPD union representative acted—at Riley's request—to contact Lima by telephone to discuss the Soares investigation. The representative stated to Lima "that Officer Riley was in fact being truthful in any statement he provided as to not being the subject of an internal affairs investigation and as to not having been informed of any discipline as a result." Ex. 26; Ex. 33 at P00940.

**Undisputed.**

172. The union representative's representation that Riley was "not . . . the subject of an internal affairs investigation" was not accurate. Riley had been a subject of "internal affairs investigation[s]." Ex. 26; *supra* SMF ¶¶ 29-58 (and sources cited).

**Disputed.** Defendant distorts the content and meaning of this communication. Sgt. Ledo's complete statement says that "Officer Riley was in fact being truthful in any statement he provided as to not being the subject of an internal affairs investigation and as to not having been informed of any discipline as a result." Sgt. Ledo did not say that Riley had not been the subject of an internal affairs investigation. Sgt. Ledo's focus was on Riley's <u>truthfulness</u> in believing he was not the subject of an internal affairs investigation. The writer also said that Riley had not been disciplined for the incident at issue. Ex. 26.

173. Following the interview, Lima reached out to Bishop Stang High School to attempt to determine why Riley had left the school. Lima had understood Riley to say that he had left Bishop Stang "due to the fact that there was a residency requirement," but Lima knew "that the high school was a private one, [so] the answer that [Riley] gave . . . did not appear plausible." Doubting Riley's explanation, Lima decided to reach out to Bishop Stang for further clarification. Ex. 27 at MSP00071; Ex. 49 (Lima Dep.) at 134-39.

**Disputed** for the reasons set forth in Response to ¶167.

174. Lima thereafter spoke to an official from Bishop Stang named Nancy Wood or Nancy Ward "who informed [him] that [Riley] did attend the high school for a year but did not return the following year based on academic performance." Ex. 27 at MSP00071.[2]

**Disputed** for the reasons set forth in Response to ¶167.

175. Also following the interview, Lima conducted the requisite neighborhood check and visited Riley's home. Riley was not present at the time, but his fiancée was. At the time, Riley lived with his fiancée on the third-floor of an apartment building in New Bedford. Ex. 27 at MSP00063, 72; Ex. 56 (Riley Fiancée Dep.) at 22.

**Undisputed.**

176. When Lima arrived, the entrance to the apartment building was unlocked. Lima proceeded to Riley's apartment, where Riley's fiancée answered the door. Riley's fiancée was "surprised" and asked Lima "how did he get to the third floor" because the door "is usually locked." Ex. 56 (Riley Fiancée Dep.) at 17-27.

**Undisputed.**

177. According to Riley's fiancée, Lima looked around the house and then stated, "You might want to get that door checked because you don't live in the greatest neighborhood." Ex. 56 (C. Riley Dep.) at 20.

**Undisputed**.

178. Lima completed his background investigation report on Riley on September 7, 2011. In the "Applicant Interview" section of the report, Lima described his conclusion that

---

[2] Counsel for Riley has since procured two affidavits from Nancy Wood/Ward stating that she does "not recall having any conversations with Trooper Lima about Mr. Riley," but also offering that she has generally not "offered opinions or conclusions to prospective employers about the reason(s) that former students did or did not return to Bishop Stang High School." Ex. 40. These affidavits do not create a genuine dispute of fact. *See Charles v. Stop & Shop Supermarket Co.*, LLC, No. CIV.A. 0-10726-DJC, 2012 WL 2402790, at *2 (D. Mass. June 25, 2012) (citing *I.V. Servs. of Am., Inc. v. Inn Dev. & Mgmt., Inc.*, 182 F.3d 51, 55 (1st Cir. 1999)) ("A lack of recollection . . . is insufficient to raise a legitimate dispute of material fact."). **Disputed**. Further, the affidavits are not from "Nancy Wood/Ward," they are from Nancy Wood. Further, defendant's quote of the Wood affidavit is incomplete. Wood said in relevant part: "During 2011, I did not know the reason(s) that Mr. Riley did or did not return to Bishop Stang High School, and I do not recall having any conversation with Trooper Lima about Mr. Riley or why he did or did not return to Bishop Stang High School after the 1993-1994 school year. . . . <u>During my tenure at Bishop Stang High School as Administrative Assistant in the Guidance Department, I have not been authorized, nor have I offered opinions or conclusions to prospective employers about the reason(s) that former students did or did not return to Bishop Stang High School</u>" (emphasis added). The underscored statement directly contradicts Lima's allegation that Wood told him "the reason(s)" that Riley "did not return to Bishop Stang High School."

Riley had received a written reprimand as part of the Soares investigation, and described Riley's reaction to being confronted with the Soares investigation at the interview. Ex. 27 (Completed Background Investigation Report) at MSP00063, 71.

**Disputed** that Lima reached a conclusion that Riley had received a reprimand. He knew the opposite to be the case. ¶¶P36-P40. Further, Riley disputes that Lima accurately describes his reaction. Rather, he described a part of Riley's reaction. He failed to state in full what Riley had said, which was that: "this letter should not be in [my] file because [I] was not disciplined [or something to that effect]." ¶P39.

179. In his background investigation report, Lima also described his skepticism that Riley had left Bishop Stang for residency reasons, and documented his follow-up with Nancy Ward, who stated that Riley did not return to the school based on his academic performance. Ex. 27 (Completed Background Investigation Report) at MSP00071.

**Disputed** that Lima ever actually believed that Riley had said that he left Bishop Stang for residency <u>or</u> academic reasons. or that Nancy Wood told Lima that Riley did not return to Bishop Stang based on academic performance. <u>See</u> Response to ¶167.

180. On the final page of the report, Lima recorded that Riley's "negative employment aspects" included being "[u]ntruthful about disciplinary action," being "[n]ot completely forthright on disclosing disciplinary action," and demonstrating a "[l]ack of attention to detail," "[l]ack of understanding," and "[a]cceptance of mediocrity" in connection with his completion of the Application. Ex. 27 (Completed Background Investigation Report) at MSP00073. *See* Ex. 48 at 42-43, 56-57; Ex. 52 (Butler Dep.) at 43-44.

**Undisputed.**

## The Background Review Board Disqualifies Riley

181. On September 7, 2011, a Review Board consisting of Major Kevin Butler, Major William Christiansen, and Captain Frank McGinn met and considered the applications of a number of candidates, including Riley. Ex. 50 at ¶ 5; Ex. 52 (Butler Dep.) at Tr. 118-19.

**Undisputed.**

182. The Review Board voted unanimously to disqualify Riley. Ex. 50 at ¶ 7.

**Undisputed.**

183. In reaching its decision, the Review Board reviewed and considered Riley's completed Application, Riley's completed Questionnaire, and Lima's completed background investigation report on Riley. Ex. 50 at ¶ 6.

**Disputed.** Members of the Review Board disagreed as to what information was provided to them. See Plf. Stmt. ¶P82. Further, the Review Board had little information beyond that provided by the background investigator and routinely conformed to the background investigator's lead. In Riley's case, the Review Board was heavily influenced by Lima's reasoning, even as it repeatedly changed. See Plf. Stmt., at ¶¶P83, P89-P92.

184. The Review Board concluded that Riley had knowingly made false statements in his Application, in his Questionnaire and to Lima during the interview, and that Riley's making of false statements constituted an automatic disqualifier under the "Automatic and Discretionary Disqualifiers" guidelines. Ex. 50 at ¶ 7.

**Disputed** to the extent that the Review Board concluded that Riley's answers on his Questionnaire formed a basis for his disqualification. Ex. 51, at 10-11; Ex. 57 at ln. 59. Further, plaintiff disputes that it actually reached the conclusions described independently. Rather, the Review Board was heavily influenced by Lima, relying entirely on Lima's assertions and doing no independent investigation or fact checking. ¶P83, P89-02.

185. Specifically, the Review Board concluded that Riley had been intentionally untruthful with respect to: (1) his role as a subject of the Soares investigation; (2) whether he received a written reprimand as a result of the Soares investigation; (3) his answers on the Questionnaire regarding the Soares investigation; and (4) the circumstances of his not returning to Bishop Stang High School. Ex. 50 at ¶ 7.

**Disputed** to the extent that the Review Board concluded that Riley's answers on his Questionnaire formed a basis for his disqualification. Ex. 51, at 10-11; Ex. 57 at ln. 59. Further, plaintiff disputes that it actually reached the conclusions described independently. Rather, the Review Board was heavily influenced by Lima, relying entirely on Lima's assertions and doing no independent investigation or fact checking. ¶P83, P89-02.

186. In reaching its decision, the Review Board also considered that Riley had failed his RISP background investigation, that Riley's Application had an abnormally large numbers of mistakes, and the quality of Riley's references. The Review Board believed that these factors supported its decision, but these factors did not amount to automatic disqualifiers and therefore did not make a difference to the Review Board's decision. Ex. 50 at ¶¶ 8-9.

**Disputed** in that Riley's claimed mistakes, RISP application or quality of his references could not be material if they "did not make a difference" to the decision at issue in this case. Further, Riley disputes that his application had "abnormally large numbers of mistakes." Many of the putative "mistakes" were the result of shoddy application software, poorly designed and misleading questions, lack of adequate information or explanation of terms, or simply differences of opinion about the meaning of terms, for example the question of whether a union is a "professional trade organization" or a credit card is a "loan." ¶¶P32, P53, P65-P70. What remained, such as mistakenly providing an incomplete list of high schools, was trivial. ¶P55. Further, white applicants' similar mistakes were not treated as harshly. E.g. ¶P54, ¶P75. Moreover, the "quality" of Riley's references was artificially diminished because of Lima's

misrepresentations and failure to interview employer references, no doubt furthering the negative impression Lima had created. ¶P48-50. Moreover, a jury would be entitled to believe that an unbiased decisionmaker would not have considered it to be significant that Riley's application to RISP was denied in 2004, based in significant part on his prior work performance as a police officer in New Bedford. Ex. 47 (Riley Dep.) at 100, 102-103. The decision was based only on evaluations in Riley's NBPD files from late 2002, which described the ways in which Riley needed more development as an officer and the last of which noted some improvement. Ex. 6, at RISP 0007-8. According to his Chief, Riley's evaluations "depict[] a journey of improvement through his probationary period and ends with the completion of that period with satisfactory reviews." Supp. Ex. 98 at P2028. Riley received no further written evaluations between 2002 and 2011. Supp. Ex. 97 at P2029-35. Further, Riley's errors on his application are also not material facts because they were not the basis for defendant's decision to reject his application. Ex. 57, ln. 59

187. Riley's credit and financial issues played no role in the Review Board's decision. Ex. 52 (Butler Dep.) at 110.

**Disputed.** Lima's misrepresentation regarding Riley's purported failure to document his mortgage fraud dispute, and failure to correct the misrepresentation, likely contributed to the negative impression Butler claimed to have formed that Riley had engaged in a "pattern of deception." See ¶210.

188. In its notes of decision for Riley, the Review Board recorded: "Made false statements on application re New Bedford PD IA invest. Lied to investigator concerning reasons for dismissal from Bishop Stang High School. Rejected by RISP 2004." Sealed Ex. 57 at Row 59; Ex. 50 at ¶ 10.

**Undisputed.**

189. By letter dated September 15, 2011, Jack Flynn informed Riley that the Review Board had disqualified him from the hiring process because the Review Board had determined that he "was untruthful on his application" and "untruthful to his background investigator." Ex. 28.

**Undisputed.**

**Riley "Appeals" the Review Board's Decision**

190. After completing his initial report, Lima spoke to a representative of RISP and learned that Riley had unsuccessfully applied to the Providence Police Department, which Riley had not disclosed on the Application and which Lima previously did not know. Sealed Ex. 60; Ex. 30 at MSP00076; Ex. 48 at 28-32; Ex. 25 at MSP000110.

**Disputed** only to the extent that Riley's application to the Providence Police Department is not a material fact because it is not a basis for defendant's rejection of Riley's application. Ex. 51, at 10-11; Ex. 57 at ln. 59.

191. On or around September 17 or 18, 2011, Riley received Flynn's rejection letter and called Lima by telephone. Riley stated that he wanted to know how Lima considered him to be untruthful. Lima stated that Riley had received a written reprimand arising from the Soares investigation and that Riley had left Bishop Stang due to academic performance issues. Lima also stated that Riley had failed to disclose his application to the Providence Police Department. Riley stated to Lima that his conclusions were inaccurate and that Lima should "reinvestigate." Ex. 47 (Riley Dep.) at 356-60; Ex. 29; Ex. 30 at MSP00074.

**Undisputed.**

192. Lima perceived Riley as "berating" him, and Riley acknowledges that he was "mad" during the phone call. Lima told Riley that "berating [him] was unprofessional." Ex. 49 (Lima Dep.) at 217-20; Ex. 48 at 17-19; Ex. 47 (Riley Dep.) at 358-59.

**Disputed.** Riley did not raise his voice or berate Lima or give rise to a "perception" of berating. ¶P85.

193. After discussing the matter with a superior in the Certification Unit, Lima called Riley back and told him that he should contact MSP Human Resources. Riley did so and was told to write a letter to Chief Administrative Officer Jack Flynn. Ex. 47 (Riley Dep.) at 360-62; Ex. 48 at 53-54; Ex. 49 (Lima Dep.) at 220; Ex. 30 at MSP00074-75.

**Undisputed.**

194. On September 22, 2011, Riley wrote to Jack Flynn asking for a "second look" at his candidacy and arguing that he had not been untruthful with respect to the Soares investigation, Bishop Stang High School, or the Providence Police Department. Riley's letter did not assert or allege that Lima had acted with racial bias. Ex. 29.

**Undisputed.**

## Lima Conducts a Supplemental Investigation

195. Separately, and on his own initiative, Lima contacted the head of the Certification Unit and asked to review his background investigation report on Riley for completeness. Lima stated that he wanted to conduct follow-up and "make sure that [he] had not missed anything" because he "was, essentially . . . accused [by Riley] of getting the report wrong." Lima was authorized to proceed. Ex. 49 (Lima Dep.) at 209-10, 218-22, 250-51; Ex. 48 at 22, 52-53.

**Undisputed.**

196. On September 21, 2011, Lima met with NBPD Chief Provencher, who confirmed that Riley was a subject of the Soares investigation, but who also told Lima that the

recommendation for reprimand "was initiated but . . . never acted on." Ex. 30 at MSP00075. *See* Ex. 49 (Lima Dep.) at 169-74.

**Undisputed.**

197. On September 22, 2011, Lima traveled to Bishop Stang High School in an effort to further investigate the reasons for Riley's leaving that school. There, Lima met with Assistant Principal Kathleen Ruginis. Ruginis reviewed Riley's transcript and told Lima that Riley would not have been allowed to "return and stay" at Bishop Stang unless he made up "three . . . failed courses."[3] Ex. 30 at MSP00075-76. *See* Ex. 49 (Lima Dep.) at 225-27.

**Disputed** that the information received from Ruginis is material. Riley in fact made up four courses over the summer following his sophomore year and was not expelled. ¶P61. Further, a jury is entitled to disbelieve that Lima had concerns about whether Riley had left for academic reasons, for the reasons set forth in Riley's Response to ¶167.

198. Also on September 22, 2011, Lima traveled to New Bedford High School and saw records reflecting that Riley had attended Dartmouth High School. Lima had not previously realized that Riley had attended Dartmouth High School. Consequently, Lima traveled to Dartmouth High School on September 26, 2011. At Dartmouth High School, Lima sought to determine whether Dartmouth High School had a residency requirement, and thus whether Riley's "residency issue was really with the Dartmouth High School and not Bishop Stang." Ex. 30 at MSP00075-76.

**Disputed** that Lima had not previously realized that Riley had attended Dartmouth High School. Riley had told him. Further disputed that Riley had not previously told Lima that Riley had left Dartmouth due to aforesaid issue. ¶P57.

199. On September 28, 2011, Lima sent a memorandum to Major Kevin Butler (the President of the Review Board) and Det. Lt. George Smith (the commander of the Certification Unit) covering the findings of his supplemental investigation. Ex. 30 (Lima Supplemental Memorandum of September 28, 2011); Ex. 50 at ¶ 1; Ex. 53 at 2-3.

**Disputed** that the contents of Lima's Second Report were truly "findings" and not false statements. *See* ¶¶P23-P80.

## The Review Board Again Votes to Disqualify Riley

---

[3] As with Nancy Wood, Riley's counsel has also procured an affidavit from Kathleen Ruginis stating that she does "not recall the specific details of [her] conversation" with Lima. Ex. 41. As with Wood, this affidavit is also insufficient to create a genuine dispute of fact. *See Stop & Shop Supermarket Co.*, 2012 WL 2402790, at *2. **Disputed**. This is not a material fact but legal argument. Further, defendant's characterization of her affidavit is incomplete and misleading. Ms. Ruginis also said that she had no knowledge of the reasons Riley left Bishop Stang High School, which contradicts Lima, who claims she advised him of those reasons. Ex. 41.

200. On September 26, 2011, a Review Board consisting of Butler, Christiansen, and Detective Captain Frank Hart met to reconsider its decision to disqualify Riley in light of Riley's letter of September 22, 2011. Ex. 50 at ¶ 11.

**Undisputed.**

201. In considering such "appeals," the Review Board followed the same process as in in the original review by reviewing the candidate's file and considering any additional information. Ex. 52 (Butler Dep.) at 98, 123-24; Ex. 67; Ex. 50 at ¶ 11.

**Disputed** that the Review Board formed an independent judgment regarding Riley. Rather, it relied almost entirely on Riley and the information he provided to determine their decisions. ¶P83, P89-P91.

202. For Riley's "appeal," the Review Board once again considered Riley's completed Application, completed Questionnaire, and Lima's background investigation report. The Review Board also reviewed and considered Riley's letter of September 22, 2011. Ex. 50 at ¶ 11.

**Disputed.** There is no evidence that any members of the Review Board that considered Riley's "appeal" (the "Appeal Board") other than Butler considered Riley's September 22, 2011 letter or accompanying materials. ¶P89, or formed an independent judgment regarding Riley. Rather, the relied almost entirely on Lima and the information he provided to determine their decisions. ¶P83, P89-P91.

203. The Review Board did not consider Lima's supplemental memorandum. Prior to the meeting, however, Lima relayed some of the same information to Butler via telephone including, at least, the fact that Riley had not received the recommended reprimand. Ex. 52 (Butler Dep.) at 76-81, 131-32; Ex. 50 at ¶ 11; Ex. 30.

**Disputed** that Butler received any information from Lima other than the fact that Riley had not received a reprimand and the purported "fact" that Riley had failed to disclose that he was a subject of the Soares Investigation. ¶P88.

204. The Review Board also considered the new information that Riley had unsuccessfully applied to the Providence Police Department which it learned from, at least, Riley's letter of September 22, 2011. Ex. 29; Ex. 50 at ¶ 12.

**Disputed.** The Appeal Board was unaware of Riley's unsuccessful application to the Providence Police Department until after its September 26, 2011 decision to deny Riley's appeal. It first learned of this issue when it received Lima's September 28, 2011 Second Investigation Report. ¶P92. Further, there is no evidence that any member of the Appeal Board other than Butler received Riley's September 22, 2011 letter or accompanying materials. ¶P89. Moreover, the fact that Riley had unsuccessfully applied to the Providence Police Department is not a material

fact because it is not a basis for defendant's rejection of Riley's application. Ex. 51, at 10-11; Ex. 57 at ln. 59.

205. On September 26, 2011, the Review Board voted unanimously that Riley would remain disqualified. Ex. 50 at ¶ 12.

**Undisputed.**

206. The Review Board determined that it remained the case that Riley had made knowingly false statements in his Application, in his Questionnaire and to Lima, and that Riley's making of false statements continued to constitute an automatic disqualifier under the "Automatic and Discretionary Disqualifiers" guidelines. Ex. 50 at ¶ 12.

**Disputed.** The Appeal Board did not determine that Riley's responses to the Questionnaire were a basis for his disqualification. Ex. 51, at 10-11; Ex. 57 at ln. 59. Riley further disputes that it formed an independent judgment regarding Riley. Rather, it relied almost entirely on Riley and the information he provided to determine their decisions. ¶P83, P89-P91.

207. In particular, the Review Board continued to believe that Riley had made false statements about his role as a subject of the Soares investigation, and that it did not make a difference whether Riley had actually received the written reprimand. Ex. 50 at ¶ 12; Ex. 52 (Butler Dep.) at 78-81.

**Disputed** that the Appeal Board formed an independent judgment regarding Riley. Rather, it relied almost entirely on Riley and the information he provided to determine their decisions. ¶P83, P89-P91. Disputed that the Appeal Board "continued to believe" that Riley had made false statements about his role as a subject of the Soares investigation. The issue of whether Riley had been untruthful regarding his role as a subject did not arise when the Review Board originally denied Riley's application. ¶¶P81-P83.

208. The Review Board also continued to believe that Riley had made knowingly false statements about his reasons for not returning to Bishop Stang High School. Ex. 50 at ¶ 12.

**Disputed** that it formed an independent judgment regarding Riley. Rather, it relied almost entirely on Riley and the information he provided to determine their decisions. ¶P83, P89-P91.

209. The Review Board also determined that Riley had falsely answered Question 20.A. by failing to disclose his unsuccessful application to the Providence Police Department. The Review Board considered Riley's explanation (that he misunderstood the question) to be not credible in light of "the overwhelming number of other indications that Riley was an untruthful individual who had attempted to conceal various embarrassing aspects of his past from MSP." Ex. 50 at ¶ 12.

**Disputed**. This assertion is unsupported by admissible evidence in that it relies on an affidavit that contradicts the affiant's deposition testimony and which should not be considered. In fact, the affiant, Butler, testified at deposition that he was unaware of Riley's application to the Providence Police Department until he received Lima's Second Investigation Report dated September 28, 2011. Ex. 52 (Butler Dep.) at 76. The Appeal Board made its decision on September 26, 2011. ¶P92.

210. Major Butler, the President of the Review Board, described Riley as having engaged in "pattern of deception that goes on and on." Ex. 52 (Butler Dep.) at 94, 117-18; Ex. 50 at ¶¶ 1, 12.

**Undisputed.**

211. By letter dated September 28, 2011, Riley was informed that "[a]fter reconsidering the information presented in the first instance as well as the representations advanced in your letter [of September 22, 2011], the Review [Board] has affirmed its original decision to remove you from the process." Ex. 67.

**Undisputed.**

**Other Candidates Assigned to Lima for Background Investigations for the 80th RTT**

**Other Candidates Assigned to Lima for Background Investigations for the 80th RTT**

212. For the 80th RTT, Lima was assigned background investigations for seven candidates in total, including Riley. Ex. 45 at ¶ 11.

**Undisputed.**

213. Of the six candidates other than Riley assigned to Lima, one failed his psychological assessment and did not make it to the point of a background investigation determination, and a second voluntarily withdrew from the process before the point of a background investigation determination. Lima did not complete a background investigation report for either one of these candidates. Ex. 45 at ¶ 12.

**Undisputed.**

214. Lima completed his background investigations on the four remaining candidates, who had the initials: (1) A.G.; (2) A.P.; (3) J.W.; and (4) J.H. All four of these candidates were white. Ex. 45 at ¶ 13. *See* Sealed Ex. 58 (A.G. investigation report); Sealed Ex. 61 (A.P. investigation report); Sealed Ex. 65 (J.H. investigation report); Sealed Ex. 64 (J.H. investigation report).

**Undisputed.**

215. Candidate A.G. was assigned candidate number 100-0059. Candidate A.P. was assigned candidate number 098-0481. Candidate J.W. was assigned candidate number 100-0184. Candidate J.H. was assigned candidate number 100-0070. Ex. 45 at ¶ 14.

**Undisputed.**

216. Like Riley, Candidates A.G., A.P., and J.W. were all found by MSP's Review Board to have failed their background investigation, and were disqualified from the hiring process on that basis. Ex. 45 at ¶ 14; Sealed Ex. 57 at Rows 58, 60, and 350; Sealed Ex. 59 (A.G. Review Board letter); Sealed Ex. 62 (A.P. Review Board letter); Sealed Ex. 66 (J.W. Review Board letter).

**Undisputed**, except that the stated reasons for the candidates' disqualifications for AG, AP and JW are set forth in Sealed Ex. 57 at rows 58, 360 and 60, respectively.

217. Candidate A.G. failed his background investigation and was disqualified due to, *inter alia*, being untruthful on his application about history of drug use. Sealed Ex. 57 at Row 58; Sealed Ex. 59; Ex. 45 at ¶ 14.

**Disputed** as incomplete and misleading. AG was also disqualified because a report from the State Police confirmed a motor vehicle stop where marijuana was destroyed and also because of an extensive driving history dating to 2003 including multiple license suspensions, and marginal employment references. Candidate AG had 21 incidents listed in his background report, including speeding, no inspection sticker and license suspensions. AG also failed to fully disclose his drug use and medical issues until forced to do so by Lima during his interview with AG. ¶P72.

218. Candidate A.P. failed his background investigation and was disqualified due to, *inter alia*, providing incomplete and inaccurate information on his Application about his prior employment history, and a poor prior employment history. Sealed Ex. 57 at Row 360; Sealed Ex. 62; Ex. 45 at ¶ 14.

**Disputed** as incomplete and misleading. AP was disqualified because of performance warnings, reprimands and written warnings from former employer Poland Springs, poor reference interviews, failure to disclose a failed mental health test in an application to the Department of Correction, failure to disclose a termination from a former employer, and an incomplete and inaccurate application. He also had a criminal history, but this is neither mentioned in Lima's summary of "negative employment aspects," nor is mentioned in the Review Board's summary of its reasons for rejecting his application, nor is it identified by defendant as a basis for rejection. ¶P73.

219. Candidate J.W. failed his background investigation due to, *inter alia*, non-payment of taxes and an extensive driver's history. Ex. 45 at ¶ 14; Sealed Ex. 57 at Row 60; Sealed Ex. 66.

**Disputed** as incomplete. JW was disqualified for non-payment of taxes in 2010, an extensive driving history and an OUI in 2007 for which he never completed the required safety program. JW had 18 incidents on his driving record, including speeding, no inspection sticker and multiple license suspensions. He failed to disclose one of his two terminations in his application until his

interview with Lima, yet was not accused of untruthfulness by Lima in his evaluation of JW's application, and his two terminations are not remarked upon by Lima. Neither JW's omission nor his two terminations were mentioned in the Review Board's summary of its reasons for rejecting his application and they are not identified by defendant as reasons for his disqualification. JW had a criminal history, which was also not remarked upon in Lima's investigation report, nor was it mentioned in the Review Board's summary of its reasons for rejecting his application and it is not identified by defendant as a reason for his disqualification. ¶P74-P76.

220. Lima completed his background investigation report on Candidate J.H. on September 2, 2011. Lima noted a number of "Positive Employment Aspects" for Candidate J.H., including "[h]onesty," particularly in acknowledging past use of marijuana, and "trustworth[iness]." For "Negative Employment Aspects," Lima wrote: "[N]othing to report/Nothing found during background investigation." Sealed Ex. 64.

**Undisputed.**

221. At the time of his interview, J.H. made three written changes to his application: adding his one high school, correcting his cell phone number, and correcting his email information. Sealed Ex. 63; Sealed Ex. 64 at MSP003658.

**Undisputed.**

222. Candidate J.H. was subsequently reviewed by the Review Board, and the Review Board determined that J.H. had passed his background investigation. Sealed Ex. 57 at Row 110; Ex. 45 at ¶ 14;

**Undisputed.**

223. Other than Riley's allegations related to this case, Lima has never before been the subject of a complaint of racial bias or discrimination, and has never before been the subject of a complaint about his conducting of background investigations. Ex. 49 (Lima Dep.) at 66-67.

**Disputed** as misleading. Lima has only performed seven background investigations, five in 2011 (¶¶213-214) and two more for the 81st RTT (Supp. Ex. 88 at 3).

**Other Candidates to the 80th RTT Disqualified due to Untruthfulness**

224. In addition to Riley, at least twenty-two other candidates failed their background investigations for the 80th RTT due, at least in part, to issues of perceived untruthfulness. Sealed Ex. 57 at Candidates 100-0123 (Row 32), 100-0059 (Row 58), 099-0407 (Row 75), 098-0635 (Row 104); 098-0498 (Row 105); 099-0010 (Row 130), 099-0053 (Row 131), 0098-141 (Row 135), 099-0294 (Row 162), 099-0247 (Row 164), 099-0309 (Row 166), 096-0477 (Row 168), 098-0373 (Row 216), 102 (Row 217), 102-0005 (Row 248), 098-0275 (Row 250), 099-0112 (Row 251), 100-

0071 (Row 264), 100-0112 (Row 296), Unnumbered (Row 334), Unnumbered (Row 336), Unnumbered (Row 337), 098-0481 (Row 360).

**Disputed** as incomplete and misleading in the absence of data as to whether the claimed "perception" of untruthfulness was genuine, and was skewed along racial lines in those cases as it was in Lima's case.

### Riley's MCAD Charge Against NBPD

225.    On September 15, 2011, Riley went to NBPD Chief David Provencher and asked him to explain the document Lima had shown Riley at the interview.  Provencher stated: "[B]ecause of your waiver we allowed access to your internal affairs file and in your file was a recommendation for a written reprimand."  Riley then asked Provencher, "why [he] was never informed about any recommendation for a written reprimand" and stated that he "thought [Provencher] said none of this was going in my file." Provencher replied, "I meant your personnel files [and] your internal affairs file is different."  Ex. 34 at MCAD00048.

**Undisputed.**

226.    On June 19, 2012, Riley filed an MCAD charge against NBPD and David Provencher, alleging that both had discriminated against him on the basis of race.  Ex. 32.

**Disputed** only on the basis that Riley's filing of an MCAD charge against NBPD and David Provencher is not a material fact.  It has no probative value as to whether defendant denied Riley admission to the 80th RTT for discriminatory reasons.

227.    Riley alleged as follows:

"On or about May of 2011, the Respondent, David Provencher, Chief of Police, informed all officers including myself involved in an incident from 2009 that there would be no discipline.  I specifically inquired as to whether or not something
would end up in my file as I was a candidate in process of being hired for the Massachusetts State Police and Chief Provencher insured me that nothing was going in my file. On or about August of 2011, I requested my personnel file and it was clear from reprimand. On or about September of 2011, I met with Robert Lima, Massachusetts State Police, and informed him that I had no written reprimand during my interview process. Mr. Lima eliminated me from the State Police hiring process for being untruthful after he discovered a recommendation for reprimand placed in my internal affairs file by Mr. Provencher.  I had no knowledge of this recommendation for reprimand being in my internal affairs file and I do not have access to my internal affairs file . . . ."

Ex. 32.

**Disputed** only on the basis that Riley's filing of an MCAD charge against NBPD and David Provencher, and his allegations therein, are not material facts. They have no probative value as to whether defendant denied Riley admission to the 80th RTT for discriminatory reasons.

228. Riley filed the charge against NBPD and Provencher because he believed that they intentionally misrepresented him to MSP by acting, without Riley's knowledge, to place the June 18, 2010 Memorandum into his internal affairs file. Ex. 34 at MCAD00047; Ex. 47 (Riley Dep.) at 392-93.

**Disputed** only on the basis that Riley's filing of an MCAD charge against NBPD and David Provencher and the basis for his beliefs regarding it are not material facts. They have no probative value as to whether defendant denied Riley admission to the 80th RTT for discriminatory reasons.

229. On January 16, 2015, the MCAD dismissed Riley's charge against NBPD for lack of probable cause. Ex. 38.

**Disputed** only on the basis that Riley's filing of an MCAD charge against NBPD and David Provencher or its dismissal are not material facts. They have no probative value as to whether defendant denied Riley admission to the 80th RTT for discriminatory reasons.

## Riley's MCAD Charge Against MSP

230. On April 26, 2012, Riley filed an MCAD charge against MSP and Lima individually alleging discrimination on the basis of race. Ex. 31; Ex. 37.

**Disputed** only on the basis that Riley's filing of an MCAD charge is not a material fact. It has no probative value as to whether defendant denied Riley's application was for discriminatory reasons.

231. On December 18, 2014, the MCAD dismissed Riley's charge against MSP and Lima for lack of probable cause. The MCAD ruled:

"[MSP] had a legitimate, nondiscriminatory reason for not hiring Complainant, as Complainant was untruthful during the application and background investigation process . . . . While he may not have understood the entirety of records that [MSP] had access to, including the recommendation for a written reprimand, Complainant had a responsibility to be truthful when asked whether he had been subjected to an internal investigation . . . . Moreover, Complainant does not provide sufficient evidence of discriminatory pretext. The five other candidates Mr. Lima interviewed were white. However, only one candidate was accepted by [MSP]. Four, including Complainant, were disqualified, and one withdrew. Complainant's two comparators . . . are not appropriate comparators, as they were not interviewed by Mr. Lima, which Complainant admitted. Moreover, [MSP] reviewed its original decision to eliminate Complainant from the application process, even though it did not have a formal appeals process."

Ex. 37.

**Disputed** only to the extent that it is not material to a jury determination in the instant case.

232. Riley thereafter appealed the MCAD's findings. Following a hearing, and on June 9, 2015, an MCAD Investigating Commissioner affirmed the lack of probable cause finding. Ex. 39.

**Disputed.** only on the basis that Riley's filing of an MCAD charge is not a material fact. It has no probative value as to whether defendant denied Riley's application was for discriminatory reasons.

## II.    PLAINTIFF'S STATEMENT OF MATERIAL FACTS IN DISPUTE, WITH DEFENDANT'S RESPONSES

### Defendant's Background Investigation Process

P1. Defendant's selection process for determining successful candidates to recruit training academy consists of the following steps: a candidate takes an initial qualifying exam. Upon receiving a minimum score, candidates are extended an offer of acceptance, Ex. 16, conditional on their successful completion of physical and mental exams, a medical screening, a written application, a questionnaire and a background investigation process. Ex. 14, at 15-16; Ex. 52 (Butler Dep.) at 56; Supp. Ex. 70 (Smith Dep.) at 47-48; Supp. Ex. 71 (Flynn Dep.) at 33-34; Ex. 45, at ¶¶3-5, 7, 8.

**RESPONSE: Denied.** Ex. 45 at ¶¶ 2-10; Def. SMF ¶¶ 59-68.

P2. The background investigation process consists of two stages: the investigation itself, followed by an evaluation and approval decision made by a Review Board consisting of three commissioned officers. Ex. 14, at 15-16; Supp. Ex. 71 (Flynn Dep.) at 34-35. Completion of the background investigation is the final step; candidates who pass it are offered appointment. Supp. Ex. 71 (Flynn Dep.) at 34-35; Ex. 52, (Butler Dep.) at 21-23.

**RESPONSE: Admitted** that the background investigation process consists of two stages.

**Denied** that the "[c]ompletion of the background investigation [was] the final step," as this was often not true. Supp. Ex. 71 (Flynn Dep.) at 33-34; Ex. 44 at n.2.

P3. At the beginning of the background investigation phase, the commanding officer of the Certification Unit responsible for conducting background investigations is to meet with all background investigators to review the investigation procedure and disqualification criteria. Ex. 14, at 15-16.

**RESPONSE: Admitted** that designees of Commanding Officer of the Certification Unit would meet with background investigators for these purposes. Supp. Ex. 70 (Smith Dep.) at 45, 48-49

P4. If the candidate being investigated is a police officer, then the investigator is required to contact all references. Ex. 52 (Butler Dep.) at 44-45.

**RESPONSE. Denied.** *Infra* P19 ("There was no formal requirement to interview any particular number of references."); Supp. Ex. 70 (Smith Dep.) at 64; Supp. Ex. 71 (Flynn Dep.) at 48.

P5. If, during an investigation, an automatic disqualifier is discovered, then the investigator is to suspend the investigation, notify a supervisor and write up a summary of what was found. Ex. 14; Supp. Ex. 70 (Smith Dep.) at 55-56, 58. The summary is to be transmitted to the Review Board, which is to determine whether the investigation should be continued. Ex. 14; Supp. Ex. 70 (Smith Dep.) at 55-56, 58. If the investigation is completed, the background investigator is to complete an investigation report that recites the facts discovered during the investigation. Supp. Ex. 71 (Flynn Dep.) at 34-35. The conclusion of the report is to contain

the investigator's summary of positive and negative factors discovered.  This summary should be based on facts rather than opinions.  Supp. Ex. 71 (Flynn Dep.) at 54.

**RESPONSE:**  First and Second Sentences: **Denied**.  Supp. Ex. 70 (Smith Dep.) at 56.  Third and Fourth Sentences:  **Admitted**.  Fifth Sentence: **Denied** as unsupported by the record citation provided.  *See also* Supp. Ex. 71 (Flynn Dep.) at 53-54; Supp. Ex. 70 (Smith Dep.) at 76-77.


P6. The investigation report is then to be provided to the Review Board, together with supporting documents (criminal record, motor vehicle violation record, copies of diplomas and grades, credit reports, military records, driving records, and copies of license and license to carry), plus the application and questionnaire). Ex. 52 (Butler Dep.) at 24-26; Ex. 14.  The Review Board is then to conduct an evaluation of the facts reported by the investigator, and approve or disapprove the candidate for admission to training.  Supp. Ex. 71 (Flynn Dep.) at 34-35, Ex. 14.  In the event that an applicant is rejected, she or he is to be provided the reasons for rejection.  Ex. 14.  All applicants are subject to the same review board process.  Ex. 14; Supp. Ex. 70 (Smith Dep.) at 28-30, 33-34, 47-48; Supp. Ex. (Flynn Dep.) at 33-35.

**RESPONSE:**  First Sentence:  **Admitted**.  Second Sentence: **Admitted** that the Review Board would conduct an evaluation of the facts reported by the investigator.  **Denied** that the Review Board would "approve or disapprove the candidate for admission to training."  The Review Board would decide whether a candidate had passed or failed the background investigation, which was only one requirement for admission to the Academy.  Ex. 45 at ¶¶ 2-10; Ex. 50 at ¶ 2. Third Sentence:   **Admitted** that a rejected applicant is provided with a summary of the reasons for rejection.  Ex. 28; Ex. 50 at ¶ 10.  Fourth Sentence:  **Admitted.**

P7. If the rejected candidate requests to be heard regarding the circumstances affecting the rejection, the Review Board is to afford the candidate a personal hearing.  Ex. 14.

**RESPONSE:  Denied.**  While the guidelines do state this, no such hearings were ever actually held, Ex. 52 (Butler Dep.) at 125, and the Superior Court affirmed (in prior litigation brought by Riley) that MSP indeed has no obligation to provide a hearing to candidates who are disqualified from the application process.  Ex. 120.

P8. There is no evidence that defendant ever conducted a job analysis of the background investigation process. Supp. Ex. 71 (Flynn Dep.) at 17, 22-25; Supp. Ex. 70 (Smith Dep.) at 22.

**RESPONSE:  Denied** as unsupported by the record citations provided.  In addition, Plaintiff's attempt to take discovery on this subject was disallowed as irrelevant by the Magistrate Judge. *See* [Doc. 84].  Plaintiff's attempt to draw inferences from a lack of evidence is thus unfounded and misleading.  There is no evidence on this subject because the Magistrate Judge found the subject irrelevant and precluded Riley's attempted discovery.  *See* [Doc. 84].   Riley declined to object to the Magistrate Judge's order in this regard.  *See Templeman v. Chris Craft Corp*., 770 F.2d 245, 247 (1st Cir. 1985) ("Absent objection by the plaintiffs, the district court had a right to assume that plaintiffs agreed to the magistrate's recommendation.").

P9. The only explanation available to background investigators or the Review Board that sets forth the knowledge, skills and abilities required for a successful candidate (other than the automatic and discretionary disqualifiers) is a general statement in an MSP regulation that states that candidates should be of "good moral character, sound work ethic, decision making

consistent with the Oath of Office, and otherwise suitable"[4].  Supp. Ex. 71 (Flynn Dep.) at

30-32; Supp. Ex. 72; Ex. 14.  Nothing in those documents explain what criteria should be

used to determine whether candidates in fact have the good moral character, sound work

ethic, and good decision-making skills to be a successful recruit.  Supp. Ex. 71 (Flynn Dep.)

at 51-52.  Two of the three members of the Review Board that considered Riley's application

had limited or no familiarity with Exhibit 14.  Supp. Ex. 107 (Christiansen Dep.) at 27-29;

McGinn 26-31.

**RESPONSE:  Denied.**  None of the statements are supported by the record citations provided.

In addition, the requirements for State Troopers, concerning good moral character and otherwise,

are extensively set forth not only in the Automatic and Discretionary Disqualifiers and Article

10, but also elsewhere in other Articles of MSP's Rules and Regulations and in the General

Laws.  Ex. 118; G. L. c. 22C, §§ 10, 14, 15.


P10.     Defendant did not establish any criteria for the Review Board to determine the weight or

importance of any particular factor employed to evaluate candidates – the Review Board was

just instructed to determine whether candidates suffered from any of the enumerated

disqualifiers.  Ex. 52 (Butler Dep.) at 37-38; Supp. Ex. 107 (Christiansen Dep.) at 36; Supp.

Ex. 70 (Smith Dep.) at 66-67.  Nor was the Review Board given standards as to how to

weigh or evaluate particular information discovered during the investigation in light of the

required knowledge, skills and abilities.  Rather, Review Board members relied on "common

sense."  Ex. 52 (Butler Dep.) at 42-43; Supp. Ex. 107 (Christiansen Dep.) at 37-38.

---

[4] This statement is contained in a 2013 version of "Article 10" of MSP regulations.  Defendant's witnesses claim
that a cognate regulation existed in 2011.  Butler 54-55.

**RESPONSE:  Denied.**  None of the statements are supported by the record citations provided.  *See also* Ex. 14 (providing specific guidance on how the Review Board was to weigh or evaluate particular information discovered).

P11.    The same factor (current alcohol or substance abuse) was identified on Exhibit 14, as both an "automatic disqualifier" requiring immediate suspension of the investigation and review by the Review Board (see ¶P5) and a "discretionary" disqualifier which did not, with no explanation as to how to determine whether the same factor should be treated as one or the other.  This was not viewed by defendant as problematic.  Supp. Ex. 70 (Smith Dep.) at 61-63.  "Trust" was the only means employed by defendant to ensure that the Review Board evaluated applicants consistent with defendant's knowledge, skill and ability criteria.  Supp. Ex. 71 (Flynn Dep.) at 55-56.

**RESPONSE:**  First and Second Sentences:  **Denied.**  "Currently abusing" drugs or alcohol was an automatic disqualifier; other issues regarding drugs or alcohol could be a discretionary disqualifier.  Ex. 14.  Third Sentence: **Denied** as unsupported by the record citation provided.  Moreover, Plaintiff's attempt to take discovery on this subject was disallowed by the Magistrate Judge.  *See* [Doc. 84]; Response to P8.

P12.    Neither of the individuals with primary responsibility for administering the background investigation process applied to Riley, specifically the Chief Administrative Officer of defendant's Division of Administrative Services, which is charged with administering the background investigation process, and the Commanding Officer of defendant's Certification Unit, which directly supervised the investigations, had any formal training in principles of

employee selection or selection testing.  Supp. Ex. 71 (Flynn Dep.) at 13-15, 22; Supp. Ex.

70 (Smith Dep.) 10-11, 20-22.  Neither had any experience designing personnel selection

programs, including background investigation programs.  Supp. Ex. 71 (Flynn Dep.) at 13-

15; Supp. Ex. 70 (Smith Dep.) at 22-24.  Neither had trained any others in how to design

and/or conduct background investigations.  Supp. Ex. 71 (Flynn Dep.) at 18; Supp. Ex. 70

(Smith Dep.) at 26.

**RESPONSE:  Denied** that these individuals had "primary responsibility for administering the

background investigation" for Riley; the individuals responsible for Riley were Trooper Lima

and the Review Board.  Def. SMF ¶¶ 76, 108.   The remainder of the statement is **Admitted** but

subject to the Magistrate Judge's conclusion that all such topics are irrelevant.  *See* [Doc. 84];

Response to P8.


P13.    None of the individuals who served on the Review Board that evaluated Riley's

application had ever served on a Review Board prior to their service for the 80th RTT to

which Riley applied.  Ex. 52 (Butler Dep.) at 17-19; Supp. Ex. 107 (Christiansen Dep.) at 22;

Supp. Ex. 108 (McGinn Dep.) at 15.  None were trained regarding their responsibilities as

board members, Ex. 52 (Butler Dep.) at 21, 33; Supp. Ex. 107 (Christiansen Dep.) at 25;

Supp. Ex. 108 (McGinn Dep.) at 21.  Most had no memory of being told what their

responsibilities were to be.  Ex. 52 (Butler Dep.) at 20; Supp. Ex. 107 (Christiansen Dep.) at

25.  Nor had any of the Review Board members been trained in the conduct of background

investigations.  Ex. 52 (Butler Dep.) at 14; Supp. Ex. 107 (Christiansen Dep.) at 25; Supp.

Ex. 108 (McGinn Dep.) at 16.  Two of the three had never conducted a background

investigation, Supp. Ex. 107 (Christiansen Dep.) at 31-32; Supp. Ex. 108 (McGinn Dep.) at

15, and the third had never conducted a background investigation for the MSP. The last

background investigation he had completed had been 11 years previously. Ex. 52 (Butler

Dep.) at 11, 13-14. One of the Review Board members, Christiansen, stated that he had no

opinion as to what was or was not a good background investigation and no understanding of

what methodology a background investigator should use. Supp. Ex. 107 (Christiansen Dep.)

at 32, 62-63. Qualification for participation on the Review Board was possession of the

requisite rank and availability. Ex. 52 (Butler Dep.) at 20, 27-29, 31; Supp. Ex. 107

(Christiansen) at 23-24; Supp. Ex. 108 (McGinn Dep.) at 19-20; Ex. 14.

**RESPONSE:** First, Second, Third, Fourth and Fifth Sentences: **Denied.** Ex. 50 at ¶ 11

(Detective Captain Frank Hart, who Plaintiff did not depose, also sat on Review Board for

Riley); Ex. 52 (Butler Dep.) at 11-15, 21-22; Supp. Ex. 108 (McGinn Dep.) at 15-16. Sixth

Sentence: **Admitted** that Kevin Butler had not performed a background investigation in 11

years. Seventh and Eighth Sentences: **Denied** as unsupported by the record citations provided.

*See also* Supp. Ex. 107 (Christiansen Dep.) at 34-37, 39-40, 43-44, 58-59; Ex. 52 (Butler Dep.)

at 18-20; 27-29; Ex. 50 at ¶ 1.


P14.   Defendant acknowledges that the purpose of a background investigation for employment

is different than that of criminal investigations, Supp. Ex. 70 (Smith Dep.) at 37-38, and that

the two are not identical, Ex. 52 (Butler Dep.) at 45-48. However, trainers of background

investigators were not required to have any experience in background investigation training.

Supp. Ex. 70 (Smith Dep.) at 44.

**RESPONSE: Denied.** None of the statements are supported by the record citations provided.

*See also* Supp. Ex. 70 (Smith Dep.) at 30-31, 37-38; Ex. 52 (Butler Dep.) at 45-49.

P15.　There were no written selection criteria for background investigators themselves, Supp.
Ex. 70 (Smith Dep.) at 32, and there is no evidence that prior experience as a background
investigator was required.  Supp. Ex. 70 (Smith Dep.) at 38.  The only selection criterion
defendant seemed to use was that background investigators be employed as an investigator in
a detective unit or District Attorney's office, Supp. Ex. 70 (Smith Dep.) at 29-32, and were
available.  Ex. 52 (Butler Dep.) at 20; Supp. Ex. 107 (Christiansen Dep.) at 23-24.  Many
background investigators, including Lima, were assigned background investigations in
addition to their regular duties, and were expected to complete the investigation
responsibilities while performing those regular job duties.  Ex. 53 at 3-4; Ex. 49 (Lima Dep.)
at 69; Ex. 52 (Butler Dep.) at 36.

**RESPONSE:**  First and Second Sentences: **Denied** as unsupported by the record citations
provided.  Third Sentence:  **Admitted**.


P16.　Contrary to MSP's stated procedure, see ¶P3, the Commanding Officer of the
Certification Unit did not meet with the background investigators for the 80th RTT in order to
review the background investigation process and the disqualification factors.  Supp. Ex. 70
(Smith Dep.) at 48-49.

**RESPONSE: Denied.**  The Commanding Officer's designees conducted the meeting and
training.  Supp. Ex. 70 (Smith Dep.) at 45, 48-51.


P17.　Background investigator training consisted solely of investigators being provided
instructions regarding document completion, report format, Exhibit 14, a sample application

package and instructions and contact information regarding access to criminal and public records regarding the applicant. Supp. Ex. 70 (Smith Dep.) at 49-53. There was no written curriculum for the training, Supp. Ex. 70 (Smith Dep.) at 53, investigators were not told the reasons for the listed disqualifiers, nor given information regarding the attributes being investigated beyond the disqualifiers. Supp. Ex. 70 (Smith Dep.) at 60, 66. Although background investigator training was intended to last an 8-hour day, Supp. Ex. 70 (Smith Dep.) at 55, Lima, who actually underwent the training, testified that it lasted at most 2-3 hours. Ex. 49 (Lima Dep.) at 49. There is no evidence that defendant tested for whether background investigator training was successful in accomplishing its purposes. Supp. Ex. 70 (Smith Dep.) at 79.

**RESPONSE:** First and Second Sentences: **Denied** as unsupported by the record citations provided. *See also* Supp. Ex. 70 (Smith Dep.) at 49-56, 60, 64, 67. Third Sentence: **Admitted**. Fourth Sentence: **Denied** as unsupported by the record citation provided and, moreover, Plaintiff's attempt to take discovery on this subject was disallowed as irrelevant by the Magistrate Judge. *See* [Doc. 84]; Response to P8.


P18.    No background investigators were trained in how to avoid subjectivity or racial bias. Supp. Ex. 70 (Smith Dep.) at 78-79.

**RESPONSE: Denied.** Ex. 70 (Smith Dep.) at 78-79 (testifying that all State Troopers are trained on avoiding racial bias).


P19.    There is no evidence that MSP required background investigators to ask standard questions of personal or employment references, nor follow any particular protocol in

pursuing, questioning or reporting references. Supp. Ex. 71 (Flynn Dep.) 47-50; Supp. Ex. 70 (Smith Dep.) at 65. There was no formal requirement to interview any particular number of references. Supp. Ex. 70 (Smith Dep.) at 64. There was no protocol for conducting neighborhood visits. Supp. Ex. 71 (Flynn Dep.) at 49. No standard list of questions was provided regarding any other topic addressed during the investigation. Supp. Ex. 70 (Smith Dep.) at 65. Background investigators were not required to keep a log of documents received during the investigation, to retain notes they made, to retain any backup data for any statements made in the background investigation report, or to make or retain a record of attempts to reach references. Supp. Ex. 70 (Smith Dep.) at 68-69. Defendant appears to have made no attempt to monitor the quality or proficiency of its background investigators, not even by monitoring whether certain investigators disproportionately reject their subjects. Supp. Ex. 70 (Smith Dep.) at 72-73.

**RESPONSE:** First Sentence: **Denied** as unsupported by the record citation provided. Second Sentence: **Admitted.** Third and Fourth Sentences: **Denied** as unsupported by the record citation provided. Fifth Sentence: **Admitted.** Sixth Sentence: **Denied** as unsupported by the record citation provided and, moreover, Plaintiff's attempt to take discovery on this subject was disallowed as irrelevant by the Magistrate Judge. *See* [Doc. 84]; Response to P8.


P20. The sole monitoring function of the Certification Unit that supervises background investigations is to ensure that the application package contains all of the information that is required when it is provided to the Review Board. Supp. Ex. 70 (Smith Dep.) at 70-71.

**RESPONSE: Denied.** Supp. Ex. 70 (Smith Dep.) at 51, 57, 60.

P21.    All of the characteristics recited in ¶¶P8-P20, <u>supra</u>, are characteristics known to permit

the operation of bias and "invite the expression of conscious and unconscious prejudices."

Supp. Ex. 75, at 8-12, 13-15.

**RESPONSE:  Denied.**  Plaintiff's expert's opinions are not "facts" and, moreover, should be

struck.  *See* [Doc. 123]; [Doc. 124].   In addition, Plaintiff's attempt to take discovery on this

subject was disallowed as irrelevant by the Magistrate Judge.  *See* [Doc. 84]; Response to P8.


P22.    Statistics regarding the background investigations performed by the MSP for the 80th

RTT show a statistically significant disparity between African-Americans and whites who

failed their background investigations and were thus denied admission.  Supp. Ex. 74, at 2-3.

In the 80th RTT, eight African-American applicants passed their background investigations,

or 57.1% of African-Americans for whom background investigations were completed.  Id.;

Supp. Ex. 75, at 36. In contrast, 286 whites passed their background investigations, or 84.9%

of whites for whom background investigations were completed.  Id.  This difference is

statistically significant and highly suggestive of discrimination. Supp. Ex. 75, at 12-14, 36.

**RESPONSE:  Denied.**  Plaintiff's expert's opinions are not "facts" and, moreover, should be

struck.  *See* [Doc. 123]; [Doc. 124].   In addition, Plaintiff's attempt to take discovery about the

experience of *non-Lima* applicants was disallowed by the Magistrate Judge, *see* [Doc. 54], with

that Order later affirmed by this Court, *see* [Doc. 112].


## Orlando Riley's Background Investigation

P23.    When he completed his application for admission to the 80th RTT in spring 2011, Riley

was an experienced New Bedford police officer of ten years' standing, including the time he

spent at the police academy.  Ex. 47 (Riley Dep.) at 54.

**RESPONSE:  Admitted** that Riley entered the NBPD academy in December 2001.  The

remainder of the characterizations are **Denied** as unsupported by the record citation provided.


P24.    Per the MSP's stated procedure, Riley sat for the MSP entrance exam Ex. 47 (Riley Dep.)

at 111, and passed with a perfect score of 100. Exh. 31, at ¶2; Ex. 1, at ¶10; Ex. 15.

**RESPONSE:  Denied.**  The written entrance exam is administered by the Commonwealth's

Human Resources Division (not MSP), and allows for scores up to 102.  Ex. 45 at ¶¶ 3, 4, 6.


P25.    On April 4, 2011, Riley received a conditional offer of acceptance, Ex. 16.  In the days

following, up to and including May 3, 2011, Riley completed a written application using

defendant's electronic form.  Ex. 47 (Riley Dep.) at 111-113.  The application consisted of

29 questions with multiple subparts to each question.  Ex. 17.  Riley submitted his completed

application on May 3, 2011.  Ex. 47 (Riley Dep.) at 113.  Riley was not competing for

appointment against other candidates.  Multiple slots were available.  Ex. 45, at ¶¶2-10.

**RESPONSE:**  First, Second, and Third Sentences: **Admitted** except as to the date.  *See* Ex. 17

(Riley's original Application, dated May 2, 2011).  Fourth Sentence: **Denied** as unsupported by

the record citation provided.  *See also* Ex. 45 at ¶ 9.


P26.    Riley's application revealed that after a two year period following his graduation from

high school in 1996 when he pursued a secondary degree, Riley had been continuously

employed. Ex. 17, at MSP 78-79, 80. He had never been terminated from a job nor disciplined. Ex. 17, at MSP 84, 87. He had no criminal record, had never used illegal drugs, and never gambled. Ex. 17, at MSP 84-85. While employed as a New Bedford Police Officer, he had never been disciplined. Ex. 17, at MSP 87. He received a single bad review, but it was during the first four months of his employment in 2002 and the deputy chief of the department determined that it was without basis and improperly given. Ex. 17, at MSP 87. Riley had never been bankrupt, was not delinquent on any loans or taxes and had never had any negative interactions with any state agencies. Ex. 17, at MSP 88-90. His driver's license had never been suspended, and with the exception of a minor accident at work, his driving record was spotless. He had received no traffic citations in the previous seven years and his firearms license had never been revoked. Ex. 17, at MSP 90-91.

**RESPONSE: Admitted** to the extent that the statement describes the information provided on the face of Riley's Application, but otherwise **Denied** as unsupported by the record citations provided. Riley was disciplined while employed by NBPD (including a verbal warning subject to progressive discipline in connection with the Soares investigation), had a known history of poor credit, had received more than a "single" bad review at NBPD, had failed his RISP background investigation, and had gambled at least once. Ex. 6 at RISP00005-08; Ex. 33 at P00937; Ex. 29 at P0065; Ex. 86.


P27.    In Riley's application, he listed nine individuals in response to its request for references. Ex. 17, at MSP 92-94. Of those nine individuals, four were colleagues or former colleagues at the New Bedford Police Department. One of those four was one of his current supervisors (Sgt. Samuel Ortega); two were former supervisors (Lt. Paul Demers and Sgt. Joseph

Garcia); and one was a co-worker (Ofc. Nathan Monteiro).  Id.; Ex. 47 (Riley Dep.) at 403.

He also identified his other current supervisor elsewhere in the application (Lt. Dennis

Hebert).  Ex. 17, at MSP 79.

**RESPONSE:  Admitted.**


P28.    Following submission of his application, Riley completed and passed the required

physical fitness, medical and mental health screenings.  Ex. 47 (Riley Dep.) at 312-315.  On

July 13, 2011, Riley requested that the high school from which he had graduated, New

Bedford High School, send Lima a copy of his high school transcript, which it did on July 14,

2011.  Supp. Ex. 76, Supp. Ex. 77; Supp. Ex. 100 (Rebelo Dep.) at 12-13, 17-20, 23, 30-32.

The transcript contained a statement of Riley's class rank upon graduation.  Supp. Ex. 78.

**RESPONSE:  Admitted.**


P29.    Prior to his interview with investigator Lima, Riley completed a 102-question

questionnaire and submitted it to Lima.  Ex. 24; Ex. 47 (Riley Dep.) at 321-23.

**RESPONSE:  Admitted.**


P30.    On September 1, 2011, Riley attended an interview conducted by investigator Lima.  Ex.

47 (Riley Dep.) at 352.  He brought with him a letter from the Headmaster of New Bedford

High School confirming his graduation from that school in June 1996.  Supp. Ex. 79. The

document did not contain his class rank.  Supp. Ex. 79.  He brought this in lieu of his

diploma, which Riley no longer had.  Supp. Ex. 80, at 4.

**RESPONSE: Admitted.**

P31.    Riley also brought to the interview a copy of a letter from his real estate lawyer verifying

his response to Question 21B on the application, which inquired as to whether Riley was 180

days delinquent on any financial obligation.  Ex. 17, at MSP 88; Supp. Ex. 81; Ex. 47 (Riley

Dep.) at134-39.  Riley had explained in his application, and the letter confirmed, that he had

resolved a dispute regarding a home loan in which he had been the victim of fraud and that

his mortgage debt was no longer owed.  Ex. 17, at MSP 88; Supp. Ex. 81; Ex. 47 (Riley

Dep.) at 134-39.

**RESPONSE:  Admitted** that Riley testified that he brought a copy of the letter to the interview.

**Denied** that the letter "verifi[ed] [Riley's] response to Question 21B" or that the "letter

confirmed" Riley's explanation.  *See* Ex. 27 at 9-10 (Lima noting that the documentation

provided by Riley did not show that he had been "alleviated . . . from this financial burden"); Ex.

90 (Riley was not released from financial obligation until September 14, 2011).


P32.    Riley's interview with Lima lasted approximately three hours.  Ex. 47 (Riley Dep.) at

353.  During the course of the interview, Lima was unaccountably and needlessly suspicious,

hostile and condescending.  Ex. 47 (Riley Dep.) at 355, 424-28.  He repeatedly bragged about

how "squared away" his own application to the MSP had been, and spent excessive amounts

of time repeating the same questions to Riley on the same subjects.  Ex. 47 (Riley Dep.) at

353-355, 424-28.  He repeatedly challenged Riley's response in the negative to Question 19,

which inquired about whether Riley ever gambled, asking him the same question repeatedly

for approximately 10 minutes. Ex. 47 (Riley Dep.) at 354-55, 424-28; Ex. 33.  Lima

repeatedly denigrated the racially diverse, Supp. Ex. 110 (Riley Aff.), at ¶5, neighborhood in

which Riley lived, including by stating that Riley did not live in an appropriate neighborhood for a state trooper. Supp. Ex. 82, Response to 6; Ex. 47 (Riley Dep.) at 408-409; Supp. Ex. 80 at 5; Supp. Ex. 105, at 8. He insinuated that Riley could have forged the graduation verification he had brought from New Bedford High School. Supp. Ex. 80, at 4. He claimed that a union was a "professional trade organization" and demanded Riley change his answer to a question as to whether he was a member of such an organization from "no" to "yes," which Riley did against his will. Ex. 47 (Riley Dep.) at 145; Ex. 17, at MSP 92 (Qn. 27). Lima also repeatedly insisted in an aggressive and hostile manner that Riley had been reprimanded as a result of an internal NBPD Internal Affairs investigation in which he was a subject over Riley's repeated denials, and that Riley had failed to disclose this fact. He pointed to a document he claimed to have obtained from Riley's New Bedford Police Department file that he claimed showed Riley to have been reprimanded. Ex. 47 (Riley Dep.) at 213-222, 427-28; Ex. 33.

**RESPONSE:** First Sentence: **Admitted.** Second and Third Sentences: **Admitted** that Riley testified that Lima told him "how squared away" and "prepared" he had been for his own application; that he perceived Lima as "talking down" to him about his mistakes and telling him that "as a police officer" he should not have made so many mistakes; and that Lima "discuss[ed] certain things over and over again" that Riley thought were "not really consequential." Ex. 47 (Riley Dep.) at 353-355, 424-28 (emphasis added). The remainder of the characterizations are **Denied** as not supported by the record citations provided. Fourth Sentence: **Admitted** that Lima asked a number of questions about gambling, before Riley eventually admitted that he had gambled at least once before. Ex. 33 at P00936-37. The remainder of the characterizations are **Denied** as unsupported by the record citations provided. Fifth Sentence: **Denied.** *See* SMF ¶¶

175-77.  Riley's statement in his affidavit that his former neighborhood was "racially diverse," Supp. Ex. 110, is irrelevant and inadmissible as improper and inadequately supported opinion; as lacking any adequately-stated basis in personal knowledge; as conclusory; and as lacking any tendency to suggest that this is what Lima was referring to.  Lima's references to the appropriateness of Riley's neighborhood related only to the fact that Riley lacked a garage or driveway, which was required in order to bring an MSP cruiser home.  Ex. 105 at P00713-14.  Sixth Sentence:  **Admitted** that, according to Riley, Lima stated, "This paper you brought me . . . should have been sent to me.  How do I know you didn't somehow have this letter doctored to make it look like you graduated from high school.  You're going to have to send this to me." Supp. Ex. 80 at P00157.  *See* Ex. 113, 114, 115.  Seventh Sentence:  **Admitted** that Riley changed his answer to this question, but the remainder of the characterizations are **Denied** as unsupported by the record citation provided.  Eighth and Ninth Sentences:  **Admitted** that Lima showed Riley the June 18, 2010 Memorandum and questioned Riley at length about the document.  The remainder of the characterizations are **Denied** as unsupported by the record citations provided.

P33.    Lima completed two investigation reports regarding Riley.  His first was dated September 5, 2011/September 7, 2011 ("First Report").  Ex. 27.[5]  His second was dated September 28, 2011 ("Second Report").  Ex. 30.

**RESPONSE:  Admitted** that Riley's Background Investigation Report was dated September 5/7, 2011, and his supplemental memo was dated September 28, 2011.  Ex. 27; Ex. 30.  The characterization contained in the footnote is **Denied.**  Ex. 27 at MSP0063, 71 (report was

---

[5] The background investigation report bears both dates.  Lima was unable to explain why. Lima I:126.

"updated" on September 7, 2011 to account for phone call of that day in which "Nancy Ward . . . informed [Lima] that Orlando did attend [Bishop Stang] for a year but did not return the following year based on academic performance.").

P34.　At the conclusion of Lima's First Report, he listed three "positive employment aspects" (one of which was qualified with a negative that Riley "appeared timid") and six "negative employment aspects," including but not limited to a claim that Riley had not been forthright on "disclosing disciplinary action (work and academic)" and was "untruthful about disciplinary action."  Ex. 27, at MSP 1900.

**RESPONSE:  Denied** that Lima intended timidity to be a "negative," which is unsupported by the record citation provided.  The remainder is **Admitted.**

P35.　Despite untruthfulness being an automatic disqualifier, Lima had not followed the MSP's stated procedure of suspending the investigation upon the discovery of same and awaiting further instruction from the Review Board.

**RESPONSE:  Denied.**  Riley provides no record citation for this statement.  *See also* Ex. 49 (Lima Dep.) at 211 (explaining that he did not reach the conclusion that Riley was untruthful until "at the end" when he "completed the report and . . . sent it forward").

### **"Untruthful About Disciplinary Action"**

P36.　The basis for Lima's conclusion in his First Report that Riley was "untruthful about disciplinary action" was Riley's purported failure to disclose that he had been reprimanded. Ex. 49 (Lima Dep.) at 153.  Lima states in the First Report that upon examining Riley's

NBPD employee file, he "found" that Riley "had received a written reprimand." Ex. 27, at 7. Lima also stated in his report that a "letter of reprimand" had been placed "into the file." Ex. 27, at 7. This was false, and Lima knew it to be false. He admitted at deposition that when he looked in Riley's file, he did not find an actual reprimand in it. Ex. 49 (Lima Dep.) at 174-175. The sole source of information upon which Lima's statement was based was a June 18, 2011 intra-office memorandum that <u>recommended</u> that Riley be reprimanded. Ex. 49 (Lima Dep.) at 148-150; Ex. 13. He admitted that a recommendation for a reprimand is not the same as a reprimand, that Ex. 13 did not say that Riley had been reprimanded, and that at the time he wrote as a fact that Riley had been reprimanded, he did not actually know this to be the case. Ex. 49 (Lima Dep.) at 169-172.

**RESPONSE:** First Sentence: **Denied.** The basis for Lima's conclusion that Riley was "untruthful about disciplinary action" was not only the June 18, 2010 Memorandum, which Lima took as evidence that Riley had been reprimanded, but also the fact that Riley had failed to disclose that he was the subject of the Soares investigation more generally. Ex. 49 (Lima Dep.) at 145-53, 170, 191, 246-49; Ex. 48 at 32-33, 35-37; Ex. 27 at 10. Second and Third Sentences: **Admitted.** Fourth, Fifth, Sixth, and Seventh Sentences: **Denied.** The testimony cited related to Lima's later-coming supplemental investigation, during which Lima learned that the recommended reprimand had never been acted upon. Ex. 49 (Lima Dep.) at 173-177. At the time of his interview and of his initial report, Lima fully believed that Riley had been reprimanded. Ex. 49 (Lima Dep.) at 145-53, 170, 191, 246-49; Ex. 48 at 32-37; Ex. 27 at 10. Furthermore, "information" indicating Riley's untruthfulness also came directly from the Application, Ex. 25, the Questionnaire, Ex. 24, and from Riley's own defensive and defiant tone

at the interview itself, Ex. 49 (Lima Dep.) at 190-91; Ex. 48 at 35-37; Ex. 50 at ¶ 7; Ex. 52 (Butler Dep.) at 92-94.

P37.    Lima and the MSP continued to state that Riley had been reprimanded years after it had been established beyond all doubt that Riley had never been reprimanded. Supp. Ex. 83, at 5-6; Ex. 49 (Lima Dep.) at 176-177.

**RESPONSE: Denied.** Lima acknowledged learning that the recommendation had never been acted on in his memorandum of September 28, 2011, Ex. 30 at MSP00075, and this fact was known to the Review Board at the time of its reconsideration decision, Ex. 50 at ¶¶ 11-12; Ex. 52 (Butler Dep.) at Tr. 76-81, 130-32.  The document relied upon by Riley is an inadmissible and irrelevant lawyer-drafted pleading.  *See also* Ex. 49 (Lima Dep.) at 177-83; [Doc. 114].

P38.    Lima asked Riley during his interview if Riley had ever been disciplined, to which Riley responded that he had not.  Lima repeated the question and Riley repeated his answer.  Lima then asked if there was anything else regarding internal affairs Riley wanted to discuss, to which Riley replied that there had been an incident in November 2009 which he had been called to discuss with internal affairs, and that when the investigation began, he had not believed he was one of the subjects, but was rather a witness.  After speaking with internal affairs, he did not hear of the investigation again and assumed it was concluded.  He told Lima that long afterwards, on May 24, 2011, he had been called into his Chief's office and told that the Chief was sustaining the complaint against everyone involved, but there was no discipline rendered, and that nothing would be placed in his file.  Ex. 33; Ex. 13; Ex. 46 at 35.

**RESPONSE:  Denied** as unsupported by the record citations provided.  This paragraph consists entirely of unfounded characterizations of Riley's own words set forth in Ex. 33 which—as unhelpful as Riley may now find them—speak for themselves.  *See* Ex. 33; Def. SMF ¶¶ 151-60.


P39.     In response to Lima's claims at the interview that Riley had been reprimanded, Riley explained that he had not been reprimanded, and repeated that in fact he had only learned that he was a subject of a disciplinary investigation (the "IA Investigation") on May 24, 2011, Ex. 47 (Riley Dep.) at 207-208, or <u>after</u> he submitted his application.  Ex. 47 (Riley Dep.) at 221, 341, Supp. Ex. 84.  Lima held a document up to Riley's face, insisting it was a reprimand. Supp. Ex. 110, ¶8; Ex. 33.  Riley explained that there should be no reprimand in his file, because he had not been disciplined.  Ex. 49 (Lima Dep.) at 189 ("[Riley] told me that this letter should not be in his file because he had not been disciplined or something to that effect"); Supp. Ex. 84.  Lima concluded, however, notwithstanding the plain meaning of the words Riley conveyed to him, that Riley uttering the phrase "this should not be in my file" was stated not because of the explanation Riley gave him, but because Riley had hoped Lima would not find out about it.  Ex. 49 (Lima Dep.) at 191.  Lima was unable to state any basis for that conclusion other than the fact that Riley uttered the phrase.  Ex. 49 (Lima Dep.) at 191.  Riley did not view the document Lima used at his interview until document production during a case at the Massachusetts Commission Against Discrimination in 2012.  Ex. 47 (Riley Dep.) at 205-210.

**RESPONSE:**  First Sentence:  **Denied** as unsupported by the record citations provided.  *See also* Response to P38; Ex. 33 at P00937.  Second Sentence:  **Admitted** that Riley characterized Lima as having held the June 18, 2010 Memorandum "up to [his] face."  Ex. 33 at P00937.  Third

Sentence:  **Denied.**  Riley responded, "that's not supposed to be in my file."  Ex. 47 (Riley Dep.) at 22.  Fourth and Fifth Sentences:  **Admitted** that Lima testified that he believed that Riley was hoping that the Soares investigation would go undiscovered, and that he formed that belief based in part upon Riley's defensive response.  Ex. 49 (Lima Dep.) at 191.  The remainder of the characterizations are **Denied** as unsupported by the record citations provided and contrary to Lima's testimony.  Ex. 48 at 37-38; Ex. 49 (Lima Dep.) at 190-91, 248-49.  Sixth Sentence: **Denied.**  Riley read the June 18, 2010 Memorandum during his interview with Lima, after Lima showed it to him.  Ex. 33 at P00937.

P40.     On September 2, 2011, Riley's union representative, an 18-year veteran of the NBPD and a sergeant, Sgt. Ledo, called Lima and told him that Riley had not been reprimanded and had not even been told that he was a subject of a disciplinary investigation.  Ex. 84.  Lima failed to disclose this conversation in his report.  Ex. 27.

**RESPONSE:  Denied.**  This characterization of Ledo's call is not accurate.  Def. SMF ¶¶ 171-72; Ex. 84.  Furthermore, Ledo's call is expressly referenced in Lima's report.  Ex. 27 at 10 ("I spoke with a supervisor who stated that the letter was never supposed to have been placed into Orlando's file . . . .").

P41.     Riley later provided additional substantiation for his statement that the letter was not supposed to be in his file because he had not been disciplined.  On September 20, 2011, Riley's union attorney sent Lima an email with attached correspondence confirming that Riley had not been disciplined.  Ex. 86. On the same day, Riley sent Lima an email from that same attorney explaining that it was reasonable for Riley not to have been aware that he was

a subject of a disciplinary investigation and attaching correspondence to support that

statement. Ex. 85.

**RESPONSE: Admitted** that the Riley sent to Lima, or had sent to Lima, the documents

appearing at Exhibit 85 and 86. Lima, however, received the same attorney correspondence

earlier than September 20, 2011, as this too was referenced in his initial report. Ex. 27 at 10

("[T]he Union's attorney would send me correspondence relating the same information. I

received and reviewed the letter sent to me, which is enclosed in this packet, regarding Orlando's

reprimand. Despite this follow up, the letter was the same as I had read in Orlando's employee

file and, in brief, basically acknowledged the reprimand, denounced it but at no time was there

any language stipulating that there had been an agreement to not have the written reprimand

officially removed or never officially placed into Orlando's file."). The remainder of the

characterizations in the statement are **Denied** as unsupported by the record citations provided.

The documents confirm that Riley had been subject to a sustained finding of misconduct, which

NBPD considered subject to its progressive discipline policy. Ex. 85; Ex. 86.


P42.    Despite having the opportunity to do so in his Second Report, Lima did not mention the

supplemental evidence that Riley had supplied to him supporting his contention that he had

not been disciplined. Ex. 30. Instead, Lima claimed that he had learned for the first time that

Riley had not been reprimanded from a conversation with Riley's Chief Provencher on

September 21, 2011, Ex. 30, the day after multiple similar communications from Riley and

his union representative. Ex. 30, at MSP 75. The Second Report did not provide any

indication that Chief Provencher had told Lima that Riley had been aware that he had been a

target of the IA Investigation. Ex. 30.

**RESPONSE:**  First and Second Sentences:  **Admitted** that Lima did not mention Exhibits 85 or 86 in his supplemental memorandum, but did describe his conversation with Chief Provencher. Lima had already described the same so-called "supplemental evidence" in his first report.  Ex. 27 at 10; Response to P41.   The remainder of the characterizations are **Denied** as unsupported by the record citations provided.  Third Sentence:  **Denied.**  Ex. 30 at MSP00075 ("I gleaned from [Provencher] that Mr. Riley was in fact a target of the 2009 internal investigation . . . ").

P43.     In his Second Report, Lima acknowledged that Riley had not been reprimanded, and shifted the emphasis of his report to a claim that Riley was untruthful about disclosing that he had been a subject of a disciplinary investigation.  Ex. 30, at MSP 75.  However, Riley had disclosed at his interview that he had learned, three weeks after he completed his application that he had been a subject of such an investigation.  Ex. 47 (Riley Dep.) at 203, 208, 341-42; Ex. 13.  Moreover, all of the information Riley and his union representatives submitted to Lima after September 1, 2011 corroborated Riley's explanation, including Sgt. Ledo's telephone conversation with Lima on September 2, 2011, Atty. Conti's email to Lima on September 20, 2011 and Riley's email to Lima on that day.  See Supp. Exs. 84-86.

**RESPONSE:**  First Sentence:  **Admitted** that Lima acknowledged in his supplemental memorandum that he had learned that the recommendation for reprimand had never been carried out.  The remainder of the characterizations are **Denied** as unsupported by the record citation provided.  *See* Response to P36.  Second Sentence:  **Admitted** that Riley, only after being prompted by Lima, revealed at the interview that he had learned that he was a subject of the Soares investigation.  Ex. 33 at P0937; Def. SMF ¶¶ 151-55.  Third Sentence:  **Denied.**  Def. SMF ¶¶ 171-72; Supp. Ex. 85 ("[I]t doesn't say you weren't aware of the investigation."); Supp.

Ex. 86 (Riley could be subject to progressive discipline in future based on Soares investigation);

Ex. 27 at 10 (discussing why Lima discounted ", all of the information Riley and his union

representatives submitted").


P44.    Lima did not report having received any of the corroborating information he received

from Riley in his Second Report.  Ex. 27.

**RESPONSE:  Admitted** that Lima did not describe having received Exhibits 84, 85, or 86 in his

supplemental report; he already had in his first report.  Ex. 27 at 10.  The characterization of the

materials as "corroborating" is **Denied.**  Def. SMF ¶¶ 171-72; Supp. Ex. 85 ("[I]t doesn't say

you weren't aware of the investigation."); Supp. Ex. 86 (Riley could be subject to progressive

discipline in future based on Soares investigation);


P45.    None of NBPD's prior communications to Riley regarding the IA Investigation state that

Riley was its subject.  Exs. 8, 9; Supp. Ex. 87; Ex. 47 (Riley Dep.) at 189.  They are fully

consistent with Riley's statement in his application that, while he had never been a subject of

an internal investigation, he was interviewed by his internal affairs unit as a witness.  Ex. 17,

at MSP 87.

**RESPONSE:  First Sentence: Admitted** that these communications did not use the word

"subject."  Nevertheless, the meaning and import of the communications in that regard was clear.

Def. SMF ¶¶ 34-38.   Second Sentence:  **Denied.**  Def. SMF ¶¶ 34-48.  Chief Provencher, who

has since passed away, testified before the MCAD that Riley should have known from the start

that he was a subject of the Soares investigation.  Def. SMF ¶¶ 38, 54.

P46.     In 2006, Riley was present at an incident at 48 Nelson Street in New Bedford which

triggered an internal investigation (the "Stallings Investigation").   Defendant contends that

Riley's purported failure to disclose his involvement in that investigation is "after acquired

evidence" of Riley's untruthfulness, but it is only such if, like defendant, the evaluator is

biased.  An unbiased evaluator would realize that Riley's nondisclosure was the result of a

lack of knowledge, just like the IA Investigation.  Riley states that he was never informed

that he was a subject of the Stallings investigation, only a witness, the contemporaneous

documents he received from NBPD are consistent with that – none inform Riley that he was

a subject of an internal investigation.  Ex. 47 (Riley Dep.) at 235-238; Supp. Exs. 101-104.

Riley received a notification on May 10, 2010 that he was cleared of a 2006 complaint

against him regarding a "disturbance in the area of County Street and Nelson Street" with

unidentified complainants. He assumed this was a mistake because he had never been told

there had been a complaint against him, he had never responded to a disturbance "in the area

of County and Nelson Street," (as opposed to 48 Nelson St.), the underlying events had

occurred four years previously, and the department had just switched email accounts and had

been experiencing bugs.  Ex. 47 (Riley Dep.) at 246.

**RESPONSE:**  First Sentence:  **Admitted.**  Second, Third, Fourth, Fifth, and Sixth Sentences:

**Denied** as unsupported by the record citations provided, and as legal argument.  *See also* Def.

SMF ¶¶ 55-58.


P47.     Defendant contends that Riley was untruthful on his questionnaire, because in response to

a question in a section entitled "Criminal History," he answered "no" to the question: "Is

your name in a case report file with any police department or law enforcement agency that

you were aware of?" The term "case report file" is not defined in the questionnaire, Ex. 24, at MSP 126. As a police officer, Riley understood the term to mean a file regarding a criminal, not a work investigation. Ex. 47 (Riley Dep.) at 328-330. Neither Lima nor the Review Board found Riley's answers on the questionnaire to be of any significance. They are not referenced in Lima's First Report, Ex. 27, and they are not identified as the basis for his disqualification. Ex. 57, ln 59; Ex. 28.

**RESPONSE:** First and Second Sentences: **Admitted.** Third Sentence: **Denied** as unsupported by the record citations provided. *See also* Ex. 47 (Riley Dep.) at 326-30; Ex. 52 (Butler Dep.) at 134-36. Fourth and Fifth Sentences: **Denied.** Ex. 50 at ¶¶ 7(a), 10, 12(a); Ex. 52 (Butler Dep.) at 39-41, 73-74, 133-35; Ex. 51 at 6-11.


## References

P48.    Lima stated in his First Report that he "did not find anyone willing to go on record" about Riley's work performance and that the most anyone was willing to say was that he was a "good guy" and "alright worker." Ex. 27, at MSP 1895. Lima acknowledged that no one said anything negative about Riley. Ex. 49, at MSP 68-69. However, when asked at his deposition, Lima claimed not to recall who, or whether, he spoke with anyone who wished to remain anonymous, or what they said (beyond parroting what he wrote in his report). Ex. 49 (Lima Dep.) at 101-02. While he stated in defendant's answer to plaintiff's interrogatory No. 16 that he actually spoke to co-workers, Supp. Ex. 88, at 18, in his deposition he stated that if he spoke to Riley's co-workers and they gave statements regarding Riley, Lima would have made a note of it. Ex. 49 (Lima Dep.) at 111-112. Lima's notes do not contain any reference to conversations with Riley's co-workers. Supp. Ex. 89.

**RESPONSE:** First Sentence: **Denied** as unsupported by the record citation provided. *See* Ex. 27 at MSP0068-69 (Lima interviewed NBPD Lieutenant Paul Demers, and State Troopers familiar with Riley, who described him as a "good officer"; others were unwilling to go on record). Second Sentence: **Admitted.** Third and Fourth Sentence: **Denied.** Ex. 49 (Lima Dep.) at 101-02; Ex. 27 at MSP0068-69. Fifth Sentence: **Denied.** Ex. 27 at MSP0068-69 (noting that there were individuals who did not want to speak "on record about Orlando's work performance," but that any information they provided was "not instrumental in providing any information towards work ethic, personality, or character").

P49.     Contrary to MSP policy, ¶P4, Lima failed to speak with four out of the five current or former NBPD colleagues whose names Riley had provided. He failed to contact Riley's then-current supervisor, Capt. Dennis Hebert. Supp. Ex. 112; Ex. 49 (Lima Dep.) at 99-100. He failed to contact Riley's former supervisor Sgt. Joseph Garcia. Supp. Ex. 111; Ex. 49 (Lima Dep.) at 92-93; Ex. 47 (Riley Dep.) at 429-31. He failed to contact then-current co-worker Ofc. Monteiro and one of his then-current supervisors, Sgt. Ortega. Ex. 1, at ¶26; Ex. 49 (Lima Dep.) at 91-92, 111-12; Supp. Ex. 89. The only NBPD colleague Lima contacted was a Lt. Demers, someone he already knew and had worked with on cases together. Ex. 47 (Riley Dep.) at 435-436; Ex. 27, at 7; Ex. 49 (Lima Dep.) at 94, 200. Lima also spoke with two MSP troopers who Riley had identified in his application as troopers with whom he was acquainted, but they were not listed as references and Lima did not know how well Riley and the troopers knew each other. Ex. 49 (Lima Dep.) at 95-97.

**RESPONSE: Admitted** that Joseph Garcia claims that he was not contacted by the State Police, Ex. 111, that Dennis Hebert "cannot recollect being contacted by the Massachusetts State

Police," Ex. 112, and that Lima did contact Lt. Demers and the two State Troopers. The

remainder is **denied** as unsupported by the record citations provided. *See also* Response to P4.


P50.     In his First Report, Lima understated the positivity of Riley's references. He stated that

Riley's former employer called him a good, caring employee. Ex. 27, at 7; Ex. 49 (Lima

Dep.) at 201. He reported that Lt. Demers described Riley as a good person and officer who

was considerate and a decent worker. Ex. 27, at 7; Ex. 49 (Lima Dep.) at 111-12. He also

reported that the state troopers with whom he spoke characterized Riley as a good officer and

person, Ex. 27, at 8; Ex. 49 (Lima Dep.) at 95-96. However, when he summarized the

purported results of his conversations with Riley's NBPD colleagues, including that of

Demers, he claimed that they had said that Riley was a "good guy" who was an "alright

worker," Ex. 27, at 7, as if Demers had not said that Riley was in fact a good police officer.

At deposition, he similarly mischaracterized the state troopers' statements to him, again

omitting that they said he was a good police officer. Ex. 49 (Lima Dep.) at 97-98. He also

omitted any reference to the positive statements he had received from the single NBPD

colleague he had contacted, or from the state troopers, or from Riley's former employer, in

his summary of "Positive Employment Aspects" at the conclusion of Lima's report, as if they

had not been made. Ex. 27, at 12.

**RESPONSE:  Denied** as unsupported by the record citations provided. In addition, this

paragraph consists almost entirely of characterizations and legal argument, all so convoluted as

to make any point-by-point response impossible. Lima's background investigation report speaks

for itself. Certain of Riley's references regarded him as caring and compassionate, which was

reflected in Lima's "positive employment aspects." Ex. 27 at 7, 8, 12. Lima did not directly

mention references in his "positive employment aspects" for most candidates.  Ex. 58; Ex. 61; Ex. 64.

### **"Lack of Attention to Personal Credit Reporting"**

P51.    Lima stated in his First Report that Riley "disclosed" at his interview that his credit report

showed a delinquent mortgage, that the credit report showed that the relevant property may

have gone into foreclosure, and that Riley could not provide any documentation to

demonstrate that the matter had been resolved.  Ex. 27, at 9-10.  This was not true.  First,

Riley disclosed the matter in his application, (answer to question 21(B)), not at his interview.

Second, he provided a letter from his attorney to support his claim that the matter had been

resolved.  See ¶P31; Supp. Ex. 81; Ex. 47 (Riley Dep.) at 134-39.  He also provided Lima

contact information for the creditor's investigator.  Riley I:139.  Lima did not report any of

this information in his First Report. Ex. 27.  At deposition he testified that he did not

remember if Riley had given him this information.  Ex. 49 (Lima Dep.) at 193.

**RESPONSE:**  First Sentence:  **Denied.**  The report does not say "'disclosed' at his interview."

Ex. 27 at 9-10.  Second, Third, and Fourth Sentences:  **Admitted** that Riley disclosed the matter

on his Application, but otherwise **Denied.**  *See* Ex. 27 at 9-10.  Fifth Sentence:  **Admitted.**  Sixth

Sentence:  **Denied.**  Ex. 27 at 9-10 (Lima noting that Riley needed to provide "additional

documentation" and "official documentation" to demonstrate what had happened with the

mortgage).  Seventh Sentence: **Admitted.**

P52.    On September 15, 2011, Riley provided Lima with additional documentation

substantiating his account regarding the mortgage fraud, this time from the bank's mortgage

investigator, confirming that the matter had been resolved.  Supp. Ex. 90.  Despite having the

opportunity to do so in his Second Report, Lima did not correct his statement from his First

Report that Riley had not documented the mortgage fraud, and he made no mention of the

supplemental documentation he had received.  Ex. 30.  At deposition, Lima tried to suggest

that Supp. Ex. 90 had not been sent to his correct email address.  Ex. 49 (Lima Dep.) at 195.

However, when challenged, Lima confirmed that the email address on Supp. Ex. 90 was

correct.  Ex. 49 (Lima Dep.) at 205-207.

**RESPONSE:**  First Sentence:  **Admitted** that Riley provided the additional documentation at

Exhibit 90 on September 15, 2011.  Riley's characterization of the document is **denied** as

inconsistent with the document itself.  Second Sentence:  **Admitted** that Lima did not mention of

Exhibit 90 in his supplemental memorandum, which focused on issues of untruthfulness, which

had been the cause for Riley's disqualification.  Ex. 30.  Third and Fourth Sentences:  **Denied** as

unsupported by the record citations provided.


P53.    Lima also claimed the purported "lack of attention to personal credit reporting" was a

reference to Riley's omission of his $1,465 credit card balance on his single credit card in his

response to question 21C on his application seeking information regarding "loans" whose

outstanding balance exceeded $1000. Ex. 49 (Lima Dep.) at 238.  However, Riley did not

understand that his small credit card balance of $1,465 is what the question sought.  Ex. 33,

at P00938.

**RESPONSE:**  First Sentence:  **Denied** as unsupported by the record citation provided.  *See also*

Ex. 27 (making no mention of Riley's credit card balance).  Second Sentence:  **Admitted.**

P54.     Successful white applicant "JH" omitted any reference to his $40,410 credit card debt on

six credit cards, see Ex. 63, at MSP 3953; Supp. Ex. 91, at MSP 3872, 3874. However, Lima

did not comment about JH's purported lack of attention to personal credit reporting. Exh. 43,

MSP 3660. In fact, Lima claimed to have found "nothing to report" regarding JH's "negative

employment aspects," id. and he was accepted into the 80th RTT by the MSP. Exh. 43, MSP

3668.

**RESPONSE:** First Sentence: **Admitted** that J.H. did not disclose credit card debt on his

Application. Second Sentence: **Admitted** that Lima did not discuss J.H.'s personal credit

reporting in his report, although he did discuss J.H.'s financial preparedness more generally. Ex.

64 at MSP03659. Third Sentence: **Admitted.**


### "Not Completely Forthright on Disclosing Disciplinary Action . . .Academic"

P55.     In the educational history section of his application, Riley listed the high school from

which he had graduated in June 1996, Ex. 17, at MSP 78, and which he had attended for his

junior and senior years, Ex. 43 at Response 26, Ex. 47 (Riley Dep.) at 15-16, 20-21, but

mistakenly omitted other high schools he attended prior to his junior and senior year, because

he misunderstood the question and thought he only needed to list the high school form which

he had graduated. Ex. 47 (Riley Dep.) at 120-121.

**RESPONSE: Admitted** that Riley listed only his high school of graduation, which he had

attended for his junior and senior years. **Denied** that this was a "mistake[] or that he

"misunderstood the question." Def. SMF ¶¶ 17, 23 .

P56.    During their discussion of Riley's educational history at his interview with Lima, Riley

informed Lima that he had also attended Muskegon High School for his freshman year,

Bishop Stang High School for his sophomore year, (1993-1994), but left Bishop Stang

because his mother could not afford to pay the tuition.  Ex. 47 (Riley Dep.) at 124; Ex. 49

(Lima Dep.) at 134-135; Ex. 30, at MSP 75.  Bishop Stang is a parochial school located in

North Dartmouth, Massachusetts.  Ex. 43 at Response 26; Ex. 47 (Riley Dep.) at 15-17.

Lima instructed Riley to add Bishop Stang and Muskegon to his application, and to request

transcripts, and he did.  Ex. 25, at MSP 119; Ex. 33, at P00939; Ex. 47 (Riley Dep.) at 122-

123.  While Riley and Lima discussed that Riley had not performed well academically at

Bishop Stang, Riley explained that this was not the reason for his departure.  Ex. 47 (Riley

Dep.) at 124.

**RESPONSE:**  First Sentence:  **Admitted** that Riley told Lima that his leaving Bishop Stang

High School "saved his mother from having to pay."  Ex. 30 at MSP00075.  Second, Third, and

Fourth Sentences:  **Admitted.**  Fifth Sentence:  **Denied** as unsupported by the record citation

provided.  *See also* Def. SMF ¶¶ 164-68.


P57.    Riley also informed Lima that his mother enrolled him in Dartmouth High School, a

public school, for the fall of 1994 using his aunt's Dartmouth address as his residence, but

that the high school discovered this and required that his mother remove him due to lack of

residency after only a few weeks, at which point Riley completed his high school at New

Bedford High School.  Ex. 47 (Riley Dep.) at 18-21; Supp. Ex. 80, at P00157, 163.  Lima

instructed him that because of the brief period of time Riley was there, and because Riley

never had a transcript from the school, there was no need to add Dartmouth to his application.  Ex. 47 (Riley Dep.) at 122-24.

**RESPONSE:**  First Sentence:  **Denied** as unsupported by the record citations provided.  *See also* Def. SMF ¶¶ 164-68.  Second Sentence:  **Admitted** that this was Riley's testimony.


P58.    Lima stated as fact in his First Report that Riley told him that he left Bishop Stang due to a residency requirement, but that in fact Riley was forced to leave for academic reasons.  Ex. 27.  This was not what Riley had told Lima.  Lima acknowledged in his First Report that it makes no sense for someone to claim he left a private school because of residency, since it is common knowledge that such schools have no residency limits.  Ex. 27; Ex. 49 (Lima Dep.) at 133-34. Lima also stated in his report that he had "discovered" that Riley left Bishop Stang because of "academic performance" from a telephone call from a Nancy Wood of Bishop Stang High School, who he claimed informed him that Riley had.  Ex. 27, at MSP 1898; Ex. 49 (Lima Dep.) at 212.  However, Administrative Assistant Nancy Wood states in her affidavit that she has no memory of speaking with Lima about Riley and could not have told him the reasons for Riley's departure because she was not employed at Bishop Stang when Riley attended in 1993-1994, she did not know Riley, she had no knowledge of the reasons for his departure, she was not authorized to offer opinions to prospective employers about the reasons students did not return to the school and she never did so in 2011 or any other year.  Ex. 40, at P02519-20.  Ms. Wood's statement is consistent with school officials' strict confidentiality obligations towards student records.  Supp. Ex. 100 (Rebelo Dep.) at 11-12; Supp. Ex. 99 (Bettencourt Dep.) at 14, 18-20, 31.

**RESPONSE: Denied.** *See* Ex. 27 at MSP0071; Def. SMF ¶¶ 167, 173, 174, 197 & n.2-3. Furthermore, this paragraph consists almost entirely of characterizations and legal arguments, and is so convoluted as to make any point-by-point response impossible. Lima's initial report and supplemental memorandum make clear what he believed (and why) regarding Riley's leaving Bishop Stang High School. Ex. 27; Ex. 30.

P59.    Lima stated in his Second Report that Riley told him he left Bishop Stang at least in part because of finances. This was a key fact he omitted from his First Report. Ex. 27; Ex. 30, at MSP 75.

**RESPONSE: Denied.** Lima did not state this in his supplemental memorandum. *See* Ex. 30 (supplemental memorandum, reporting that Riley had said that he left Bishop Stang to New Bedford High School "due to the fact that he used his aunt's Dartmouth address and to avoid a residency conflict and therefore left Bishop Stang and saved his mother from having to pay for his high school").

P60.    Lima reported in his Second Report that he visited Bishop Stang, reviewed Riley's transcript with Assistant Principal Kathleen Ruginis, and discussed Riley's academic record with her. Ex. 30, at MSP 75. Ruginis confirmed Riley's assertion that Riley did not leave for academic reasons. Ex. 30, at MSP 75 ("According to [Ms. Ruginis] Mr. Riley did make up two of his classes and could return"). Nothing in that reported conversation revealed the reason why Riley left, or supported Lima's definitive statement that Riley left because of academics. Riley's transcript says nothing on a subject. Ex. 2. Ruginis herself states that she had no knowledge of the reason for Riley's departure. Ex. 41. Lima did not

acknowledge in his Second Report that Riley had not been untruthful about his reasons for leaving Bishop Stang.  Ex. 30.

**RESPONSE:**  First Sentence:  **Admitted.**  Second and Third Sentences:  **Denied.**  Ex. 30 at MSP0075 (Ruginis stated that Riley "could not return and stay at the high school" unless he re-enrolled in all failed courses not previously made up).  Fourth Sentence: **Denied.**  Ex. 2 (indicating multiple course failure that had not been made up).  Fifth Sentence:  **Denied.**  *See* Def. SMF ¶ 197 & n.3.  Sixth Sentence:  **Denied.**  Riley was untruthful about the reasons he left Bishop Stang.  *See* Def. SMF ¶¶ 6, 168, 173-74, 197 & nn. 2-3; Ex. 27; Ex. 30; Ex. 47 (Riley Dep.) at 44 ("Q. To the best of your knowledge, could you returned to Bishop Stang High School for junior year without making up those classes?  A.  No -- yes, I could have.  Q.  What -- sorry, can you please explain that?  A.  Because I could have repeated myself, my year there.  Q. Sorry, my question was could you have gone to your junior year at Bishop Stang without making up those classes?  A. No.")


P61.    Riley was not required to leave Bishop Stang for academic reasons.  Over the summer, he made up four of the seven classes he had failed his sophomore year over the summer.  Ex. 47 (Riley Dep.) at 146-47; Ex. 2.  He could have made up the remaining courses while he was attending Bishop Stang during his junior or senior year.  Ex. 47 (Riley Dep.) at 147-48.

**RESPONSE:**  First Sentence:  **Denied.**  Ex. 47 (Riley Dep.) at 41-44, 124-25; Ex. 27 at 10; Ex. 30 at MSP00075; Def. SMF ¶¶ 6, 168, 173-74, 197 & nn. 2-3.  Second Sentence:  **Admitted.**  Third Sentence:  **Denied.**  Ex. 47 (Riley Dep.) at 44 ("Q. To the best of your knowledge, could you returned to Bishop Stang High School for junior year without making up those classes?  A. No -- yes, I could have.  Q.  What -- sorry, can you please explain that?  A.  Because I could

have repeated myself, my year there.  Q. Sorry, my question was could you have gone to your junior year at Bishop Stang without making up those classes?  A. No."); Ex. 27 at 10.

P62.    Lima also stated in his Second Report that he visited New Bedford High School and "discovered" that Riley had briefly attended Dartmouth High School, and that it was Dartmouth High School, not Bishop Stang, from which he had been required to withdraw on account of residency.  Ex. 30, at MSP 75-76.  Lima describes this purportedly newly discovered information as if it were evidence of <u>Riley's</u> dishonesty, about residency, even though Riley had just turned 16 years old (d.o.b. Aug. 26, 1978, Ex. 17, at MSP 77) and was not responsible for enrolling himself in school.  Ex. 30, MSP 76; Ex. 47 (Riley Dep.) at 18-19.

**RESPONSE:**  First Sentence: **Admitted.**  Second Sentence: **Denied** as characterizations unsupported by the record citations provided.  *See also* Def. SMF ¶¶ 17, 23.

P63.    Lima claimed in his Second Report that Riley had not provided Lima with his New Bedford High School transcript, Ex. 30, at MSP 75.  This was not true.  New Bedford High School's records demonstrate that Riley's transcript was sent to Lima in mid-July 2011, well in advance of Riley's interview.  Supp. Exs. 76-77; Supp. Ex. 100 (Rebelo Aff.) at 12-13, 17-20, 23, 30-32.  Further, in his First Report, Lima noted that "no transcript" had been provided from Muskegon and Bishop Stang High Schools, but did not make the same note regarding New Bedford High School.  Ex. 27, at MSP 1893.  In the entry regarding New Bedford High School, Lima noted Riley's class rank.  The only document Lima received from New Bedford High School that contained Riley's class rank was Riley's transcript.  Ex. 27, at

MSP 1893; Supp. Ex. 78; Supp. Ex. 79; Supp. Ex. 100 (Rebelo Dep.) at 39-41; Supp. Ex. 99 (Bettencourt Dep.) at 24.

**RESPONSE:** First and Second Sentences: **Admitted** that Lima said this but, read in context, it is obvious that Lima meant to refer here to Riley's *Bishop Stang* transcript, which had not been provided, SMF ¶ 121, and which was the only record that showed that Riley "was a student at Dartmouth High School," Ex. 30 at MSP0075-76. *Compare* Ex. 2 (Bishop Stang transcript) with Ex. 78 (New Bedford High School transcript). Third, Fourth, Fifth, and Sixth Sentences: **Admitted.**

P64. The New Bedford School District keeps meticulous records, noting every request for transcripts and every occasion when an individual reviews a student transcript. Supp. Ex. 100 (Rebelo Dep.) at 10-12. Those records show that Riley's transcript was released to the MSP on July 14, 2011 at Riley's request, and that graduation verification letters were released on July 13, 2011 and September 7, 2011. They show no record of a release of Riley's transcript to Lima after Riley's interview on September 1, 2011.

**RESPONSE: Denied** as unsupported by the record citations provided.

## "Lack of Attention to Detail"

P65. The application form that Riley completed and submitted to the MSP does not include instructions. It does not contain definitions for terms or phrases that it employs. Nowhere is contact or any other information provided for an applicant to obtain clarification for the meaning of terms or phrases or questions. Ex. 17.

**RESPONSE:** First and Second Sentences: **Denied.** Not only are instructions and explanations provided throughout the Application itself, Ex. 17, but the Application was also accompanied by a separate "Instructions Sheet," Ex. 117. In particular, applicants were instructed that they must understand each question asked of them on the Application. Ex. 17 at MSP00096. Third Sentence: **Denied.** Ex. 47 (Riley Dep.) at Tr. 317 ("[Lima] said if I had any question about the material to contact him."); Ex. 49 (Lima Dep.) at Tr. 244.

P66. Riley completed his application electronically, but the software used to create the form caused errors where information added in the correct location appeared at an incorrect location. Ex. 47 (Riley Dep.) at 118-120, 144; Ex. 49 (Lima Dep.) at 122-24. For example, information regarding his his sister's and brother's employment appeared in the section regarding his own employment history. Ex. 47 (Riley Dep.) at 118-120, 144; Ex. 49 (Lima Dep.) at 122-24; Ex. 25, at MSP 103-104.

**RESPONSE: Admitted** that Riley testified that a computer "glitch" caused the mistakes referenced in this paragraph. **Denied** that there was any "software" involved; there was only a fillable PDF. Ex. 117.

P67. Riley misunderstood a question about his military history and checked "no" instead of "yes" in answer to a question as to whether he was registered for the selective service. Ex. 25, at MSP 105; Ex. 47 (Riley Dep.) at 125-126. This was a common mistake. Ex. 62, at MSP 3338 (Cand. "AP"); Ex. 47 (Lima Dep.) at 240-41; Supp. Ex. 96, at MSP 4421 (Cand. "JW").

**RESPONSE: Admitted.**

P68.    Defendant claims Riley failed to list a motor vehicle accident in which he had been

involved in response to Question 26F.  However, he had already reported the accident in a

previous section of the application, in Question 20E, that asked him if he had been involved

in a work-related traffic accident.  Ex. 25, at MSP 111.  He assumed that if the form had

already asked about work-related accidents, it would not make sense for the application to be

asking him to provide identical information in two separate questions.  Ex. 47 (Riley Dep.) at

142-144.

**RESPONSE:  Admitted** that Riley testified that he misunderstood the question.


P69.    Lima criticized Riley at his interview for failing to list his union as a "professional trade

association" in which he had a membership.  But Riley believed that a union is not a

professional trade association.  Ex. 47 (Riley Dep.) at 145.

**RESPONSE:**  First Sentence:  **Denied** as unsupported by the record citation provided.  Second

Sentence:  **Admitted**.


P70.    In his Second Report, Lima claims that he discovered that Riley had omitted an

application to the Providence Police Department in his response to Question 20, which bears

the title "Investigations Record."  Ex. 25, at MSP 110.  Specifically, question 20A asks if

Riley had undergone a background investigation previously, and then says "if yes," list all of

the departments Riley had applied to.  Ex. 25, at MSP 110.   Riley read this question to be

asking for a list of all departments for which Riley had undergone a background

investigation.  Ex.47 (Riley Dep.) at 129-131.  Numerous other questions are structured in

this format, specifically, they ask "if x," then list all examples of "x." type of question.

These include Questions: 8a ("Have you ever been suspended or expelled for any high school

. . . .? If 'YES', please explain"); 9a ("Have you had any extended work absences . . . ? If

'YES' please explain"); 12(A)("Are you registered for Selective Service?" If 'YES',

Selective Service Number"); 15 ("Does anyone reside with you . . . ? If 'YES', provide . . .

Name of Person/Relationship"); 16 ("Employment Termination: Has any of the following

[types of terminations] happened to you in the past ten . . . years? If 'YES', begin with the

most recent occurrence . . . providing the date fired . . . ."); 17A ("Have you ever been

convicted of a felony? . . . If you answered 'YES' to any of the above questions, explain

your answer (s)") et seq. For this reason, Question 20A was misleading, inconsistent with

the structure of other questions, and imposed an obstacle to reliability of background

investigations. Supp. Ex. 75, at 22; Supp. Ex. 110, ¶8; Exh. 33.

**RESPONSE:** First Sentence: **Denied** as a characterization unsupported by the record citation

provided. *See also* Ex. 30 (Lima writes that he learned from RISP about Riley's Providence

Police Department application, which Riley had failed to disclose both in response to Question

20.A., and which Riley had also failed to disclose in response to Lima's direct interview question

as to whether RISP and NBPD were the only police departments to which Riley had applied).

Second Sentence: **Denied.** This paraphrasing of Question 20.A. is not accurate. Ex. 25 at

MSP00110. Third Sentence: **Admitted** that Riley so testified. **Denied** that Riley believed this.

Def. SMF ¶¶ 22, 27. Fourth and Fifth Sentences: **Denied** as unsupported by the record citations

provided, and as contrary to Riley's own acknowledgement that he misunderstood the question.

Ex. 29. Moreover, Plaintiff's expert's opinions are not "facts" and, in any event, should be

struck. *See* [Doc. 123]; [Doc. 124].

**Different Standards Applied**

P71.   The spreadsheet entitled "80th RTT Candidate Background Results" sets forth the conclusions of the Review Board regarding the reasons for each unsuccessful candidate's rejection, including Riley's.  Ex. 51, at 10-11; Ex. 57 at ln. 59.

**RESPONSE:  Denied** as unsupported by the record citations provided.  The spreadsheet sets forth "the most important reasons for a candidate's failure."  Ex. 50 at ¶ 10.  *See* Ex. 51 at 6-11 (spreadsheet reflects "some of the reasons that we disqualified him"); Ex. 52 (Butler Dep.) at 41, 73, 133-35.


P72.   Candidate AG was disqualified because a report from the Dartmouth State Police confirmed a motor vehicle stop where marijuana was destroyed; an extensive driving history dating to 2003, including multiple license suspensions; and marginal employment references.  Sealed Ex. 57 at Row 58.  Candidate AG had 21 incidents listed in his background report, including speeding, no inspection sticker and license suspensions. Ex. 58, at MSP 4636.  AG also failed to fully disclose his drug use and medical issues until forced to do so by Lima during his interview with AG.  Ex. 58, at MSP 4641.  However, Lima did not label AG as "untruthful" in the Negative Employment Aspects of AG's investigation report, and in his discussion of AG's negative employment aspects, he said that AG "appeared repentant and appeared to disclose upon questioning."  Ex. 58, at MSP 4641.

**RESPONSE:**  First Sentence: **Admitted** that these were some of the most important reasons for A.G.'s failure.  *See* Ex. 50 at ¶ 10; Ex. 57 at Row 58.  Plaintiff omits the first listed reason: "Lied on application regarding use of drugs."  Ex. 57 at Row 58.   Second Sentence: **Admitted.**  Third

Sentence: **Admitted.**  Fourth Sentence:  **Admitted** that Lima did not use the word "untruthful" in A.G.'s negative employment aspects, and noted that A.G. was "repentant."

P73.　Candidate AP was disqualified because of performance warnings, reprimands and written warnings from former employer Poland Springs; poor reference interviews; failure to disclose a failed mental health test in an application to the Department of Correction; failure to disclose a termination from a former employer; and an incomplete and inaccurate application.  Sealed Ex. 57 at Row 360. AP also had a criminal history, but this is neither mentioned in Lima's summary of "negative employment aspects," Ex. 61, at MSP 3367, nor is it mentioned in the Review Board's summary of its reasons for rejecting his application. Ex. 62; Sealed Ex. 57 at Row 360.

**RESPONSE:**  First Sentence: **Admitted** that these were the most important reasons for A.P.'s failure.  *See* Ex. 50 at ¶ 10.  Second Sentence:  **Denied** as unsupported by the record citation provided, which demonstrates only that A.P. had appeared in criminal court, not that he had a "criminal history."  Ex. 61 at MSP03359.

P74.　Candidate JW was disqualified for non-payment of taxes in 2010, an extensive driving history, and an OUI in 2007 for which he never completed the required safety program. Sealed Ex. 57 at Row 60.  JW had 18 incidents on his driving record. Ex. 65, at MSP 4225. His record included speeding, no inspection sticker and multiple license suspensions.  Ex. 65, at MSP 4225 (JW).  Until his interview with Lima, JW failed to disclose one of his two terminations from prior employment, debts owed to the Department of Veterans Affairs, very substantial credit card debt, or the fact that he was delinquent on his 2009 and 2010 tax

returns, and that he owed unpaid taxes on his 2010 return.  Supp. Ex. 96.  Lima did not

accuse JW of untruthfulness or cover-up, or remark upon his two terminations.  Ex. 49 (Lima

Dep.) at 242-43; Ex. 65, at MSP 4223-4232.

**RESPONSE:**  First Sentence: **Admitted** that these were the most important reasons for J.W.'s

failure.  *See* Ex. 50 at ¶ 10.  Second and third sentences:  **Admitted.**  Fourth Sentence:  **Denied**

as unsupported by the record citations provided**.**  Lima and J.W. did discuss these issues prior to

the interview.  Ex. 116.  Fifth Sentence:  **Admitted.**


P75.    Instead of being characterized as "untruthful," JW's highly incriminating omissions were

instead characterized as "erroneous entries" that evidenced a "lack of attention to detail."  Ex.

94, at MSP 4232.  Neither JW's omissions nor his two terminations were mentioned in the

Review Board's summary of its reasons for rejecting his application, Ex. 66, and they are not

identified by defendant as reasons for his disqualification.  Sealed Ex. 57 at Row 60.

**RESPONSE:  Denied** as unsupported by the record citation provided.  *See also* Response to

P74.


P76.    Candidate JW also had a criminal history.  Ex. 49 (Lima) at 242-43.  JW's criminal

history was not remarked upon in Lima's investigation report, Ex. 65, at MSP 4801, 4223-

4232, nor was it mentioned in the Review Board's summary of its reasons for rejecting his

application, Ex. 66, and it is not identified by defendant as a reason for his disqualification.

Sealed Ex. 57 at Row 60.

**RESPONSE:** First Sentence: **Admitted.** Second Sentence: **Denied.** J.W. was disqualified in part because of an OUI, Ex. 66, and J.W.'s criminal history and drivers' history were summarized in Lima's report, Ex. 65 at MSP04224-25.

P77. Successful candidate JH's file contained a negative employment review in April 2011, reflecting an overall rating of "2" on a scale of 1-5. Supp. Ex. 109. This was not noted by Lima in his investigation report. Instead, he claimed that he formed an "impression" that JH's supervisor thought him to be an "exemplary employee" and identified JH's "work in the civilian/business sector" and "supervisory experience" as "positive employment aspects." (Ex. 64, at MSP 3656). When asked at his deposition, Lima could not identify the basis for his claim that JH was "exemplary." Ex. 47 (Lima Dep.) at 235. JH failed to list any reference to his $40,410 credit card debt on six credit cards, see Ex. 63, at MSP 3953; Supp. Ex. 91, at MSP 3872, 3874. He also failed to list any high schools he had attended. Lima also reported that JH admitted to using illegal drugs, yet this was not identified as a negative, but instead used as a "positive employment aspect." Ex. 64, at MSP 3660; Ex. 63, at MSP 3688, At the conclusion of his report regarding JH, Lima recited, among the 11 positive employment aspects he identified for JH, that JH was "honest", "trustworthy" and had "good academic record" and that he could not identify any negative employment aspects Ex. 64, at MSP 3660.

**RESPONSE:** First Sentence: **Denied.** There is no basis for the characterization of this employment review as "negative." Plaintiff has cherry-picked and de-contextualized just one of the employment reviews that was before Lima, which were overwhelmingly positive. *See* Ex. 119 (full records). Second Sentence: **Admitted** that Lima did not mention this performance

review.  Third Sentence:  **Admitted**.  Fourth Sentence:  **Denied** as unsupported by the record citation provided.  Lima simply could not recall.  Ex. 47 (Lima Dep.) at 235.  Fifth Sentence: **Admitted**.  Sixth Sentence:  **Admitted** that J.H. initially left off any high school, before later correcting.  Ex. 63 at MSP03943.  Seventh Sentence:  **Denied** as a characterization unsupported by the record citation provided.  J.H. acknowledged trying marijuana experimentally twice, Ex. 63 at MSP03950, and Lima credited J.H.'s honesty in so acknowledging as a positive employment aspect, Ex. 64 at MSP03660.  Eighth Sentence:  **Admitted.**


P78.    In his First Report, Lima said, in a purportedly positive employment aspect, that Riley "appeared timid."  Ex. 27, at MSP 1900.  No other candidate Lima reviewed contained a negative comment in a summary of "positive" employment aspects.  Compare Ex. 58, at MSP 4641 (AG), Ex. 64, at MSP 3660 (JH), Ex. 61, at MSP 3367 (AP), Ex. 65, at MSP 4232 (JW).  Lima does not state any factual basis for his evaluation of Riley as "timid."  Ex. 27.  Lima did not ask any of the references he interviewed whether Riley was "timid."  Ex. 49 (Lima Dep.) at 207.  Such subjective evaluative statements are not appropriate for a background investigation report. Supp. Ex. 75, at 18-19.

**RESPONSE:** First Sentence:  **Admitted.**  Second Sentence:  **Denied.**  Ex. 58 at MSP04640-41 (noting in A.G.'s positive employment aspects that A.G. had made "teenage mistakes" regarding poor academic performance, use of marijuana, and poor driving history); Ex. 65 at MSP04228, 4232 (indicating in J.W.'s positive employment aspects that "most" but not all of his former employers thought he was a "good worker"); Ex. 64 at MSP03660 (noting experimentation with marijuana in J.H.'s positive employment aspects).  Third Sentence:  **Denied.**  Ex. 27 at 10-11 (noting concerns with Riley's answers in response to questions about financial history).  Fourth

Sentence:  **Denied** as unsupported by the record citation provided.  Fifth Sentence:  **Denied.**
Plaintiff's expert's opinions are not "facts" and, in any event, should be struck.  *See* [Doc. 123];
[Doc. 124].  *See also* Supp. Ex. 71 (Flynn Dep.) at 53-54; Supp. Ex. 70 (Smith Dep.) at 76-77.


P79.    Lima did not label any other candidate he investigated, including those who, like Riley,

   made mistakes filling out their application such as successful candidate JH, as being

   "accepting of mediocrity."  Compare Ex. 58, at MSP 4641 (AG); Ex. 64, at MSP 3660 (JH);

   Ex. 61, at MSP 3367 (AP); Ex. 64, at MSP 4232 (JW).  Lima claims that this comment is

   based on Riley saying "it is what it is" in response to errors on his application. Ex. 49 (Lima

   Dep.) at 203-05. Riley did not say this.  Supp. Ex. 110 (Riley Aff.), at ¶4.  Lima could not

   point to a single error to which Riley had this response nor recount how many times it was

   said, Ex. 49 (Lima Dep.) at 203-205, and no reference to this statement appears in his

   investigation report.  Ex. 27.

**RESPONSE:**  First Sentence:  **Denied.**  While Lima did not use this exact phrase with other

candidates, he did record that A.P. displayed "[l]ack of attention" on the Application, Ex. 61 at

MSP03367, and that J.W. also displayed "[l]ack of attention to detail (numerous errors/erroneous

entries on application)," Ex. 65 at MSP04232.  Second Sentence:  **Denied** as unsupported by the

record citation provided.  The comment was based both on Riley's errors and Riley commenting,

"it is what it is" in response to those errors.  Ex. 49 (Lima Dep.) at 203-05; Ex. 27.  Third

Sentence: **Admitted** that Riley has provided an affidavit in which he denies he made this precise

statement.  Ex. 110.  Riley did testify, however, that he contemporaneously agreed with almost

all of the changes he had to make to his Application.  Ex. 47 (Riley Dep. at 118-26, 141-42, 152-

53.  Riley also told Lima that his mistakes were due to a "computer glitch," Ex. 49 (Lima Dep.)

at 121-22, when in fact there was no software or application involved other than a fillable PDF, Ex. 117.  Fourth Sentence:  **Denied.**  Ex. 49 (Lima Dep.) at 203-205; Ex. 27 at 12 (recording that Riley had "accept[ed] errors on application—per interview").

P80.     In contrast to his failure to interview all but one of Riley's references from his employer, Lima interviewed virtually all of the employer references from the other candidates he investigated.  See Exs. 58, 61, 64-65.

**RESPONSE:  Denied** as unsupported by the record citations provided.  *See also* Ex. 17 at MSP00092 (Application required that applicant provide at least ten unique, non-employer references); Ex. 64 at MSP03656-57 (Lima recorded four reference interviews for J.H.); Ex. 58 at MSP04639-40 (Lima recorded two reference interviews for A.G.); Ex. 61 at MSP03363 (Lima recorded five reference interviews for A.P.); Ex. 65 at MSP04228-29 (Lima recorded three reference interviews for J.W.).

**Review Board Decisions**

P81.     The Review Board reviewed Lima's report on September 7, 2011 and made its decision to reject Riley immediately.  Ex. 13.

**RESPONSE:  Admitted** that the Review Board reviewed Riley's background investigation and rejected him on the same day.  The characterization of an "immediate[]" decision is **Denied** as unsupported by the record citation provided**.**  *See also* Ex. 50.

P82.     Members of the Review Board disagreed on whether they reviewed any documents other than Lima's report.  See Supp. Ex. 107 (Christiansen Dep.) at 48, (only remembered

reviewing background investigation report); Ex. 52 (Butler Dep.) at 25, 35, 39-40 (Review

Board reviewed Riley's application, questionnaire, background investigation report, list of

disqualifiers); Supp. Ex. 108 (McGinn Dep.) at 41 (no memory of what was reviewed).

**RESPONSE: Denied.** There was no disagreement; Christiansen and McGinn simply could not

recall their review of Riley. Ex. 107 (Christiansen Dep.) at 28-29, 48-49; Ex. 108 (McGinn

Dep.) at 41. *See also* Ex. 52 (Butler Dep.) at 39-40.


P83.    The Review Board did no independent investigation or fact checking of Lima's assertions

in his report. Supp Ex. 107 (Christiansen Dep.) at 49-50 (did not recall performing any

independent investigation of facts or conclusions in BI reports or fact-checking of

investigator's conclusions); Ex. 52 (Butler Dep.) at 57-58; Supp. Ex. 108 (McGinn Dep.) at

33-35 (no recollection regarding whether he reviewed any materials, and if so, what). The

sole data source on which it relied was Lima. Supp. Ex. 107 (Christiansen Dep.) at 55-56;

Ex. 52 (Butler Dep.) at 99-104, 110-112. It also found Lima's list of positives and negatives

useful. Ex. 52 (Butler Dep.) at 43.

**RESPONSE:** First Sentence: **Denied.** The Review Board closely scrutinized the primary

source documents, including Riley's Application and Questionnaire. Ex. 50 at ¶¶ 6-12; Ex. 52

(Butler Dep.) at 35, 39-41, 73-74, 133-35. Second Sentence: **Denied.** Ex. 50 at ¶¶ 6-12; Ex. 52

(Butler Dep.) at 73-74; Ex. 57 at Line 59 & Ex. 27 (Review Board also considered Riley subject

to disqualification because he had failed his RISP background investigation, which was not

discussed in Lima's report); Ex. 29 & Ex. 50 at ¶¶ 11-12 (Review Board considered Riley's

letter of September 22, 2011 in its reconsideration decision). Third Sentence: **Admitted.**

P84.    On September 15, 2011, the MSP informed Riley that his application had been rejected

for two reasons: he was untruthful on his application and he was untruthful to the background

investigator.  Ex. 28.  The MSP did not inform Riley that he had a right to request a hearing

before the board.  Ex. 28.

**RESPONSE:** First Sentence:  **Admitted.**  Second Sentence:  **Denied** that Riley had "a right to

request a hearing."  *See* Def. Response to P7.


P85.    On September 18, 2011, stunned, Ex. 33, at P00941, at receiving the Review Board's

letter rejecting his application for "untruthfulness," Riley called Lima about the investigation.

Ex. 47 (Riley Dep.) at 357-58.  Riley did not raise his voice or "berate" Lima during this

conversation. Ex. 47 (Riley Dep.) at 358.  Riley asked Lima the basis for Lima's claim that

Riley had been untruthful, and Lima responded that it was that Riley had not disclosed his

"written reprimand," that he had told Lima that he left Bishop Stang for financial reasons, but

had in fact left because of academics, and that Riley did not disclose his application to the

Providence Police Department on his MSP application.  Ex. 47 (Riley Dep.) at 358-359.

Riley accurately informed Lima that none of these claims were valid, and that Lima should

correct his errors.  Ex. 47 (Riley Dep.) at 359.  Lima did not inform Riley that he had a right

to be heard by the Review Board in appeal of his rejection, but was told he could "contact

human resources" if he wished.  Ex. 47 (Riley Dep.) at 360-61.  Riley then contacted MSP's

human resources department and was told that he could "write a letter" about his objections.

Again, he was not told of his right to request a hearing.  Ex. 47 (Riley) at 362-363.

**RESPONSE:** First Sentence:  **Admitted** that Riley called Lima on September 18, 2011, and

claims to have been "stunned" by his disqualification.  Second Sentence:  **Denied.** Ex. 47 (Riley

Dep.) at 358-59 (acknowledging that he was mad on the phone call). Third Sentence: **Admitted** that these were the subject matters discussed, by the characterization is **denied** as unsupported by the record citation provided. Fourth Sentence: **Denied** as unsupported by the record citation provided**.** *See also* Ex. 30; Ex. 29. Fifth Sentence: **Denied** that Riley had a "right" to a hearing. *See* Def. Response to P7. Sixth Sentence: **Admitted.** Seventh Sentence: **Denied** that Riley had a "right" to a hearing. *See* Def. Response to P7.


P86.    Distressed about his rejection, Supp. Ex. 110 (Riley Aff.) at ¶6, on September 22, 2011, Riley wrote a letter to the Chief Administrative Officer of the Certification Unit, John F. Flynn (received on Sept. 26, 2011), explaining his objections to the MSP's decision. Exh. 12. He explained, as he had to Lima, that he had not in fact been reprimanded and attached documents from his Chief of Police and union representatives substantiating his claim. Ex. 29. He explained that he left Bishop Stang for financial, not academic, reasons. Finally, he explained that he had omitted the Providence Police Department application because he read the question on his application to only require information regarding those applications for which background investigations were conducted, and apologized for any misunderstanding. Ex. 29.

**RESPONSE:** First Sentence: **Admitted** that Riley has provided an affidavit in which he states he was "distressed," and that he wrote the September 22, 2011 Letter. Second, Third, and Fourth Sentences: **Denied** as characterizations unsupported by the record citation provided. Riley's September 22, 2011 Letter speaks for itself. Ex. 29.

P87.    On September 26, 2011, the Review Board, consisting of two of the same individuals who had rejected Riley's application (Butler and Christiansen) together with a third (Capt. Francis Hart) (the "Appeal Board") reviewed Riley's appeal and sustained the Review Board's original decision.  Supp. Ex. 95.  It was the MSP's practice to constitute an appeal board identical to the original Review Board whenever practical.  Ex. 52 (Butler Dep.) at 123-124.  However, such a feature is procedurally unfair, since it is well known among personnel selection specialists that the same body will tend to confirm its original decision even with new information.  Supp. Ex. 75.

**RESPONSE:**  First Sentence:  **Admitted.**  Second Sentence:  **Admitted** that this was Butler's practice.  Ex. 52 (Butler Dep.) at 123-124.  Third Sentence:  **Denied.**  Riley's expert's opinions are not "facts" and, in any event, should be struck.  *See* [Doc. 123; Doc. 124].


P88.    The only information Butler could recall receiving from Lima prior to the meeting of the Appeal Board was that Riley had not been reprimanded and that Riley had been a "target" of the New Bedford IA Investigation.  Ex. 52 (Butler Dep.) at 131-132.   This was discussed when the Appeal Board met.  Id.

**RESPONSE:**  First Sentence: **Admitted** that Lima had relayed the information from his phone call with the NBPD Chief, including that Riley had not received the recommended reprimand.  Ex. 52 (Butler Dep.) at 131-132.   Second Sentence:  **Admitted.**


P89.    There is no evidence that the entire Appeal Board considered Riley's September 22, 2011 letter or accompanying materials (Ex. 29).  Butler says that it did.  Ex. 52 (Butler Dep.) at 115-116, 120-121. Christiansen says it did not, Supp. Ex. 107 (Christiansen Dep.) at 70.

Butler also claims to have reviewed a copy of a letter provided to Lima from Riley's union representative, Sgt. Ledo, Supp. Ex. 84, explaining the reasons why Riley did not report that he had been a subject of a disciplinary investigation at NBPD. Ex. 52 (Butler Dep.) at 86-88. Neither document had any impact on the Review Board's decision. Butler dismissed Ledo's information, despite knowing him and having no basis to doubt his veracity. Ex. 52 (Butler Dep.) at 87-89. Butler dismissed Riley's statement (corroborated by the Ledo statement) that he did not know about being a subject of the IA Investigation because of Riley's "whole pattern of deception" for which his only source was Lima's reports. Ex. 52 (Butler Dep.) at 94-95. Based on the same "pattern of deception" as reported by Lima, he dismissed Riley's claim that he misread the question about law enforcement applications as well as his apology for his misunderstanding. Ex. 52 (Butler Dep.) at 117-118.

**RESPONSE: Denied.** This paragraph consists almost entirely of argument and characterizations unsupported by the record citations provided, and is so convoluted as to make any point-by-point response impossible. The very purpose of the September 26, 2011 meeting was to review the September 22, 2011 Letter and reconsider its decision in light of that letter. SMF ¶ 200. Christianson gave no such testimony. Ex. 107 (Christiansen Dep.) at 70. Butler explained in detail why he placed no weight on Exhibit 84, as it was an advocacy piece drafted by Riley's union representative, and because it was contrary to the other evidence of Riley's mendacity before the Review Board. Ex. 52 (Butler Dep.) at 87-92. The reasons for the Review Board's conclusions on September 26, 2011 are discussed in detail at Exhibit 50.


P90. Butler stated that he had been "concerned" by Lima's statement in his First Report that Riley had allegedly received a reprimand. Ex. 51, at MSP 451. When he later learned that

Riley had not received a reprimand, he claimed that it would not have impacted his decision. Ex. 52 (Butler Dep.) at 79, 81, 84. Butler testified that if he had seen Ex. 13, or 86, both of which clearly show that Riley had never been reprimanded, it would have had no impact on his decision. Ex. 52 (Butler Dep.) at 82, 84-85. He states that neither Supp. Ex. 84, nor an email from the union's attorney to Riley, Supp. Ex. 86, explaining that Riley was reasonable in believing himself not to be a target would have made a difference either. Ex. 52 (Butler Dep.) at 85.

**RESPONSE:** First Sentence: **Admitted.** Second Sentence: **Admitted** that whether or not Riley received the reprimand ultimately did not make a difference to the Review Board's decision, either initially or upon reconsideration. Ex. 50; Ex. 52 (Butler Dep.) at 79-84. Third and Fourth Sentences: **Denied** that any of these documents "show that Riley had never been reprimanded" or that "Riley was reasonable" in thinking he was not a subject of the Soares investigation. Ex. 13; Ex. 86; Ex. 84; Ex. 86; Ex. 49 (Lima Dep.) at 146-54, 246-47; Def. Response to P89; Def. SMF ¶¶ 34-41. **Admitted** that Butler testified that none of these documents would have made a difference, for the reasons largely summarized in Exhibit 50.


P91. Butler insisted at deposition that Riley had admitted that Lima's claim in his First Report that Riley gave a false reason for leaving Bishop Stang High School (financial reasons) and that Riley was actually forced to leave for academic reasons based on a conversation with Nancy Wood. Ex. 27, at 10; Ex. 52 (Butler Dep.) at 99-104; Ex. 49 (Lima Dep.) at 212. Despite Lima admitting in his Second Report that Riley had not been required to leave Bishop Stang, and despite reviewing Riley's September 22, 2011 letter that explained that he

was not expelled for academic reasons, Butler continued to insist that Riley was lying, again basing that opinion solely on Lima's reports. Ex. 52 (Butler Dep.) at 125-27.

**RESPONSE: Denied** as characterizations unsupported by the record citations provided. Butler testified that he recalled reading that Riley "eventually admitted that he had academic problems and then tried to say that if had gone back to take makeup classes, he would have been invited back." Ex. 52 (Butler Dep.) at 101-03. This was an accurate recollection of Riley's September 22, 2011 Letter, in which he acknowledged academic problems at Bishop Stang. Ex. 29. Lima's supplemental memorandum did not "admit[] . . . that Riley had not been required to leave Bishop Stang"; Lima accurately reported further confirmation that Riley had failed his sophomore year and could not return without making up classes. Ex. 30; Def. SMF ¶¶ 6, 168, 173-74, 197 & nn. 2-3.


P92.    Butler did not learn about any issue regarding Riley's application to the Providence Police Department until he saw Lima's Second Report. Ex. 52 (Butler Dep.) at 76-77. The Appeal Board made its decision on September 26, 2011. Ex. 52 (Butler Dep.) at 130; Supp. Ex. 95. The Second Report was provided on September 28, 2011. Ex. 30 (2d Investigative Report).

**RESPONSE:** First Sentence: **Denied.** Butler learned about the Providence Police Department issue prior to the reconsideration decision through, at least, Riley's own September 22, 2011 Letter. Ex. 29; Ex. 52 (Butler Dep.) at 115-16; Ex. 50 at ¶ 12(c). Second and Third Sentences: **Admitted.**

P93.     After Riley's interview with Lima on September 1, 2011, Lima scheduled a time to

conduct a home/neighborhood visit, but failed to show up on the promised date without

explanation or notice.  Ex. 33, at P00940.  Instead, he surprised Riley's fiancé at home,

stayed long enough to comment that she and Riley "did not live in the greatest

neighborhood," and left.  Ex. 56 (C. Riley Dep.) at 18-20.\

**RESPONSE:**  First Sentence:  **Denied** as unsupported by the record citation provided.  Second

Sentence:  **Admitted** that Riley's fiancée testified that Lima said this, but the remainder of the

characterizations are **Denied** as unsupported by the record citations provide.

Respectfully submitted,

MASSACHUSETTS STATE POLICE

By its attorneys,

MAURA HEALEY
ATTORNEY GENERAL,

/s/ Jesse M. Boodoo
Jesse M. Boodoo, BBO No. 678471
Nicholas Rose, BBO NO. 670421
Assistant Attorneys General
Government Bureau/Trial Division
One Ashburton Place, Room 1813
Boston, MA  02108
(617) 727-2200
jesse.boodoo@state.ma.us
nicholas.rose@state.ma.us

Dated:  December 18, 2017

## CERTIFICATE OF SERVICE

I, Jesse M. Boodoo, Assistant Attorney General, hereby certify that I have this day, December 18, 2017, served the foregoing document upon the attorney of record for all parties by filing it through the ECF system.

/s/ Jesse M. Boodoo
Jesse M. Boodoo