_____
                              )
                              )

**ORLANDO RILEY,**              )
                              )
          **Plaintiff,**         )
                              )
      **v.**                   )
                              )
                              )    **Civil Action No. 15-14137**
**MASSACHUSETTS DEPARTMENT**  )
**OF STATE POLICE,**       )
                              )
          **Defendant.**     )
                              )
                              )
_____)

## MEMORANDUM AND ORDER

**CASPER, J.**                                        **May 24, 2018**

### I.    Introduction

Plaintiff Orlando Riley ("Riley") filed a complaint against the Massachusetts Department of State Police ("MSP"), claiming that MSP discriminated against him on the basis of his race when it disqualified him from admission to the 2011 MSP Academy class. D. 11. MSP has now moved for summary judgment, D. 118, and to strike the expert report of Joel P. Wiesen, D. 123. Riley has also moved for additional discovery pursuant to Fed. R. Civ. P. 56(d). D. 128. The Court heard arguments on the pending motions and took the matters under advisement. D. 163. For the reasons discussed below, the Court DENIES MSP's motion for summary judgment, D. 118, DENIES Riley's Rule 56(d) motion as moot, D. 128, and DENIES MSP's motion to strike the expert report of Joel P. Wiesen, D. 123.

## II.    Standard of Review

### A.    Motion for Summary Judgment

Summary judgment is granted when there is no genuine dispute as to any material fact and the undisputed facts establish that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  "A fact is material if it carries with it the potential to affect the outcome of the suit under the applicable law."  Santiago–Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000) (quoting Sánchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996)).  A genuine dispute of material fact occurs when the factual evidence "is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The moving party carries the burden of establishing the absence of a genuine dispute of material fact and that it is entitled to judgment as a matter of law.  Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000).  If the movant satisfies this burden, the non-moving party may not merely refer to allegations or denials in her pleadings.  Anderson, 477 U.S. at 256.  Instead, he "must, with respect to each issue on which he would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in her favor."  Borges ex rel. S.M.B.W. v. Serrano–Isern, 605 F.3d 1, 5 (1st Cir. 2010).  "As a general rule, this requires the production of evidence that is 'significant[ly] probative.'"  Id. (quoting Anderson, 477 U.S. at 249) (alteration in original).  The Court must "view the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor."  Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009).

### B.    Motion to Strike Expert Testimony

Under Fed. R. Evid. 702, a qualified expert witness may testify "in the form of an opinion, or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."  Fed. R. Evid. 702; see United States v. Mooney, 315

F.3d 54, 62 (1st Cir. 2002). This rule "assign[s] to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Cipollone v. Yale Indus. Prods., Inc., 202 F.3d 376, 380 (1st Cir. 2000) (quoting Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 597 (1993)). "[T]he district court must perform [this] gatekeeping function by preliminarily assessing 'whether the reasoning or methodology . . . properly can be applied to the facts at issue'" by examining the several factors on a case-specific inquiry. Seahorse Marine Supplies, Inc. v. Puerto Rico Sun Oil Co., 295 F.3d 68, 80 (1st Cir. 2002) (quoting Daubert, 509 U.S. at 592-93). If the Court determines that the expert's testimony is reliable and relevant, "the traditional and appropriate means of attacking shaky but admissible evidence" is through "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." Milward v. Acuity Specialty Prods. Grp., Inc., 639 F.3d 11, 15 (1st Cir. 2011) (quoting Daubert, 509 U.S. at 590).

## III.    Factual Background

The following facts are undisputed unless otherwise noted. Riley, who is African-American, has been employed as police officer with the New Bedford Police Department ("NBPD") since 2002. D. 160 ¶¶ 1, 2. In April 2009, Riley sat for the MSP written examination, a prerequisite for obtaining an appointment with the MSP Academy (the "MSP Academy"), and received a raw, passing score of 100. D. 160 ¶ 88. In February 2011, Riley received a notification of eligibility thereby requesting confirmation of his interest to compete for the Academy class scheduled to commence in October 2011. D. 160 ¶ 89. MSP then provided Riley with a conditional offer of employment as Academy Trainee. D. 160 ¶ 90. In May 2011, Riley completed the application and submitted it to MSP the following day. D. 160 ¶ 91. The application contained a signature page which required Riley to certify that "I have read each question asked of me and

understand each question.  My statements on this form and any attachments to this form are true and correct to the best of my knowledge and belief are made in good faith."  D. 160 ¶ 93.  Riley signed and dated this page.  Id.  On May 2, 2011, Riley submitted a required notarized agreement certifying to the following:  "I understand that false or misleading information given herein or during interview(s) will result in my being disqualified from further consideration and/or terminated from employment with the Department of State Police."  D. 160 ¶ 94.  On question No. 8 of the application (which asked for the schools the applicant was attending or had attended beyond junior high school), Riley failed to list all of the high schools he attended.  D. 160 ¶ 98. On question No. 20(A) of the application (which asked an applicant to "list ALL of the [police or law enforcement] departments you have applied to"), Riley did not disclose his 1999 unsuccessful applications to the Providence Police Department ("PPD") nor to the New Bedford Police Department ("NBPD")  D. 160 ¶¶ 101, 102.   Question No. 20(E) asked, among other things, whether an applicant had ever been "a subject of an internal investigation or citizen's complaint," to which Riley checked a box for "NO," but also added, in the supplemental space provided on the application, that he had "never been a subject of investigation within my police department.  The only time I was interviewed by my internal affairs unit was as a witness."  D. 160 ¶ 104; D. 121-17.  The parties dispute whether Riley was aware at the time he answered this question that he was a subject of a NBPD internal affairs investigation (the "Soares investigation[1]").  D. 160 ¶ 105.

---

[1] The "Soares investigation" was an internal investigation performed by the NBPD involving an arrestee, John Soares.  As alleged, when Soares was brought to the NBPD headquarters to await booking, he sat on a bench in Riley's vicinity.  While awaiting booking, Soares managed to get out of the handcuffs.  Later that night when Riley and another officer escorted Soares and another arrestee to be transported, Soares took off running and escaped for several days.  The parties dispute whether Riley was responsible for this prisoner because, according to Riley, he was accountable for his own arrestee and Soares was under the charge of another officer.  Deputy Chief David Provencher then initiated misconduct proceedings and an investigation against Riley charging him with violating NBPD's rules and regulations in addition to allowing Soares to escape.

Riley contends that he learned of the investigation on May 24, 2011 and prior to that he was told he was merely a witness to the investigation. D. 160 ¶¶ 105, 107.

The background investigation is a phase in the MSP's hiring process that is organized and administered by the MSP's Certification Unit. D. 160 ¶ 70. This phase was conducted by MSP troopers, each of whom were assigned between five to ten candidates. D. 160 ¶ 71. Trooper Robert Lima ("Lima") was assigned by the MSP to conduct Riley's background investigation. D. 160 ¶ 108. Lima has been employed by the MSP since 2006. D. 160 ¶ 109. Lima conducted the background investigation between July and September 2011. D. 160 ¶¶ 108, 115. On July 7, 2011, Lima contacted Riley via telephone to initiate a conversation and informed Riley to reach out to him if he "had any question about the material." D. 160 ¶ 116. The parties dispute whether the MSP made it clear that errors discovered after completion of the application should be corrected over the phone and whether waiting to disclose such errors during the in-person interview would be later be perceived "untruthful." D. 160 ¶¶ 117 – 119. On August 17, 2011, Riley contacted Lima via email making him aware there had been changes to the contact information of the references he previously provided on his application. D. 160 ¶ 123. Riley did not indicate in this email that he had learned that he was a subject of the Soares investigation. D. 160 ¶ 125. On or about August 22, 2011, Riley sought to review his NBPD personnel file, however, the parties dispute Riley's reasons for doing so. D. 160 ¶ 126. MSP asserts that Riley "was worried that MSP might consider the Soares investigation to be a 'negative.'" Id. Riley, on the other hand, maintains that he simply "wished to confirm that no disciplinary information had been placed in it as he had assured would be the case." Id. On August 22, 2011, Riley again

D. 160 ¶¶ 29-34; D. 121-1-. Riley disputes that the investigation was exclusively and primarily focused on him. D. 160 ¶ 34.

emailed Lima to provide the name of his "RISP [Rhode Island State Police] background investigator," but did not mention the Soares investigation. D. 160 ¶¶ 127, 128.

Sometime prior to September 1, 2011, Riley also completed a questionnaire provided to him by Lima. D. 160 ¶ 129. This questionnaire similarly required applicants to certify that all statements are true and complete, which Riley did. D. 160 ¶¶ 132, 133. The parties dispute that Riley understood this certification to apply to the questionnaire only and not the application he had completed several months earlier. D. 160 ¶¶ 134, 135. Riley asserts that his answers on the questionnaire are not material facts since they were not the basis for MSP's rejection of his application. D. 160 ¶¶ 132-135, 138-141. Pursuant to a written release signed by Riley, Lima visited NBPD and reviewed Riley's personnel and internal affairs files on September 1, 2011. D. 160 ¶ 142. In doing so, Lima uncovered a June 18, 2010 Memorandum[2] with "[Chief] Provencher's further handwritten annotations from May 24, 2011." D. 160 ¶ 143. Upon discovery of this Memorandum, Lima believed that Riley had "received a written reprimand based on the Soares Investigation." D. 160 ¶ 145. The parties dispute whether Lima knew the documentation was merely for a recommendation for a written reprimand and not in fact a written reprimand. Id.

The parties also dispute whether Riley ever disclosed that he had later learned he was a subject of the Soares investigation. D. 160 ¶ 151. Riley maintains that he did disclose such information when Lima and Riley reached the topic of the investigations during the in-person

---

[2] At the end of the Soares investigation, Deputy Chief Provencher wrote a memorandum on June 18, 2010, to (then) Chief Ronald Teachman recommending that Riley receive a written reprimand due to the "sustained finding that Riley had violated NBPD's rules and regulations." D. 160 ¶ 41. Chief Teachman, however, did not act upon this recommendation before his retirement. D. 160 ¶ 42. After becoming Chief, Provencher informed Riley that he was being issued a verbal warning, that the case was closed and that "nothing was going in [Riley's] file. D. 160 ¶¶ 43-45. Provencher's annotation to the June 18, 2010 memorandum is dated May 24, 2011. D. 160 ¶ 143; D. 121-13.

interview. Id. When Lima asked why Riley had not disclosed this information until this point in the process, he explained "because there was no discipline involved and I would rather discuss this issue with you during my interview so that I could tell you in detail about the incident and there wouldn't be any misunderstandings." D. 160 ¶ 153. When Lima then asked why Riley did not discuss the incident on his application, Riley explained that he completed the application on May 3, 2011 and the "[C]hief did not make a decision on [the] matter until May 24, 2011." D. 160 ¶ 155. He added that he was not aware the Soares "investigation was still pending because it was so long in between the time when [he] first spoke with internal affairs until the time [the] [C]hief closed the investigations." Id. Riley maintains that Chief Provencher assured him that the incident would not be in his file given that he had not received a reprimand. D. 160 ¶ 159. On September 2, 2011, a NBPD union representative, at Riley's request, contacted Lima to discuss the Soares investigation. D. 160 ¶ 171. This representative informed Lima that "Officer Riley was in fact being truthful in any statement he provided as to not being the subject of an internal affairs investigation and as to not having been informed of any discipline as a result." Id.

Lima interviewed Riley for approximately three hours on September 1, 2011. D. 160 ¶ 146. The parties agree that portions of the interview were spent reviewing and correcting mistakes on Riley's application. D. 160 ¶ 147. The parties disagree, however, about Lima's tone and attitude during this interview which Riley characterizes as "suspicious, hostile and condescending" and contends that Lima "spent excessive time repeating the same questions on the same subjects, including challenging Riley's answer that he did not gamble, denigrat[ing] Riley's neighborhood, insinuate[ing] that Riley forged documents, claim[ing] he made mistakes that were not mistakes and repeatedly insist[ing] over Riley's denials that Riley had been reprimanded." Id. With respect to Riley's neighborhood, Riley contends that after the interview, Lima visited his residence located

on the third-floor of an apartment building in New Bedford.  D. 160 ¶ 175.  When Lima arrived, Riley was not home, however his fiancée answered the door and was surprised that Lima had gotten up to the third floor given that the entry to the building was "usually locked."  D. 160 ¶ 176. According to Riley's fiancée, once inside the apartment, Lima looked around the house and commented that they "might want to get [the] door checked because [they] don't live in the greatest neighborhood."     D. 160 ¶ 177.

Lima completed his background investigation report ("First Report") on September 7, 2011.  D. 160 ¶ 178; D. 121-27.  In the First Report, Lima stated that he learned that Riley had "additional debt" and that Riley had a loan of $65,000 due to a mortgage Riley took out on a property "that allegedly was cancelled."  D. 121-27 at 9-10.  Lima noted in this report that Riley had not provided any documentation indicating that he no longer had this debt and that upon reading the credit report, he learned the property may have gone into foreclosure.  Id.  Lima also noted that Riley informed him that the mortgage debt had been resolved but that Riley "could not provide any additional documentation to stipulate his claim."  D. 121-27 at 10.  Additionally, despite learning otherwise, Lima disclosed in this same section that "a written reprimand was to be placed in [Riley's NBPD] file" as a result of the Soares investigation.  D. 160 ¶ 178. Specifically, Lima noted that "[a]t no time did [Riley] list on his application or tell me about the internal investigations where he received a written reprimand."  D. 121-27 at 10.  Also in the First Report, Lima talked about Riley's missing high school transcripts.  Id.  Specifically, Lima mentioned Riley's failure to disclose and provide a transcript for Bishop Stang High School ("Bishop").  Id.  Lima noted that he asked Riley about such and that Riley stated he was under the impression that he was only required to produce the transcript for New Bedford High School, the high school from which he had graduated.  Id.; D. 162 at 10.  According to the First Report, when

Lima asked Riley for an explanation, Riley stated he left Bishop due to a "residency requirement." D. 121-27 at 10. According to Lima, because Bishop is a private school, Riley's answer did not seem plausible so he followed up with the school and spoke with the school's administrative assistant. Id. According to Lima, this source informed him that Riley had not returned the following year as a result of "academic performance." Id. Riley disputes that he ever told Lima the reason for not returning to Bishop was as result of a "residency requirement." D. 160 ¶ 165. Instead, Riley states he told Lima he did not return to Dartmouth High School, a public school, for this reason. Id. Moreover, an affidavit from the Bishop administrative assistant attests that she "did not know the reason(s) that [] Riley did or did not return to Bishop [], and [does] not recall having any conversation with Trooper Lima about [] Riley or why he did or did not return to Bishop." D. 121-40 at 3. In his application, Riley's listed nine references, four of which were colleagues or former colleagues at the NBPD. 160 ¶ P27. In the First Report, Lima stated he "did not find anyone to go record about [Riley's] work performance but only that he was a good guy who was caring and an 'alright' worker." D. 121-27 at 7. Riley contends that Lima failed to contact four of the five current and former colleagues including two of Riley's then-current supervisors. D. 160 ¶ P49. Rather, Riley argues, Lima opted to contact two MSP troopers mentioned elsewhere in his application and with whom Lima only was acquainted and were not among his listed references. Id. The MSP does not dispute that Lima contacted at least two of Riley's references consisting of Riley's then-current and former supervisors and the two aforementioned MSP troopers. Id.

On September 7, 2011, a three-person Review Board consisting of Major Kevin Butler, Major William Christiansen, and Captain Frank McGinn met to consider the applications of a number of candidates. D. 160 ¶ 181. The Review Board considered Riley's application and voted

unanimously to disqualify him. D. 160 ¶¶ 181, 182. According to MSP, the Review Board applies "an internal set of guidelines known as the 'Automatic and Discretionary Disqualifiers.[3]'" D. 160 ¶ 81. Riley contends, however, that the Review Board had "little information beyond that provided by the background investigator and routinely conformed to the background investigator's lead." D. 160 ¶ 183. By letter dated September 15, 2011, the MSP informed Riley of his disqualification from the October 2011 MSP Academy. D. 160 ¶ 189; D. 121-28. The Review Board determined Riley "was untruthful on his application" and "untruthful to his background investigator." D. 121-28.

On September 22, 2011, after learning of the disqualification, Riley wrote to the MSP requesting reconsideration of its decision. D. 160 ¶ 194. Around this time, Lima met with NBPD Chief Provencher who made him aware that although the recommendation for reprimand was initiated, it was never acted upon. D. 160 ¶ 196. In light of Riley's letter, the Review Board met on September 26, 2011 to reconsider the decision to disqualify Riley. D. 160 ¶ 200. This Review Board consisted of two original board members and Detective Captain Frank Hart. Id. Parties dispute whether the Review Board actually considered Riley's "appeal." D. 160 ¶¶ 200-203. Riley argues rather than forming an independent judgment as the MSP asserts, the Review Board again relied almost entirely on Lima's First Report and the information he provided. D. 160 ¶ 202. The MSP asserts that the Review Board again considered Riley's completed application and questionnaire as well as Lima's initial background investigation report and decided unanimously at their September 26, 2011 meet to sustain their decision to disqualify Riley. Id.; D. 121-50. On

---

[3] The "Automatic and Discretionary Disqualifiers" guidelines indicates that the candidates should automatically be disqualified if: "(1) 'they knowingly misrepresented or falsified information submitted on the Application and/or Personal History Statement, resumes or any other documents filed in conjunction with the hiring process for the Massachusetts State Police;' or (2) 'knowingly made false statement to the background investigator.'" D. 160 ¶ 83.

September 28, 2011, two days after the September 26th decision had been made, Lima submitted another report (the "Second Report").  D. 160 ¶ 199; D. 121-30.  The parties dispute whether the contents of this report were "truly 'findings' and not false statements" covering the findings of Lima's supplemental investigation.  Id.  In the Second Report, Lima indicated that, after been informed of his disqualification, Riley called him and "continued to berate [him]" and that "Riley's tone was accusatory and upbraiding."  D. 121-30 at 2-3.  In this report, Lima again mentioned Riley having been a subject of an internal investigation, but noted that "a letter of reprimand was initiated but the former Chief of Police never acted on the proposed disciplinary action." D. 121-30 at 3.  Lima also again mentioned the nondisclosure of Riley's attendance at Bishop in addition to other high schools that Riley failed to disclose.  Id.  As to Riley's prior unsuccessful applications to police departments, Lima also reported that he had reviewed the RISP Investigation record and that Riley received a letter of non-acceptance and that Riley was similarly turned down by the PPD "due to a poor or high enough test score."  D. 121-30 at 4.  The parties dispute whether Lima communicated information regarding all of his new findings to the Review Board.  D. 160 ¶¶ 203, 205.

By a letter dated September 28, 2011, the Review Board notified Riley that "after reconsidering the information presented in the first instance as well as the representations advanced in your letter [of September 22, 2011], the Review [Board] has affirmed its original decision to remove you from the process."  D. 160 ¶ 211.

## IV.    Procedural History

Riley initiated this action on December 14, 2015, D. 1, and filed an amended complaint on March 28, 2016.  D. 11.  Riley asserts a claim of racial discrimination under Title VII against the MSP.  D. 11, ¶¶ 55-57.  The MSP have now moved for summary judgment, D. 118, and to strike

the expert report and anticipated testimony of Joel P. Wiesen, D. 123. Riley has moved for

supplemental discovery under Rule 56(d). D. 128. The Court now turns to these pending motions.

## V.      Motion for Summary Judgment

### A.      <u>Legal Framework</u>

When there is no direct evidence of discrimination under Title VII, as in this case, the Court

applies the <u>McDonnell-Douglas</u> burden-shifting framework. <u>Torrech-Hernandez v. Gen. Elec.</u>

<u>Co.</u>, 519 F.3d 41, 48 (1st Cir. 2008). Under this framework, the plaintiff must first establish a

prima facie case of discrimination. <u>Id.</u> In the context of a failure-to-hire, establishing a prima

facie case requires the plaintiff to show that he: "1) was within a protected class; 2) met the

employer's legitimate performance expectations; 3) was adversely affected; and 4) … [the

employer accepted] another with similar skills and qualifications." <u>Thomas v. Eastman Kodak</u>

<u>Co.</u>, 183 F.3d 38, 56 (1st Cir. 1999) (quoting <u>Mulero-Rodriguez v. Ponte, Inc.</u>, 98 F.3d 670, 673

(1st Cir. 1996)). If the plaintiff succeeds in this showing, the burden then shifts to the employer

who must articulate "a legitimate, nondiscriminatory basis for its adverse employment action."

<u>Torrech-Hernandez</u>, 519 F.3d at 48 (quoting <u>Hoffman v. Applicators Sales & Serv., Inc.</u>, 439 F.3d

9, 17 (1st Cir. 2006). If the employer does so, "the burden shifts back to the [plaintiff], who must

then show, by a preponderance of the evidence, that the 'reason given by the employer for the

discharge is pretextual, and, moreover, that it is pretext for [race] discrimination.'" <u>Id.</u> (citation

omitted). "The ultimate burden of proving unlawful discrimination rest at all times with [the

plaintiff]." <u>Tobin v. Liberty Mut. Ins. Co.</u>, 433 F.3d 100, 105 (1st Cir. 2005).

### B.      <u>Prima Facie Case</u>

"[A] complainant's initial burden of establishing a *prima facie* case of disparate treatment

is not onerous." <u>Johnson v. Allyn & Bacon, Inc.</u>, 731 F.2d 64, 70 (1st Cir.), <u>cert. denied</u>, 469 U.S.

1018 (1984). The MSP does not dispute that Riley has met the first three elements of a prima facie

case. The MSP asserts, however, that Riley cannot establish a prima facie case because he cannot demonstrate the fourth element – that he was similarly situated to any candidate hired by MSP. D. 119 at 18-19. Riley contends that JH, a Caucasian applicant, was indeed a similarly situated candidate. D. 135 at 14-15. The touchstone for considering comparators in a disparate treatment case is reasonableness. See Ray v. Ropes & Gray LLP, 799 F.3d 99, 114 (1st Cir. 2015). That is, "while the plaintiff's case and the comparison cases that he advances need not be perfect replicas, they must closely resemble one another in respect to relevant facts and circumstances." Id. (quoting Conward v. Cambridge Sch. Comm., 171 F.3d 12, 20 (1st Cir. 1999)). The comparator must demonstrate that there are enough common traits to permit a reasonable jury to infer discriminatory animus motivated the adverse action. See Rodriguez-Cuervos v. Wal-Mart Stores, Inc., 181 F.3d 15, 21 (1st Cir. 1999). "[T]he ultimate determination as to whether parties are similarly situated is a fact-bound inquiry and, as such, is normally grist for the jury's mill." Cordi-Allen v. Conlon, 494 F.3d 245, 251 (1st Cir. 2007).

Here, both Riley and JH both passed the written examination and were both investigated by Lima, during the same MSP Academy process, involving the same Review Board and – according to Riley – engaged in similar and, in some respects, more egregious conduct. D. 162 at 13-14. Riley asserts that despite JH's failure to disclose any of the high schools he attended, such nondisclosure neither drew Lima's attention nor did Lima assume, as he did with Riley, that JH was concealing negative information. Id. at 13. Instead, Riley contends, Lima ignored it and commented that JH had a "good academic record." Id. Riley further claims that Lima took exception to the fact that he did not disclose a credit card debt of $1,465.00 and that he was allegedly subject to a mortgage of $65,000.00, which Riley explained was a cancelled debt and submitted supporting documentation. Id. Riley alleges that despite the fact that successful

candidate JH made an arguably more egregious omission pertaining to the same question by failing to disclose six different credit card debts totaling $40,410.00 – Lima failed to even note these omissions on JH's investigation report and instead called him "honest" and "trustworthy." Id. He further asserts that although JH admitted to using illegal drugs and that his file contained an overall employment rating of "two" out of five, Lima likewise did not note this as "negative employment" on JH's investigation report. D. 160 ¶ P77. Instead, Riley argues, Lima noted that he "formed an 'impression' that JH's supervisor thought him to be an 'exemplary employee' and identified JH's 'work in the civilian/business sector' and 'supervisory experience' as 'positive employment aspects.'" Id. As alleged by Riley, JH also owed debts to the Department of Veterans Affairs, was delinquent on his 2009 and 2010 tax returns and failed to disclose that he owed 2010 taxes until his in-person interview with Lima. Id. Despite these omissions, Riley argues, Lima did not label JH as "untruthful," but instead JH passed the background investigation and he was subsequently accepted into the Academy. Id. Against this backdrop, there remains a genuine dispute of material facts as to whether Riley and JH are similarly situated. As such, this Court concludes that Riley has established a prima facie case under Title VII. See Thomas, 183 F.3d at 65. Since the "[e]stablishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee," Tex Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981), the burden shifts to the MSP to produce evidence that Riley's disqualification was for a legitimate, nondiscriminatory reason. Id.

### C. Nondiscriminatory Justification

The MSP offers a non-discriminatory reason for rejecting Riley's background investigation: that Riley was untruthful in his application, questionnaire and in-person interview. D. 119 at 22. Riley does not dispute that this constitutes a nondiscriminatory justification. D. 162

at 15.  Thus, it is Riley's burden to show that the MSP's proffered reason was pretext for race discrimination.

### D.    **Pretextual Justification**

This Court is aware that there is no "mechanical formula" to establish pretext.  <u>Chungchi Che v. Mass Bay Transp. Auth.</u>, 342 F.3d 31, 39 (1st Cir. 2003).   Whether a justification is pretextual depends almost entirely on the facts of each case and, as a consequence, courts are cautious about removing this query from the jury by way of granting summary judgment.  <u>See Thomas</u>, 183 F.3d at 57; <u>Hodgens v. Gen. Dynamics Corp.</u>, 144 F.3d 151, 167 (1st Cir. 1998); <u>see also</u> <u>Petitti v. New England Tel. & Tel. Co.</u>, 909 F.2d 28, 34 (1st Cir. 1990) (noting that "determinations of motive and intent, particularly in discrimination cases, are questions better suited for the jury, as proof is generally based on inferences that must be drawn, rather than on the proverbial 'smoking gun'" (citation and quotation marks omitted)).

In the present case, Riley contends that the MSP's justification for disqualifying him is pretextual because, had he been white, he would have been given the benefit of the doubt despite his errors on his application.  D. 162 at 15.  He argues that the MSP would not have regarded his omissions "as anything other than innocuous."  <u>Id.</u> at 20.  In support of this contention, Riley offered the aforementioned evidence of the difference in treatment between him and another applicant – JH – whom Riley alleges is similarly situated[4] and was accepted into the 2011 MSP Academy.  D. 162 at 14.  Riley specifically avers that Lima's background investigation process was biased and that he was treated differently from not only successful candidate JH, but also

---

[4] On March 22, 2018, Riley filed a motion for leave to supplement his summary judgment filings presenting evidence he characterizes as "newly discovered," regarding a possible second similarly situated comparator accepted into the same MSP Academy.  D. 168 ¶¶ 4-7.  The Court did not consider this evidence when deciding this summary judgment motion.  Accordingly, the Court denies Riley's motion to supplement the summary judgment record, D. 168, as moot.

treated more harshly than the three unsuccessful Caucasian candidates. Id. at 14-15. MSP claims that because Lima interviewed four Caucasians candidates in addition to Riley and rejected three of the four, the decision to reject Riley was not discriminatory, but instead based upon Lima's conclusion that Riley was untruthful in his application, questionnaire and in-person interview. D. 119 at 22. The fact that Lima rejected the other three Caucasian candidates, Riley contends, does not demonstrate that Lima did not discriminate against him because these candidates' "flaws" were far more egregious and thus, he was treated more harshly compared to these Caucasian candidates. D. 162 at 12. Riley claims a background check of these candidates revealed poor driving records including speeding, no inspection sticker, license suspensions and an OUI. Id. Additionally, Riley argues that one of the unsuccessful applicants was rejected for negative employment references and lying about drug use. Id. The remaining applicants, Riley asserts, were rejected for failure to pay taxes and/or criminal histories. Riley contends that notwithstanding these "flaws," Lima did not characterize these Caucasian candidates as untruthful, but instead noted that these omissions were minor. Id. at 14. Riley argues that unlike even the unsuccessful, Caucasian comparators, he has an excellent driving record, positive employment references, no criminal history, is current on his taxes and has never used drugs. Id. at 12.

With respect to MSP's argument concerning Riley's failure to disclose an alleged mortgage, Riley explains that not only did he disclose this mortgage on his application, but he also provided Lima, during his interview, with ample evidence establishing that he was a victim of identity theft and that the mortgage was not his loan and had been cancelled as fraudulent. Id. With regard to his credit card debt, Riley explains that since the question on the application called for the listing of "loans," he did not believe a credit card debt to be a "loan" and thus did not list it. Id. at 13. Riley argues that notwithstanding the fact that JH failed to disclose greater debt on

six different credit cards, Lima did not even mention this information on JH's report at all.  Id.

The MSP argues that, unlike JH, Riley's failure to disclose was purposeful and intended to conceal

negative information and thus rose to sufficient cause for disqualification.  Id. at 10-11.  Riley

responds that while it is true that he made some mistakes on his application and questionnaire, it

was not intended to be dishonest as Lima and the MSP subjectively assumed.  D. 135 at 12.

Addressing the issue of failure to disclose a written reprimand by the NBPD, Riley argues

that the MSP knew he was not untruthful because Lima's statement about such was false and that

Lima knew it to be false when he wrote it in his First Report for the Review Board's consideration

and later became the basis for his rejection.  Id. at 7-8.  Riley points to Lima's deposition during

which he conceded that the document Lima characterized as a reprimand was not a reprimand that

was imposed.  Id. at 8; D. 121-49 at 38-39.  Riley contends that when it became clear to the MSP

that he had been truthful in answering this question, MSP shifted gears, suggesting instead that

Riley failed to disclose that he had been a subject of an investigation.  Id.

When an employer provides "different and arguably inconsistent explanations" for

rejecting an employee, a reasonable jury may infer (but need not) that the articulated reasons are

pretextual.  Dominguez-Cruz, 202 F.3d at 432 (quoting Thurman v. Yellow Freight Sys., Inc., 90

F.3d 1160, 1167 (6th Cir. 1996) (observing that "[a]n employer's changing rationale for making

an adverse employment decision can be evidence of pretext"), opinion amended, 97 F.3d 833 (6th

Cir. 1996).  According to Riley, even in the Second Report, Lima failed to correct the error

regarding the absence of any written reprimand, which had been a centerpiece of the First Report.

D. 135 at 7-8.  Even as to the MSP's contention that, at a minimum, he did not disclose that he

was the subject of that investigation, Riley counters that he had disclosed that he was a witness in

an internal investigation in the application.  Id. at 8.  MSP further argues that Riley was also

untruthful in failing to disclose his unsuccessful 1999 application to the PPD. D. 119 at 5. Riley contends that his failure to disclose was not dishonest, but a mistake to a question that was confusing and structured in a fundamentally unfair manner. D. 135 at 11-12.

Riley further contends that MSP's background investigation process was susceptible to racial bias at the outset because it was ad hoc, subjective and lacked in standards. Id. at 3. Riley explains that with the exception of a list of "Automatic and Discretionary Disqualifiers," MSP did not provide its investigators with any objective guidance on how to determine the characteristics of "good moral character, sound work ethic, decision making consistent with Oath of Office, and otherwise suitable" or training on how to avoid subjectivity and/or bias. Id.; see e.g., Garrett v. Hewlett-Packard Co., 305 F.3d 1210, 1218 (10th Cir. 2002) (holding that pretext might be demonstrated when the evaluation system lacks objective standards or guidance).

This ad hoc background investigation process, Riley contends, is one reason why a disproportionate, 43% of African-American candidates failed the background investigation stage and was not even considered compared to 15% of Caucasian candidates who failed in the 2011 MSP Academy applicant pool. D. 135 at 3. Riley points to evidence of Dr. Wiesen's conclusion that this disparity is a consequence of MSP's flawed background investigation system underscoring a question of fairness. Id. at 4. Although statistical evidence alone may not probative of discrimination, McMillan v. Mass Soc. for Prevention of Cruelty To Animals, 140 F.3d 288, 303 (1st Cir. 1998) (quoting Bazemore v. Friday, 478 U.S. 385, 400 n.10 (1986)), "statistical evidence is permissible on the issue of pretext in a disparate treatment case since 'statistics as to . . . employment policy and practice may be helpful to a determination of whether [the employer's conduct] conformed to a general pattern of discrimination.'" Id. (quoting McDonnell Douglas Corp. v. Green, 411 U.S. 792, 805 (1973)).

Riley makes several additional arguments suggesting pretext. He asserts that Lima's repeated comments that he lived in a neighborhood that was unfit for a state trooper is evidence of pretext given that his neighborhood is racially diverse. D. 160 ¶ 147. He likewise contends that Lima misrepresented his references when Lima claimed that he could not find anyone at NBPD that was willing to go on record about Riley's performance and that this demonstrates pretext. Id. at 9. Notwithstanding numerous, positive references, Riley argues, Lima characterized him as merely an "alright worker" and also failed to list them as a "positive employment aspect" on the report. Id. To further demonstrate pretext, Riley similarly points to Lima's mischaracterization of his educational record by contesting that he was forced to withdraw from Bishop for academic reasons. Id. at 32. Given this record, this Court concludes that Riley has raised a genuine dispute of material facts at least as to the pretextual nature of the reason for being rejected from the 2011 MSP Academy such that the disputed factual record contains evidence from which a reasonable jury could find in Riley's favor as to this issue.

### E.     Liability Theory

MSP contends that to survive summary judgment, Riley must also establish negligence requiring him to prove that MSP reasonably should have known of racial animus on the part of Lima. D. 167 at 2-3. This Court disagrees. Title VII prohibits employers or potential employers from engaging in discrimination in the workplace. 42 U.S.C. § 2000e-2. Employer is defined as "a person engaged in an industry . . . and any agent of such person." 42 U.S.C. § 2000e(b). Most courts have recognized that the inclusion of "any agent" language was intended to encompass the doctrine of *respondeat superior* into Title VII. See Fantini v. Salem State Coll., 557 F.3d 22, 30 (1st Cir. 2009); Smith v. Metro. Sch. Dist. Perry Twp., 128 F.3d 1014, 1024 (7th Cir. 1997); Lenhardt v. Basic Inst. of Tech., Inc., 55 F.3d 377, 380 (8th Cir. 1995); Stults v. Conoco, Inc., 76

F.3d 651, 655 (5th Cir. 1996); Mason v. Stallings, 82 F.3d 1007, 1009 (11th Cir. 1996); Birkbeck v. Marvel Lighting Corp., 30 F.3d 507, 510 (4th Cir. 1994); Miller v. Maxwell's Int'l Inc., 991 F.2d 583, 587 (9th Cir. 1993); Hernández Torres v. Intercontinental Trading, Ltd., No. CIV. 94-1057 (HL), 1994 WL 752591, at *5 (D.P.R. Dec. 22, 1994) (holding that the "'employer' definition removes the possible defense of an employer who otherwise might attempt disowning responsibility for the acts of his employees or other agents").

At issue then is whether Lima's actions, while acting within the scope of his employment, are imputable to MSP. While it is true that discriminating statements and actions of ordinary employees are typically not imputable to the employer, courts have found animus is imputable to the employer when the employee is in a position to influence the key decisionmaker. Abramson v. William Paterson Coll., 260 F.3d 265, 285–86 (3rd Cir. 2001) (holding that "it is sufficient if those exhibiting discriminatory animus influenced or participated in the decision to terminate"); Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 55 (1st Cir. 2000) (explaining that plaintiff can demonstrate pretext for discrimination by "show[ing] discriminatory comments were made by the key decisionmaker or those in a position to influence the decisionmaker)"; Russell v. McKinney Hosp. Venture, 235 F.3d 219, 226 (5th Cir. 2000). Still, the biased, intermediary employee's conduct must be "a causal factor of the ultimate employment action." Staub v. Proctor Hosp., 562 U.S. 411, 420 (2011). This standard requires "some direct relation between the injury asserted and the injurious conduct alleged." Id. at 419 (quoting Hemi Grp., LLC v. City of New York, 559 U.S. 1, 9 (2010)).

Here, the MSP assigned Lima, although only a trooper, to conduct Riley's background investigation, D. 160 ¶ 108, and then the MSP (specifically, the Review Board) relied upon his investigation to disqualify Riley. That is, at the request of the MSP and while acting within the

scope of his employment, Lima produced two reports, one of which was submitted to the Review Board for the final determination of Riley's application. D. 160 ¶¶ 183, P33. It is undisputed that, at a minimum, the Review Board considered and relied upon Lima's First Report in making and then sustaining its decision to disqualify Riley. D. 160 ¶ 183. Under these circumstances, at a minimum, the record demonstrates that a genuine dispute of material fact exists regarding whether Lima's actions were the proximate cause of his disqualification by the Review Board, See Chattman v. Toho Tenax Am., Inc., 686 F.3d 339, 353 (6th Cir. 2012), and a reasonable jury may find that Riley can establish that MSP's stated reason for rejection is a pretext for discrimination by demonstrating discriminatory treatment on the part of Lima who was in a position to influence MSP – the decisionmaker. Mulero–Rodríguez, 98 F.3d at 675–76.[5]

---

[5] In resolving the summary judgment motion, D. 118, this Court did not consider Riley's Rule 56(d) motion, D. 128, and therefore denies D. 128 as moot.

**VI.     Motion to Strike Expert Report and Testimony of Dr. Wiesen**

MSP has moved to strike the expert report and anticipated testimony of Dr. Wiesen, an industrial psychologist, retained by Riley to opine on three issues in support of his racial discrimination claim: a) whether the background investigation system used by MSP for screening the 2011 MSP Academy promoted screening of job candidates fairly, accurately, and in a racially neutral manner ("Topic A"); b) whether the background investigation system used by Lima in screening for the 2011 MSP Academy promoted screening of job candidates fairly, accurately, and in a racially neutral manner ("Topic B"); and c) whether the background investigation system applied to Riley was fair, accurate, and racially neutral ("Topic C"). D. 124-1 at 4. As to each of these topics, MSP objects that all of Dr. Wiesen's opinions are not sufficiently supported by reliable methodology or data, that they invades the province of the jury, and admission of them would be more prejudicial than probative. In addition, as to Topic A, MSP also objects that any opinion about the MSP background investigation for the 2011 MSP Academy (and the results of same for African-American and non-African-American applications), and not just as it was employed by Lima, is not relevant to Riley's claim and would be unduly prejudicial to admit. The Court disagrees with both contentions and addresses each in turn.

As summarized above, the touchstones of determining the admissibility of expert testimony under Fed. R. Evid. 702 is whether the proffered opinion rests upon a reliable foundation and is relevant to the issues that the jury must decide. Cipollone, 202 F.3d at 380. As to a reliable foundation, as the expert report makes clear, Dr. Wiesen bases his opinion on his education, training, professional expertise and scientific methods. Although the MSP does not seriously question his credentials, Dr. Wiesen has worked in the development of fair and valid personnel assessment methods and instruments for the assessment, selection and promotion of employees.

D. 124-1 at 4-6.  He has developed selection tools for hundreds of police departments and fire departments as well as private organizations.  Id.  Dr. Wiesen worked for the Commonwealth of Massachusetts' Human Resources Division where he led the program to validate all civil service examinations.  Id.  Since leaving the employ of the Commonwealth, he has consulted for an array of workplaces regarding personnel assessment matters.  Id.  He has published a number of articles and papers on employee selection processes and hiring practices.  D. 124-1 at 31.  Moreover, as his report also makes clear, he applied scientific methodology, namely by using well established standards to evaluate whether the background investigation for the 2011 MSP Academy employed by the MSP generally, by Lima specifically, and as applied to Riley more specifically, bore any of the generally acceptable practices that reflect a standardized, valid, reliable and fair selection process.  D. 124-1 at 7-8, 26-27.  Having considered his report and the bases for his opinions even in light of MSP's challenge, the Court does not conclude that any of Dr. Wiesen's proffered opinion lack a reliable basis.

MSP presses more forcefully its argument that these opinions, particularly as to Topic A concerning the MSP's overall background investigation system, are not relevant, or, alternatively, that their limited probative value is outweighed by their unduly prejudicial effect. Although the parties had some battles in the course of discovery about whether evidence about the MSP's overall practices as to MSP Academy candidates (not interviewed by Lima) is relevant to Riley's claim centered on Lima's allegedly discrimination actions, see, e.g., D. 112-13, the admission of Topic A regarding an evaluation of MSP's overall background investigation system for the 2011 Academy is relevant as context for Dr. Wiesen's other opinions about Lima's employment of this system and its adverse effect on Riley.  See Conway v. Electro Switch Corp., 825 F.2d 593, 597 (1st Cir. 1987)) (citing Sweeney v. Bd. of Trs. of Keene State Coll., 604 F.2d

106, 113 (1st Cir. 1979)); see Santiago–Ramos, 217 F.3d at 56.    This is particularly true where it cannot be reasonably disputed that the MSP's overall background investigation system overlaps with that employed by Lima, the trooper that the MSP charged with carrying out the investigation of Riley.    Moreover, the Court does not agree with MSP that admission of Dr. Wiesen's conclusions about the nature of MSP's overall background investigation adversely affecting African-American applicants would be inappropriate here where Riley alleges discriminatory treatment, not disparate impact, against MSP.    Instead, the Court agrees that such evidence is relevant, at least, to whether the MSP can rely upon Riley's "failure" in the background investigation conducted by Lima as a non-discriminatory justification for his disqualification as opposed to a pretext for discrimination as Riley contends.    See D. 134 at 8-9 and cases cited. Moreover, the jury will have the benefit of the Court's instructions about the applicable law, the nature of the claim in this case and the purposes for which they can consider certain evidence.

Finally, MSP also asserts Dr. Wiesen's testimony invades the province of jury because his findings are not truly expert opinions, but merely conclusions that the jury could make without expert assistance. D. 124 at 15.  It is well established that proffered opinions must be within the expert witness' scientific, technical, or specialized knowledge and not merely opinions that can easily be drawn by the trier of fact.  United States v. Zajanckauskas, 441 F.3d 32, 39 (1st Cir. 2006).  Here, however, it is not reasonable to assume that a lay juror would understand the standards that an expert in the field of industrial psychology would use to evaluate the validity of an employee screening process in the absence of such expert opinion.  It will remain for the jury to decide what, if any, weight it will give such opinion.

**VII.    Conclusion**

For the foregoing reasons, the Court DENIES MSP's motion for summary judgment, D. 118, DENIES Riley's Rule 56(d) motion as moot, D. 128, and DENIES MSP's motion to strike the expert report of Joel P. Wiesen, D. 123.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge
