# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

_____

ORLANDO O. RILEY,         )
        **Plaintiff**        )
           )
**v.**           )
           )
**MASSACHUSETTS DEPARTMENT**    )    **Civil Action No.: 1:15-CV-14137-DJC**
**OF STATE POLICE,**        )
        **Defendant**      )
_____)

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW OR FOR A NEW TRIAL

## I.    INTRODUCTION

Defendant's Motion for Judgment as a Matter of Law or For a New Trial (Doc. 253) does not come close to meeting the exacting standards applicable to such motions.  A motion for judgment as a matter of law may only be granted if the evidence could lead a reasonable person to only one conclusion. All inferences must be drawn in favor of the non-moving party, and judgment may not be entered if there is substantial evidence supporting the verdict. See Conway v. Electro Switch Corp., 825 F.2d 593, 598 (1st Cir. 1987) and cases cited; Tobin v. Liberty Mut.  Ins. Co., 553 F.3d 121, 136-37 (1st Cir. 2009)(verdict should be set aside only if evidence, viewed in light most favorable to non-moving party, points so overwhelmingly in favor of moving party that a reasonable person could not have arrived at verdict).  Motions for new trial are governed by similarly restrictive standards.  Conway, 825 F.2d at 598-99.  They may be granted only if the trial judge believes that the outcome is so against the clear weight of the evidence that upholding the verdict will result in a miscarriage of justice. Id.

Here, neither standard can be met, since plaintiff offered the jury substantial evidence from which it could reasonably conclude that MSP's purported concerns about Riley's truthfulness were not legitimate, but rather a pretext for race discrimination.   As the authorities cited supra make clear, MSP is not entitled to overturn the jury's verdict merely because MSP might perceive the evidence differently.  Its motion must be denied.

II.     **SUMMARY OF PLAINTIFF'S EVIDENCE**

In seven days of trial, from December 3 - December 11, 2018, plaintiff presented 17 witnesses, including four employees of defendant (Lima, McGinn, Christiansen, Butler); three employees of Riley's former high schools, New Bedford High School (Rebelo) and Bishop Stang High School (Ruginis, Wood); four New Bedford Police Department colleagues (Hebert, Feliciano, Ledo, Garcia); a fellow 2011 MSP applicant (Grundy); his union attorney (Conti); an expert industrial psychologist (Wiesen); two family members (Phillips, C. Riley); and himself.  Defendant offered one additional witness (Flynn).  A total of 68 exhibits were admitted.

A.     **MSP'S INVESTIGATION SYSTEM WAS SUSCEPTIBLE TO BIAS**

.  The evidence showed that Riley's rejection, at the final background investigation stage of his candidacy, resulted from the application of a highly subjective system in which background investigators with little training and supervision were given great discretion in candidate consideration and evaluation.  Test. of Lima; McGinn; Christiansen; Butler; Wiesen.  Overall, the system failed to provide for fairness or accuracy or to prevent operation of racial bias. Wiesen Test.  Thus, for example, background investigators received only a few hours of training.  Test. of Lima, Butler.  The conduct of background investigations was not reviewed on an ongoing basis by supposed supervisors.  Test. of Lima, Wiesen.  The Review Boards that made final decisions did no independent fact-finding, and normally accepted the perspective of the background investigator.  If a Review Board decision were questioned, it was reviewed by the same body that made the original decision, creating little opportunity for fairness or oversight.  Test. of Butler, Wiesen.

As a result of these features, the background investigation system produced racially biased results.  Although 85% of white applicants passed the background investigation to attend the 80th RTT, only 57% of African-American applicants did.  Wiesen Test.

B.     **AFRICAN-AMERICANS TREATED DIFFERENTLY**

The evidence showed that the background investigation system as applied by Lima resulted in the African-American applicant, Riley, being treated differently than similarly-situated non-African-

Americans. For example, Riley was criticized for failing to list the first few high schools he attended, but the successful applicant, JH, did not list any high schools at all and was not criticized. Test. of Riley; Lima; Exs. 9, 32, 38. Riley misunderstood and answered wrong a question on his application regarding Selective Service and was criticized, but two non-African-American applicants made the same mistake and were not. Test. of Riley; Lima; Exs. 17, 19, 33, 44. Successful candidate JH had a recent weak job performance review, but this was not acknowledged in Lima's report, which praised JH's work, while Lima's report failed to acknowledge the three Riley references who said that he was a "good cop." Lima Test.; Exs. 32, 38, 56. Lima failed to contact four of the five fellow New Bedford police officers Riley had identified in his application as people willing to go on record on his behalf, yet claimed that "no one was willing to go on record on Riley's behalf," an implicitly negative comment based on <u>positive</u> comments made in passing by Riley's co-workers. Test. of Lima; Garcia; Hebert; Exs. 38, 32-34, 44. White 2011 applicant Grundy, also investigated by Lima, did not acknowledge his past drug use until he was confronted at his interview, yet unlike his report on Riley, who volunteered that he had been the subject of a department investigation at <u>his</u> interview, Lima's report on Grundy did not label Grundy untruthful. Test. of Grundy, Riley; Ex. 34.

The evidence showed that Riley's qualifications were most similar to JH's, and that Lima was aware of this fact. Like JH, and unlike other applicants, Riley had no history with drugs, no negative driving record, no criminal history, and no prior reprimands. Test of Lima, Riley; Exs. 32, 38. Lima testified that he was aware that: applicant Grundy had a history with drugs, a negative driving record that included over 15 items, and a criminal history; applicant JW had a negative driving history with license suspensions and a criminal record; and applicant AP had a criminal history. Lima Test; Exs. 33, 34, 44. Yet Riley was treated as if his record were as suspect as those of the latter applicants: his interview was described as akin to a criminal interrogation, he was accused of doctoring his high school graduation verification, his neighborhood was denigrated to his and his (then) fiancée's face, and Lima was a no-call/no-show for a scheduled home visit. Test. of Riley, C.Riley. In contrast, Grundy, for example, was treated respectfully, professionally and with courtesy. Grundy Test.

### C.      EVIDENCE OF PRETEXT – HIGH SCHOOLS ISSUE

The jury had substantial evidence showing that MSP's attacks on Riley over high school issues were pretexts. Evidence showed that candidate AP did not list a high school he had attended for a month on his application until his interview, but he was not labeled untruthful for that reason.  Lima Test; Exs. 19, 19A.  In contrast, Riley omitted a high school he had attended for a few weeks and was accused of a cover-up. Test. of Riley, Lima; Exs. 31, 38.  Similarly, JH omitted his entire high school history without consequence.  Lima Test.; Exs. 9, 32.

The jury also heard evidence that Riley listed only the high school he graduated from out of habit, and that when he added two of the three others he attended (Bishop Stang. and Muskegon) he was instructed by Lima not to add the third (Dartmouth) because he attended for only a brief period. Riley Test.  Riley testified that he informed Lima that he left Bishop Stang for financial reasons, which his mother confirmed.  Test. of Riley; Phillips.

The evidence showed as well that Lima was untruthful in claiming that Riley had lied to cover up being expelled from Bishop Stang for academic reasons.  Lima stated in his first investigative report (First Report) that Bishop Stang employee Wood confirmed that Riley left for academic reasons.  Ex. 38.  But Wood testified that she did not and would not have said that to Lima.  Test. of Lima, Wood. Similarly, Lima claimed to have confirmed this "fact" with Bishop Stang administrator Ruginis, but she denied discussing Riley's reasons for leaving with Lima. Test. of Lima, Ruginis; Ex. 48.  Moreover, as Ruginis and Lima testified, Riley's academic record confirmed he had made up failed courses and was not forced out academically.  Test. of Lima, Ruginis; Ex. 55.

### D.      EVIDENCE OF PRETEXT – THE DISCIPLINARY ISSUE

The evidence showed that Riley learned that he had been the subject of a New Bedford disciplinary investigation after he submitted his MSP application in early May 2011, when he also learned that there would be no discipline and the matter would be dropped.  Test. of Riley,  Ledo; Exs. 18, 58, 62.  In summer 2011, Riley had two interactions with Lima, focusing only on supplemental information Lima sought. Riley Test.; Exs. 20, 25, 26, 29.  Lima's written communications with Riley

during that period did not seek corrections to his application, Exs. 20, 29, and no other applicants updated their applications before their interviews, although many did so at the interviews themselves. Lima Test.; Exs. 14, 17, 19, 19A.

The evidence shows that Riley, having expected to discuss the investigation at his interview, brought the issue up, but Lima immediately focused only on attempting to get Riley to admit that his department had disciplined him. Ex. 38; Riley Test.  The evidence also shows that Riley's union representative and union attorney told Lima verbally and in writing that Riley had not been disciplined. Test. of Riley, Ledo, Conti; Exs. 38, 58.  Nevertheless, although unsure whether Riley had in fact been reprimanded, Lima repeated several times in the First Report that Riley had been reprimanded and had untruthfully covered it up.  Lima Test.; Ex. 38.

### E.      EVIDENCE OF PRETEXT – THE SECOND REPORT

The evidence also shows that Riley's application was rejected by MSP's Review Board in a decision whose sole information source was the First Report. Test. of Christiansen, Butler; Exs. 38, 43. After hearing of the decision, Riley called Lima and told him that he had gotten certain facts wrong. Test. of Riley, Lima.  Lima then learned from Riley's Chief, and again from Conti, that Riley had been truthful about not being disciplined.  Test. of Lima, Conti; Ex. 61.

Having received that confirmation, and having also learned from Ruginis that Riley was not discharged for academic reasons, Lima wrote a second investigative report (Second Report) and shared its contents with Butler.  Test. of Lima, Butler; Ex. 48.  Rather than correct his former misstatements, Lima shifted his focus and looked for new grounds to attack Riley for purported untruthfulness.  Id. Lima now emphasized that Riley did not disclose that he had been the subject of the disciplinary investigation (he had, Riley Test.; Ex. 48); did not volunteer that he had applied to the Providence Police Department in response to a question that Riley believed did not seek this information; and that Riley had been rejected by the Rhode Island State Police seven years previously.  Ex. 48; Lima Test.

The evidence also shows that before filing his Second Report, Lima went to the effort of finding and interviewing a representative of the Rhode Island State Police about Riley's background

investigation there, even though he had not interviewed four of Riley's five police colleagues listed on

Riley's application.  Ex. 48.  He also stated untruthfully in his second report that Riley had not provided

him with his New Bedford High School transcript.  Test. of Riley, Lima, Rebelo; Exs. 23, 24, 48.

Riley wrote an appeal to Flynn that explained that he had disclosed his department investigation

at his interview, that he had not known about it at the time of his application, that he had not covered up

his high school history, and that the omission of the Providence Police Department on his application

was based on his understanding of the applicable question.  Riley Test.; Ex. 62.  Butler reviewed Riley's

letter before the second Review Board decided to sustain Riley's rejection, but did not share it with the

board.  Test. of Butler, Christiansen.  Butler disregarded Riley's factual assertions, assumed he was

lying, and, relying entirely on Lima, concluded that Riley's application should again be rejected because

he was reprimanded; because he did not disclose that he had been the subject of a disciplinary

investigation; and because he covered up his reasons for leaving Bishop Stang.. Butler Test.  The

Review Board re-rejected Riley's application accordingly.  Ex. 49.

### F.       EVIDENCE OF EMOTIONAL DISTRESS

The evidence showed that as a result of Riley's rejection from the MSP, he was a changed man.

The news of his rejection ruined his bachelor party and his wedding. Riley wept on the stand while

testifying about the effect the rejection had on him. Where before he was upbeat, happy, very close to

his children and fiancée/wife, afterwards he was subdued, unhappy, withdrawn from his friends and

family, and overate and spent much of his time lying in bed.  Test. of Feliciano, Phillips, C. Riley; Riley.

Eventually he sought counseling, which he has continued to the present.  Riley Test.

While there were other sources of emotional distress that arose in the seven years between

Riley's rejection and the present, those were transitory and were described as having significantly less of

an impact than the MSP rejection, whose emotional consequences continued up until the time of trial.

Test. of Riley, Feliciano, C.Riley, Phillips.

III.     **DEFENDANT IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW**

MSP attacks the jury's verdict, claiming: (1) Riley did not introduce sufficient evidence that he was treated differently from a comparator with similar "suggestions or concerns of untruthfulness"; and (2) Riley did not offer sufficient evidence that defendant's purported reason for his termination was a pretext for discrimination.  Both arguments really reduce to one, because both require a showing that seven days of testimony from 18 witnesses and 68 exhibits failed to supply adequate evidence that MSP did <u>not</u>, in fact, have good faith "concerns" about Riley's truthfulness, and instead singled Riley out for dishonest treatment of his candidacy.

MSP's argument relies primarily on hand-picked portions of the testimony of Lima and Butler that support its view of the evidence, and largely ignores (as explained below) most of the other testimony and exhibits demonstrating that defendant's claimed "concerns" about truthfulness were a sham and pretext.  Thus MSP's motion fails the standards set forth in §I, <u>supra</u>.

A.     **SUBSTANTIAL EVIDENCE THAT "CONCERN ABOUT TRUTHFULNESS" WAS PRETEXT FOR DISCRIMINATION**

1.     <u>**Weaknesses, Implausibilities, Inconsistencies, Incoherencies**</u>

There was more than sufficient evidence presented for the jury to conclude that defendant, and in particular Lima and Butler, were not operating in good faith and did not in fact have "concerns" about Riley's untruthfulness.  This included evidence that: Lima admitted that he did not know whether Riley had been reprimanded, but stated the reprimand as fact in his First Report; Lima falsely stated in his First Report that he had received information from Wood purporting to show that Riley had tried to cover up an academic expulsion; once it became clear that Riley had been truthful about never having been reprimanded and about his high school history, Lima (and Butler) shifted the focus of their accusations to attacking Riley for not divulging that he had been a subject of the Soares investigation (that did not lead to a reprimand) and introduced a new reason for his rejection (failure to disclose

Providence application)[1]; Lima went to extraordinary lengths to dig up additional adverse information by interviewing a Rhode Island State Police officer about a seven-year-old background investigation, while taking no steps to speak with four of five current work references; in a similar vein, Lima went to look through Riley's New Bedford High School records on the false pretext, stated in his Second Report, that Riley had not provided his New Bedford High School transcript; Butler continued to rely on justifications, in particular that Riley had been reprimanded and had covered up his reasons for leaving Bishop Stang, despite acknowledged evidence that Riley had <u>not</u> been reprimanded and had not lied about his Bishop Stang history. Test. of Lima, Butler; Exs. 38, 48.  This combination of untruthfulness, shifting reasons and continued reliance on disproven claims was ample basis for the jury to disbelieve defendant's explanation for its actions.  See <u>Santiago-Ramos v. Centennial P.R. Wireless Corp.</u>, 217 F.3d 46, 56 (1st Cir. 2000)(plaintiff can establish pretext by showing "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons")(citations omitted).

### 2.       The Bases for Defendant's Purported Conclusions Were Not Credible

MSP's Motion claims that the jury should have credited its protestations about its belief in Riley's dishonesty because: Riley failed to correct his application after he learned that he was the subject of the Soares investigation until Lima confronted him at his interview; he denied in a Questionnaire that his name was in a "Case Report"; in the same Questionnaire he stated that his application was accurate; he omitted three of his four high schools from his application; he omitted his Providence Police Department application; and he said "that's not supposed to be in my file" when confronted with Lima's false evidence of a supposed reprimand.  Motion, at 5-6, 9.  But there was ample evidence from which a jury could conclude that Lima and Butler did not really believe that any of these

---

[1] This shift alone is evidence of pretext. <u>See</u> <u>Dominguez-Cruz v. Suttle Caribe, Inc.</u>, 202 F.3d 424, 427, 431-32 (1st Cir. 2000)(jury may infer pretext where employer provides different and inconsistent explanations for adverse action)(citing cases). <u>Accord</u>, <u>Billings v. Town of Grafton</u>, 515 F.3d 39, 56 (1st Cir. 2008); <u>Santiago-Ramos v. Centennial P.R. Wireless Corp.</u>, 217 F.3d 46, 56 (1st Cir. 2000); <u>Pierce v. President & Fellows of Harvard Coll.</u>, 994 F. Supp. 2d 157, 163 (D. Mass. 2014).

circumstances demonstrated Riley's dishonesty.

First, multiple applicants omitted substantial material information from their applications and failed to correct or update their applications before their interviews, but were not criticized or treated as dishonest.  This included successful candidate JH and candidates Grundy and AP.  Lima Test.; Exs. 9, 14, 19, 19A, 32, 34, 44.  Moreover, Lima claimed to have instructed Riley to update his application and confirmed that in a follow-up email, yet the confirming email reflected no such instruction, supporting a jury inference that Lima never asked for an updated form. Lima Test.; Ex. 20.  Nor was the jury required to credit Lima's account of Riley's interview, Lima Test., or specifically Lima's testimony that he and not Riley first raised the Soares issue there, especially given Lima's dishonesty about other matters. Moreover, Grundy did not admit his drug history until confronted, but was not characterized as dishonest.  Test. of Lima, Grundy; Exs. 14, 34. Thus, a jury could conclude that MSP's purported concern about Riley's alleged failure to correct his application until confronted was invented and biased.

Second, as to Riley's "Case Report" Questionnaire answer, the question appears in a section of the Questionnaire entitled "criminal history."  Butler seemed to concede on redirect that the question was open to interpretation, testifying that he "believed" that the question referred to internal affairs reports despite its classification under "criminal history."  Butler Test.  A jury was certainly entitled to conclude that defendant did not seriously believe that Riley was being willfully dishonest when he interpreted an admittedly ambiguous phrase as a reference only to criminal "case reports."  Riley Test.

Third, and similarly, it would be entirely reasonable for the jury to determine that any negative response by MSP to Riley's Questionnaire affirmance was feigned, exaggerated or not credible, given that the document asked its signer to affirm the accuracy of his application, an entirely different document that the signer would have completed four months earlier, which was not in the signer's possession at the time of the affirmance, which contained many dozens of detailed questions, and where the fact that the affirmation related to a completely separate document was not brought to the signer's attention. Ex. 30. This would have been especially plausible given

that Riley testified that he believed that the affirmation referred to the Questionnaire.  Riley Test.

Fourth, as to the high schools, applicants JH and AP also omitted their high schools, yet were not accused of coverups or dishonesty on that score.  Exs. 9, 19, 32, 44.  A jury could readily conclude from this circumstance alone that MSP did not really believe Riley's mistake to be any more sinister than JH's or AP's.

Fifth, as to the Providence Police Department, it was reasonable for the jury to conclude that defendant did not really believe that Riley's omission was intentional, where the question at issue was so manifestly misleading, Ex. 16; Wiesen Test., and where other candidates, for example JH, who omitted more than $40,000 in credit card debt, were not considered dishonest.  Exs. 9, 22, 32.

Finally, as to the "that's not supposed to be in my file" argument, the jury was entitled to disbelieve Lima's account of that interaction and credit Riley's testimony that he said that his Chief had told him that he was not to be disciplined and that nothing was to be placed in his file.  Riley Test.  The jury was certainly entitled to do so where Ledo and Conti both testified that the Chief had told Riley exactly that, Test. of Conti, Ledo, especially where Lima's credibility was already substantially undermined by his dishonesty on the other matters outlined above.

### B.   SUBSTANTIAL FURTHER EVIDENCE OF PRETEXT WAS PRESENTED

In addition to the evidence of pretext discussed in §III(A) supra, the jury was presented with substantial additional evidence, including, as set forth in §II(B): Riley was faulted for errors or mistakes for which others were not; Lima showed little interest in Riley's performance with the New Bedford Police Department although Riley was Lima's only law enforcement officer applicant; JH's weak performance review was disregarded and his employment record praised, while praise from Riley's references was not acknowledged; Riley was treated as if his entirely clean record were as suspect as those with substantial criminal and driving records; Riley was interrogated as if he were a criminal suspect, while others were treated respectfully; Lima denigrated Riley's neighborhood, and was a no show/no call for a home inspection he scheduled.

Evidence of pretext also included Wiesen's testimony and those of others that the background

investigation system as a whole, and as applied to Riley, was subjective, <u>ad hoc</u> and lacking standards

and that as a result, it excluded African-American applicants at the background investigation stage at a

statistically significant higher rate than whites.

Ignoring both the deficiencies in its process of assessing Riley's "truthfulness" and the law

underscoring the importance of those deficiencies for showing pretext, MSP asserts that the subjectivity

of its process is irrelevant to pretext, claiming that truthfulness is necessarily a subjective judgment not

measurable by standardized methods.  Of course, that is inaccurate as a factual matter. <u>See</u>, <u>e.g.</u>,

<u>Pluskota v. Roadrunner Freight Sys.</u>, 524 N.W.2d 904, 908 (Wis.1994) (written "honesty tests" are

generally lawful and are in wide use by employers). MSP's argument also assumes away the central

issues of whether Lima in fact was <u>not</u> legitimately engaged in assessing Riley's "truthfulness" and

whether the flaws in the BI process facilitated Lima's and the Review Board's biased decision-making..

Evidence of subjectivity in MSP's background investigation system helps establish Riley's race

discrimination claim for two other reasons.  First, if MSP's BI system does not actually measure the

characteristics claimed, then MSP's rationale that the BI revealed Riley's flaws becomes simply a

subjective judgment, which the jury could have found to be a pretext. <u>See</u>, <u>e.g.</u>, <u>Garrett v. Hewlett-Packard</u>

<u>Co.</u>, 305 F.3d 1210, 1218 (10th Cir.2002)(lack of objective standards indicates pretext); <u>Bergene v. Salt</u>

<u>River Project Agr. Imp. and Power Dist.</u>, 272 F.3d 1136, 1142 (9th Cir.2001)(same); <u>Goosby v. Johnson</u>

<u>& Johnson Med., Inc.</u>, 228 F.3d 313, 320 (3d Cir. 2000) (same); <u>Weldon v. Kraft, Inc.</u>, 896 F.2d 793, 798

(3d Cir. 1990) (same). <u>See</u> <u>also</u> <u>Duckworth v. Mid-State Mach. Prods.</u>, 736 F. Supp. 2d 278, 289-91 (D.

Me. 2010) (hiring discrimination case; use of subjective standards to deny employment helps establish

pretext and discrimination); <u>Phair v. New Page Corp.</u>, 708 F. Supp. 2d 57 (D. Me. 2010)(same).

Second, if an employee selection system lacks indicia of objectivity, that very fact supports an

inference of discrimination.  <u>See</u>, <u>e.g.</u>, <u>Jauregui v. City of Glendale</u>, 852 F.2d 1128, 1136 (9th Cir.

1988)(subjective criteria in selection decisions are "particularly susceptible to discriminatory abuse");

<u>Pegues v. Mississippi State Employment Serv. of Miss. Employment Sec. Com.</u>, 699 F.2d 760, 765 (5th

Cir. 1983)(same); <u>Royal v. Missouri Highway & Transp. Comm'n</u>, 655 F.2d 159, 164 (8th Cir.

1981)(same); <u>Banks v. City of Albany Fire Dep't</u>, 953 F. Supp. 28 (N.D.N.Y. 1997 (subjective decision-making evidence of discrimination). <u>Cf.</u> <u>Satz v. ITT Financial Corp.</u>, 619 F.2d 738, 746 (8th Cir. 1980(disparate treatment may be proven where employment decisions, made subjectively without definite standards, result in pattern clearly disfavoring minorities or females). <u>See</u> <u>also</u> <u>Love v. TVA Bd. of Directors, No. 3</u>, 2008 U.S. Dist. LEXIS 26853*12, *43-44, *48-49 (M.D. Tenn. Mar. 31, 2008)(expert testimony that employer did not insure interview questions' job-relatedness nor maintain objective scoring system, creating environment where discrimination "could easily occur," helped support inference of discrimination in disparate treatment case).

MSP claims that Dr. Wiesen's testimony regarding evidence of MSP's own statistics, which reveals gross racial disparities in the 2011 BI pass rates (85% whites, 57% blacks), does not demonstrate pretext. Yet under applicable law, such statistics help prove that the particular negative treatment of the plaintiff is discriminatory, and that the reasons for it are pretextual, if bolstered (as here) by other facts demonstrating pretext. Ever since <u>McMillan v. Mass. SPCA</u>, 140 F.3d 288 (1st Cir. 1998), it has been First Circuit law that statistical data evidencing discriminatory patterns are admissible in disparate treatment cases "unless they are 'so incomplete as to be inadmissible as irrelevant.'" <u>Id.</u> at 303, quoting <u>Bazemore v. Friday</u>, 478 U.S. 385, 400 n.10 (1986).  MSP points to no facts that demonstrate that these statistics are incomplete.  <u>See also</u> <u>Currier v. United Techs. Corp.</u>, 393 F.3d 246, 250-53, 253 n.8 (1st Cir. 2004) (statistical evidence along with evidence of pretext supports jury verdict based on disparate treatment). <u>Accord,</u> <u>Phair</u>, 708 F.Supp. 2d at 68; <u>Martin v. Envelope Div. of Westvaco Corp.</u>, 850 F. Supp. 83, 90-91 (D.Mass. 1994); <u>Seiface v. Areva, Inc.</u>, 2015 U.S. Dist. LEXIS 152356 at *9-12 (D. Mass. 2015); <u>Flebotte v. Dow Jones & Co.</u>, 2000 U.S. Dist. LEXIS 19875 (D. Mass. 2000). <u>Cf.</u> <u>Love</u>, 2008 U.S. Dist. LEXIS 26853 at *15, 18-19, 49 (underrepresentation of minority employees in job category that plaintiff sought to join, as well as employer's failure to meet numerical hiring goals of its affirmative action plan, relevant in disparate treatment hiring case because "significant underrepresentation of a racial group in an employer's workforce, combined with independent circumstantial evidence, can support an inference of discrimination").  Here, as in these cases, statistics

were held properly admissible to support verdicts based on circumstantial evidence of discrimination.

In this case, the statistics offered are closely linked to the decision Riley challenges. They relate to racial disparities in selection for the same position he sought, for the same recruit class for which he was considered. Although investigators varied, all utilized the same background investigation system to which he was subjected, with the decision made by the same Review Board as in his case. In these circumstances, the racial disparity was relevant and indeed important evidence in demonstrating the discriminatory nature of the selection process.

MSP alleges that these statistics are valueless unless they are specifically linked to Lima. But under the case law, statistics need not be tied to a particular decision-maker to demonstrate pretext or discrimination. Furthermore, MSP's position ignores that Lima was acting within the same flawed system, allowing for the same exercise of biases, as other investigators who disproportionately rejected black applicants. As Dr. Wiesen testified, Lima's harshly unfair treatment of Riley, as well as his more generous approach to white candidates, arose within and was facilitated by the deficiencies of the same system that produced a disproportionate black failure rate. The statistical evidence and the evidence of the flawed system dovetail to create further links in the chain of evidence from which the jury could have concluded that Riley was excluded for pretextual and discriminatory reasons.

## C.   DEFENDANT IS LIABLE FOR ITS AGENTS' ACTIONS

Reviving an argument rejected by this Court on summary judgment (Doc. 170), MSP again mistakenly claims that in order for liability to attach, Riley must show that the Review Board was negligent.  It did not submit a jury instruction on the issue of employer liability and did not object to the Court's jury instruction on the issue, which did not require a showing of negligence.  Defendant must be held to have waived this argument.  See Rios v. Municipality of Guaynabo, 2017 U.S. Dist. LEXIS 127550, at *13 n.7 (D.P.R. Aug. 9, 2017)(defense's FRCP 50(b) argument waived where not included in proposed jury instructions and defendant did not object to court's instructions on issue); Gardner v. Simpson Fin., 963 F. Supp. 2d 72, 79 (D. Mass. 2013)(same).

Moreover, as plaintiff argued previously, this standard has no application outside harassment cases.[2] MSP's reliance on <u>Velázquez-Pérez v. Devs. Divers. Realty Corp.</u>, 753 F.3d 265 (1st Cir. 2014), is misplaced. <u>Id.</u> at 270 (analysis expressly limited to <u>quid pro quo</u> harassment cases). In that case, the court applied a negligence standard to determine employer liability for a harasser's successful campaign to get a victim fired. In contrast, here Lima (1) was not a co-worker of Riley's and (2) was acting within the scope of his employment in conducting his background investigation. As such, the <u>Ellerth</u> agency principles, including its Restatement negligence standard, are entirely inapplicable.[3]

Lima was conducting his background investigation as MSP's agent. Under longstanding Title VII jurisprudence applicable to discriminatory actions by agents taken in the course of their employment, MSP is responsible for Lima's acts and omissions on a <u>respondeat superior</u> basis. As a consequence, it is directly liable for all the discriminatory acts that Lima performed and the Review Board ratified. Rest. (Third) of Agency, §7.07; 42 U.S.C. § 2000e(b)(term "employer" in Title VII includes agent); <u>Indest v. Freeman Decorating</u>, 164 F.3d 258, 262 (5th Cir. 1999) (Title VII  incorporated "agent" into "employer" definition in Title VII in order to incorporate <u>respondeat superior</u> liability, citing cases from two federal circuits); <u>Jimenez v. Dyncorp. Intl., LLC</u>, 635 F. Supp. 2d 592, 601-02 (W.D. Tex. 2009)(applying agency principles to determine employer liability under Title VII).

Accordingly, MSP is liable for Lima's treatment of Riley. <u>See</u> <u>Howard v. Univ. of S. Miss.</u>, 1980 U.S. Dist. LEXIS 17102, *1-3, *17-18 (S.D. Miss. Apr. 17, 1980)  (where employer's screener discriminatorily discouraged plaintiff applicant, employer liable; relief denied on unrelated grounds); <u>McGarry v. Bd. of County Commrs.</u>, 175 F.3d 1193, 1199-1200 (10th Cir. 1999) (conclusions in report by employee, who investigated plaintiff's non-hire, constitute evidence within scope of employee-

---

[3]Every case in the First Circuit that has applied Restatement (Second) of Agency, §219(2), has arisen from sexual harassment, sexual assault, physical assault, or murder.  <u>See</u> <u>Costos v. Coconut Island Corp.</u>, 137 F.3d 46 (1st Cir. 1998) (rape); <u>Lipsett v. Univ. of P.R.</u>, 864 F.2d 881 (1st Cir. 1988)(sexual harassment); <u>Nichols v. Land Transp. Corp.</u>, 223 F.3d 21 (1st Cir. 2000) (road rage attack); <u>Harrison v. Corr. Med. Servs.</u>, 2003 U.S. Dist. LEXIS 9223 (D. Me. May 30, 2003) (sexual assault); <u>Newell v. Celadon Sec. Servs.</u>, 417 F. Supp. 2d 85 (D. Mass. 2006) (sexual harassment); <u>Jamshab v. Nationwide Ins. Co.</u>, 2004 U.S. Dist. LEXIS 26097 (D. Me. Dec. 29, 2004) (murder); <u>Liu v. Striuli</u>, 36 F. Supp. 2d 452 (D.R.I. 1999) (sexual harassment); <u>Doe v. Oyster River Coop. Sch. Dist.</u>, 992 F. Supp. 467 (D.N.H. 1997) (same); <u>Rios v. Municipality of Guaynabo</u>, 938 F. Supp. 2d 235, (D.P.R. 2015) (same).

investigator's agency; considered against employer); <u>Williams v. Nashville Network</u>, 132 F.3d 1123,

1126, 1131-33-27 (6th Cir. 1997) (employer liable under Title VII for judgment as a matter of law where

non-supervisory staffer screened out applicant).

    **D.**    **RILEY'S EMOTIONAL DISTRESS AWARD WAS SUPPORTED BY SUBSTANTIAL EVIDENCE**

Defendant has no argument to defeat Riley's emotional distress award.  Riley's claim for

emotional distress damages was supported by his own very compelling, and at times tearful, testimony

and the testimony of one of his close friends, his wife and his mother.  Test. of Riley, Feliciano, C.Riley,

Phillips.  All of them established a direct causal link between Riley's denial of admission by the MSP

and a dramatic, negative change in his behavior and self-presentation.   All of them testified that those

changes manifested in obvious symptoms of severe emotional distress.  <u>Id.</u>  Riley, his wife and his

mother testified that the other sources of emotional stress that occurred between his rejection and the

trial were transitory at most.  Test. of Riley, C.Riley, Phillips.  Riley's tearfulness on the stand as he

described the impact the MSP's decision had on him could not have more clearly illustrated the causal

link between that decision and the distress he described.  No speculation on the jury's part was required.

Defendant cites no authority for its claim that the absence of medical testimony or

documentation should nullify the jury's distress award, because there is none.  To the contrary, the First

Circuit is clear that such evidence is not required.  <u>Tuli v. Brigham & Women's Hospital</u>, 2011 U.S.

App. Lexis 18003, *45 (1st Cir. Aug. 29, 2011)(medical testimony not required to show emotional harm;

$1.6 mil. emotional distress award) <u>citing</u> <u>Koster v. Trans World Airlines, Inc.</u>, 181 F.3d 24, 35 (1st

Cir.), <u>cert. denied</u>, 528 U.S. 1021, 120 S. Ct. 532, 145 L. Ed. 2d 412 (1999)(same; $250,000 award).

The jury's emotional distress award was fully supported.

**IV.**    <u>**DEFENDANT IS NOT ENTITLED TO A NEW TRIAL**</u>

For the reasons stated above, MSP is also not entitled to a new trial, because the verdict was not

against the weight of the evidence.  But there are other reasons MSP has no right to a new trial.  MSP

argues that the jury could not properly have believed Riley's explanations for not disclosing the Soares

investigation earlier, and for not disclosing the Stallings investigation, calling those explanations implausible.  MSP also revives its contention that Dr. Wiesen should have been excluded.  Both arguments fail.

###### A.      THE JURY COULD PROPERLY HAVE REJECTED MSP'S POSITION ON THE STALLINGS AND SOARES INVESTIGATIONS

MSP claims it was against the weight of the evidence for the jury to believe Riley's testimony that he did not know he was a subject of the Soares or Stallings investigations.  Instead, MSP argues, Riley's failure to disclose both investigations was probative of his untruthfulness. But there was no failure to disclose. Riley disclosed in his application that he had been a <u>witness</u> in the Soares internal investigation, Ex. 16 and at his interview with Lima he disclosed that he had learned after completing his application that he was one of its <u>subjects</u>. Riley Test.  The Motion makes much of earlier NBPD communications to Riley about the investigation, but (like Lima, Lima Test.) concedes that nothing in those communications stated that Riley was a subject.  <u>See</u> Exs. 6-8.

As noted, Riley provided Lima before and after the First Report, and later the Review Board, corroborative information from his union that at the time he completed his application, and until his May 24, 2011 meeting with his Chief, he had been unaware that he was an investigation subject.  Test. of Riley, Ledo, Conti; Exs. 58, 60-62. It was reasonable for the jury to believe that evidence.

MSP claims that Riley's failure to disclose the 2006 "Stallings Investigation" is evidence of Riley's untruthfulness. However, it was reasonable for the jury to conclude that Riley's nondisclosure was the result of a lack of knowledge, as with the Soares Investigation. Riley was never informed that he was a subject of the Stallings investigation. Riley Test. Contemporaneous NBPD documents do not so inform Riley. Exs. 3-5.  Riley had never seen the Stallings Internal Affairs investigative documents before NBPD produced them in this litigation.  Riley Test. Because his New Bedford investigative interview focused on the behavior of a fellow officer who had hit an arrestee with his service weapon, and because he had never been informed he was a subject of the investigation, Riley believed he had been interviewed as a witness, not a subject. Riley Test. After almost four years of inactivity in the

matter, Riley received a brief email advising him that a complaint, relating to an incident stated to have

occurred at a different address, was "not sustained." Riley Test. Given the very extended passage of

time and inactivity; department email system problems at the time; the address difference; and the fact

that Riley was unaware of any complaint pending against him, Riley assumed that the email was sent to

him in error. Riley Test.  Thus, it was not against the weight of the evidence for the jury to conclude

that, as of his 2011 MSP application, Riley did not understand himself to have been the subject of a

2006 citizen complaint.

        **B.**     **DR. WIESEN'S TESTIMONY WAS PROPER**

        **1.**     **<u>Dr. Wiesen Was Fully Qualified to Testify</u>**

MSP argues, yet again, that Dr. Wiesen was not qualified to testify as an expert in this case,

despite the Court's multiple prior rulings to the contrary.  Specifically, the Motion claims that Dr.

Weisen lacks expertise in public safety background investigations. However, MSP misstates Dr.

Wiesen's background. Dr. Wiesen testified about his extensive education and experience in determining

the validity and fairness of employee selection tools. Wiesen Test.  This included a 2017 presentation at

the International Chiefs of Police Association Annual Conference on police selection methods that

screen out minority candidates and alternative selection methods that would both improve force

performance and result in greater minority hiring.  Dr. Wiesen was responsible for all oral interviews for

police promotions for the Commonwealth of Massachusetts for five years, and he is currently

developing an operational method designed to select police officers low in bias.  He has studied training

material from national background investigation training programs and Massachusetts Civil Service

Commission bypass decisions, which discuss the role of candidate backgrounds in disqualifying

otherwise successful candidates.  Wiesen Test.

Further, although MSP minimizes Dr. Wiesen's self-designed test for police departments, the

PCBS, that tool has been used regularly by two municipalities for many years and in the past has been

used by others as well.  It is intended to measure personal qualities for which law enforcement

departments would want to screen.  Its role clearly parallels and even overlaps with that of MSP's own

background questionnaire, part of every candidate's background investigation process. The process of developing the PCBS entailed a nationwide review of police background investigation procedures, and Dr. Wiesen has remained current in this area since.  Wiesen Test.

For 15 years, Dr. Wiesen was responsible for validating all Massachusetts Civil Service examinations; for part of that time, he was responsible for validating all tests given by the state. While working for the Commonwealth, he was responsible for developing selection tools for dozens of thousands of state employees, and he has worked for a living analyzing the quality of assessment methods ever since.  Wiesen Test. Those are the chief skills reflected in his report, and amply on display in his trial testimony.  Nothing in MSP's Motion, or Dr. Wiesen's testimony, demonstrates that Dr. Wiesen lacked the expertise on background investigations needed to assist the jury in this case.

Moreover, this Court has previously, and correctly, rejected defendant's argument that Dr. Wiesen must have specific expertise in each detail about which he testifies.  To the contrary, Dr. Wiesen's extensive knowledge and experience regarding employee selection systems is more than sufficient.  See, e.g., Allmond v. Akal Sec., Inc., 2007 U.S. Dist. LEXIS 23374, at *6-7 (M.D. Ga. Mar. 29, 2007) (general knowledge in a field normally sufficient to qualify a witness as expert in field's sub-specialties); Torres-Ocasio v. Texaco P.R., Inc., 2007 U.S. Dist. LEXIS 56102, at *6-8 (D.P.R. Aug. 1, 2007)(same); see generally Gaydar v. Sociedad Instituto Gineco-Quirurgico y Planificacion Familiar, 345 F.3d 15, 24-25 (1st Cir. 2003)(expert physician need not be specialist in specific discipline to testify regarding that discipline); Allen v. Martin Surfacing, 263 F.R.D. 47, 54, 58, 63 (D. Mass. 2008)(same). Not to the contrary is Daubert v. Merrell Dow Pharms., Inc., 43 F.3d 1311 (9th Cir. 1995)(Daubert II)(test of admissibility is whether expert opinions grow (only) out of litigation, or out of scientifically valid principles and pre-existing research); McGovern ex rel. McGovern v. Brigham & Women's Hosp., 584 F.Supp. 2d 418 (D. Mass. 2008) (physician testimony rejected in absence of any differential diagnosis or other explanation for how challenged actions caused stroke).

## 2.    Dr. Wiesen's Testimony was Not "Disparate Impact" Testimony

MSP also argues, once again, that Dr. Wiesen's statistical analysis showing the disproportion in white/black failure rates for the 2011 BI tool (discussed below) is "disparate impact" testimony, which prejudiced MSP and confused the jury. This assertation is misguided. Dr. Wiesen did not apply disparate impact analysis to this case, and Riley has not alleged that MSP maintains a facially neutral employment practice that adversely impacts a protected class, cf., e.g., Hazen Paper Co. v. Biggins, 507 U.S. 604, 609 (1993), nor called upon MSP to justify that practice as "job-related" and "consistent with business necessity." Cf., e.g., Jones v. City of Boston, 752 F.3d 38, 53 (1st Cir. 2014). Rather, this aspect of Dr. Wiesen's analysis helped show that the subjective features of MSP's BI system are so significant, their openness to conscious and unconscious manipulation so evident, and their potential for racial bias so great that Riley's BI results cannot constitute a "legitimate, non-discriminatory reason" for his rejection. Instead, those results constitute a pretext for discrimination. That analysis helps meet Riley's burden under his disparate treatment claim, as held in multiple comparable cases.  See, e.g., Love, 2008 U.S.Dist. LEXIS 26853, at *48-49 (in race and age discrimination-in-hiring disparate treatment case, expert permitted to testify that hiring process lacked objective criteria; interviewer training was limited; interview methods were flawed, lacked validation, and allowed for subjectivity and bias in decision-making; evidence of subjectivity and defendant's departures from professional human resources standards admissible as pretext evidence, citing rulings from three circuit courts).

Other courts have admitted similar evidence. See Tuli v. Brigham & Women's Hosp., Inc., 592 F.Supp. 2d 208, 214-17 (D. Mass. 2009)(in disparate treatment case, social psychologist permitted to testify that defendant's behaviors are consistent with type of context in which workplace discrimination usually occurs)[4]; Samaha v. Wash. State DOT, 2012 U.S. Dist. LEXIS 190352 (E.D. Wash. 2012)(in disparate treatment case, expert testimony admissible to show subjectivity permits bias); Butler v. Home

---

[4]See also Phair, 708 F.Supp. 2d 57 at 66-67 (in disparate treatment case, admitting evidence of subjectivity in standards for assessing performance because it "can be used, consciously or otherwise, to mask unlawful discrimination") citing Robinson v. Polaroid Corp., 732 F.2d 1010, 1015 (1st Cir. 1984).

_Depot_, 984 F. Supp. 1257, 1265 (N.D. Cal. 1997).  Cf. Hnot v. Willis Group Holdings, Ltd., 2007 U.S. Dist. LEXIS 40243 (S.D.N.Y. 2007)(permitting expert testimony describing circumstances in which discrimination typically influences employment decisions, and applying analysis to defendants' workplaces); Apilado v. N.Am Gay Amateur Ath. Alliance, 2011 U.S. Dist. LEXIS 159575 (W.D.Wash. 2011)(same).  In all these cases, expert testimony about subjective or otherwise problematic employment policies and practices was held admissible to support disparate-treatment plaintiffs' claims of particularized discriminatory mistreatment.

### 3.    Dr. Wiesen's Testimony Did Not Invade the Jury's Province

Relying on two of the same authorities that the Court previously found insufficiently persuasive, MSP renews its argument that Dr. Wiesen's testimony was unnecessary.  Riley has previously responded in detail to MSP's "unnecessary" argument (Doc. 134, at 16-17), and will not repeat its response here; this Court has previously rejected that argument in its May 24, 2018 order (Doc. 170, at 24).  The Court ruled that lay jurors would not necessarily understand the standards that industrial psychologists use to evaluate screening processes, and that Dr. Wiesen may add value by explaining how those standards apply here.  This is precisely what Dr. Wiesen did at trial.  He explained the criteria used by industrial psychologists to evaluate screening processes (standardization, validity, reliability and fairness) and explained the aspects of the screening processes to which those criteria apply.  He then explained how he applied those criteria to the MSP's background investigation process, and how he determined that the process was lacking in all of those criteria.  He also explained how that lack rendered the process susceptible to bias. Wiesen Test.  It was therefore appropriate, and not an invasion of the jury's role, for Dr. Wiesen to testify as to his review of the application materials and background investigation reports of Riley and the other applicants because it provided the context needed in order for his evaluation of the background investigation system to make sense to the jury.

## V.    CONCLUSION

Defendant has failed to demonstrate its entitlement to judgment notwithstanding the verdict or to a new trial.  Its Motion should be denied.

Respectfully submitted,

PLAINTIFF
Orlando Riley

By his attorneys,


/s/ Ellen J. Messing
Ellen J. Messing
BBO No. 343960
emessing@mrwemploymentlaw.com
James S. Weliky
BBO No. 631066
jweliky@mrwemploymentlaw.com
Messing, Rudavsky & Weliky, P.C.
50 Congress St., 1000
Boston, MA 02109
Dated:  January 30, 2019                  (617) 742-0004


## CERTIFICATE OF SERVICE

I, James S. Weliky, hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants, on January 30, 2019.

/s/ James S. Weliky
James S. Weliky
Dated:  January 30, 2019